the human body to correct a deformity, improve function, or relieve symptoms of a disease.

*"Outpatient surgical facility"* means any facility with a medical staff of *doctors* which operates pursuant to law for the purpose of performing *surgical procedures;* and which does not provide accommodations for patients to stay overnight. This does not include facilities such as: acute-care clinics, urgent-care clinics, ambulatory care clinics, urgecenters, free-standing emergency facilities and *doctor* offices.

"*Periodic preventive care visits"* means the routine tests and procedures for the purpose of detection of abnormalities or malfunctions of bodily systems and parts according to accepted medical practice.

"*Platform*" means the technology, system, software, application, modality, or other method through which a health professional remotely interfaces with a *covered person* when providing health care service or procedure as a *telemedicine medical service* or *telehealth service.*

*"Policy,"* when italicized, means the master policy issued and delivered to the *policyholder.* It includes the attached pages, the applications, and any amendments.

*"Policyholder"* means the entity shown as the *policyholder* on the Data Page of the *policy* and certificate.

*"Policy term"* means the period that this certificate is to be in force. The *policy term* cannot be extended.

*"Preexisting condition"* means an *injury* or *illness* for which the *covered person* received medical advice or treatment within the 12 months immediately preceding the applicable effective date the *covered person* became insured under the *policy*:

*"Primary insured"* means a member who satisfies the eligibility requirements of the *policy,* and who is identified as the primary insured on the front of the certificate.

*"Proof of loss"* means information required by *us* to decide if a claim is payable and the amount that is payable. It includes, but is not limited to, claim forms, medical bills or records, other plan information, and network repricing information. *Proof of loss* must include a copy of all Explanation of Benefit forms from any other insurance, including Medicare.

*"Prosthetic device"* means an artificial device designed to replace, wholly or in part, an arm or leg.

*"Reconstructive surgery"* means *surgery* performed on an abnormal body structure caused by birth defects, developmental abnormalities, trauma, infection, tumors, or disease in order to improve function or to improve the patient's appearance, to the extent possible.

*"Remote patient monitoring"* means the use of synchronous or asynchronous electronic information and communication technology to collect personal health information and medical data from a patient at an *originating site* that is transmitted to a *medical practitioner* at a *distant site* for use in the treatment and management of medical conditions that require frequent monitoring.

*"Residence"* means the physical location where *you* live. If *you* live in more than one location, and *you* file a United States income tax return, the physical address (not a P.O. Box) shown on *your* United States income tax return as *your* residence will be deemed to be *your* place of *residence.* If *you* do not file a United States income tax return, the residence where *you* spend the greatest amount of time will be deemed to be *your* place of *residence*.

*"Routine-in-hospital newborn infant care expenses"* means expenses actually incurred by or on behalf of a *covered person* born while the *policy* is in force for those services and supplies which are:

A. Administered or ordered by a *doctor;*
B. Routinely provided for the care of the newborn infant; and
C. Provided while an *inpatient* of a *hospital* within the first five days following the *covered person's* birth or before the mother ceases to be an *inpatient,* whichever occurs first.

"*Routine patient care costs*" means the costs of *medically necessary* health care services or supplies which are considered *covered expenses* under this plan regardless of whether the *covered person* is participating in a clinical trial.

*Routine patient care costs* do not include:

A. The cost of an investigational new drug or device that is not approved for any indication by the United States Food and Drug Administration, including a drug or device that is the subject of the clinical trial;
B. The cost of a service that is not a health care service, regardless of whether the service is the subject of the clinical trial;
C. The cost of a service that is clearly inconsistent with widely accepted and

established standards of care for a particular diagnosis;

D. The cost of managing the clinical trial; or

E. The cost of any health care service specifically excluded from coverage under this plan.

In addition, *covered expenses* will not include:

A. *Routine patient care costs* provided through the research institution, person or entity conducting the clinical trial unless the institution and each health care provider agrees to accept reimbursement at the rate established under this plan as payment in full; or

B. Any costs incurred for services that are a part of the subject matter of the clinical trial and that are customarily paid for by the institution, person or entity conducting the clinical trial.

*"Spouse"* means *your* lawful wife or husband.

*"Store-and-forward technology"* means technology that stores and transmits or grants access to a *covered person's* clinical information and review by a health care professional at a different location than the *covered person.*

*"Substance-related and addictive disorders* means alcoholism and *substance-related and addictive disorders* that are listed in the current edition of the <u>International Classification of Diseases section on Mental and Behavioral Disorders</u> or the <u>Diagnostic and Statistical Manual of Mental Disorders</u> of the American Psychiatric Association. The fact that a disorder is listed in either of these reference manuals does not mean that treatment of the disorder is a *covered expense.*

*"Surgery"* or *"surgical procedure"* means an invasive diagnostic procedure or the treatment of a *covered person's illness* or *injury* by manual or instrumental operations, performed by a *doctor* while the *covered person* is under general or local anesthesia or conscious sedation.

"*Telehealth service*" means a health service, other than a *telemedicine medical service*, delivered by a health professional licensed, certified, or otherwise entitled to practice in Texas and acting within the scope of that license to a patient at a different physical location than the health professional using telecommunications or information technology.

*"Telemedicine medical service*" means a health care service delivered by a *doctor* licensed in Texas, or other health professional acting under the delegation and supervision of a *doctor* licensed in Teas, and acting within the scope of the health care professional's license to a patient in a different physical location using telecommunications of information technology the use of electronic information and communication technology to deliver healthcare services, including without limitation the assessment, diagnosis, consultation, treatment, education, care management or self-management of a patient.

*Telemedicine medical services* includes *store-and-forward technology* and *remote patient monitoring*.

Benefits do not include *telemedicine medical services* or *telehealth services* provided by only synchronous or asynchronous audio interaction, including:

A. Audio-only telephone conversation;

B. A facsimile transmission; or

C. A text only e-mail.

D. *Virtual care services* provided by a *designated virtual network provider,* as described in the Virtual Care Rider if selected and attached to this *policy/*certificate.

"*Treatment for autism spectrum disorder*" means care, treatments, interventions, services or items which are reasonably expected to: (A) prevent the onset of an *autism spectrum disorder;* (B) reduce or ameliorate the physical, mental, or developmental effects of an *autism spectrum disorder;* or (C) assist to achieve or maintain maximum functional activity in performing daily activities after being diagnosed with an *autism spectrum disorder.*

*Treatment for autism spectrum disorder* shall include the following care when prescribed, provided or ordered by a *doctor*:

A. *Evidence-based treatments;*

B. Psychiatric care, meaning direct, consultative, or diagnostic services provided by a licensed psychiatrist;

C. Psychological care, meaning direct or consultative services provided by a licensed psychologist;

D. Pharmacy care, meaning prescription medications and any health-related services necessary to determine the need of effectiveness of the medications;

E. Habilitative or rehabilitative care, meaning professional, counseling, and guidance

services and treatment programs, including *applied behavioral analysis*, that are intended to develop, maintain, and restore the functioning of an individual; and

F. Therapeutic care, including behavioral speech, occupational, and physical therapies that provide treatment in the areas of: (1) self-care and feeding; (2) pragmatic, receptive, and expressive language; (3) cognitive functioning; (4) *applied behavioral analysis*, intervention, and modification; (5) motor planning; and (6) sensory processing.

Therapeutic care, including behavioral speech, occupational, and physical therapies that provide treatment for *autism spectrum disorder* in the area of *applied behavioral analysis,* intervention, and modification is limited to those services provided or supervised by a board-certified behavior analyst.

*"Unproven service(s)"* means services, including medications, that are determined not to be effective for treatment of the medical condition, and/or not to have a useful effect on health outcomes, due to insufficient and inadequate clinical evidence from *well-conducted randomized controlled trials* or *well-conducted cohort studies* in the prevailing published peer-reviewed medical literature.

A. *"Well-conducted randomized controlled trials"* means that two or more treatments are compared to each other, the patient is not allowed to choose which treatment is received, and neither the provider nor the patient is informed as to which treatment the patient is receiving.

B. *"Well-conducted cohort studies"* means patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.

"*Urgent care center"* means a facility, not including a *hospital emergency* room or a *doctor's* office that provides treatment or services that are required:

A. To prevent serious deterioration of a *covered person's* health; and

B. As a result of an unforeseen *illness* or *injury,* or the onset of acute or severe symptoms.

# SECTION 3
# POLICYHOLDER PROVISIONS

**POLICYHOLDER AUTHORITY:** The *policyholder* will act on behalf of all members in all matters pertaining to the *policy*, and every.

A. Act done by the *policyholder;* or

B. Agreement between *us* and the *policyholder,*

will be binding on the member.

**NOTICE:** Written notice to the *policyholder* or *you* will be effective on the date it is placed in the United States Mail. Notice will be deemed to be properly addressed if it reflects the last address shown in *our* records.

# SECTION 4
# ELIGIBILITY

**CLASSIFICATION OF ELIGIBLE PERSONS:** All persons in the following class are eligible for insurance under the *policy:*

| CLASS | CLASS DEFINITION |
|---|---|
| I | All contributing members of the *policyholder* association |

**DATE OF ELIGIBILITY:** The *primary insured* is eligible for insurance on the date the *primary insured* becomes a member of one of the classes defined above.

**DEPENDENT ELIGIBILITY:** The eligibility of the *primary insured's dependents* is tied to the eligibility of the *primary insured*. All *dependents* of the *primary insured* on the *primary insured's* date of eligibility are also eligible for coverage as of that date.

A newborn child or adopted child of a *covered person* may become insured under the *policy* according to the provisions entitled Adding a Newborn Child or Adding an Adopted Child in Section 5.

With the exception of a child covered under a medical support order, no other person may be added as a *covered person* under this certificate.

## SECTION 5
## EFFECTIVE DATE OF INSURANCE

**EFFECTIVE DATE OF INSURANCE:** The effective date of insurance for initial *covered persons* is shown on the Data Page of the certificate.

**ADDING A NEWBORN CHILD:** An *eligible child* born to *you* or *your spouse* while this plan is in force will be a *covered person* from the time of birth. The newborn child will be covered from the time of birth for *loss* due to *Injury* and *Illness*, including *loss* from complications of birth, premature birth, and medically diagnosed defects present at birth.

No change in premium is needed for the newborn child to continue as a *covered person.*

**ADDING AN ADOPTED CHILD:** If *you* notify *us* within 60 days of filing for adoption, an *eligible child* will be a *covered person* from the date *you* or *your spouse* became party to a suit seeking to adopt the child. A newborn adopted child for which petition to adopt was filed within 60 days of birth will be covered from the date of birth. The adopted child will be covered for loss due to *injury* and *illness*, including loss from complications of birth, premature birth, and congenital defects.

No change in premium is needed for the adopted child to continue as a *covered person.*

## TERMINATION OF INSURANCE

**TERMINATION OF CERTIFICATE:** Insurance for all *covered persons* will automatically terminate on the earliest of:

A. The date the *policy* is terminated;

B. The termination date shown on the Data Page, subject to cancellation for fraud;

C. Nonpayment of premiums when due, subject to the Grace Period provision;

D. The end of the premium period on or after the date the *primary insured* turns 65, if the *primary insured* is the only *covered person*; or

E. The date of the *primary insured's* death, if the *primary insured* is the only *covered person.*

*We* will refund any premium paid and not earned due to automatic termination of the certificate.

*You* may also terminate this certificate by giving written notice to *us*. Termination by *you* will be effective on the last day for which premium has been paid.

**TERMINATION OF COVERED PERSON**: A *covered person's* coverage under this certificate will terminate at the end of the premium period on or after the date of his or her 65th birthday.

**CONTINUATION OF COVERAGE DUE TO DIVORCE OR TERMINATION OF MEMBERSHIP IN THE POLICYHOLDER ASSOCIATION GROUP:** If a person ceases to be a *covered person* due to divorce or termination of membership in the policyholder association group, the person will be eligible for continuation of coverage for the remainder of the original *policy term* selected. *We* will offer to continue the person's coverage by issuing an individual certificate if the person resides in a state where *we* offer this type of coverage. If the person resides in a state where *we* do not offer this type of coverage, then a continuation certificate cannot be issued. The premium rate applicable to the new certificate will be determined based on the current residence of the *covered person*. All other terms and conditions of the new certificate will be the same as the original coverage. *Preexisting conditions* will be determined from the original effective date of coverage. The termination date of coverage will remain the same as the termination date of the original certificate. *Deductible amounts*, waiting periods and maximum benefit limits will be satisfied under the new certificate to the extent satisfied under this certificate at the time that the continuation of coverage is issued.

**Notification Requirements:** It is the responsibility of *you* or *your* former *spouse* to notify *us* within 31 days of the termination of your membership or *your* legal divorce. *You* must provide the address to which their continuation of coverage should be issued.

**Continuation of Coverage:** *We* will issue the continuation of coverage within 30 days after the date *we* receive timely notice of *your* ineligibility for coverage.

*Your* former *spouse* must pay the required premium within 31 days following notice from *us* or the new certificate will be void from its beginning.

**BENEFITS AFTER THE MASTER POLICY TERMINATES** In the event that the master *policy* terminates, coverage under any existing certificates will not be affected. Coverage under such certificates will remain in force for the duration of

the *policy term* selected and any benefit period established during the *policy term.*

**CANCELLATION FOR FRAUD:** *We* may cancel coverage under the *policy* if there is fraud or intentional material misrepresentation made by or with the knowledge of a *covered person* in filing a claim for *policy* benefits. If coverage is terminated under these circumstances, *we* will refund any unearned premium and there will be no benefits after coverage terminates.

**CONTINUATION UPON THE PRIMARY INSURED'S DEATH:** If more than one person is covered under this certificate, it may be continued after a *primary insured's* death by the *primary insured's spouse* if a *covered person;* otherwise, by the youngest child who is a *covered person*.

The certificate will be changed to a plan appropriate, as determined by *us*, to the *covered person(s)* that continue to be covered under it. The *primary insured's spouse* or youngest child will replace the *primary insured*. A proper adjustment will be made in the premium required for the certificate to be continued. *We* will also refund any premium paid and not earned due to the *primary insured's* death. The refund will be based on the number of full months that remain to the next premium due date.

**EXTENSION OF BENEFITS UPON TERMINATION OF THE MASTER POLICY:** If a *covered person* is an *inpatient* in a *hospital* on the date that the master *policy* is terminated and the master *policy* is replaced without any gap in coverage by a group health insurance policy with another insurer or by a self-funded health care plan, benefits for *covered expenses* for the continuous *hospital* confinement will be extended. These extended benefits will be paid solely for *covered expenses* incurred during the *inpatient hospital* confinement. Any extended benefit will cease on the earliest of:

A. The date the *covered person's hospital* confinement ends, or

B. The date the benefits for the *hospital* confinement would have ceased under any other provision of the *policy*/certificate.

## PREMIUMS

**PREMIUM PAYMENTS:** The *primary insured* is solely responsible for the premium payments for this *policy*/certificate. Monthly premium, if the *primary insured* elected to pay on a monthly basis, is due the last day of the period for which the preceding premium was paid. Monthly premiums must be paid through a pre-authorized charge to a bank account or credit card.

**GRACE PERIOD:** *You* have until the 31st day following each premium due date to pay all premiums due. This certificate will remain in force during the grace period. However, the grace period will never extend coverage under the *policy* beyond the termination date shown in the Data Page.

*We* will pay benefits for *your covered expenses* incurred during the 31 day grace period. Any such benefit payment is made in reliance on the receipt of the full premium due from *you* by the end of the grace period.

**REINSTATEMENT:** If coverage under the *policy* lapses due to nonpayment of premium, *we* may require an application to reinstate coverage. If an application is not required, coverage will be reinstated when premium is accepted.

If *we* require an application, coverage will be reinstated upon our approval. If *we* do not approve the application for reinstatement, but fail to notify the *primary insured* in writing of the disapproval, coverage will be reinstated on the 45th day after the date of *our* receipt of the application.

The reinstated coverage will cover *loss* from *illness* and *injury.* However, the reinstated coverage will not cover *loss* from:

A. *Injury* sustained between the date the coverage lapsed and the date it was reinstated; or

B. *Illness* first manifested, for which *you* received medical advice or treatment, between the date coverage lapsed and the date it was reinstated.

The reinstated coverage will still have the same termination date shown in the Data Page.

**BILLING/ADMINISTRATIVE FEES:** Upon prior written notice, *we* may impose an administrative fee for credit card payments. This does not obligate *us* to accept credit card payments. *We* may charge a $20 fee for any check or automatic payment deduction that is returned unpaid.

## SECTION 6
## GENERAL BENEFIT PROVISIONS

**AMOUNT PAYABLE:** The total amount payable for each *covered person* per *policy term* will not exceed

the maximum benefit limit as shown in the Data Page.

*We* will pay *our* portion of the applicable coinsurance in excess of the applicable *deductible amount(s)* and *copayment amount(s)* for a service or supply that:

A. Qualifies as a *covered expense* under one or more benefit provision(s); and

B. Is received while the *covered person's* insurance is in force under the *policy* if the charge for the service or supply qualifies as an *eligible expense.*

The amount payable will be subject to:

A. Any specific benefit limits stated in the *policy*;

B. A determination of *eligible expenses;* and

C. Any exclusion for expenses incurred at a non-*network provider.*

The applicable *deductible amount(s), coinsurance percentage* and *copayment amount(s)* are shown in the Data Page.

**TRANSPLANT BENEFITS:** For expenses incurred for or related to organ or tissue transplants, the *eligible expense* is stated under the Transplant Expense Benefits provision in the *policy/*certificate.

## MEDICAL BENEFITS

**COVERED EXPENSES:** For the purposes of these benefits, the term "*covered expenses*" means expenses actually incurred by a *covered person* for those services and supplies listed below which are:

A. Administered or ordered by a *doctor;*

B. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness*; and

C. Not excluded anywhere in the *policy.*

**COVERED EXPENSES:** *Covered expenses* are limited to charges:

A. Made by a *hospital* for:

1. Daily room and board and nursing services, not to exceed the *hospital's* most common semi-private room rate;

2. Daily room and board and nursing services while confined in an *intensive care unit,* not to exceed the applicable maximum limits shown on the Data Page;

3. *Inpatient* use of an operating, treatment or recovery room;

4. Outpatient use of an operating, treatment or recovery room for *surgery*;

5. Services and supplies, including drugs and medicines, which are routinely provided by the *hospital* to persons for use only while they are *inpatients;*

6. *Emergency* treatment of an *injury* or *illness*, even if confinement is not required. However, charges for the use of the *emergency* room itself for treatment of an *injury* or *illness* will be subject to the additional *emergency* room deductible shown in the Data Page if the *covered person* is not directly admitted to the *hospital* for *inpatient* treatment of that *injury* or *illness*.

   *Emergency* treatment shall include:

   a. A medical screening examination or other evaluation required by state or federal law to be provided in a *hospital emergency* room, freestanding *emergency* medical care facility, or comparable facility that is necessary to determine whether a medical *emergency* condition exists.

   b. Necessary *emergency* care services, including treatment and stabilization of an *emergency* medical condition; and

   c. Following treatment or stabilization of an *emergency* medical condition, services originating in a *hospital emergency* facility or freestanding *emergency* medical care facility or comparable *emergency* facility until the insured can reasonably be expected to transfer to a *network provider.*

B. For *surgery* in a *doctor's* office or at an *outpatient surgical facility*, including services and supplies;

C. Made by a *doctor* for professional services, including *surgery*;

D. Made by a *medical practitioner* for professional services;

E. For dressings, crutches, orthopedic splints and braces, casts, or other *necessary medical supplies;*

F. For diagnostic testing using radiologic, ultrasonographic, or laboratory services (psychometric, behavioral and educational testing are not included);

G. For chemotherapy whether administered orally, intravenously or by injection;

H. For radiation therapy or treatment;

I. For the cost and administration of an anesthetic;

J. For oxygen and its administration;

K. For the rental of a standard hospital bed, a standard walker, a standard or non-motorized wheelchair, a wheelchair cushion and a ventilator;

L. For expenses incurred by *covered persons* who have been diagnosed with insulin dependent or non-insulin dependent diabetes, elevated blood glucose levels induced by pregnancy, or any other medical condition associated with elevated blood glucose levels limited to:

1. The following equipment and supplies

    a. Blood glucose monitors;

    b. Blood glucose monitors for the legally blind;

    c. Test strips for glucose monitors, including glucose control solutions, lancets, and lancing devices;

    d. Visual reading and urine test strips, and tablets that test for glucose, ketones and protein;

    e. Insulin;

    f. Syringes, needles, insulin analogs and injection aids, including devices used to assist with insulin injection and needleless systems;

    g. Batteries, skin preparation items, adhesive supplies, infusion sets, insulin cartridges, and durable and disposable devices to assist in the injection of insulin;

    h. Insulin pumps, insulin infusion devices, and related supplies;

    i. Repairs and maintenance of insulin pumps to the extent not covered under a manufacturer's warranty, and rental fees for replacement pumps during a period of repair, both of which are limited to the purchase price of a similar new pump;

    j. Prescription and non-prescription medications for controlling blood sugar level;

    k. Podiatric appliances for the prevention of complications associated with diabetes, including no more than 2 pairs of therapeutic footwear per *covered person*, per calendar year;

    l. Glucagon emergency kits and injectable glucagon.

    m. Immunizations for influenza and pneumococcus;

    n. Daily room and board, nursing services, and routinely provided inpatient services while confined in an *extended care facility* or a *rehabilitation facility*, subject to the same limits as if the *covered person* were confined in a *hospital*;

    o. Biohazard disposal containers;

    p. Any new or improved treatment or monitoring equipment or supplies approved by the United States Food and Drug Administration and available to the public on or after the *covered person's effective date*; and

2. *Diabetes self-management training* provided to a *covered person* or a *covered person's caretaker*: (1) after the initial diagnosis of diabetes; (2) for additional training authorized on the written order of a *medical practitioner* after a significant change in symptoms that requires changes in the self-management regime; and (3) for periodic or episodic continuing education when prescribed by a *medical practitioner* as needed due to the development of new techniques and treatments for diabetes.

M. For *dental expenses* when a *covered person* suffers an *injury,* after the *covered person's effective date* of coverage, which results in:

1. Damage to his or her natural teeth; and

2. Expenses which are incurred within six months of the accident or as part of a treatment plan which was prescribed by a *doctor* and began within six months of the accident.

*Injury* to the natural teeth will not include any injury as a result of chewing;

Information for dental procedures may be found by visiting www.myuhc.com.

N. For hemodialysis and the charges by a *hospital* for processing and administration of blood or blood components;

O. For the treatment of breast cancer, a minimum of:

   1. 48 hours of *inpatient* care following a mastectomy; and

   2. 24 hours of *inpatient* care following a lymph node dissection.

P. For the following, when provided to a *covered person* who is receiving benefits for *covered expenses* in connection with a mastectomy and who elects breast reconstruction:

   1. All stages of reconstruction of the breast on which the mastectomy has been performed;

   2. *Surgery* and reconstruction of the other breast to produce a symmetrical appearance; and

   3. Prosthesis and treatment for physical complications of mastectomy, including lymphedemas.

Q. For colorectal cancer examinations and laboratory tests for colorectal cancer in accordance with the published American Cancer Society guidelines.

R. For *reconstructive craniofacial surgery* and related services:

   1. For a *covered person* of any age who is diagnosed as having a craniofacial anomaly if the *surgery* is *medically necessary* to improve functional impairment that results from the craniofacial anomaly, as determined by a nationally approved cleft-craniofacial team, approved by the American Cleft Palate-Craniofacial Association in Chapel Hill, North Carolina.

   2. To attempt to create a normal appearance of a craniofacial abnormality of a *dependent* less than 18 years of age which was caused by congenital defects, developmental abnormalities, trauma, tumors, infection, or disease.

   When part of a written treatment plan, *covered expenses* for treatment of a craniofacial anomaly include *reconstructive craniofacial surgery,* dental care, vision care, and the use of at least (1) hearing aid.

   *"Reconstructive craniofacial surgery"* as used in this benefit provision means the use of *surgery* to alter the form and function of the cranial facial tissues due to a congenital or acquired musculoskeletal disorder.

S. Made by an assistant surgeon, limited to 16 percent of the *eligible expense* for the *surgical procedure.*

T. For diagnosis or treatment of a spine and back disorder, subject to the limit(s) stated in the Data Page.

U. For artificial eyes or larynx.

V. For the most appropriate model of *prosthetic device* or *orthotic device* that adequately meets the medical needs of the *covered person*, as recommended by the *covered person's* physician, podiatrist, prosthetist or orthotist.

   *Covered expenses* shall include:

   1. Professional services related to the fitting and use of the device.

   2. Repair and replacement of the device unless necessitated by the misuse or loss of the device by the *covered person.*

W. For screening for *autism spectrum disorder* for an *eligible child* at 18 and 24 months of age.

X. For generally recognized services prescribed for the diagnosis and treatment of *autism spectrum disorder* for *covered persons*, including: (1) *evidence–based treatments*; (2) evaluation and assessment services; (3) applied behavior analysis; (4) behavior training and behavior management; (5) speech therapy; (6) occupational therapy; (7) physical therapy; and (8) medications or nutritional supplements used to address symptoms of *autism spectrum disorder*.

   For *covered persons* 10 years of age or older, outpatient applied behavior analysis for the treatment of *autism spectrum disorders* shall be limited to a maximum of $50,000 per *policy term*.

Y. For *medically necessary care* and treatment of *loss* or impairment of speech or hearing, including communicative disorders.

Z. For *medically necessary* amino acid modified preparations, low protein modified food products, and any other special dietary products and formulas prescribed by a *doctor* for the therapeutic treatment of phenylketonuria (PKU), galactosemia, organic adicdemias and disorders of amino acid metabolism.

AA. For *medically necessary* hearing aids or cochlear implants for a covered *eligible child* up to age 18 years. This benefit includes the following:

1. Fitting and dispensing services and the provision of ear molds as necessary to maintain optimal fit of hearing aids;
2. Any treatment related to hearing aids and cochlear implants, including coverage for habilitation and rehabilitation as necessary for education gain; and
3. Any treatment related to hearing aids and cochlear implants, including coverage for habilitation and rehabilitation as necessary for education gain.

*Covered expenses* are limited to

1. One hearing aid in each ear every three years; and
2. One cochlear implant in each ear with internal replacement as audiologically or *medically necessary.*

BB. For *routine-in-hospital newborn infant care expenses*.

CC. For newborn screening tests for hypothyroidism, phenylketonuria, galactosemia, sickle-cell anemia, and other genetic disorders as mandated by state law. This will include the cost of test kits, in the amount provided by the Department of State Health Services on its internet website under 33.019 as of the date the test was administered,

DD. For *children's preventive health care services* for any *covered person* eligible by reason of age. Immunization services that qualify as *children's preventive health care services* are exempt from any *deductible amounts,* coinsurance provisions, or *copayment amounts*.

EE. For *child immunizations*, exempt from any *deductible amounts*, copayment amounts and coinsurance requirements.

FF. For medically accepted bone mass measurement for the detection of low bone mass and to determine the risk of osteoporosis and fractures associated with osteoporosis for a *covered person* who is:

1. A postmenopausal woman who is not receiving estrogen replacement therapy;
2. An individual with vertebral abnormalities, primary hyperparathyroidism, or a history of bone fractures; or
3. An individual who is receiving long-term glucocorticoid therapy or being monitored to assess the response to or efficacy of an approved osteoporosis drug therapy.

GG. For one digital rectal exam and one prostate specific antigen test per *policy term* per *covered person* for screening for the early detection of prostate cancer. Benefits shall be exempt from the *deductible amount.* Coverage for screenings does not diminish or limit diagnostic benefits otherwise available under the *policy*/certificate.

HH. For a *medically necessary gastric pacemaker.*

II. For treatment of *medical disorders requiring specialized nutrients and formulas,* including treatment with *medical foods,* regardless of whether the delivery method is enteral or oral.

JJ. For *telemedicine medical* services to the same extent that those services provided, regardless of the *platform* used, would otherwise be *covered expenses* under the *policy*/certificate.

*Covered expenses* shall include a facility fee to the *originating site*. The combined reimbursement to the *originating site* and *distant site* shall be limited to the *covered expense* for the service when provided in person.

KK. For one screening test for hearing loss administered within the first 30 days after birth, and related necessary diagnostic follow-up care during the first 24 months after birth. Charges incurred for the

screening test and follow-up care shall be exempt from the *deductible amount*.

LL. For charges incurred for cognitive rehabilitation therapy, cognitive communication therapy, neurocognitive therapy and rehabilitation, neurobehavioral, neurophysiological, neuropsychological, and psychophysiological testing or treatment, neurofeedback therapy, remediation, post-acute transition services, or community reintegration services necessary as a result of and related to an acquired brain injury.

MM. For diagnostic and surgical treatment of temporomandibular joint disorders and craniomandibular joint disorders.

NN. For up to $200 every five years for one of the following noninvasive screening tests for atherosclerosis and abnormal artery structure and function:

1. Computerized tomography (CT) scanning measuring coronary artery calcification; or
2. Ultrasonography measuring carotid intima-media thickness and plaque.

Benefits are limited to male *covered persons* between the ages of 45 and 76 and female *covered persons* between the ages of 55 and 76 who:

1. Are diabetic; or
2. Have an intermediate or high risk of developing coronary heart disease based on the Framingham Health Study Coronary Prediction algorithm.

OO. For *routine patient care costs* for services, items or drugs provided in connection with a Phase I, II, III or IV clinical trial if the clinical trial is conducted in relation to the prevention, detection or treatment of a *life-threatening disease or condition* and is approved by:

1. The Centers for Disease Control and Prevention;
2. The National Institutes of Health;
3. The United States Food and Drug Administration (USFDA);
4. The United States Department of Defense;
5. The United States Department of Veterans Affairs; or
6. An institutional review board of an institution in the state of Texas that has an agreement with the Office for Human Research Protections of the United States Department of Health and Human Services.

PP. For an annual screening for the early detection of ovarian cancer and cervical cancer for *covered persons* 18 years of age or older, including:

1. A CA 125 blood; and
2. A conventional Pap smear screening or a screening using liquid-based cytology methods, as approved by the United States Food and Drug Administration for the detection of the human papillomavirus.

QQ. For an annual screening by *low-dose mammography* for the presence of occult breast cancer for *covered persons* 35 years of age or older. This age limit does not apply to *diagnostic mammogram*.

RR. For *diagnostic mammogram*

SS. For diagnosis and treatment of *mental disorders, substance-related and addictive disorders* the same as any other *illness*, including services received in:

1. A *psychiatric day treatment facility;*
2. A *residential treatment center for children or adolescents*;
3. A *crisis stabilization unit; and*
4. A *chemical dependency treatment center.*

**Definitions:** As used in this provision, the following terms have the meanings set forth below.

A. *"Crisis stabilization unit*" means a 24-hour residential program that is usually short-term in nature and that provides intensive supervision and highly structured activities to persons who are demonstrating an acute demonstrable psychiatric crisis of moderate to severe proportions.

B. "C*hemical dependency treatment center*" means a facility that provides a program for the treatment of chemical dependency under a written treatment plan approved and monitored by a physician that is:

1. Affiliated with a *hospital* under a contractual agreement with an established system for patient referral;

2. Accredited as a *chemical dependency treatment center* by the Joint Commission on Accreditation of Healthcare Organizations;

3. Licenses as a chemical dependency treatment program by the Texas Commission of Alcohol and Drug Abuse; or

4. Licensed, certified, or approved as a chemical dependency treatment program or center by another state agency

C. *Psychiatric day treatment facility"* means a mental health facility which:

1. Provides treatment for individuals suffering from acute *mental disorders* in a structured psychiatric program utilizing individualized treatment plans with specific attainable goals and objectives appropriate both to the patient and the treatment modality of the program; and

2. Is clinically supervised by a *doctor* of medicine who is certified in psychiatry by the American Board of Psychiatry and Neurology.

The facility must be accredited by the Joint Commission on Accreditation of Hospitals and must not treat a patient for more than eight hours in any 24-hour period.

D. *"Residential treatment center for children and adolescents"* means a child-care institution that provides residential care and treatment for emotionally disturbed children and adolescents and that is accredited as a residential treatment center by the Council on Accreditation of Hospitals, or the American Association of Psychiatric Services for Children.

**AMBULANCE SERVICE BENEFITS:** *Covered expenses* will include ambulance services for local transportation:

A. To the nearest *hospital* that can provide services appropriate to the *covered person's illness* or *injury;* or

B. To the nearest neonatal special care unit for newborn infants for treatment of *illnesses*, *injuries*, birth defects, or complications of premature birth that require that level of care.

Benefits for air ambulance services are limited to:

A. Services requested by police or medical authorities at the site of an *emergency*; or

B. Those situations in which the *covered person* is in a location that cannot be reached by ground ambulance.

*Covered expenses* for air ambulance services are limited to the maximum amount shown in the Data Page.

**Exclusions:** No benefits will be paid for:

A. Expenses incurred for ambulance services covered by a local governmental or municipal body, unless otherwise required by law;

B. Non-*emergency* air ambulance;

C. Air ambulance outside of the 50 United States; and

D. Ambulance services provided for a *covered person's* comfort or convenience.

## HOME HEALTH CARE EXPENSE BENEFITS

**HOME HEALTH CARE EXPENSES:** Under this clause, *covered expenses* for *home health care* are limited to the following charges:

A. *Home health aide services*;

B. Services of a private duty registered nurse rendered on an *outpatient* basis;

C. Professional fees of a licensed respiratory, physical, occupational or speech therapist required for *home health care*;

D. I.V. medication and pain medication to the same extent as it would have been covered during an *inpatient hospital* stay;

E. Hemodialysis, and for the processing and administration of blood or blood components;

F. *Necessary medical supplies*; and

G. Rental of the *durable medical equipment* set forth below to the same extent as it would have been covered during an *inpatient hospital* stay:

1. I.V. Stand and I.V. Tubing;
2. Infusion Pump or Cassette;
3. Portable Commode;
4. Patient Lift;
5. Bili-lights; and

6. Suction Machine and Suction Catheters.

(At *our* option, *we* may approve the purchase of the equipment in lieu of its rental if the rental price is projected to be more than the equipment purchase price, but only from a provider *we* approve before the purchase. If the equipment is purchased, the *covered person* must return the equipment to *us* when it is no longer in use.)

**DEFINITIONS:**

*"Home health aide services"* means those services provided by a home health aide employed by a *home health care agency* and supervised by a registered nurse, which are for the personal care of a *covered person*.

*"Home health care"* means care or treatment of an *illness* or *injury* at the *covered person's* home that is: (A) provided by a *home health care agency;* and prescribed and supervised by a *doctor.*

*"Home health care agency"* means a public or private agency or one of its subdivisions, which:

A. Operates pursuant to law as a *home health care agency;*

B. Is regularly engaged in providing *home health care* under the regular supervision of a registered nurse;

C. Maintains a daily medical record on each patient; and

D. Provides each patient with a planned program of observation and treatment by a *doctor,* in accordance with existing standards of medical practice for the *injury* or *illness* requiring the *home health care.*

An agency which is approved to provide *home health care* to those receiving Medicare benefits will be deemed to be a *home health care agency.*

**LIMITATIONS:** *Covered expenses* for *home health aide services* will be limited to 7 visits per week. Each eight-hour period of *home health aide services* will be counted as one visit.

*Covered expenses* for intermittent private duty registered nurse visits (not more than 4 hours each) will be limited to $75 per visit.

**EXCLUSION:** No benefits will be payable for charges related to respite care, *custodial care* or educational care.

## REHABILITATION AND EXTENDED CARE FACILITY EXPENSE BENEFITS

*Covered expenses* include expenses incurred for *rehabilitation services* or confinement in an *extended care facility,* subject to the following limitations:

A. *Covered expenses* available to a *covered person* while confined primarily to receive *rehabilitation* are limited to those specified in this provision.

B. *Rehabilitation* services or confinement in a *rehabilitation facility* or *extended care facility* must begin within 14 days of a *hospital* stay of at least 3 consecutive days and be for treatment of, or *rehabilitation* related to, the same *illness* or *injury* that resulted in the *hospital* stay.

C. *Covered expenses* for *rehabilitation* and *extended care facility* expenses are limited to a combined maximum of 60 days per *policy term* for each *covered person.*

D. *Covered expenses* for *provider facility services* are limited to charges made by a *hospital, rehabilitation facility,* or *extended care facility* for:

   1. Daily room and board and nursing services;

   2. Drugs and medicines that:

      a. Are prescribed by a *doctor;*

      b. Must be filled by a licensed pharmacist; and

      c. Are approved by the U.S. Food and Drug Administration; and

   3. Diagnostic testing.

E. *Covered expenses* for non-*provider facility* services are limited to charges incurred for the professional services of *rehabilitation medical practitioners.*

**Maximum Benefits:** Subject to the limitations stated in this Rehabilitation and Extended Care Facility Expense Benefits provision, benefits for *covered expenses* under this provision are limited to 60 days per *policy term* for each *covered person.*

Care ceases to be *rehabilitation* upon *our* determination of any of the following:

A. The *covered person* has reached maximum therapeutic benefit;

B. Further treatment cannot restore bodily function beyond the level the *covered person* already possesses;

C. There is no measurable progress toward documented goals; or

D. Care is primarily *custodial care.*

For the purposes of this provision, *provider facility* means a *hospital, rehabilitation facility,* or *extended care facility.*

**DEFINITIONS:**

*"Acute rehabilitation"* means two or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for three or more hours per day, five to seven days per week, while the *covered person* is confined as an *inpatient* in a *hospital, rehabilitation facility,* or *extended care facility.*

*"Extended care facility"* means an institution, or a distinct part of an institution, which:

A. Is licensed as a *hospital, extended care facility* or *rehabilitation facility* by the state in which it operates;

B. Is regularly engaged in providing 24-hour skilled nursing care under the regular supervision of a *doctor* and the direct supervision of a registered nurse;

C. Maintains a daily record on each patient;

D. Has an effective utilization review plan;

E. Provides each patient with a planned program of observation prescribed by a *doctor;* and

F. Provides each patient with active treatment of an *illness* or *injury,* or related *rehabilitation,* in accordance with existing standards of medical practice for that condition.

*Extended care facility* does not include a facility primarily for rest, the aged, the treatment of *substance-related and addictive disorders*, *custodial care,* nursing care, or for care of *mental disorders* or the mentally incompetent.

*"Intensive day rehabilitation"* means two or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for three or more hours per day, five to seven days per week.

*"Maximum therapeutic benefit"* means the point in the course of treatment where no further improvement in a *covered person's* medical condition can be expected, even though there may be fluctuations in levels of pain and function.

*"Medically stabilized"* means that the person is no longer experiencing further deterioration as a result of prior *injury* or *illness* and there are no acute changes in physical findings, laboratory results or radiologic results which necessitate acute medical care. Acute medical care does not include *acute rehabilitation.*

*"Pain management program"* means a program using interdisciplinary teams providing coordinated, goal-oriented services to a *covered person* who has chronic pain that significantly interferes with physical, psychosocial, and vocational functioning, for the purpose of reducing pain, improving function, and decreasing dependence on the health care system. A *pain management program* must be individualized and provide physical rehabilitation, education on pain, relaxation training, and medical evaluation.

"*Rehabilitation*" means care for restoration (including by education or training) of one's prior ability to function at a level of *maximum therapeutic benefit.* This type of care must be *acute rehabilitation, subacute rehabilitation,* or *intensive day rehabilitation,* and it includes *rehabilitation therapy,* and *pain management programs.* An *inpatient* hospitalization will be deemed to be for *rehabilitation* at the time the patient has been *medically stabilized* and begins to receive *rehabilitation therapy* or treatment under a *pain management program.*

*"Rehabilitation facility"* means an institution or a separate identifiable *hospital* unit, section, or ward that: (A) is licensed by the state as a *rehabilitation facility;* and (B) operates primarily to provide 24-hour primary care or *rehabilitation* of sick or injured persons as *inpatients.*

*Rehabilitation facility* does not include a facility primarily for rest, the aged, long term care, assisted living, *custodial care,* nursing care or for care of the mentally incompetent.

*"Rehabilitation medical practitioner"* means a *doctor,* physical therapist, speech therapist, occupational therapist, or respiratory therapist. A *rehabilitation medical practitioner* must be licensed or certified by the state in which care is rendered and performing services within the scope of that license or certification.

*"Rehabilitation therapy"* means physical therapy, occupational therapy, speech therapy, or respiratory therapy.

*"Subacute rehabilitation"* means one or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for one-half hour to two hours per day, five to seven days per week, while the *covered person* is confined as an *inpatient* in a *hospital, rehabilitation facility,* or *extended care facility.*

**Exclusion:** No benefits will be paid under this Rehabilitation and Extended Care Facility benefit provision for charges for services or confinement related to treatment or therapy for *mental disorders* or *substance-related and addictive disorders.*

## TRANSPLANT EXPENSE BENEFITS

**TRANSPLANT EXPENSES COVERED UNDER MEDICAL BENEFITS:** The following types of tissue transplants are *covered expenses* under the Medical Benefits provision:

A. Cornea transplants;

B. Artery or vein grafts;

C. Heart valve grafts;

D. Prosthetic tissue replacement, including joint replacements; and

E. Implantable prosthetic lenses, in connection with cataracts.

**ALL OTHER COVERED EXPENSES FOR TRANSPLANT EXPENSES:**

**COVERED EXPENSES:** For the purposes of these benefits, the term "*covered expenses*" means expenses actually incurred by a *covered person* for those services and supplies listed below which are:

A. Administered or ordered by a *doctor;*

B. Provided in connection with a *listed transplant;*

C. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness;* and

D. Not excluded anywhere in the *policy.*

These *covered expenses* will be paid as a limited expansion of the Medical Benefits. They will be subject to the terms of that provision, including deductibles, coinsurance, exclusions and limitations.

If *we* determine that a *covered person* is an appropriate candidate for a *listed transplant,* Medical Benefits *covered expenses* will be provided for:

A. Pre-transplant evaluation;

B. Pre-transplant harvesting;

C. Pre-transplant stabilization, meaning an *inpatient* stay to medically stabilize a *covered person* to prepare for a later transplant, whether or not the transplant occurs;

D. High dose chemotherapy;

E. Peripheral stem cell collection;

F. The transplant itself, not including the acquisition cost for the organ or bone marrow; and

G. Post transplant follow-up.

**DEFINITIONS:** As used in this provision, the following terms have the meanings indicated:

*"Allogeneic bone marrow transplant"* or *"BMT"* means a procedure in which bone marrow from a related or non-related donor is infused into the transplant recipient and includes peripheral blood stem cell transplants.

*"Autologous bone marrow transplant"* or *"ABMT"* means a procedure in which the bone marrow infused is derived from the same person who is the transplant recipient and includes peripheral blood stem cell transplants.

*"Center of Excellence"* means a *hospital* that: (A) specializes in a specific type or types of *listed transplants;* and (B) has agreed with *us*, to provide quality care on a cost efficient basis.

*"Listed transplant"* means one of the following procedures and no others:

A. Heart transplants;

B. Lung transplants;

C. Heart/lung transplants;

D. Kidney transplants;

E. Liver transplants; and

F. Bone marrow transplants for the following conditions:

   1. *BMT* or *ABMT* for Hodgkin's lymphoma;

   2. *BMT* or *ABMT* for non-Hodgkin's lymphoma;

3. *BMT* for severe Aplastic Anemia;
4. *BMT* or *ABMT* for Acute Lymphocytic and Nonlymphocytic Leukemia;
5. *BMT* for Chronic Myelogenous Leukemia;
6. *ABMT* for Testicular Cancer;
7. *BMT* for Severe Combined Immunodeficiency;
8. *BMT* or *ABMT* for Stage III or IV Neuroblastoma;
9. *BMT* for Myelodysplastic Syndrome;
10. *BMT* for Wiskott-Aldrich Syndrome;
11. *BMT* for Thalassemia Major;
12. *BMT* or ABMT for Multiple Myeloma;
13. *ABMT* for pediatric Ewing's sarcoma and related primitive neuroectodermal tumors, Wilm's tumor, rhabdomyosarcoma, medulloblastoma, astrocytoma and glioma;
14. *BMT* for Fanconi's anemia;
15. *BMT* for malignant histiocytic disorders; and
16. *BMT* for juvenile myelo-monocytic leukemia.

**TRANSPLANT DONOR EXPENSES:** *We* will cover the medical expenses incurred by a live donor as if they were medical expenses of the *covered person* if:

A. The *covered person* received an organ or bone marrow of the live donor;

B. The transplant was a *listed transplant;* and

C. They would otherwise be considered *covered expenses* under the *policy.*

**EXCLUSIONS:** No benefits will be paid under these Transplant Expense Benefits for charges:

A. For search and testing in order to find a suitable donor;

B. For a prophylactic bone marrow harvest or peripheral blood stem cell collection when no *listed transplant* occurs;

C. For animal to human transplants;

D. For artificial or mechanical devices designed to replace a human organ temporarily or permanently;

E. For obtaining or transporting the organ or tissue unless expressly provided for in this provision;

F. To keep a donor alive for the transplant operation;

G. For a live donor where the live donor is receiving a transplanted organ to replace the donated organ;

H. Related to transplant not included under this provision as a *listed transplant*; or

I. For a *listed transplant* under study in an ongoing phase I or II clinical trial as set forth in the United States Food and Drug Administration ("*USFDA*") regulation, whether or not the trial is subject to *USFDA* oversight.

J. Which are excluded in the General Exclusions and Limitations section of the *policy.*

**LIMITATIONS ON TRANSPLANT EXPENSE BENEFITS:** In addition to the exclusions and limitations specified elsewhere in this section:

A. *Covered expenses* for *listed transplants* will be limited to two transplants for each *covered person*.

B. If a designated *Center of Excellence* is not used, *covered expenses* for a listed transplant will be reduced by 25% after application of any *deductible amounts* coinsurance provisions or copayment amounts.

C. Benefits may be limited by the Coordination of Benefits Provision, the exclusions and limitations stated in the General Exclusions and Limitations section of the *policy* or other terms and conditions of the *policy*.

# SECTION 7
# GENERAL EXCLUSIONS AND LIMITATIONS

A. No benefits will be paid for: Any service or supply which would be provided without cost to *you* or *your* covered *dependent* in the absence of insurance covering the charge.

B. Expenses/surcharges imposed on *you* or *your* covered *dependent* by a provider (including a *hospital*) but which are actually the responsibility of the provider to pay.

C. Any services performed by a member of the *covered person's immediate family,* other than a dentist.

D. Any services not identified and included as *covered expenses* under the *policy*/certificate. *You* will be fully responsible for payment for any services that are not *covered expenses*.

E. Any part of the charges that are in excess of *eligible expenses.*

Even if not specifically excluded by the *policy*, no benefit will be paid for a service or supply unless it is:

A. Administered or ordered by a *doctor*; and

B. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness.*

No benefits will be paid for any services not identified and included as *covered expenses* under the *policy*. *You* will be fully responsible for payment for any services which are not *covered expenses.*

*Covered expenses* will not include, and no benefits will be paid for any charges which are incurred:

A. For non-*emergency* services or supplies received from a provider who is not a *network provider*, except as specifically provided for by this *policy*.

B. For weight modification, or for surgical treatment of obesity, including wiring of the teeth and all forms of intestinal bypass *surgery*;

C. For breast reduction or augmentation;

D. For any drug, treatment or procedure that promotes conception, including but not limited to:

   1. Artificial insemination; or

   2. Treatment for infertility or impotency;

E. Sterilization or reversal of sterilization;

F. Abortion (unless the life of the mother would be endangered if the fetus were carried to term);

G. For treatment of malocclusions, disorders of the temporomandibular joint or craniomandibular disorders except as described in *covered expenses* of the Medical Benefits provision;

H. For expenses for television or telephone, or for expenses for other persons;

I. For marriage, family, or child counseling for the treatment of premarital, marriage, family or child relationship dysfunctions;

J. For stand-by availability of a *medical practitioner* when no treatment is rendered;

K. For telephone consultations or failure to keep a scheduled appointment;

L. Made by a *hospital* for room and board and nursing services for the first Friday or Saturday of an *inpatient* stay which begins on one of those days, unless:

   1. It is an *emergency*; or

   2. *Medically necessary inpatient surgery* is scheduled for the day after the date of admission;

M. For services or supplies which are not actually provided while the *policy*/certificate is in force;

N. For *dental expenses*, including braces for any medical or dental condition, surgery and treatment for oral surgery, except as expressly provided for under Medical Expense Benefits;

O. For *cosmetic treatment*, except for *reconstructive surgery* which is incidental to or follows surgery or an *injury* which was covered under the *policy,* or is performed to correct a birth defect in a child who has been a *covered person* from its birth until the date *surgery* is performed;

P. For diagnosis or treatment of learning disabilities, attitudinal disorders, or disciplinary problems;

Q. For diagnosis or treatment of nicotine addiction.

R. For charges related to, or in preparation for, tissue or organ transplants, except as expressly provided for under the Transplant Expense Benefits.

S. For high-dose chemotherapy prior to, in conjunction with, or supported by *ABMT/BMT*, except as specifically provided under the Transplant Expense Benefits provision;

T. For eye refractive *surgery*, when the primary purpose is to correct nearsightedness, farsightedness, or astigmatism;

U. While confined primarily to receive *rehabilitation, custodial care,* educational care or nursing services (unless expressly provided for by the *policy*);

V. For eyeglasses, contact lenses, hearing aids, eye refraction, visual therapy, or for any exam or fitting related to these devices, except as expressly provided for under the *policy*;

W. Due to *pregnancy* (except for *complications of pregnancy*);

X. For any expenses, including expenses for diagnostic testing, incurred while confined primarily for well-baby care, except as expressly provided for under the *policy*;

Y. For preventive care or prophylactic care, including routine physical exams, premarital exams and educational programs, except as expressly provided for by the *policy*;

Z. For expenses incurred outside of the United States, except for expenses incurred for *emergency* treatment of a *covered person*;

AA. As a result of:

1. Intentionally self-inflicted bodily harm (whether the *covered person* is sane or insane);
2. *Injury* or *illness* caused by an act of declared or undeclared war; or
3. The *covered person* taking part in a riot; or
4. The *covered person's* commission of a felony, whether or not charged;

BB. For or related to *durable medical equipment* or for its fitting, implantation, adjustment or removal or for complications therefrom, except as expressly provided for under the *policy;*

CC. For or related to surrogate parenting;

DD. For or related to treatment of hyperhidrosis (excessive sweating);

EE. For fetal reduction *surgery*;

FF. As a result of an *injury* or i*llness* arising out of, or in the course of, employment for wage or profit, if the *covered person* is insured, or is required to be insured, by worker's compensation insurance pursuant to applicable state or federal law. If *you* enter into a settlement that waives a *covered person's* right to recover future medical benefits under a worker's compensation law or insurance plan, this exclusion will still apply.

GG. Except as specifically identified as a *covered expense* under the *policy*/certificate, expenses for alternative treatments including acupressure; acupuncture; aroma therapy; hypnotism; massage therapy; rolfing; and other forms of alternative treatment as defined by the Office of Alternative Medicine of the National Institutes of Health.

HH. For any *illness* incurred as a result of the *covered person* being intoxicated, as defined by applicable state law in the state in which the *loss* occurred, or under the influence of illegal narcotics or controlled substance unless administered or prescribed by a *doctor;*

II. For joint replacement, unless related to an *injury* that is covered under the *policy;*

JJ. For non-*emergency* treatment of tonsils, adenoids, hemorrhoids, or hernia;

KK. For modification of the physical body in order to improve the psychological, mental or emotional well-being of the *covered person*, such as sex-change *surgery*;

LL. As a result of any *injury* sustained during or due to participating, instructing, demonstrating, guiding, or accompanying others in any of the following:

1. Professional or semi-professional sports;
2. Intercollegiate sports (not including intramural sports);
3. Parachute jumping;
4. Hang-gliding;
5. Racing or speed testing any motorized vehicle or conveyance;
6. Scuba/skin diving (when diving 60 or more feet in depth);
7. Skydiving;
8. Bungee jumping; or
9. Rodeo sports.

MM. As a result of any *injury* sustained during or due to participating, instructing, demonstrating, guiding, or accompanying others in any of the following if the *covered person* is paid to participate or instruct:

1. Operating or riding on a motorcycle;
2. Racing or speed testing any non-motorized vehicle or conveyance;
3. Horseback riding;
4. Rock or mountain climbing; or
5. Skiing.

NN. As a result of any *injury* sustained while operating, riding in, or descending from any type of aircraft if the *covered person* is a pilot, officer, or member of the crew of such aircraft or is giving or receiving any kind of training or instructions or has any duties that require him or her to be aboard the aircraft;

OO. For vocational or recreational therapy, vocational rehabilitation, or occupational therapy, except as expressly provided for by the *policy*

PP. For a service for which a non-*network provider* waives, does not pursue, or fails to collect any applicable *copayment amount, deductible amount,* or *coinsurance percentage* owed.

QQ. For any portion of the charges which are in excess of the *eligible expense.*

**EXPERIMENTAL OR INVESTIGATIONAL TREATMENT OR UNPROVEN SERVICES:** *Covered expenses* will not include, and no benefits will be paid for any charges which are incurred for *experimental or investigational treatment(s)* or *unproven services*. The fact that an *experimental or investigational treatment* or *unproven service* is the only available treatment for a particular condition will not result in benefits if the procedure is considered to be an *experimental or investigational treatment* or *unproven service* for the treatment of that particular condition.

## SECTION 8
## PREEXISTING CONDITIONS

*Preexisting conditions,* and complications resulting from a *preexisting condition*, will not be covered under the *policy*/certificate*.*

## COORDINATION OF BENEFITS ("COB")

This Coordination of Benefits ("COB") provision applies to this *plan* when a *covered person* has health care coverage under more than one *plan*. "*Plan"* is defined under Definitions below.

The order of benefit determination rules govern the order in which each *plan* will pay a claim for benefits. The *plan* that pays first is called the *primary plan*. The *primary plan* must pay benefits in accordance with its policy terms without regard to the possibility that another *plan* may cover some expenses. The *plan* that pays after the *primary plan* is the *secondary plan*. The *secondary plan* may reduce the benefits it pays so that payments from all *plans* equal 100 percent of the total *allowable expense.*

**DEFINITIONS:** As used in this provision, the following terms have the meanings set forth below.

"*Allowable expense"* means a health care expense, including deductibles, coinsurance, and copayments, that is covered at least in part by any of the *plans* covering the person.

When a *plan* provides benefits in the form of service, the reasonable cash value of each service will be considered as both an *allowable expense* and a benefit paid.

If all *plans* covering the person are *high-deductible health plans* and the person intends to contribute to a health savings account, the primary *high-deductible health plan's* deductible is not an *allowable expense*, except for any health care expense incurred that may not be subject to the deductible.

The following are examples of expenses that are not *allowable expenses.*

A. An expense or portion of an expense that is not covered by any of the *plans.*

B. Any expense that a health care provider or physician is prohibited from charging a *covered person* by law or in accordance with a contractual agreement*.*

C. The difference between the cost of a semi-private room in the *hospital* and a private room, unless one of the *plans* routinely provides coverage for private *hospital* room expenses.

D. If a person is covered by two or more *plans* that do not have negotiated fees and that compute their benefit payments based on *usual and customary fees,* allowed amounts, relative value schedule reimbursement methodology, or other similar reimbursement methodology, any amount in excess of the highest reimbursement amount for a specific benefit.

E. If a person is covered by two or more *plans* that provide benefits or services based on negotiated fees, any amount in excess of the highest of the negotiated fees.

F. If a person is covered by one *plan* that does not have negotiated fees and that calculates its benefits or services based on *usual and customary fees*, allowed amounts, relative value schedule

reimbursement methodology, or other similar reimbursement methodology and another plan that provides its benefits or services based on negotiated fees, the *primary plan's* payment arrangement shall be the *allowable expense* for all *plans*. However, if the health care provider is contracted with the *secondary plan* to provide the benefit or service for a specific negotiated fee or payment amount that is different than the *primary plan's* arrangement and if the health care provider's or physician's contract permits, that negotiated fee or payment shall be the *allowable expense* used by the *secondary plan* to determine benefits.

G. The amount of any benefit reduction by the *primary plan* because a *covered person* has failed to comply with plan provisions. Examples of these types of plan provisions include second surgical opinions, prior authorization of admissions or services, and network provider arrangements.

*"Closed panel plan"* is a *plan* that provides health benefits to *covered persons* primarily in the form of services through a panel of providers that have contracted with or are employed by the *plan*, and that limits or excludes benefits for services provided by other providers, except in cases of emergency or referral by a panel member.

*"Custodial parent"* means a parent with the right to designate the primary residence of a child by a court order. In the absence of a court order–the parent with whom the child resides more than one half of the calendar year without regard to any temporary visitation.

*"High deductible health plan"* means a high deductible health plan, as determined by the Internal Revenue Service and Insurance Code Chapter 1653.

*"Plan"* is any of the following that provides benefits or services for medical or dental care or treatment. However, if separate contracts are used to provide coordinated coverage for members of a group, the separate contracts are considered parts of the same *plan* and there is no COB among those separate contracts.

*"Plan"* includes:

A. Group blanket or franchise accident and health insurance policies, excluding disability income protection coverage;

B. Individual and group health maintenance organization evidences of coverage;

C. Individual accident and health insurance policies;

D. Individual and group preferred provider benefit plans and exclusive provider benefit plans;

E. Group insurance contracts, individual insurance contracts, and subscriber contracts that pay or reimburse for the cost of dental care;

F. Medical care components of individual and group long-term care contracts;

G. Limited benefit coverage that is not issued to supplement individual or group in-force policies;

H. Uninsured arrangements of group or group-type coverage;

I. Medical benefits under automobile insurance contracts; and

J. *Medicare* or other governmental benefits, as permitted by law.

*"Plan"* does not include:

A. Disability income protection coverage;

B. The Texas Health Insurance Pool;

C. Workers' compensation insurance coverage;

D. Hospital indemnity coverage benefits or other fixed indemnity coverage;

E. Specified disease coverage;

F. Supplemental benefit coverage;

G. Accident only coverage;

H. Specified accident coverage;

I. School accident-type coverages that cover students for accidents only, including athletic injuries, either on a "24-hour" or a "to and from school" basis;

J. Benefits for non-medical components of group long-term care policies;

K. Medicare supplement policies,

L. A state plan under Medicaid;

M. A governmental plan, which, by law, provides benefits that are in excess of those of any private insurance plan or other non-governmental plan;

N. An individual accident and health insurance policy that is designed to fully integrate with other policies through a variable deductible.

Each contract for coverage is a separate *plan*. If a *plan* has two parts and COB rules apply only to one of the two, each of the parts is treated as a separate *plan.*

*Plan* means the part of the contract providing the health care benefits to which the COB provision applies, and which may be reduced because of the benefits of other *plans*. Any other part of the contract providing health care benefits is separate from this *plan*. A contract may apply one COB provision to certain benefits, such as dental benefits, coordinating only with like benefits, and may apply other separate COB provisions to coordinate other benefits.

*"Primary plan"* is the *plan* that pays first without regard to the possibility that another *plan* may cover some expenses.

*"Secondary plan"* is the *plan* that pays after the *primary plan*. The *secondary plan* may reduce the benefits it pays so that payments from all *plans* do not exceed 100% of the total *allowable expenses.*

*"Usual and customary fees"* means the amount paid for a medical service in a geographic area based on the what providers in the area usually charge for the same or similar medical service, so long as those charges are reasonable.

**ORDER OF BENEFIT DETERMINATION RULES:** When two or more *plans* pay benefits, the rules for determining the order of payment are as follows:

A. The *primary plan* pays or provides its benefits as if the *secondary plan* or *plans* did not exist.

B. A *plan* which does not have a COB provision that is consistent with this regulation will always be the *primary plan*. There is one exception: coverage that is obtained by virtue of membership in a group that is designated to supplement a part of a basic package of benefits may provide that the supplementary coverage shall be excess to any other parts of the *plan* provided by the *policyholder*. Examples of these types of situations are major medical coverages that are superimposed over base *plan* hospital and surgical benefits, and insurance type coverages that are written in connection with a *closed panel plan* to provide out-of-network benefits.

C. A *plan* may consider the benefits paid or provided by another plan in determining its benefits only when it is *secondary* to that other *plan*.

D. If the *primary plan* is a *closed panel plan* and the *secondary plan* is not, the *secondary plan* shall pay or provide benefits as if it were the *primary plan* when a *covered person* uses a noncontracted provider, except for *emergency* services or authorized referrals that are paid by the *primary plan*.

E. When multiple contracts providing coordinated coverage are treated as a single *plan*, this section applies only to the *plan* as a whole, and coordination among the component contracts is governed by the terms of the contracts. If more than one carrier pays or provides benefits under the *plan*, the carrier designated as primary within the *plan* must be responsible for the *plan's* compliance with this provision.

F. If a person is covered by more than one *secondary plan*, the order of benefit determination rules decides the order in which *secondary plans'* benefits are determined in relation to each other. Each *secondary plan* must take into consideration the benefits of the *primary plan* or *plans* and the benefits of any other *plan* that, under these rules, has its benefits determined before those of the *secondary plan.*

G. The first of the following rules that describes which *plan* pays its benefits before another *plan* is the rule to use.

   1. **Non-Dependent/Dependent -** The *plan* that covers the person other than as a dependent, for example as an employee, member, subscriber or retiree is *primary* and the *plan* that covers the person as a dependent is *secondary*. However, if the person is a *Medicare* beneficiary and, as a result of federal law, *Medicare* is:

      a. *secondary* to the *plan* covering the person as a dependent; and

      b. *primary* to the *plan* covering the insured person as other than a dependent;

      then the order of benefits between the two *plans* is reversed so that the *plan* covering the person as an employee, member, policyholder, subscriber or

retiree is *secondary* and the other *plan* is *primary plan.* An example includes a retired employee.

2. **Dependent Child Covered Under More Than One Plan -** Unless there is a court decree stating otherwise, the order of benefits when a child is covered by more than one *plan* is as follows:

   a. For a dependent child whose parents are married or living together, whether or not they have ever been married:

      i. The *plan* of the parent whose birthday falls earlier in the calendar year is the *primary plan;*

      ii. If both parents have the same birthday, the *plan* that has covered the parent the longest is the *primary plan.*

   b. For a dependent child whose parents are divorced or separated or not living together, whether or not they have been married.

      i. If a court decree states that one of the parents is responsible for the dependent child's health care expenses or health care coverage and the *plan* of that parent has actual knowledge of those terms, that is the *primary plan*. That rule applies to the plan years commencing after the *plan* is given notice of the court decree;

      ii. If a court decree states that both parents are responsible for the dependent child's health care expenses or health care coverage, the provisions of subparagraph a. above shall determine the order of benefits;

      iii. If a court decree states that the parents have joint custody without specifying that one parent has responsibility for the health care expenses or health care coverage of the dependent child, the provisions of subparagraph a. above shall determine the order of benefits;

      iv. If there is no court decree allocating responsibility for the dependent child's health care expenses or health care coverage, the order of benefits for the child are as follows: the *plan* covering the *custodial parent*; the *plan* covering the spouse of the *custodial parent*, the *plan* covering the non-*custodial parent*; and then the *plan* covering the spouse of the non-*custodial parent.*

   c. For a dependent child covered under more than one *plan* of individuals who are not the parents of the child, the order of benefits shall be determined, as applicable, under paragraphs a and b above as if those individuals were parents of the child.

   d. For a dependent child who has coverage under either or both parents' plans and has his or her own coverage as a dependent under a spouse's *plan*, G.5. below applies.

   e. In the event the dependent child's coverage under the spouse's *plan* began on the same date as the dependent child's coverage under either or both parents' *plans*, the order of benefits must be determined by applying the birthday rule in a. above to the dependent child's *parent(s) and the dependent's spouse.*

3. **Active/Retired or Laid Off Employee -** The *plan* that covers a person as an active employee who is neither laid off nor retired, is *primary*. The *plan* the covers that same person as a retired or laid-off employee is the *secondary plan*. The same would hold true if a person is a dependent of an active employee and that same.

4. **Continuation Coverage -** If a person whose coverage is provided pursuant to COBRA or under a right of continuation pursuant to federal or state law is covered under another *plan*, the *plan* covering the person as an employee, member, subscriber, or retiree (or as that person's dependent) is *primary*, and the continuation coverage is *secondary*. If the other *plan* does not have this rule, and if, as a result, the

*plans* do not agree on the order of benefits, this rule is ignored.

5. **Longer/Shorter Length of Coverage -** The *plan* that covered the person as an employee, member, subscriber or retiree longer is *primary.*
6. If the preceding rules do not determine the *primary plan*, the *allowable expenses* shall be shared equally between the *plans* meeting the definition of *plan*. In addition, this *plan* will not pay more than it would have paid had it been *primary.*

**EFFECT ON THE BENEFITS OF THIS PLAN:** When this *plan* is *secondary* it will calculate the benefits it would have paid in the absence of other health care coverage and apply that calculated amount to any *allowable expense* under its plan that is unpaid by the primary plan. Payments may be reduced by an amount so that, when combined with the amount paid by the *primary plan*, the total benefits paid or provided by all plans for the claim do not exceed 100 percent of the total *allowable expense* for that claim. The *plan* deductible will be credited any amounts it would have credited in the absence of other health care coverage.

If a *covered person* is enrolled in two or more *closed panel plans* and if, for any reason, including the provision of service by a nonpanel provider, benefits are not payable by one *closed panel plan*, COB must not apply between that *plan* and the other *closed panel plan.*

**COMPLIANCE WITH FEDERAL AND STATE LAWS CONCERNING CONFIDENTIAL INFORMATION:** Certain facts about health care coverage and services are needed to apply these COB rules and to determine benefits payable under this *plan* and other *plans*. Claims Administration will comply with federal and state law concerning confidential information for the purpose of applying these rules and determining benefits payable under this *plan* and other *plans* covering the person claiming benefits. Each person claiming benefits under this *plan* must give Claims Administration any facts it needs to apply those rules and determine benefits.

**FACILITY OF PAYMENT:** A payment made under another *plan* may include an amount that should have been paid under this *plan*. If it does, Claims Administration may pay that amount to the organization that made that payment. That amount will be treated as though it were a benefit paid under this *plan*. Claims Administration will not have to pay that amount again. The term "payment made" includes providing benefits in the form of services, in which case "payment made" means reasonable cash value of the benefits provided in the form of services.

**RIGHT OF RECOVERY:** If the amount of payments made by Claims Administration is more than it should have paid under this COB provision, it may recover the excess from one or more of the persons it has paid or for whom it has paid; or any other person or organization that may be responsible for the benefits or services provided for the *covered person*. The "amount of the payments made" includes the reasonable cash value of any benefits provided in the form of services.

**CONFORMITY WITH STATE LAW:** This Coordination of Benefits provision complies with the current laws of the state in which this certificate was issued. If the law changes, or if *you* move *your residence*, *your* certificate will be considered to be amended to reflect applicable state law.

## REIMBURSEMENT

If a *covered person's illness* or *injury* is caused by the acts or omissions of a *third party, we* will not cover a *loss* to the extent that it is paid as part of a settlement or judgment by any *third party*. But, if payment by or for the *third party* has not been made by the time *we* receive acceptable *proof of loss*. *We* will have the right to be reimbursed to the extent of benefits *we* paid for the *illness* or *injury* in accordance with Chapter 140 of the Texas Civil Practices and Remedies Code if the *covered person* subsequently receives any payment from any *third party*. The *covered person* (or the guardian, legal representatives, estate, or heirs of the *covered person*) shall promptly pay *us* back from the settlement, judgment, or any payment received from any *third party.*

As a condition for *our* payment, the *covered person* or anyone acting on his or her behalf (including, but not limited to, the guardian, legal representatives, estate, or heirs) agrees:

A. To fully cooperate with *us* in order to obtain information about the *loss* and its cause;
B. To immediately tell *us* in writing of any claim made or lawsuit filed on behalf of a *covered person* in connection with the *loss*;
C. To include the amount of benefits paid by *us* on behalf of a *covered person* in any claim made against any *third party*;
D. That *we*:

1. Will have a lien on all money received by a *covered person* in connection with the *loss* equal to the amount *we* have paid;
2. May give notice of that lien to any *third party* or *third party's* agent or representative;
3. Will have the right to intervene in any suit or legal action to protect *our* rights;
4. Are subrogated to all of the rights of the *covered person* against any *third party* to the extent of the benefits paid on the *covered person's* behalf; and
5. May assert that subrogation right independently of the *covered person*.

E. To take no action that prejudices *our* reimbursement and subrogation rights;

F. To sign, date and deliver to *us* any documents *we* request which protect *our* reimbursement and subrogation rights;

G. To not settle any claim or lawsuit against a *third party* without providing *us* with written notice of the intent to do so;

H. To pay *us* back from any money received from any *third party*, to the extent of benefits *we* paid for the *illness* or *injury*, whether obtained by settlement, judgment, or some other way, and whether or not the *third party's* payment is expressly designated as a payment for medical expenses; and

I. That *we* may reduce other benefits under the *policy* by the amounts a *covered person* has agreed to pay *us* back.

Furthermore, as a condition of *our* payment, *we* may require the *covered person* or the *covered person's* guardian (if the *covered person* is a minor or legally incompetent) to execute a written reimbursement agreement. But, the terms of this provision remain in effect whether or not an agreement is actually signed.

*We* have a right to be reimbursed in full regardless of whether or not the *covered person* is fully compensated by any recovery received from any *third party* by settlement, judgment, or some other way.

Should *we* recover all or part of the benefits *we* paid, *we* will pay *our* share of attorney fees and costs associated with the *covered person's* claim or lawsuit in accordance with Chapter 140 of the Texas Civil Practice and Remedies Code.

If a dispute arises as to the amount a *covered person* must pay *us* back, the *covered person* (or the guardian, legal representatives, estate, or heirs of the *covered person*) agrees to place sufficient funds in an escrow or trust account to satisfy the maximum lien amount asserted by *us* until the dispute is resolved.

Definition: As used in this provision, the following term has the meaning indicated:

"*Third party*" means a person or other entity which is or may be obligated or liable to the *covered person* for payment of any of the *covered person's* expenses for *illness* or *injury*. The term "*third party*" includes, but is not limited to, an individual person; a for-profit or non-profit business entity or organization; a government agency or program; and an insurance company. But, the term "*third party*" will not include any insurance company with a *policy* under which the *covered person* is entitled to benefits as a named insured person or an insured *dependent* of a named insured person except in those jurisdictions where statutes or common law does not specifically prohibit our right to recover from these sources.

## SECTION 9
## CLAIMS

**NOTICE OF CLAIM:** *We* must receive notice of claim within 30 days of the date the *loss* began or as soon as reasonably possible.

**CLAIM FORMS:** *We* will furnish claim forms after *we* receive notice of a claim. If *our* usual claim forms are not furnished within 15 days *you* or *your* covered *dependent* may file a claim without them. The claim must contain written *proof of loss.*

**PROOF OF LOSS:** *You* or *your* covered *dependent* must give *us* written *proof of loss* within 90 days of the *loss.*

Failure to provide written *proof of loss* within 90 days of the date of the *loss* will not invalidate or reduce a claim if:

A. It was not reasonably possible to provide written *proof of loss* within that time;

B. Written *proof of loss* is provided as soon as reasonably possible; and

C. Unless the claimant does not have the legal capacity to provide *proof of loss*, *proof of loss* is provided not later than the first anniversary of the date the *proof of loss* is otherwise required.

**COOPERATION PROVISION:** When a *loss* occurs, each *covered person* or their representative must promptly:

A. Sign, date and deliver to *us* an authorization which may be needed to obtain relevant information from *doctors, hospitals* and other *third parties*;

B. Answer any relevant questions, under oath, which *we* may ask about the *loss*;

C. Give *us* a copy of any relevant document that pertains to the *loss*; and

D. Give *us* any other assistance which *we* may reasonably require to process the claim.

**CUSTODIAL PARENT:** This provision applies if the parents of a covered *eligible child* are divorced or legally separated and both the custodial parent and the non-custodial parent are subject to the same court or administrative order establishing custody. The custodial parent, who is not a *covered person*, will have the rights stated below if we receive a copy of the order establishing custody.

Upon request by the custodial parent, *we* will:

A. Provide the custodial parent with information about the terms, conditions benefits, exclusions and limitations of the *policy*;

B. Accept claim forms and requests for claim payment from the custodial parent; and

C. Make claim payments directly to the custodial parent for claims submitted by the custodial parent. Payment of claims to the custodial parent, which are made under this provision, will fully satisfy *our* obligations.

A custodial parent may, with *our* approval, assign claim payments to the *hospital* or *medical practitioner* providing treatment to an *eligible child.*

**TIME FOR PAYMENT OF CLAIMS:** Benefits will be paid as soon as *we* receive proper *proof of loss.* All benefits payable under the *policy*/certificate will be paid no later than the 60th day after the date the *proof of loss* is received.

**PAYMENT OF CLAIMS:** Except as set forth in this provision, all benefits are payable to *you* or to *your* assignee. Any accrued benefits unpaid at *your* death or *your dependent's* death may, at *our* option, be paid either:

A. To the beneficiary; or

B. To the estate.

If any benefit is payable:

A. To *your* or *your dependent's* estate; or

B. To a beneficiary who:

   1. Is a minor; or

   2. Is not able to give valid release;

*we* may pay up to $1,000 to any relative who, in *our* opinion, is entitled to it.

*We* may pay all or any part of the benefits provided by the *policy* for *hospital*, surgical, nursing or medical services, directly to the *hospital* or other person rendering such services.

Any payment made by *us* in good faith under this provision shall fully satisfy *our* obligation to the extent of the payment. *We* reserve the right to deduct any overpayment made under the *policy* from any future benefits payable under the *policy.*

**FOREIGN CLAIMS INCURRED FOR EMERGENCY CARE**: Claims incurred outside of the United States for *emergency* care and treatment of a *covered person* must be submitted in English or with an English translation. Foreign claims must include the applicable medical records in English to show proper *proof of loss.*

**PHYSICAL EXAMINATION:** *We* have the right to have *you* or *your* covered *dependent* examined at *our* own expense when and as often as *we* may reasonably require while a claim is pending. *We* also have the right to have an autopsy made where it is not prohibited by law.

**ASSIGNMENT:** *We* will reimburse a *hospital* or health care provider if:

A. *Your* health insurance benefits are assigned by *you* in writing; and

B. Verified by *us*.

Any assignment to a *hospital* or person providing the treatment, whether with or without *our* approval, shall not give such *hospital* or person, any right or privilege granted to *you* under the *policy* except for the right to receive benefits, if any, which *we* have determined to be due and payable.

**MEDICAID REIMBURSEMENT:** *We* will pay the benefits of the *policy* to the state if *we* receive notice that payment has been made under Medicaid for *covered expenses* incurred by a *covered person*.

*Our* payment to the state will be limited to the amount payable under the *policy* for the *covered*

*expenses* for which reimbursement is due. Payment under this provision will be made in good faith. It will satisfy *our* responsibility to the extent of that payment.

The amount payable under the *policy* will not be changed or limited for reason of a *covered person's* being eligible for coverage under the Medicaid program of the state in which he or she lives.

**CONSERVATORS:** If this certificate is a Family or One-Parent Family Plan, benefits paid on behalf of any *eligible child* will be paid to the Texas Department of Human Services after written notice to *us* at *our* home office if the parent is:

A. A possessory conservator of the *eligible child* under an order issued by a court in the state of Texas or is not entitled to possession of or access to the child; and

B. Is required by court order or court-approved agreement to pay child support.

Benefits will also be paid to the Texas Department of Human Services if the Department is:

A. Paying benefits on behalf of the *eligible child* under Chapter 31 or Chapter 32 of the Human Resources Code; and

B. *We* are notified through an attachment to the claim for benefits when the claim is first submitted to *us* that the benefits must be paid directly to the Texas Department of Human Services.

*We* may pay benefits on behalf of any *eligible child* to a non-*covered person* if a court order providing for the managing conservator of the *eligible child* has been issued by a court of competent jurisdiction.

Before any benefits will be paid to a managing conservator, *we* must receive a certified copy of the court order establishing the person as managing conservator, or evidence designated by the Texas State Board of Insurance that the non-*covered person* qualifies to be paid benefits.

**CONTINUITY OF CARE:** If a *covered person* receives treatment for *special circumstances* from a provider who ceases to be a *network provider* during the course of treatment, the *covered person* and/or the provider may request that benefits for the treatment for those *special circumstances* continue to be paid as if that provider were still a *network provider*. *Covered expenses* for treatment of the *special circumstances* will continue to be paid only while coverage remains in force during the *policy term* as follows:

A. For the first 90 days after the date the provider ceases to be a *network provider*; or

B. For a *covered person* who has been diagnosed as *terminally ill*, for 9 months after the date the provider ceases to be a *network provider.*

C. For a pregnancy that is past the 24th week at the time of termination, will extend through delivery of the child, for immediate postpartum care, and the follow-up checkup within the six-week period after delivery.

As used in this provision*, "special circumstances*" means a condition regarding the treating physician or *network provider* reasonably believes that discontinuing care by the treating physician or provider could cause harm to the *covered person*. Examples of an insured who has a *special circumstance* include a *covered person* with a disability, acute condition, or life-threatening *illness,* or a female *covered person* is past the 24th week of pregnancy.

## UNIFORM PROVISIONS

**CONTRACT:** The entire contract between the *policyholder* and *us* consists of:

A. The *policy*;

B. The applications of the *policyholder* and the persons insured; and

C. Riders issued to certificateholders.

All statements contained in the applications will, in the absence of fraud, be deemed representations and not warranties. No statement made by an applicant for insurance will be used to void the insurance or reduce the benefits, unless contained in a written application which is signed by the applicant.

No agent may:

A. Change the *policy*;

B. Waive any provisions of the *policy*;

C. Extend the time for payment of premiums; or

D. Waive any of *our* rights or requirements.

**NON-WAIVER:** If *we* or *you* fail to enforce or to insist on strict compliance with any of the terms, conditions, limitations or exclusions of the *policy*, that will not be considered a waiver of any rights under the *policy*. A past failure to strictly enforce

the *policy* will not be a waiver of any rights in the future, even in the same situation or set of facts.

**MISSTATEMENT IN APPLICATION:** A misstatement in the written application for coverage signed by the *primary insured* may be used to void coverage and/or deny or reduce a claim for loss incurred within 24 months of the effective date of coverage under the *policy.*

After 24 months following the effective date of coverage under the *policy*, no misstatement, except for a fraudulent misstatement, may be used to void or reduce *your* coverage and/or deny a claim for loss incurred under the *policy.*

**CONDITIONS PRIOR TO LEGAL ACTION:** On occasion, *we* may have a disagreement related to coverage, benefits, *premiums*, or other provisions under this *policy*. Litigation is an expensive and time-consuming way to resolve these disagreements. Therefore, with a view to avoiding litigation, *we* request that *you* give written notice to *us* of *your* intent to sue *us* prior to bringing any legal action. *Your* notice must:

A. Identify the coverage, benefit, premium, or other disagreement;

B. Refer to the specific policy provision(s) at issue; and

C. Include all relevant facts and information that support your position.

**LEGAL ACTION:** No action at law or in equity may be brought to recover reimbursement under the *policy* before the 61st days after written *proof of loss* has been furnished. No such action may be brought after the end of three years after the time written *proof of loss* is required to be furnished.

**CONFORMITY WITH STATE STATUTES:** The *policy* will be interpreted by the laws of the state in which it is delivered. Any part of the *policy* which is in conflict with the laws of the state in which it is delivered is changed to conform to the minimum requirements of that state's laws.

# OUTPUTPATIENT PRESCRIPTION DRUG EXPENSE BENEFITS RIDER

This rider is effective at the same time as the *policy*/certificate.

By attachment of this rider, *covered expenses* under the *policy*/certificate are expanded to include the charges incurred by a *covered person* for outpatient *prescription drugs* as stated in this rider.

**COVERED EXPENSES:** *Covered expenses* for outpatient *prescription drugs* are limited to charges from a licensed pharmacy for drugs that, under applicable state law, may be dispensed only upon the written prescription of a *doctor*.

**Off-Label Drugs for the Treatment of Cancer:** *Covered expenses* shall include any drug approved by the United States Food and Drug Administration (*USFDA*) for the treatment of cancer, even if not approved for the specific type of cancer for which the drug has been prescribed if:

A. The drug has been recognized as safe and effective for treatment of that specific type of cancer in any of the following standard reference compendia, unless the use is identified as not indicated in one or more of these standard reference compendia:

    1. The American Hospital Formulary Services Drug Information;
    2. The National Comprehensive Cancer Network Drugs and Biologics Compendium;
    3. The Elsevier Gold Standard's Clinical Pharmacology; or
    4. Other authoritative compendia as identified by the Secretary of the United States Department of Health and Human Services or the Commissioner, at our discretion.

B. The drug has been recognized as safe and effective for treatment of that specific type of cancer in two articles from medical literature that have not had their recognition of the drug's safety and effectiveness contradicted by clear and convincing evidence presented in another article from medical literature.

If the drug is deemed to have met this criteria, the drug will be considered a *covered expense,* regardless of whether administered orally, intravenously or by injection.

*Covered expenses* shall not include the charges for any drug for which the *USFDA* has determined its use to be contraindicated for the treatment of the specific type of cancer for which the drug has been prescribed.

**INSURED'S RESPONSIBILITY:** for a covered *prescription drug*, the insured will be required to pay the lesser of:

A. The applicable prescription drug copayment amount*,* if any;

B. The allowable claim amount; or

C. The amount an individual would pay if purchasing without health benefits or discounts.

**MEMBER PHARMACIES:** For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is used, *we* will pay the charges at the negotiated rate, subject to the *prescription drug copayment amount* or the *deductible amount* and *coinsurance percentage* shown in the Data Page, whichever is applicable. For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is not used, charges will be treated the same as any other medical *covered expense* incurred at a non-*network provider*. This may be less than the expense incurred by the *covered person* for the *prescription order*.

**NON-MEMBER PHARMACIES:** *Covered expenses* do not include charges incurred at a non-*member pharmacy* or at a *member pharmacy* when *your* health insurance card is not used, unless as a result of an *emergency*.

**NOTICE AND PROOF OF LOSS:** In order to obtain payment for *covered expenses* incurred as a result of an *emergency* at a non-*member pharmacy* or at a *member pharmacy* when *your* health insurance card is not used, notice of claim and *proof of loss* must be submitted directly to *us*. For *covered expenses* incurred at a *member*

*pharmacy* when *your* health insurance card is used, the *member pharmacy* has agreed to file necessary notice of claim and *proof of loss* with *our* pharmacy benefits manager.

**TIER ASSIGNMENTS:** The cost sharing for a *prescription drug* is determined by the tier to which the *prescription drug* is assigned. United Healthcare's Prescription Drug List Management Committee (*"PDLMC"*) assigns each *prescription drug* to a tier. *You* can find the tier status for a *prescription drug* by accessing *your* prescription benefits on *our* website or by calling the telephone number on *your* health insurance identification card.

**TIER CHANGES:** The *PDLMC* determines changes in tier placement over time. They consider multiple factors including, but not limited to, clinical and economic factors. Clinical factors may include, but are not limited to, evaluation of the place in therapy, relative safety or relative efficacy of the *prescription drug,* as well as whether supply limits should apply. Economic factors may include, but are not limited to, the *prescription drug's* acquisition cost including, but not limited to, available rebates and assessments on the cost effectiveness of the *prescription drug*. The tier to which a *prescription drug* is assigned may change periodically. These changes generally occur quarterly. If a *prescription drug's* tier changes, the cost sharing may change and *you* may be required to pay more or less for the *prescription drug*.

Some *prescription drugs* are more cost effective for treatment of specific indications as compared to others. So, a *prescription drug* may be listed on multiple tiers, depending on the condition for which the *prescription drug* was prescribed.

**PRESCRIPTION DRUG LIST:** *Covered expenses* for *prescription drugs* are limited to those included in the Prescription Drug List (*"PDL"*) provided by *our* pharmacy benefits manager, OptumRx, at the time *your prescription order* is filled (formulary drugs). The *PDL* is determined by the UnitedHealthcare Prescription Drug List Management Committee comprised of senior level UnitedHealth Group physicians and business leaders. Their goal is to help ensure access to a wide range of medications while helping to control health care costs. As affiliates of UnitedHealthcare, both *we* and OptumRx use this *PDL* to administer *prescription drug* benefits.

*You* may be entitled to benefits for a *prescription drug* not included in the *PDL* (non-formulary drugs) without any added cost sharing beyond that required of formulary drugs if:

A. After consultation with *your doctor, we* determine that the formulary drugs are inappropriate therapy for *your* condition; or

B. *You* have been using the non-formulary drug for 6 months prior to its exclusion from the *PDL*, and *your doctor* determines that either the formulary drug is inappropriate therapy for *your* condition or that changing the drug therapy presents a significant health risk.

**PRESCRIPTION CONTRACEPTIVES:** *Covered expenses* include *prescription drugs* and devices approved by the United State Food and Drug Administration *(USFDA)* for use as a contraceptive. *Covered expenses* shall also include *outpatient contraceptive services*.

For purposes of these benefits, *outpatient contraceptive services* means a consultation, examination, procedure, or medical services that is provided on an outpatient basis and that is related to the use of a drug or device intended to prevent pregnancy.

**PRESCRIPTION EYE DROPS:** *Covered expenses* include prescription eye drops and refills of prescription eye drops to treat chronic eye disease when:

A. The *doctor* prescribing the original prescription indicated that additional quantities are needed;

B. The refill does not exceed the total quantity of dosage units authorized by the *doctor* prescribing the original prescription, including refills; and

C. The refill does not exceed the total quantity of dosage period and is:

   1. Not earlier than the 21 days after the date a prescription for a 30-day supply of eye drops is dispensed;