# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BREWER, | § | |
| | § | |
| VS. | § | C.A. NO. 4:22-CV-00969 |
| | § | |
| GOLDEN RULE INSURANCE | § | |
| COMPANY AND TOBIAS & | § | |
| ASSOCIATES, INC. D/B/A | § | |
| GETMEHEALTHCARE | § | |

---

VIDEOTAPED ORAL DEPOSITION
OF MICHAEL BREWER
TAKEN ON FEBRUARY 20, 2023

---

ORAL DEPOSITION of MICHAEL BREWER, produced as a witness at the instance of the Defendants, was duly sworn, was taken in the above-styled and numbered cause on the 20th of February, 2023, from 10:00 o'clock a.m. to 02:41 o'clock p.m., before Angela Steele, Shorthand Reporter, Notary, in and for the State of Texas, reported by machine shorthand at, The Cobos Law Firm, 711 W. Alabama Street, Houston, Texas, pursuant to the Federal Rules and the provisions states on the record or attached hereto.

Page 5

PROCEEDINGS
**********************

THE VIDEOGRAPHER: We are now on the record at 10:00 a.m. on February 20th, 2023. This begins the videotaped deposition of Michael Brewer in the matter of Michael Brewer vs. Golden Rule Insurance Company and Tobias & Associates, Inc. doing business as GETMEHEALTHCARE.
Counsel, please state your appearances for the record and the witness will be sworn.
MR. KACAL: Yes, I'm Nicholas Kacal with the Cobos Law Firm on -- here on behalf of the plaintiff Michael Brewer.
MR. CLACK: Lance Clack for Golden Rule Insurance Company.
MS. PRIETO: Leida Prieto for Tobias & Associates, Inc.
THE COURT REPORTER: Raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give in this action will be the truth, the whole truth, and nothing but the truth under the penalties of perjury?
THE WITNESS: Yes, ma'am.
THE COURT REPORTER: Thank you.
EXAMINATION

Page 6

BY MS. PRIETO:
Q. Good morning. Can you please state your full name for the record.
A. Yes, Michael Arthur Brewer.
Q. Okay. I represent Tobias & Associates. Do you understand who I am and who I represent?
A. Yes.
Q. Have you ever given a deposition before?
A. No.
Q. So I'm going to go through a couple of just ground rules so that we can have a clean record. The court reporter who is to your right is writing down everything we say, and so in order for her to be able to get -- answer you, I would ask that you provide a verbal response so no nodding or no un-uh or uh-huhs. And so if I reiterate and say, "was that a yes," I'm not trying to be rude, I just want to make sure that we have a clean record.
If you didn't hear my question or you didn't understand me, please answer me to restate it or rephrase it. I -- I'm not here to trick you so I want to make sure that you understand what I'm asking. If you need a break, that's completely fine. I would just ask that you answer the last question that was posed before we take that break. And it may be kind of hard sometimes, in a

Page 7

deposition you think about it like having a conversation with somebody, and so I would ask that you let me finish my question before you answer, and I will try to do the same, let you finish your answer before I ask another question just so it's easier for the court reporter.
Are you under the influence of any alcohol or drugs that might impair your ability to give testimony today?
A. No.
Q. Okay. Did you have a chance to meet with your attorney prior to your deposition?
A. Yes.
Q. Okay. I don't want to know what you guys talked about, I just want to know about how long you met for?
A. Just recently about 40 minutes.
Q. Did you review any documents in preparation for your deposition?
A. Yes.
Q. Do you remember what those are?
A. I don't remember all of them, but I remember it was me versus Golden Rule and what my policy was about.
THE COURT REPORTER: Keep your voice up, please.
THE WITNESS: Yes. Yes, ma'am.
BY MS. PRIETO:

Page 8

Q. When you say "your policy," did you look at the first policy and the second policy or just one of them?
A. Just the information that was provided in the packet.
Q. Okay. What is your current address?
A. 2106 Barrington Pointe Drive, League City, Texas 77573.
Q. Okay. Who do you reside with?
A. With my wife, Miriam Quiroz, my two stepchildren Daysi Huerta and Gianlucan Huerta and my son Tenoch Brewer.
Q. Alright. Are any of those kids over the age of 18?
A. Yes.
Q. Okay, which one?
A. Gianlucan and --
THE COURT REPORTER: Spell that.
THE WITNESS: G-i-a-n-l-u-c-a-n.
A. And, yes, ma'am, they are -- Daysi Huerta and Gianlucan are both over 18.
BY MS. PRIETO:
Q. Okay. Do you have any other family that currently resides in Harris County that's over the age of 18?
A. No.

Page 9

Q. Okay. What is your highest level of education?
A. Associates degree.
Q. What did you obtain your associates in?
A. Applied science -- or it's a science degree that was culinary -- a culinary arts degree.
Q. Where did you obtain your associates from?
A. It was the Art Institute of Houston.
Q. Are you currently employed?
A. Yes.
Q. Okay. Where are you employed at?
A. Self-employed at Main St Bistro.
Q. And who do you do at Main St Bistro?
A. Run the business and the chef.
Q. Okay. About how many days a week do you currently work?
A. Six.
Q. Okay. And how many hours do you think you work in those six days?
A. Maybe 40.
Q. Okay. Have you ever been convicted or arrested for a crime?
A. No.
Q. Okay. Have you ever been a party to another civil lawsuit?
A. I don't recall any that I have. For a personal,

Page 10

I don't believe so, no.
Q. What about for your business?
A. The business there was one with Gordon Food Service.
Q. What was the nature of that lawsuit?
A. Old invoice. An old invoice that needed to be paid.
Q. You sued Gordon Food Service or Gordon Food Service sued --
A. Gordon Food Service sued me.
Q. Okay. When did you first reach out to Tobias & Associates?
A. I actually was going through chemotherapy, that was all pretty much set up by my mother who represented me for that, so...
Q. Okay. How long had you been going through chemo before, I guess, your mom reached out to Tobias?
A. I don't recall exactly, but I know that on the 15th around there I was notified that I had testicular cancer, but I was already on Golden Rule's plan and, I guess, started treatment, I believe, around that time as well.
Q. Okay. The 15th of what? What month?
A. November.
Q. Okay. I have that you had -- that you reached

Page 11

out to Tobias before -- before then. So let's see. I have that you did one application with them in June of 2021. Do you recall that?
A. I don't. That was set up by my mother who did that.
Q. Okay. Do you know how your mother found out about Tobias & Associates?
A. I do not.
Q. So in June of 2021 you never spoke to anybody at Tobias?
A. No, ma'am.
Q. So I'm going to show you what's going to be marked as Exhibit 1.
(Exhibit 1 was marked for identification.)
Q. So this is on the bottom Bates labeled as Tobias 37, it's the first page. Do you see your name under applicant?
A. Yes.
Q. Okay. And the title of the document is Application For short-term Medical Insurance Golden Rule Insurance Company. Do you see that?
A. Yes.
Q. Okay. If you turn the page, do you remember seeing this at all, this -- this application at all?

Page 12

A. No, I cannot recall. I don't remember seeing that.
Q. Do you know when your mom called Tobias about the first policy that you had what she asked for?
A. No, ma'am.
Q. Before reaching out to Tobias what kind of -- did you have insurance?
A. No.
Q. Okay. When was the last time before reaching out to Tobias that you had insurance?
A. I can't remember, but it had been years. I don't remember.
Q. Okay. So if you turn to page -- it's going to say 4 at the bottom. Do you see where it says signature and it has your name and it says esign?
A. Yes.
Q. And it's dated June 9th, 2021?
A. Yes.
Q. Okay. You don't remember signing this page online?
A. I'm sorry, did you say June 9th?
Q. Yes, June 9th, 2021.
A. Okay. I honestly -- I might have gotten something to esign, but I don't remember. Like I said, I was -- it was a different time back then, I was getting

Page 25

have to look at some of the reports.
Q. Okay. Let me show you what's going to be marked as Exhibit No. 3 to your deposition.
(Exhibit 3 was marked for identification.)
Q. Take a minute to read it and then let me know if you remember getting this e-mail.
A. No, I don't remember.
Q. Okay. So this is dated November 3rd, 2021. Do you know by the time that you received this e-mail you knew you had cancer?
A. I did not know I had cancer until later when I was told when I met with Dr. Dhir, so if this was November 3rd I did not know.
Q. Okay. Do you remember calling anybody at the Tobias & Associates?
A. I don't remember.
Q. Did you talk to anybody at Tobias & Associates to get an insurance policy after November 3rd?
A. No, my mother mainly handled all that for me.
Q. Okay. Do you know if your mom told anybody at Tobias that you had a testicle removal?
A. I don't know if she said anything, no.
Q. Do you know if your mom might have told anybody at Tobias & Associates that you had cancer?

Page 26

A. I don't know if she did or not either.
Q. Do you know if your mom told anybody at Tobias & Associates anything related to your health?
A. I don't know what she had spoke to them about at all.
Q. Okay. And you never spoke to anybody at Tobias personally?
A. No.
Q. I have that there was another application that was submitted, this one was submitted on November 5th, 2021. This is going to be marked as exhibit -- I think I'm on --
THE COURT REPORTER: Four.
(Exhibit 4 was marked for identification.)
BY MS. PRIETO:
Q. Do you remember filling out this application?
A. I don't remember. I don't recall.
Q. Again, if we go to what's Page 4, do you see a signature block there?
A. I do.
Q. And who does it says it's signed by?
A. Michael Brewer.
Q. And the date it was signed?
A. 11/5/21.

Page 27

Q. Do you know if you filled this out?
A. I don't know who filled it out. I don't know. I don't remember.
Q. I just want to go over and it's on Page 2, again, your medical history, M2. Does that look like the same question that we spoke about earlier talking about medical treatment related to cancer?
A. Yes, it looks the same.
Q. Okay. And what's marked there?
A. No.
Q. Okay. Back to Page 4. Does this page look like the one that we discussed earlier in the prior application?
A. Yes, it does.
Q. Okay. And similarly it tells you on No. 2 that it's not -- that no benefits would be paid for a health condition that exist prior to the date of insurance?
A. Correct.
Q. And it tells you on No. 3, again, that the coverage is not to be a continuation of any prior coverage?
A. I see that, yes.
Q. Okay. Oh, you know what I forgot to ask you about No. 3. For M3, which is on Page 3, sorry, this was asked: During the past 12 months has any applicant been

Page 28

advised to undergo any tests, treatments, hospitalization, or surgery that has not yet been completed or for which results have not yet been received. Do you see that?
A. Yes.
Q. And what's marked for that question?
A. No.
Q. Okay. At this -- at this time since it was November 5th, you had already had your testicle removal, correct?
A. Yes.
Q. Okay. And then had you already -- had you already seen Dr. Dhir?
A. I had not. I didn't -- that's why I didn't know my testicle was removed so I did not, no.
MR. CLACK: I just want to make sure I heard that right. So your testimony that as of November 5th you did not know that your testicle has been removed?
THE WITNESS: That's right. The way it was folded over the sack that it happened it created the boldus (phonetic) area on there.
THE COURT REPORTER: What kind of area?
THE WITNESS: Boldus.
THE COURT REPORTER: Bolus?
THE WITNESS: It was enlarged but it was also because it was healing and, yes, so it was folded

Page 93

your mom said she talked to somebody who said something different?
MR. KACAL: Objection. Form.
A. My mother handled it. I was told to sign what I was told to sign through the agents.
Q. Is that a "yes?"
A. I was told to sign -- to sign through the agents.
Q. Is it your testimony to the ladies and gentlemen of the jury that you ignored the seven times with regard to the second certificate and the six or seven times with regard to the first certificate that Golden Rule told you that they were not covering preexisting conditions and that you ignored all that because your mom told you something different?
MR. KACAL: Objection. Form:
A. It was -- I don't remember doing any of this. I was just told -- what my mother had told me.
Q. I mean, beyond sending you 13 pieces of correspondence that told you they were not going to cover a preexisting condition, what more would Golden Rule have done to convey that message to you?
A. Probably get more directly in contact with me. I don't remember. I don't know how they would have.
Q. Yeah. How would Golden Rule have known that you were not reviewing the application, the welcome letter, or

Page 94

the certificate that set forth your coverage?
A. I thought that they would known that.
Q. They would have known that you weren't reading any of it?
A. Not that I wasn't reading it, but that it was being relayed through me through my mother.
Q. Well, how would they have known that you were not reading all of these documents that they sent you including documents and acknowledgments that you signed as having read?
A. I was just sent a link through a esite to sit there and sign it. That's all I was -- that's all I had communications with.
Q. Well, you recall on the applications we looked at places where when you signed you acknowledged that you not only had read but agreed to the statements above those signatures?
A. I don't remember reading any of the other stuff. I just remember being send the signatures and signing it, being told to sign there.
Q. I'm not asking whether you recall as you sit here, as you recall doing it back then, I'm asking, we just looked at those applications where by your signature you acknowledged reading and understanding the application forms that you were submitting?

Page 95

A. My signatures are on there.
Q. Yeah. And right above there it says: I've read it, I understood it, I know what I'm doing, right? You made that representation to Golden Rule?
MR. KACAL: Objection. Form.
Q. Correct?
A. I just remember signing it, that's all I remember completely doing. I don't remember checking anything offered or talking to any agents about anything. I just remember being told a link to sign it and that's what I did.
MR. CLACK: I -- I'm going to object to that as nonresponsive.
Q. My question is a little bit different. My question is: As you sit here today, you would agree with me that when you put those electronic signatures on the applications you were representing to Golden Rule that you had read and understood the forms you were signing?
A. I was just sent the link. I did not read them. I was just told to sign.
Q. And my question's a little different. How was Golden Rule supposed to know that you were just signing things without reading them?
A. Because they were probably in touch with the agent.

Page 96

Q. How would the agent have known that you were not reading the links you were sent?
A. Because I was just told to sign it to renew it.
Q. Who told you that?
A. My mother.
Q. Alright. How would the agent have known what your mother was telling you? And how would your agent have known that -- well, let's do it one at a time. I'm compounding myself.
MR. CLACK: Would you object --
MR. KACAL: Objection. Form.
Q. How would the agent have known what your mother was telling you with regards to the applications?
A. Because she would have relayed it back to the agent.
Q. Did she tell you that she did that?
A. She said she was taking care of it. She didn't go into specific things.
Q. Did your mother tell you, I told the agent you weren't going to read anything, you were just going to sign it without even glancing at it?
A. No, she did not say that, I believe --
Q. Okay.
A. -- but I don't know.
Q. You don't know what conversations took place been

Page 101

BY MR. CLACK:
Q. Mr. Brewer, you understand that you are under oath just as you were before we took the break?
A. Yes, sir.
Q. Looking at the two certificates in front of you that we were discussing this morning, can you tell me any difference between the coverages in those certificates as you sit here today?
A. Exhibit 10 and 6?
Q. Yes.
A. The term and the length was one specific difference and price and base as well for coverage.
THE COURT REPORTER: What was that?
A. The base it was, I believe, $5,000 and 12 months and the other one was 184 days and 2,500.
BY MR. CLACK:
Q. So the deductible, the term. Any other differences between those two certificates that you are aware of?
A. Not that I'm aware of.
Q. Okay. If you look in front of you there is a document there clipped together marked Exhibit 11. Do you see that?
A. Yes, sir.
(Exhibit 11 was marked for

Page 102

identification.)
Q. And this is a series of medical records affidavit, notices at the beginning, and a series of Bates stamped pages that are just Bates stamped 1 through 36. Is that what you have as well?
A. Yes.
Q. Okay. Turning with me, if you will, to the page that was Bates Stamped 1. Do you see that, that is first page in a series of your medical records, looks like, for treatment for visits to CLS-HTX Urology?
A. Let me see that -- let me see what it says. Dr. Dhir I see this one, yes, so that would have been Clear Lake.
Q. Okay. And turning with me, if you will, to page Bates Stamped 8. Do you see that Page 8 is a record of your visit to Dr. Dhir on June 14th, 2021?
A. June 14, 2021, yes.
Q. Alright. Is that the first time you saw Dr. Dhir to your recollection?
A. I believe so, yes.
Q. What lead you to go see Dr. Dhir on June 4th, 2021?
A. My testicle -- one of my testicles was starting to get enlarged.
Q. There is a -- a note there for reason for

Page 103

appointment, it says: Testicular mass or persistent pain. Do you see that?
A. Yes.
Q. Does that fit with your recollection?
A. Testicular mass does, but it was persistent pain.
Q. And then there is under history of present illness it says: 37 year old with chronic hydrocele, notes it has doubled in size over the last few weeks, denies any urinary symptoms, denies fever, notes some LLQ abdominal pain. Do you see that entry?
A. Yes.
Q. Does that fit with your recollection of your symptoms on June 14th, 2021?
A. Besides the abdomen pain, which I said it was, I don't think it had anything -- he told me it didn't have anything to do with related; but, yes, no urinary symptoms, no fever, any of that, yes, sir.
Q. Alright. And then down at the bottom -- towards the bottom there is an entry there it says under male: Testes normal right testis. Enlarged and hardened, left testis 5 centimeters. Did I read that correctly?
A. Yes.
Q. Does that fit with your recollection of your symptoms on or about June 14, 2021?
A. Yes.

Page 104

Q. This visit came about five days after you applied for the first Golden Rule short-term plan -- I'm sorry, about nine days after you applied for the first Golden Rule short-term plan, correct?
A. I don't remember when I first applied for it but, yes, if it -- if it is. When was the first date that I applied for it?
Q. So if you look back at Exhibit 1.
A. Okay.
Q. What is the date of Exhibit 1?
A. It's 9/21.
Q. Alright. So this doctor's visit on June 14th was five days after you applied for coverage with Golden Rule the first time, correct?
A. I believe so, yes.
Q. You had not had coverage prior to applying for that first Golden Rule short-term policy for about nine years, at least nine years, correct?
A. Yes, around nine years, yes.
Q. Okay. When did you first notice this mass or swelling of your left testicle?
A. Obviously, I don't recall. It was kind of right when I got into an accident when I was younger, but it really started to swell probably around that time.
Q. Did you have discussions with your mother about

Page 105

your need to seek medical treatment for this enlarged testicle?
A. I just said I might need insurance pretty soon. Not over the testicle.
Q. Did you have any discussions with your wife prior to going and seeking -- or prior to the visit with Dr. Dhir?
A. No.
Q. Did someone else refer you to Dr. Dhir?
A. I don't remember. I don't believe so. I just think that they're a couple that we did research on and he came up with the most stars.
Q. Who is we?
A. My mother and I.
Q. Okay. Did you have a primary care physician at that time?
A. I believe I did not.
Q. When was the last time you saw a doctor of any type prior to this doctor visit on June 14th, 2021, with Dr. Dhir?
A. I don't remember, but it was for a subdural hematoma in an accident and I don't remember when that was. It was sometime within when my restaurant and Main St Bistro was opened up I do go see a medical doctor.
Q. Do you recall if it was within a year of this

Page 106

June 14, 2021 visit?
A. No.
Q. So you haven't had coverage for about ten years, then you went and got coverage or applied for coverage with Golden Rule on June 9th of 2021, correct?
A. Correct.
Q. And then you went to Dr. Dhir for the first time on June 14th, 2021, correct?
A. Correct.
Q. And he prescribed some antibiotics at that time?
A. Yes.
Q. And then ultimately the antibiotics I take it were not successful in treating your condition?
A. Correct.
Q. And then turn with me, if you will, to Page 16. Actually turn with me, look at Page 15. There's an entry on Page 15 it says: Case cancelled, patient took aspirin within the last five days. Do you see that?
A. Yes.
Q. Originally when they scheduled to do the surgery on you to fix whatever was going on with your left testicle on October 8th and then it had to be rescheduled?
A. I don't know when it had to be rescheduled, but I don't even remember the whole aspirin part. I think it was for a headache that I had but, yes.

Page 107

Q. Okay. And there is an entry on Page 16 for October 21st, and is that the date that you had your orchiectomy?
A. I believe so, yes.
Q. Okay. Turn with me, if you will, to Page 24.
A. Okay.
Q. And do you see that Page 24 is a pathology report for you?
A. Yes.
Q. In the upper right it says: Collected 10/21/2021. Do you see that?
A. Collected 10/21/2021; received 10/22, yes.
Q. That's the date that -- that October 21st date is -- was the date of your orchiectomy, correct?
A. Correct.
Q. And it says: Reported October 26, 2021, correct?
A. Yes.
Q. Alright. And then there's a box that says: Final diagnosis. Do you see that box?
A. Yes.
Q. And it says: Partially necrotic malignant germ cell tumor. Did I read that correctly.
A. Correct.
Q. Alright. And then below there it says: This case will be sent to a uropathologist for expert

Page 108

consultation to further classify this malignant testicular tumor. This case was discussed with Dr. Rohit, Dhir's assistant, Rachel, per telephone conversation at 10:15 a.m. on 10/26/2021. Do you see that?
A. Yes.
Q. Alright. So does that tell you that the lab made the diagnosis that you had cancerous tumor on October 26th of 2021?
A. Yes. But I have not seen these until now.
Q. That's --
A. Yeah, that's -- that's what it says now, yes, sir.
Q. Okay. Look back with me, if you will, at Page 2. And do you see on Page 2 there is a list there of patient encounters and there are dates and times?
A. Yes.
Q. Alright. There is the entry there you see for October 21st, 2021, when you had your surgery, correct?
A. Yes.
Q. And then there is an entry there for October 26, 2021, 10:23 a.m., which looks like that's probably when pathology talked to Rachel at Dr. Dhir's office, right?
A. That's what it stated earlier, yes.
Q. And then above that there's an entry for November 4th, 4:19 p.m., that says P/O follow-up appointment. Do

Page 169

All I know we talked to Dr. Campbell but whatever he suggested, but I don't remember exactly. It was just my mother who took care of that stuff.
Q. Okay. So I guess your testimony is you didn't tell your mom, Mom, I'm going to get this kind of treatment and that kind of treatment is going to get covered on the policy, correct?
A. I told her what I needed and what kind of treatment, but I don't remember the time of day. I don't -- I know I kept her in the loop because she was the one handling the insurance, and I kept her in the loop because she wanted to know how sick I was.
Q. So what did you tell her? So I want to know like --
A. I don't remember exactly.
MR. KACAL: Let her finish her question.
Q. Let me go back. So when you fill out -- or when you signed the second application on November 5th, 2021, what kind of treatment did you think you were going to get?
A. I did not know.
Q. Okay.
A. I don't --
Q. So then -- sorry. So then it's possible that you did not communicate to your mom, I need X treatment

Page 170

covered under a new policy?
A. I don't remember what was said exactly. That was a long time ago. I just remember I kept her updated on what was going on with me, but it was the -- I -- she handled all that. I don't remember everything and every word that was said at that time. I don't -- I couldn't give you a definitive answer and I don't want to sit there and tell you something that's not true.
Q. Sure. Is it fair to say that when your mom talked to Tobias & Associates right before, I guess it would have been, November 4 and November 5th, she didn't tell them and she couldn't have told them my son has cancer because you didn't know that allegedly, right?
A. Yeah, I did not know that until the 15th until I talked to -- around the 15th, around -- after my orchiectomy and my surgery to have my testicle removed. After that -- about three weeks after that so is when I found out that I had cancer.
Q. So on November 4th and 5th did you tell your mom, I had my testicle -- some part of my testicle removed because I remember you said you didn't know that it was fully removed, right?
A. I did not re -- I did not know it was fully removed. I thought they did a portion of it, correct.
Q. Okay. And at that were you having any symptoms

Page 171

that you would have relayed to your mom?
A. Just I was having pain because of the surgery, but other than that, no. And that quickly went away.
Q. Okay. And you didn't -- you told us earlier that you didn't know that they were -- that they had biopsied --
A. Correct.
Q. -- on the testicle that --
A. Sorry, yes. That's correct.
Q. Okay. And so it's possible then November 5th and 4th you didn't communicate to your mom, I'm going to need more treatment, I have cancer, I'm concerned that I'm going to have to keep going to doctors related to my issues with my testicle?
A. We didn't relay anything until really we knew that other than we were going to continue to get coverage and I did not know what sym -- or what my actual outcome was. I did not know that.
MS. PRIETO: Okay, I'll pass the witness.
MR. KACAL: Again, we reserve our questions for trial.
THE VIDEOGRAPHER: We're off the record at 2:41 p.m.
(Proceedings ended at 2:41 p.m.)

Page 172

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL BREWER, §
§
VS. § C.A. NO. 4:22-CV-00969
§
GOLDEN RULE INSURANCE COMPANY AND TOBIAS & ASSOCIATES, INC. D/B/A GETMEHEALTHCARE §

---

REPORTER'S CERTIFICATION
OF MICHAEL BREWER
TAKEN ON FEBRUARY 20, 2023

---

I, Angela Steele, Shorthand Reporter, Notary in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, MICHAEL BREWER, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above foregoing deposition as set forth in typewriting is a full, true and correct transcript of the proceeding has at the time of taking of said deposition.

I further certify that I am not in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of this attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

Certified to by me on this, the 20th day of February, 2023.

Angela Steele

______________________

Angela S. Steele,
Shorthand Reporter, Notary
Expiration: 10/17/23
Firm Registration No.
ESQUIRE DEPOSITION SOLUTIONS
1235 North Loop West
Suite 510
Houston, Texas 77008
(713) 524-4600



Reference No.: 9151743

Case: BREWER V. GOLDEN RULE INS.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

______________________

Michael Brewer

NOTARIZATION OF CHANGES
(If Required)

Subscribed and sworn to on the ______ day of

______________________, 20____ before me,

(Notary Sign)______________________

(Print Name) Notary Public,

in and for the State of ______________________



Reference No.: 9151743
Case: BREWER V. GOLDEN RULE INS.

Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________

SIGNATURE:______________________DATE:___________
Michael Brewer



Reference No.: 9151743
Case: BREWER V. GOLDEN RULE INS.

Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________
Page No._____Line No._____Change to:______________
______________________
Reason for change:______________________

SIGNATURE:______________________DATE:___________
Michael Brewer