# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BREWER, | § | |
| | § | |
| VS. | § | C.A. NO. 4:22-CV-00969 |
| | § | |
| GOLDEN RULE INSURANCE | § | |
| COMPANY AND TOBIAS & | § | |
| ASSOCIATES, INC. D/B/A | § | |
| GETMEHEALTHCARE | § | |

---

VIDEOTAPED ORAL DEPOSITION
OF CAROLYN ANN BREWER
TAKEN ON FEBRUARY 21, 2023

---

ORAL DEPOSITION of CAROLYN ANN BREWER, produced as a witness at the instance of the Defendants, was duly sworn, was taken in the above-styled and numbered cause on the 21st of February, 2023, from 10:02 o'clock a.m. to 03:37 o'clock p.m., before Angela Steele, Shorthand Reporter, Notary, in and for the State of Texas, reported by machine shorthand at, The Cobos Law Firm, 711 W. Alabama Street, Houston, Texas, pursuant to the Federal Rules and the provisions states on the record or attached hereto.

PROCEEDINGS

**********************

THE VIDEOGRAPHER: Alright. We are now on the record. This is the videotaped deposition of Ann Brewer in the matter of Michael Brewer versus Golden Rule Insurance Company, et al. Today's date is February 21st, 2023 and the time is now 10:02 a.m.

Counsel, will you please introduce yourselves and the witness will be sworn.

MR. KACAL: Yes, I'm Nicholas Kacal with the Cobos Law Firm here on behalf of Plaintiff Michael Brewer.

MS. PRIETO: Leida Prieto on behalf of Defendant Tobias & Associates, Inc.

MR. CLACK: Lance Clack for Defendant Golden Rule Insurance Company.

THE COURT REPORTER: Raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give in this action will be the truth, the whole truth, and nothing but the truth under the penalties of perjury?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

EXAMINATION

BY MS. PRIETO:



Q. Good morning, Ms. Brewer. Can you please state your full name for the record.
A. Carolyn Ann Brewer.
Q. Okay. I represent Tobias & Associates. Do you understand who I am and who I represent?
A. Yes, I do.
Q. Have you ever given a deposition before?
A. No.
Q. So I'm going to go through a few ground rules. The court reporter to your right will be taking down everything we say, and so it's important that you provide verbal responses. She can take that down. So if you ever shake your head and then I ask, you know, "is that a yes," I'm not trying to be rude, I just want to make sure that it's on the record.
A. Okay.
Q. It's also important that you let me finish my question before you start your answer so that it's easier for her to take everything down. If you need a break, that's fine. I will just ask that you answer the last question that was posed. And then if you don't hear or understand one of my questions, please let me know and I'll rephrase it or restate it.
Are you under the influence of alcohol or drugs that might impair your ability to provide testimony



today?
A. No.
Q. Okay. Did you have a chance to meet with an attorney before your deposition?
A. Yes.
Q. Okay. I don't want to know what you guys talked about, I just want to know about for how long you met?
A. I got here about a little after 9:00, so I've just been reading things, and I had a few phones calls for myself out in the parking lot I had to do, so; but right around a little after 9:00 I would say.
Q. Okay. What documents did you review?
A. I reviewed the -- the -- goodness. The timeline, I guess the ones that Michael had yesterday the -- I don't know what you call them, I'm sorry.
Q. The exhibits?
A. The exhibits. Yes, thank you.
Q. Is there anything else that you looked at?
A. No.
Q. What is your current address?
A. My current address is 5180 North Lariat Drive, Castlerock, Colorado 80108. And that's L-a-r-i-a-t Drive.
Q. Okay. During 2021 and 2022, was that your same address?
A. That's correct.



Q. Do you have any experience as an insurance agent?
A. I'm sorry, but I'm a little hard of hearing. Can you just raise it -- your voice maybe just a little so I can hear. Thank you.
Q. Okay. Do you have any experience as an insurance agent?
A. No.
Q. Okay. Have you ever worked in the insurance field?
A. When I was maybe 20 -- in my early, early 20s I was an adjuster is Detroit for the Iron Worker -- Reinforced Iron Workers. But that was just paying the claims, that was nothing else. Just paid claims.
Q. Those claims were for what type of insurance?
A. It was the union, the -- like the carpenters iron workers reinforced steel, all the union workers in Detroit.
Q. Okay.
A. And it was strictly just paying them, just sending them to be paid.
Q. Okay. When did Mr. Brewer first tell you that he needed insurance?
A. He said in June. I believe it was June, right around June 10th -- 9th, 10th.
Q. Of what year?

Page 9

A. Of 2021.
Q. Okay. Did he tell you why he needed insurance?
A. He said he was getting older, he had just -- he had, had another child, and that he, you know, needed -- started to -- he felt like he needed insurance.
Q. Were you aware he had any symptoms or medical issues at that time in June of 2021?
A. No.
Q. What did you do to look for insurance for Mr. Brewer?
A. I -- his partner had called me and said, "We've been looking for insurance, but I don't speak English very well so could you do it. Could you look for it."
Q. What --
A. And she gave me the name of Tobias and she gave me their number.
Q. Whenever Mr. Brewer's partner told you that he needed insurance, what did she say that he wanted specifically? Did she give you any idea of --
A. He wanted medical insurance.
Q. Okay. Did she give you -- did she tell you, What we're looking for is a certain type of deductible or for a certain type of premium, anything like that?
A. Nope.
Q. Okay.

Page 10

A. No.
Q. Do you know how she had to Tobias & Associates name and number?
A. I think she just looked on the internet.
Q. Okay. Besides reaching out to Tobias & Associates, did you talk to any other agent?
A. No. I -- oh, well I told her that I had -- no, I didn't reach out to any other insurance companies.
Q. Okay. Do you remember when you first reached out to Tobias & Associates?
A. When I first talked with them?
Q. Yes.
A. I believe it was the on -- it was either the 9th -- the 9th or the 10th, yes.
Q. Of June?
A. Of June, yes.
Q. 2021.
A. 2021.
Q. Was there any particular reason besides the fact that Michael Brewer's partner gave you Tobias' contact information that you chose to reach out to them?
A. No.
Q. Do you remember who you spoke to at Tobias & Associates?
A. Shane Brody [sic] and Christopher Davis.

Page 11

Q. Did you talk to Mr. Davis back in June of 2021?
A. No, it was strictly Shane Brody.
Q. And what was the conversation about between you and Mr. Brody?
A. Getting insurance for Michael.
Q. What did you -- what did you ask for in particular when you spoke to Mr. Brody?
A. I asked for insurance, health insurance.
Q. Okay.
A. I asked for health insurance.
Q. And what did Mr. Brody tell you?
A. He told me that he could get insurance from June until December because it was June at that point and it could be renewed when the policy -- about a month before the policy was up he would send a renewal.
Q. Okay. Is there any reason why you chose a short-term policy?
A. I did not realize it was a short-term policy.
Q. Have you ever had a short-term policy before?
A. No.
Q. Were you told that it was going to be a short-term policy?
A. No.
Q. Were you told any specifics about the type of coverage that you were going to obtain?

Page 12

A. No. It was just supposed to be insurance from June until December.
Q. Okay. Did you communicate any of your conversations with Mr. Brody to Mr. Brewer?
A. Yes.
Q. Okay. What did you tell Mr. Brewer?
A. I told him that they would -- they said that they can get him an insurance policy from June until December, renewable at the end of the year.
Q. Okay. Well, let me show you what was previously -- it's put in your stack -- what was previously marked as Exhibit No. 1 --
A. Okay.
Q. -- to Michael Brewer's deposition.
(Exhibit 1 was previously marked and proffered to the witness.)
A. What is this?
Q. Have you ever seen -- you can flip through it, but have you ever seen this before?
A. No.
Q. On Page 1 of Exhibit 1 under e-mail, is that your e-mail?
A. Under Exhibit 1, Page 1. I'm trying to find it.
Q. So it will be a box at the very bottom that says contact information and it has a phone number --

Page 13

A. Yes, that's my e-mail.
Q. Okay. Do you remember giving your e-mail to Tobias & Associates?
A. Yes, I do.
Q. Okay. Did Tobias & Associates send you a link for an application?
A. No, they filled it out over the phone. I gave them the information.
Q. Okay. And then after you gave the information, were you then sent a link to this e-mail?
A. Yes.
Q. Okay. Did you then click on that link and go through it?
A. As far as I -- I -- restated the question because I don't understand go through what.
Q. This application.
A. No. As -- okay, let me -- no, I didn't go through the application. There was -- I -- in my opinion, there wasn't -- as far as I can remember, there wasn't a link to look at the application, but I cannot remember to be honest with you. But I did give them the -- when they asked me questions, I did give them the response they needed.
Q. Okay. So I guess let me ask you if they asked you on Page 2. Under medical history did they ask you if

Page 14

Mr. Brewer within the last five years he had cancer?
A. No.
Q. Did they -- okay. Did they ask you whether he had undergone any tests that had not yet been completed?
A. No.
Q. Okay. If you go to the following page, Page 4. Do you remember seeing this page?
A. No.
Q. Okay. Do you know whether or not you signed an application on behalf of Mr. Brewer?
A. No, I did not sign an application for Mr. Brewer.
Q. Okay. Do you know how Mr. Brewer got a copy of this application?
A. I don't think he did get a copy of this application.
Q. And why do you say that?
A. Because I don't think I got a copy of this application.
Q. Okay. Do you know whether Mr. Brewer had to sign anything in order to get insurance?
A. I think he had to esign.
Q. Okay. And would he have gotten -- since sent the portal to be able to esign from you?
A. Could you repeat the question?
Q. Sure. It's our understanding that Tobias -- the

Page 15

communications all went through you.
A. Yes.
Q. Were you the one that then gave him access to the portal to be able to esign?
A. I don't believe there was ever -- I'm not clear what you mean about portal.
Q. Was it a link or something that he had to click on online to be able to esign?
A. I -- I believe so, yes.
Q. Okay. Would that have gone through you?
A. It was either through my e-mail or his telephone number because that's to both that are on there. So I'm not sure which one of them it went through, whether I sent it or whether it went through his telephone number because I gave him his number.
Q. Okay. At what point do you reach out to Tobias & Associates the second time?
A. The second time was he sent -- Christopher Davis sent an e-mail on 11/3 saying that it was time for renewal and then I called him on 11/5 of 2021.
Q. Okay. Is there any particular reason that you decided to reach back out to Tobias instead of going somewhere else to get insurance?
A. No.
Q. When you called Mr. Davis, what did you tell him?

Page 16

A. I told him that we would like to renew his policy.
Q. Okay. In your stack there should be something that -- it says at the bottom as Exhibit 4. It should be an e-mail.
MR. CLACK: Got to move some trees.
MR. KACAL: I believe it's 3.
MS. PRIETO: 3?
MR. KACAL: Yeah.
MS. PRIETO: Sorry.
Q. And can you look for Exhibit No. 3, I thought was the one.
(Exhibit 3 was previously marked and proffered to the witness.)
A. Alright.
Q. Okay. Is this the e-mail that you referred to earlier?
A. Yes, it is.
Q. Okay. So did this go to Mr. Brewer or to you?
A. To me.
Q. This e-mail was dated November 3rd, 2021. It says: I wanted to reach out as your UnitedHealthcare medical insurance policy is coming to its expired/ --
A. Expiration.
Q. -- expiration, sorry -- expiration/renewal date.

Page 17

Do you see that?
A. Yes.
Q. Okay. And it says: In order to renew this coverage or explore alternative carrier options, please contact me direct either via e-mail or phone. And then he list the phone number. Do you see that?
A. Yes.
Q. Whenever you reached out to Mr. Davis, did he tell you that you would be renewing a policy or that you had to apply for a brand new policy?
A. He said that I could renew the policy. When I asked -- when I called, I said, "I would like to renew the policy, and he said, just -- he said, "I can renew it, just a moment," and he put me on hold.
Q. Okay. After he comes back from hold does he tell you anything else?
A. He said in the -- I wrote it on this little slip that I kept and that's when he -- when all the information was on there. He said, "Same coverage effective this date," and he give me the -- the deductible, how much it would be. Deductible, how much it would be per month and you know, Michael's -- would have to pay out, the percentage that, you know, have. I think it was 70/30 if I can -- if I recall right.
Q. Okay. When you talked to Mr. Davis on -- after

Page 18

this e-mail, do you tell him anything about Michael's health?
A. Yes, I do.
Q. Okay.
A. I told him that he had -- they thought it was an infection, but anyway that he had an -- a testicle removed and that it looked suspicious, you know, and that he, you know, could be ongoing with, you know, his medical. And that's what I said, but I did tell him that he, you know, had his one testicle removed.
Q. Okay. How did you know that he had a testicle removed?
A. How do I know he had one? Because Michael told me. I mean, I know he had the surgery. The surgery was back in October.
Q. So by November you were aware that his entire testicle had been removed?
A. Yes.
Q. And then you said that it looked suspicious?
A. Yes.
Q. What did you mean by that?
A. I meant because my -- I looked it up on the internet, my daughter is in science, my son-in-law is -- has medical training, he's, you know, he's a doctor of chiropractor, he went through medical school. And we've

Page 19

talked about it as a family, you know, and we all came to the conclusion that it could be cancerous, it could be, you know, something to be concerned about because, you know, it has -- something to be concerned about.
Q. Okay. Do you know if Mr. Brewer told you at that time that he thought it might be cancerous?
A. No, he did not.
Q. So you said that you had told them that he might got -- might have ongoing medical treatment, did you specifically tell them that you thought Michael might have cancer treatments?
A. No, I did not. But I told them that it look suspicious and it could be ongoing.
Q. At this point did Mr. Brewer tell you that he needed something specific when it came to insurance?
A. No, it was just we thought it was a renewal.
Q. Was there any particular reason why there was a change between the -- 184 days to 12 months of coverage?
A. Because we got it in June to December, and he said it would be renewed -- we could renew in December; so that's the reason that we renewed it for a year after that.
Q. You didn't find it odd that one policy was for 184 days and the alleged renewal would be for a significantly more period of time?

Page 20

A. No, I did not.
Q. Okay. Did you make any determinations regarding deductible?
A. The --
Q. So the deductible also changed from one policy to the next, did you make any determination regarding, yes, let's change the deductible or not?
A. No, they did.
Q. At this point did you guys consider going to the Marketplace to obtain insurance?
A. No. We thought we were covered under the insurance policy.
Q. Had you had a chance to read the first policy that Mr. Brewer had?
A. No, we never received a policy.
Q. Okay. Did you know whether or not Mr. Brewer was pending pathology results around that November timeframe, November 2021?
MR. KACAL: Objection. Form.
You can answer.
A. Did I? No. No.
Q. Were you -- did you come down to Texas whenever Michael had his testicle removed?
A. No.
Q. Do you know whether he was accompanied by

just be calling them up and saying we wanted to, you know, maybe add a person or, you know, something like that but that's it. I mean -- and I never did it, so I don't know.
BY MS. PRIETO:
Q. Okay. Do you then -- are you -- do you come back to Texas in December of 2021?
A. Yes.
Q. Okay. At that time did you go through Michael Brewer's mail at any point?
A. Yes.
Q. Okay. And when you went through his mail, did you look at any insurance documents?
A. There was nothing in there except for bills from his doctors, like Dr. Dhir. That was it.
Q. Do you know about when you came to Texas in December?
A. We came to Texas actually after he was admitted on the 1st I believe. Yes, we came down on the 1st. Yeah.
Q. Do you know if he got a copy of his policy sent to him?
A. He did not get a copy of his policy, I looked. I looked in boxes for everything.
Q. At that point did you think that was odd that he wouldn't get a copy of his policy?



A. We tried to do -- that's when I called to -- tired to get on the portal and couldn't get on the portal, so I called Chris Davis to try to get on the portal.
Q. Were you able to get on the portal?
A. No. They had the wrong birth date and it was never fixed.
Q. Okay. Did you tell Mr. Davis why you wanted to get on the portal?
A. We just wanted to get on the portal; I mean, we wanted to log in, but no.
Q. Did you ever ask Mr. Davis for a copy of Mr. Brewer's policy?
A. Yes, I told him we never received a policy.
Q. Okay. At that point do you know if he sent you one?
A. He never -- no policy was ever sent.
Q. How long did you stay in Texas, you know, from December to how long?
A. I believe three weeks. I'm not really sure but around that area. I know it was probably through Christmas off and on. I would go back for maybe two or three days and come back, and that was that whole year of 2022.
Q. Okay. So you called up Mr. Davis, you said, Hey, I can't get in the portal, he's not able to let in, do you



call him again to see if he --
A. Um-hmm.
Q. -- can get you on? How many times did you call to try to get on the portal?
A. I don't know. A couple maybe, one or two.
Q. Do you call him again to request the policy?
A. When I talked to him the one time I asked -- I told him that we did not receive an -- a policy.
Q. Okay. Do you ever contact anybody else at Tobias & Associates to either get on the portal or get a copy of the policy?
A. I -- when I have called -- when I called a couple times no one -- they said that they would give Chris the message and have him call me back but no one ever called me back.
Q. Do you know who paid for the second insurance policy?
A. I did.
Q. Did you pay any out of pocket for Mr. Brewer's medical treatment following 2021?
A. For which medical treatment are you talking about?
Q. For his cancer treatment.
A. Yes.
Q. Do you know how much you paid?



A. Umm, total from probably about 150,000 for MD Anderson, and that's not including his surgery.
Q. How much did you pay for his surgery?
A. About 130.
Q. Okay. And those are both like 150,000 and then 130,000?
A. That's correct.
Q. Okay. Where did you get that money?
A. Out of my retirement and savings.
Q. Okay. Is there any particular reason why you paid for the second insurance policy instead of having Mr. Brewer pay for it?
A. Because he was -- you know, at that point he had just had a child, he was -- had this restaurant and everything and I didn't want to burden him with the fact of, what, however much it was. How much? $5,000, 6,000. It was another bill.
Q. After you talked to Tobias & Associates that Mr. Brewer had a complete testicle removal and that it appeared suspicious, did they tell you anything in response?
A. No, not a thing. That's when he got off the phone, put me on hold, and then came back and said, We can renew the policy here's what it is, same policy. You know, here's the deductible, here's what it will cost --

Page 81

Q. Alright. Based on that does it look like you were disconnected or something happened that you had to keep calling back in?
A. I do not recall. I just know that I talked to them several times that day just about the policy but -- renewal policy, but I don't -- I -- to be honest, I do not remember.
Q. Where were you when you made these calls?
A. I was in Colorado.
Q. Are these times local time in Colorado?
A. They are.
Q. Where were you-- were you in your house in Colorado?
A. I was.
Q. Do you recall what room?
A. My living room office.
Q. Do you recall anything else that was said on these November 5th calls that you have not already relayed?
A. I do not.
Q. If we turn to the next page there is a list of five calls. They're on November 4th and November 5th, 2021. Do you see that?
A. I do.
Q. Alright. Those three calls in the middle that

Page 82

have the 561-910-4194, are those basically the same three calls that are on the first page for November 5th?
A. Yes.
Q. These other three calls with the 832 numbers, who are those calls to or from.
A. The last one's my husband, and the top one is my daughter.
Q. Do those have anything to do with this lawsuit?
A. No.
Q. Are they just on here because of the way that this was printed they got --
A. That's correct.
Q. -- part of the search?
A. That's correct.
Q. The third page of the exhibit, the Exhibit 8 --
A. Yes.
Q. -- there are some handwritten notes on a note pad that says, Oh, my gourd. Do you see that?
A. Yes.
Q. Is this your handwriting?
A. That is.
Q. They're -- when were these notes taken?
A. On the 5th.
Q. And then there are some dates, what are those dates?

Page 83

A. I believe that is when the first -- that was when the one expired and the other one started.
Q. And then there's price. What does that refer to?
A. The price is 285.19 plus 20 I think that was for -- I'm not really sure what the 20 was for.
Q. And then under that it says: Coverage and what does it say below that?
A. Same coverage. Same cover.
Q. And then below that there is some numbers. What are those numbers?
A. 5,000 70/30, and I'm not sure what the 1734 is. Maybe that the deductible. No, 5,000 -- 70/30, 1734. I think that's the -- is that the year? No, that's not the year. (Indecipherable.)
THE COURT REPORTER: I can't hear you.
A. I'm not really sure what the 1734 is.
BY MR. CLACK:
Q. Did you take any other notes --
A. No.
Q. -- during these phone calls with Tobias --
A. No.
Q. -- & Associates?
A. I did not.
MR. KACAL: Allow him to finish his question.

Page 84

THE WITNESS: I'm sorry.
BY MR. CLACK:
Q. Alright. Then if you go back to the first page of Exhibit 8 there are two calls on November 8th, 2021. Do you see that?
A. I do.
Q. And it looks like the first one of those you called Tobias & Associates and then you got a call back that lasted a minute. Is that what you see as well?
A. I do.
Q. What were those two calls on November 8th about?
A. I believe we couldn't get into the portal. I couldn't get into the portal.
Q. Okay. Look with me, if you will, at Exhibit 4.
(Exhibit 4 was previously marked and proffered to the witness.)
A. Yes.
Q. Alright. Do you recognize Exhibit 4 as the application for the second Golden Rule short-term policy?
A. Yes.
Q. Did this one work the same way, you got a link from Tobias & Associates and then you forwarded that link to Michael to fill out?
A. Yes.
Q. And I notice at the top the birth date is the

Page 89

conversation, or do you recall anything that Michael said to you at that time?
A. No, I did not.
Q. Did you have conversations with Michael after the conversations with Tobias & Associates on November 5th, 2021?
A. Yes, I did.
Q. Alright. Tell me about those conversations.
A. Just told him that I renewed the insurance.
Q. Well, did you renew the insurance, or did you get the link and then he had to fill out the link and esign and do all those things?
A. I -- corrected. I talked to them and then sent him the link and he -- and when I say "I got it," it means I talked to Tobias.
Q. Alright.
A. Uncorrect.
Q. Certainly when we look at the esignatures that are on Exhibit 4, those are Michael's esignatures, correct?
A. Yes, they are.
Q. You did not sign --
A. I did not sign the applications.
Q. Alright.
MR. KACAL: I know we're all getting

Page 90

excited here.
THE WITNESS: Yeah.
MR. KACAL: It's insurance coverage --
THE WITNESS: I got excited.
MR. KACAL: -- I'm telling you.
BY MR. CLACK:
Q. Look with me at Tobias 55 or Exhibit 4.
A. Yes.
Q. Do you see up at the top of Tobias 55 there's a paragraph in slightly larger language than the rest of the text?
A. Yes, I do.
Q. And that paragraph says: Be sure to check your policy certificate carefully to make sure you are aware of any exclusions or limitations regard coverage of preexisting conditions or health benefits. Did I read that correctly?
A. You did.
Q. That is identical to the language that we saw that was part of Exhibit 1, isn't it?
A. It is.
Q. And then below there, there is a statement of understanding. Do you see that?
A. I do.
Q. And under that it says: I have read this

Page 91

application and represent the information shown on it is true and complete. Did I read that correctly?
A. You did.
Q. And then it says: I understand that no benefits will be paid for a health condition that exist prior to the date the insurance takes effect. Did I read that correctly?
A. You did.
Q. And that is identical to the language in the statement of understanding that we saw in the first application that was Exhibit 1, correct?
A. Correct.
Q. And below there is Michael Brewer's esignature dated November 5th, 2021, correct?
A. Correct.
Q. Turn with me, if you will, to Tobias 58, still part of Exhibit 4.
A. Yes.
Q. Tobias 58 is a disclosure dated -- I'm sorry -- it's a disclosure form that says at the top: Is this short-term health insurance plan right for me? You must read and signed this form. Do you see that?
A. I do.
Q. And then below the bolded language there is some language that says: This plan does not need to follow

Page 92

federal Affordable Care Act ACA rules. Unlike ACA plans, this short-term plan may not cover all injuries or sicknesses including any you have before applying. Do you see that language?
A. I do.
Q. That language is identical to the language in the disclosure form that was part of Exhibit 1, isn't it?
A. That's correct.
Q. And then below that there is a question: Can I renew or extend this plan? And the answer is no, correct?
A. Correct.
Q. That language is also identical to the language in the disclosure form that was part of Exhibit 1, isn't it?
A. Correct.
Q. And then if we turn to the next page there is a sentence in bold and it says: Am I covered for an injury, illness, or disease that I had before I applied for this plan, a preexisting condition? Do you see that sentence?
A. I do.
Q. And then below that it says: No, you must tell the truth when answering questions about your health. We can deny claims for any injury, illness, or disease you had before signing up for this plan whether or not you tell us about this condition. Did I read that correctly?

Page 93

A. You did.
Q. And is that language identical to the language in this disclosure that we saw that was part of Exhibit 1?
A. It is.
Q. Turn with me, if you will, to Tobias 62. The bottom of Tobias 62 there is an esignature where MB signed this form on November 5th, 2021, correct?
A. Correct.
Q. And above that it says: You must confirm you read and understand this form in bold language, correct?
A. Correct.
Q. And then below that it says: Did you read and understand the limited benefits offered by this plan before you applied or paid for coverage, correct?
A. Correct.
Q. Below that there is a box, and that box is checked, correct?
A. Correct.
Q. To the best of your knowledge MB is the one who put that check mark there, correct?
A. As far as I know, yes, correct.
Q. And then it says: Yes, I read and understand the benefits and limits of this plan. I was not required to make a payment or apply for the certificate before getting this disclosure form. Did I read that correctly?

Page 94

A. Yes.
Q. Below that it says: Don't sign this document if you don't understand it, correct?
A. Correct.
Q. And then they repeated the -- the form repeats that sentence in Spanish, correct?
A. Correct.
Q. That is identical to the language that we saw that was part of this form for Exhibit 1, correct?
A. Correct.
Q. And then below that Michael signed it. That's his esignature below it, right?
A. Correct.
Q. If we look at the last page of Exhibit 4, there's a page Tobias 65, an acknowledgment of application completion. Do you see that?
A. I do.
Q. And that says in Item 5: I specifically adopt the statement of understanding presented on the last page of the application immediately above my signature. Did I read that correctly?
A. On No. 5? The last -- oh, here it is. Yes.
Q. We know that, that statement of understanding in Bullet Point 2 says that the coverage will not pay for a preexisting condition, correct?

Page 95

A. Correct.
Q. Just below that Item 5 Michael put the X next to the sentence that says, I understand the above listed acknowledgment, correct?
MR. KACAL: Objection. Form.
A. Correct.
Q. And the below that he signed and dated it November 5th, 2021, correct?
A. Correct.
Q. I think one of the things that I am hearing from you is that you were unaware or did not know that the second short-term plan did not -- oh, the second short-term plan did not cover any condition that Michael developed while the first short-term plan was in force. Is that your testimony?
A. That's correct.
Q. And is that because you did not actually click the link and go through and review these application materials that we have looked at in Exhibit 4?
A. That is because I don't -- neither Michael or I recall getting these as I told you before. Tobias and them filled out a lot of this for us.
Q. Well, let's focus on what you recall. You never went through and esigned Exhibit --
A. That's correct.

Page 96

Q. -- 4? Michael is the one that clicked on the link and went through and looked at these pages and affixed his esignature?
A. Correct.
Q. As you sit here today, you think that Michael was a -- is an honest and truthful person, correct?
A. Correct.
Q. And so you think when he made these certifications to Golden Rule that he had reviewed these forms, read these forms, and understood these forms, that those were true and accurate certifications, correct?
A. I cannot tell -- I do not know if they sent this entire packet is what I'm saying. The only thing I know is the esignature. In other words, I've never seen these before.
Q. Well, whether you've seen them or not --
A. No, then Michael.
Q. Yeah, Michael signed them, he put the Xs in the boxes both on the acknowledgement of application and the last page of the disclosure form. He went through them, he clicked on the link, he signed them, right?
MR. KACAL: Objection. Form.
A. To my knowledge he did sign it, but I -- like I said, I do not know that he received everything in this packet.

Page 105

Q. Have you looked at the welcome letters prior to today that we looked at?
A. No.
Q. Have you looked at Exhibit 6 and 10, the certificates that we looked at prior to today?
A. 6 and 10 hold one, let me look. 6, I have not. And 9 -- I have not.
Q. Does it bother you at all as you sit here today that all of these representations, all these times that Golden Rule told Michael in written that these policies could not be renewed and they did not cover preexisting conditions that he ignored all that language or didn't bring that language to your attention?
MR. KACAL: Objection. Form.
A. Does it bother me?
Q. Yeah.
A. No, it does not bother me that -- and I don't -- rephrase that question.
Q. If you had known in November, December of 2021 that the welcome letter that Golden Rule sent to Michael that had his ID cards says this policy does not cover preexisting conditions, would you have talked to Michael about getting other insurance?
A. Well, let me put it this way. I was unaware of it, and the fact that he -- well, let me put it this way.

Page 106

The renewal -- we thought it was a renewal for just to continue. Preexisting condition, he had the condition in December and actually November and October, and I don't think we realized that it was a preexisting condition under -- he already had the condition and so it was ongoing and it was a renewal.
Q. Alright.
MR. CLACK: I'm going to object to it was a renewal.
Q. But certainly he had the condition that's at issue in this lawsuit in October and November and the first part of December of 2021. We agree on that, right?
A. That he had the -- yes, I do.
Q. He was diagnosed with cancer -- or he was told that he had cancer certainly by November 15th of 2021, correct?
A. That's correct.
Q. And he was undergoing chemotherapy in the first week or so of December 2021 prior to the effective date of the second short-term plan, correct?
A. That is correct.
Q. Okay. If you had read the welcome letter or if Michael had read the welcome letter for the second short-term plan and said, Hey, this plan is not going to cover any condition that arose prior to the effective date

Page 107

of this plan, would you have reached out to Tobias or to somebody to talk about getting different insurance?
A. If we had realized that?
Q. Uh-huh.
A. I'm not -- I don't know. I -- you know, I can't speculate right now what we would have done. I think it was right now we just thought it was a renewal.
Q. And you keep saying that. Why do you think it was a renewal?
A. Because of the e-mail.
Q. Exhibit --
A. Tobias' e-mail, Chris --
Q. -- Exhibit 3?
A. Chris's. Was a renewal. And when we talked -- when I talked to him he said that the same coverage -- and I told him what was going on -- the same coverage, you know, it would be -- it would just be, you know, different deductible, different amounts, and it would be from December to December.
Q. Alright.
A. So I feel like it was -- you know, they said it was a renewal?
Q. Who said it was renewal?
A. Chris. Christopher Davis.
Q. So you're relying on Exhibit 3 and then the

Page 108

conversation with Mr. Davis on November 5th, correct?
THE COURT REPORTER: November 5th?
MR. CLACK: 5th.
A. Yes.
BY MR. CLACK:
Q. Okay. Exhibit 3 says expiration/renewal, correct?
A. Correct.
Q. And then it says: In order to renew this coverage or explore alternative carrier options please contact me, correct?
A. Um-hmm.
Q. So is that a "yes?"
A. Yes.
Q. And all of this in an e-mail that does not even identify the insured by name or any policy by number, correct?
A. That's correct.
Q. Okay. There's nothing in Exhibit 3 that tells you whether what is about to happen is going to be an expiration or whether it's a policy that you can renew, correct?
MR. KACAL: Objection to form.
You can answer.
A. Yes.

Page 109

Q. What tells you that you -- what in Exhibit 3 do you think tells you, you can renew the short-term plan that was then in effect?
A. The language, in order to renew this coverage.
Q. The sentence that says --
A. And if you would like to renew your current plan. If you would like to renew -- your renewal date, renew and renew, renew.
Q. Alright. You're relying on the fact that he uses the word renewal next to expiration and the sentence that says, in order to renew this coverage or explore alternative carrier options, and the sentence that says, if you would like to renew your current plan at the same level of coverage those three plans, correct?
A. Correct.
Q. You understood when you got this e-mail this was some foreign e-mail that was automatically generated and was not personalized to either you or Michael Brewer or to the specific coverage he had, right?
A. I did not.
Q. You mean, the Dear Client was not a tip off that this was not a very personalized e-mail?
A. They had my e-mail that I -- you know, it was to me. It was sent to my e-mail.
Q. You don't get ever spam e-mails that are, you

Page 110

know, Dear Client or use your wrong name or anything like that?
A. If they do they go to spam usually.
Q. Why did you think it was more reasonable to rely on this e-mail Exhibit 3 and this one alleged conversation with Mr. Davis as opposed to the more than a dozen times that Golden Rule informed Michael in writing that these policies could not be renewed and would not cover preexisting conditions?
A. Because he was a representative, he represented the insurance company.
Q. You understand that insurance policies are written documents and that insurance benefits are based on written documents, correct?
A. That's correct.
Q. Alright. And you understand that's why Golden Rule goes through the trouble of sending all these disclosures and welcome letters and certificates and having Mr. Brewer or MB sign acknowledgments is because it's the written documents that govern what are we paid and not paid, correct?
A. Correct.
Q. You understood that when you talked to Christopher Davis there were a lot of terms in that policy that he did not go over with your in that conversation?

Page 111

A. Chris -- Christopher Davis did not go over a lot of things in that conversation. He was quickly to renew a policy.
Q. I think you told me that notwithstanding the link shown on Exhibit 8 that shows about call -- 40 minutes of calls --
A. Um-hmm.
Q -- for a bunch of that time you were on hold. Is that a fair statement?
A. And that is a fair statement.
Q. Is it -- how long do you think you actually spent, not on hold, but actually talking to a human being on those three calls on November 5th?
A. That's hard for me to speculate how much, but I know I was on a call -- hold for a long time. He didn't even go over the application the first time -- the second time, excuse me.
Q. Are we talking about something between five and ten minutes of actual human interaction?
A. Maybe. I don't -- to my best recollection I do not remember the exact time. I could say it was a short time. I was on hold a long time.
Q. So you spent between five and ten minutes more or less with Mr. Davis on the phone on November 5th, 2021, setting up this second short-term policy for Michael

Page 112

Brewer, correct?
A. Yes.
Q. And you understood there were a lot of terms in that short-term plan that you had not discussed with Mr. Brewer -- I'm sorry, you had not discussed with Mr. Davis, correct?
A. Mr. Davis did not talk to me about anything, just to renew the policy.
Q. You understood that there were a number of terms in the short-term plan that would be dependent on the actual certificate, the actual documents, and that had not been read off to you or otherwise discussed between you and Mr. Davis on November 5th, 2021, correct?
A. I don't understand the question.
Q. It was probably a terrible question to be honest.
A. Could be.
Q. When you talked to Mr. Davis on November 5th, 2021, you understand that there were a lot of details and a lot of provisions in the second short-term certificate that you were not going over with him?
A. I wouldn't say a short-term, I was just -- as far as what a renewal and it was the same coverage. He -- you know, that's -- that's what I want -- that's what he said, same coverage, you know, from here to here.
Q. He didn't try to go through, for instance,

Q. Okay. How did you get that policy?
A. I got it as a -- I just got it as a policy, and I have it as a supplement for -- I have it as a supplement for Medicare.
Q. Did you go online or did you speak to an agent to get that policy?
A. I spoke to an agent.
Q. Do you know what -- was that agent -- who that agent is?
A. No, it's been...
Q. Did you tell -- back in November of 2021, did you tell Tobias & Associates that you needed a policy that would provide for cancer treatment?
A. I told them that there was a possibility that it was -- that he had the -- his testicle removed and that, that was going to be an ongoing. I did tell them that and that it looked suspicious, that -- you know, it could be suspicious. So, yes, I told them that he had it, you know, his testicle removed. Yeah, I was upfront with them on that.
Q. My -- my -- my question is a little different. I asked if you had specifically asked for coverage that -- like a policy that would coverage cancer treatment?
A. No, I did not.
Q. Okay. Did you ask Tobias & Associates for a



policy that would cover treatment to his testicle -- to Michael's testicles?
A. I just asked for the renewal of his policy. That's what they said, it was a renewal of policy.
Q. Who then the answer would be no?
A. No.
Q. Okay. Did you ask Tobias & Associates for a policy that would cover any urology treatment?
A. No.
Q. Okay. Did Mr. Davis tell you that the second policy was going to be a continuation of the first policy?
A. He said it was a renewal of the first policy.
Q. And so the answer would be no, he didn't tell you it was --
A. No.
MR. KACAL: Objection. Form.
THE WITNESS: I'm sorry.
MS. PRIETO: I will pass the witness.
MR. KACAL: We will reserve our questions for trial.
THE VIDEOGRAPHER: We are off the record at 3:37 p.m.
(Proceedings ended at 3:37 p.m.)



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BREWER, | § | |
| | § | |
| VS. | § | C.A. NO. 4:22-CV-00969 |
| | § | |
| GOLDEN RULE INSURANCE | § | |
| COMPANY AND TOBIAS & | § | |
| ASSOCIATES, INC. D/B/A | § | |
| GETMEHEALTHCARE | § | |

-----------------------------------------------------

REPORTER'S CERTIFICATION
OF CAROLYN ANN BREWER
TAKEN ON FEBRUARY 21, 2023

I, Angela Steele, Shorthand Reporter, Notary in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, CAROLYN ANN BREWER, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above foregoing deposition as set forth in typewriting is a full, true and correct transcript of the proceeding has at the time of taking of said deposition.



I further certify that I am not in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of this attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

Certified to by me on this, the 21st day of February, 2023.

Angela Steele

Angela S. Steele,
Shorthand Reporter, Notary
Expiration: 10/17/23
Firm Registration No.
ESQUIRE DEPOSITION SOLUTIONS
1235 North Loop West
Suite 510
Houston, Texas 77008
(713) 524-4600

Page 173

Reference No.: 9151744

Case: BREWER vs GOLDEN RULE INSURANCE

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

________________________
Ann Brewer

NOTARIZATION OF CHANGES
(If Required)

Subscribed and sworn to on the ______ day of

________________________, 20____ before me,

(Notary Sign) ____________________________

(Print Name) Notary Public,

in and for the State of ___________________

Page 174

**Reference No.: 9151744**
**Case: BREWER vs GOLDEN RULE INSURANCE**

**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**

**SIGNATURE:_______________________DATE:___________**
**Ann Brewer**

Page 175

**Reference No.: 9151744**
**Case: BREWER vs GOLDEN RULE INSURANCE**

**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**
**Page No._____Line No._____Change to:______________**
____________________________________________
**Reason for change:__________________________**

**SIGNATURE:_______________________DATE:___________**
**Ann Brewer**