# EXHIBIT "G"

Golden Rule®
A UnitedHealthcare Company

7440 Woodland Drive
Indianapolis, IN 46278-1719

For Inquiries: (800) 657-8205

In this certificate, *"you,"* or *"your"* will refer to the *primary insured* named below, and *"we," "our"* or *"us"* will refer to Golden Rule Insurance Company, a stock company. Defined terms are in italics.

## AGREEMENT AND CONSIDERATION

*We* certify that, as of the applicable *effective date* shown in the Data Page, *you* became insured under the group insurance *policy* shown in the Data Page. *We* will pay benefits for a *loss* as set forth in the *policy.* This certificate is issued in exchange for and on the basis that the information shown on *your* application is correct and complete. Therefore, PLEASE READ YOUR APPLICATION. If it is not complete or has an error, please let *us* know. An incorrect or incomplete application may cause *your* certificate to be voided or claims to be reduced or denied. All provisions, limitations, and exclusions of the group insurance *policy* apply to the insurance evidenced by this certificate, even if not mentioned in this certificate.

## POLICY TERM AND NONRENEWABILITY

The premium *you* paid put this certificate in force as of the *effective date* shown in the Data Page. It will stay in force until the termination date shown in the Data Page, subject to receipt of premiums and cancellation for fraud. The *policy term* will begin and end at 12:01 A.M., where *your residence* is located. This certificate cannot be renewed beyond the termination date listed in the Data Page.

## 10-DAY RIGHT TO EXAMINE AND RETURN THIS CERTIFICATE

Please read this certificate. If *you* are not satisfied, *you* may notify Golden Rule within 10 days of the date *you* received it. Premium paid will be refunded, less claims paid. Coverage under this certificate shall be voided as if coverage had never been issued.

Patrick F. Carr
President

## Short Term Medical Expense Certificate

**Upon timely payment of premiums, coverage will remain in force until the termination date shown in the Data Page, subject to cancellation for fraud in the submission of a claim.**

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your certificate might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

# TABLE OF CONTENTS

This table of contents is provided as a general guide to the major sections of the certificate. The section headings will not affect the validity, construction or effect of the *policy* provisions.


**Section**

DATA PAGE ........................................................................ 1

This section is a summary of the specific benefits that apply to *you* and *your* covered *dependents.*

GENERAL DEFINITIONS ........................................................................ 2

All *italicized* words are defined, either here or in the provision in which they are used.

POLICYHOLDER PROVISIONS ........................................................................ 3

These provisions will affect *your* group insurance coverage. Premium, *policy* termination and notice are some of the provisions in this section.

ELIGIBILITY ........................................................................ 4

This section lists eligibility requirements for *you* and any *dependents.*

GENERAL PROVISIONS ........................................................................ 5

This section includes a person's *effective date* and termination of coverage.

BENEFIT PROVISIONS ........................................................................ 6

This section details the benefits provided under this coverage.

GENERAL EXCLUSIONS and LIMITATIONS ........................................................................ 7

Read carefully and note that each benefit provision may have specific exclusions and limitations.

SPECIAL CONDITIONS and PROVISIONS ........................................................................ 8

Some of the provisions in this section are *preexisting conditions*, and coordination of benefits.

UNIFORM PROVISIONS ........................................................................ 9

This section includes many provisions required by law, including claims procedures.

## DATA PAGE

**Master Policy** - GO-USTAG20
**Policyholder** - FACT

**Certificate Number -** 096-540-158
**Primary Insured -** Michael Brewer
**Plan -** Individual
**Policy Term -** one day less than 12 months

**EFFECTIVE DATE** (at 12:01 a.m. on)........................................................... December 12, 2021

**TERMINATION DATE** (at 12:01 a.m. on):......................................................December 11, 2022*
*The grace period will never extend beyond this termination date.

**IMPORTANT:**

**Benefits are available only for *eligible expenses* incurred at a *network provider.* No benefits are payable for non-*emergency* expenses incurred at a non-*network provider.***

***Network providers* have agreed to discounted pricing for *covered expenses* with no additional billing to *you* other than *deductible amounts*, *copayment amounts*, and coinsurance. Non-*network providers* may bill *you* for any amount up to the billed charge.**

***Covered expenses* for *emergency* treatment received from a non-*network provider* will be paid as *eligible expenses*.**

**Non-*emergency covered expenses* provided at a *network* facility by a non-*network* facility-based physician will be paid as *eligible expenses*. As a result, *you* will be responsible for paying the difference between the amount billed by the non-*network* facility-based physician and the *eligible expense*.**

**AMOUNT PAYABLE**
**Maximum Benefit Limit**
Per *covered person*, per *policy term*............................................................$1,000,000

**DEDUCTIBLE AMOUNT**, per *covered person*, per *policy term*

**Network Provider**..................................................................................................$5,000

Maximum number of *covered persons* required to pay the *network provider deductible amount,* per family, per *policy term*.............................................................Two

Unless otherwise stated, the *network provider deductible amount* will not apply to *covered expenses* subject to a *copayment amount.*

**COINSURANCE PERCENTAGE**
For *eligible expenses* in excess of the applicable *deductible amount*.................................30%
(Not applicable to *covered expenses* subject to a *copayment amount,* unless otherwise specifically stated)

**NETWORK COINSURANCE OUT-OF-POCKET MAXIMUM**, per *covered person*, per *policy term*............................................................................................................ $10,000



CONFIDENTIAL GRIC 000741

**BENEFIT LIMITS/SPECIFICS**

**EMERGENCY ROOM DEDUCTIBLE** (for each visit) for *injury* or *illness* to an *emergency* room when the *covered person* is not directly admitted to the *hospital*............................................ $500

Note: After satisfaction of the *emergency* room deductible, *covered expenses* are subject to any applicable *deductible amount* and *coinsurance percentage*.

**NETWORK PROVIDER COPAYMENT AMOUNTS**

**URGENT CARE:** *Copayment amount* per occurrence at an *urgent care center*................. $50

**OUTPATIENT PRESCRIPTION DRUGS**

**Tier 1**, *prescription drug copayment amount* per *prescription order* or refill.................. $25

The *prescription drug copayment amount* applies only when a health insurance identification card is used at a *member pharmacy*.

**Tiers 2, 3, and 4,** will be subject to the applicable *deductible amount* and *coinsurance percentage*.

**Maximum Outpatient Prescription Drugs Covered Expenses,**
per *covered person*, per *policy term*......................................................................... $2,500

NOTE: Tier status for a *prescription drug* may be determined by accessing *your prescription drug* benefits via *our* website or by calling the telephone number on *your* health insurance identification card. The tier to which a *prescription drug* is assigned may change as detailed in the Outpatient Prescription Drug Expense Benefits Rider.

No benefits are payable for a *prescription drug* received from a non-*member pharmacy*, unless as a result of an *emergency*.

No benefits are payable for expenses in excess of the cost of the *generic drug* when a *brand-name drug* is purchased and the *generic drug* is available.

If a *generic drug* becomes available for a *brand-name drug,* the tier placement of the *brand-name drug* may change, and *your* cost sharing may change and an *ancillary charge* may apply.

"*Generic drug*" means a *prescription drug* product: (1) that is *chemically equivalent* to a *brand-name drug;* or (2) that *we* identify as a generic product based on available data resources including, but not limited to, Medi-Span, that classify drugs as either brand or generic based on a number of factors. *You* should know that all products identified as a "generic" by the manufacturer, pharmacy or *your* physician may not be classified as a *generic drug* by *us*.

**SPINE AND BACK DISORDERS**

Maximum *covered expenses* for outpatient spine and back disorders services, per *covered person*, per *policy term*................................................................................ $2,500

This limit does not apply to *inpatient* expenses or outpatient *surgery*.

**AIR AMBULANCE**

Maximum *covered expenses*, per *covered person*, per *policy term*................................ $5,000

**INPATIENT HOSPITALIZATION**

Daily Hospital room and Board
and Nursing Services Limit.................................................. Most Common Semi-Private Rate

Intensive Care Unit Limit.............................................................................. *Eligible Expenses*

**We may from time to time negotiate fee discounts with health care professionals and facilities. Benefit calculations will be based upon the discounted price, if any.**

**NOTICE: A FACILITY-BASED DOCTOR OR MEDICAL PRACTITIONER MAY NOT BE A NETWORK PROVIDER IN YOUR HEALTH BENEFIT PLAN'S PROVIDER NETWORK, EVEN THOUGH THE DOCTOR OR MEDICAL PRACTITIONER PROVIDES HEALTH-CARE SERVICES AT A NETWORK FACILITY. IF THE DOCTOR OR MEDICAL PRACTITIONER IS NOT A NETWORK PROVIDER IN YOUR HEALTH BENEFIT PLAN'S PROVIDER NETWORK, YOU MAY BE RESPONSIBLE FOR PAYMENT OF THE DOCTOR'S OR MEDICAL PRACTITIONER'S FEES NOT PAID BY YOUR HEALTH BENEFIT PLAN.**



CONFIDENTIAL GRIC 000743

## Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**Golden Rule Insurance Company**
To get information or file a complaint with your insurance company or HMO:

> **Call: Grievance Administrator**
> **Toll-free: 1-800-657-8205**
> Email: uhoappealsandgrievances@uhc.com
> Mail: PO Box 31371, Salt Lake City, UT 84131-0371

**The Texas Department of Insurance**
To get help with an insurance question or file a complaint with the state:

> Call with a question: 1-800-252-3439
> File a complaint: www.tdi.texas.gov
> Email: ConsumerProtection@tdi.texas.gov
> Mail: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

## ¿Tiene una queja o necesita ayuda?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros o HMO. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañía de seguros o HMO. Si no lo hace, podría perder su derecho para apelar.

**Golden Rule Insurance Company**
Para obtener información o para presentar una queja ante su compañía de seguros o HMO:

> **Llame a: Grievance Administrator**
> **Teléfono gratuito: 1-800-657-8205**
> electrónico: uhoappealsandgrievances@uhc.com
> Dirección postal: PO Box 31371, Salt Lake City, UT 84131-0371

NTC-145-G-45 0420

**El Departamento de Seguros de Texas**

Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:

Llame con sus preguntas al: 1-800-252-3439
Presente una queja en: www.tdi.texas.gov
Correo electrónico: ConsumerProtection@tdi.texas.gov
Dirección postal: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

# APPLICATION FOR SHORT TERM MEDICAL INSURANCE
# GOLDEN RULE INSURANCE COMPANY
# INDIANAPOLIS, INDIANA 46278-1719

**Please list only those persons needing coverage.**

## Applicant(s) Information

| Gender | Name (Last, First, M.I.) | Social Security Number | Birth Date* | MUST BE ACCURATE** Height | Weight |
|---|---|---|---|---|---|
| ☑ Male ☐ Female | Primary (You) BREWER MICHAEL | ***-**-***2 | 07 17 83 | 6' 0" | 175 |
| ☐ Male ☐ Female | Spouse | - - | | | |
| ☐ Male ☐ Female | Child 1 | | | | |
| ☐ Male ☐ Female | Child 2 | | | | |
| ☐ Male ☐ Female | Child 3 | | | | |
| ☐ Male ☐ Female | Child 4 | | | | |

*If born within 30 days prior to the effective date of coverage, the person will not be covered under the policy/certificate.

**Applicants must meet our height and weight guidelines to qualify for coverage.

**Resident Physical Address (where you live and pay taxes). PO Boxes are not accepted.**

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| 2106 BARRINGTON POINTE DR | LEAGUE CITY | TX | 77573 |

**Mailing Address (if different than Resident Address)**

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

**Payor (if not you)**

| Name (Last, First, M.I.): | Relationship to Primary |
|---|---|
| | ☐ Relative ☐ Other (Specify):________ |

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

## Contact Information

| | Phone Number | Email | Applicant |
|---|---|---|---|
| **Primary (You)** | 832 496-7371 ☐ Check if not a mobile phone. | cabie19363@yahoo.com | |
| **Spouse** | | | |
| **Dependent Child age 18 and over** | | | |
| **Dependent Child age 18 and over** | | | |
| **Payor (if not you)** | - | | |

## Plan Selection

| | | | | |
|---|---|---|---|---|
| **Requested Effective Date:** 12 / 12 / 2021<br>*(See Statement of Understanding section)* | | | **Months of Coverage:** 12 | |
| **Plans**<br>*(Choose one plan)* | ☐ **Premier Elite** | 100/0 - $0 | ☐ **Copay** | 80/20 - $5,000 |
| | ☐ **Plus Elite** | 100/0 - $0 | ☑ **Value** | 70/30 - $10,000 |
| | ☐ **Plus** | 80/20 - $2,000 | | |
| **Deductible Amount**<br>*(Choose one)* | ☐ $2,500 - Available for Plus Elite, Plus, Copay, and Value plans only<br>☑ $5,000 - Available for all plans<br>☐ $7,500 - Available for Plus Elite, Plus, Copay, and Value plans only<br>☐ $10,000 - Available for Premier Elite, Plus Elite, and Copay plans only<br>☐ $14,000 - Available for Premier Elite only<br>☐ $15,000 - Available for Plus Elite, Plus, Copay, and Value plans only | | | |

## Optional Benefits Selection

| | |
|---|---|
| **Supplemental Accident Benefit** | ☐ $2,500 ☐ $5,000 ☐ $7,500 ☐ $10,000 ☐ $15,000 |
| **Consecutive Short Term Plans** | ☐ (If this option is selected, a condition that began during the first Short Term Medical Expense policy/ certificate with us will not be a preexisting condition under later Short Term Medical Expense policies/ certificates with us during a continuous, uninterrupted period of coverage, as defined in the Consecutive Short Term Plans Rider.) |
| **Virtual Care Rider** | ☐ |

## Application Questions

| **General Information** | | **Yes** | **No** |
|---|---|---|---|
| G1 | During the past 5 years, has any applicant been declined for insurance by a carrier other than Golden Rule Insurance Company due to health reasons?<br>If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4<br>The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| G2 | Has any applicant lived in the 50 states of the USA or the District of Columbia for **less than** the past 12 months?<br>If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4<br>The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| G3 | During the past 12 months, has any applicant smoked cigarettes or e-cigarettes or used tobacco in any form (including smokeless tobacco) or nicotine substitute?<br>If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 | ☐ | ☑ |
| **Medical History Information** | | **Yes** | **No** |
| M1 | Is any applicant currently pregnant, an expectant parent, in the process of adopting a child, or undergoing infertility treatment?<br>**If yes, coverage cannot be issued.** | ☐ | ☑ |
| M2 | Within the last 5 years, has any applicant received medical or surgical consultation, advice, or treatment, including medication, for **any of the following:** blood disorders, liver disorders, kidney disorders, chronic obstructive pulmonary disorder (COPD) or emphysema, diabetes, cancer, multiple sclerosis, heart or circulatory system disorders (excluding high blood pressure), Crohn's disease or ulcerative colitis, or alcohol or drug abuse or immune system disorders?<br>If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4<br>The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |

| Application Questions *(continued)* | | | |
|---|---|---|---|
| M3 | During the past 12 months, has any applicant been advised to undergo any test (except for HIV test), treatment, hospitalization, or surgery which has not yet been completed or for which results have not yet been received?<br>If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4<br>The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| M4 | Within the last 5 years, has any applicant received treatment, advice, medication, or surgical consultation for HIV infection from a doctor or other licensed clinical professional, or had a positive test for HIV infection performed by a doctor or other licensed clinical professional?<br>If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4<br>The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| **Other Coverage Information** | | **Yes** | **No** |
| O1 | Does any applicant now have, or is any applicant currently applying for, other hospital or medical expense insurance that **will not** terminate prior to the requested effective date?<br>If yes, provide the following details. | ☐ | ☑ |

| Type of Coverage (e.g. major medical, short term, critical illness) | Insurance Company Name | Applicants Covered | Planned Termination Date (if any) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| For Applicants with Current Short Term Medical Coverage With Us | | Yes | No |
|---|---|---|---|
| S1 | Does any applicant currently have short term limited duration medical insurance coverage with Golden Rule Insurance Company that will **not** terminate prior to the requested effective date?<br>If yes, please answer question a below. | ☐ | ☑ |
| | a. Do you want to terminate the current short term medical coverage the effective date of the new policy/certificate, if issued? If yes:<br>i. Any illness, injury, or condition that began during the current coverage will be considered a preexisting condition under the new policy/certificate and may not be covered; and<br>ii. Any deductible amount, coinsurance percentage and other amounts paid by you under your current coverage do **not** count toward the new policy/certificate.<br>If you answer no to question S1a, the effective date of the new policy/certificate, if issued, will be the date your current short term medical coverage terminates. | ☐ | ☐ |



CONFIDENTIAL
GRIC 000748

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy/certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy/certificate might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

## Statement of Understanding

I have read this application and represent that the information shown on it is true and complete. I understand that:

(1) No insurance will become effective unless my application is approved and the appropriate premium is actually received by Golden Rule with this application.

(2) No benefits will be paid for a health condition that exists prior to the date insurance takes effect.

(3) If coverage is issued, the coverage will not be a continuation of any prior coverage.

(4) Incorrect or incomplete information in this application may result in voidance of coverage and claim denial.

(5) The information provided in this application, and any supplement or amendments to it, will be made a part of any policy/certificate that may be issued.

(6) If my application is approved, insurance will be effective the later of: (a) the requested effective date, or (b) the effective date approved by Golden Rule.

(7) If other short term limited duration medical insurance is still active with Golden Rule for any applicant on that effective date, then the effective date of the new coverage, if issued, will be the date the current short term medical coverage terminates unless otherwise indicated in this application.

(8) The producer is only authorized to submit the application and initial premium and may not change or waive any right or requirement.

(9) If I have provided a phone number, Golden Rule may provide a welcome call. If I have provided a mobile phone number, Golden Rule may also text me (a) prior to the end of my short term medical coverage, (b) if my coverage lapses, and/or (c) if my premium is past due.

(10) The policy/certificate does not cover the charges for services received from a non-network provider, except for emergencies.

## Signature Information

| | Signature | Date Signed |
|---|---|---|
| Proposed Insured (or Parent/Legal Guardian if Proposed Insured is a child) | MICHAEL BREWER (esign) | 11 05 21 |

### Important Notes:

- **No application will be accepted if received by Golden Rule more than 15 days after the date signed.**
- **Altered applications will not be accepted.**

## To Continue Your Application for Coverage, You Must Become A Member Of FACT

**Read and fill out the following FACT Membership Enrollment Form.**

### FACT Membership Enrollment Form

I hereby enroll for Basic ($4 a month) membership in the FEDERATION OF AMERICAN CONSUMERS AND TRAVELERS (FACT). Upon completion of this enrollment form and payment of initial dues, I understand that: (a) I will be entitled to FACT's benefits; (b) these benefits may change from time to time; (c) some benefits may have a delayed effective date; (d) my membership will become effective on the day this enrollment form is dated and signed;
(e) I am eligible to apply for association group insurance; and (f) I authorize the release of my name, address, date of birth, certificate and phone numbers, application date, membership level, and email address listed on the Golden Rule Application for Short Term Medical Insurance to FACT. Note: Accident Insurance is included in your FACT membership and you will have an opportunity to name your beneficiary(ies) by mail or on the FACT website.

X MICHAEL BREWER (esign) — Member's Signature

2021-11-05 — Date

FACT ENFO STM 0216

If you wish to apply for association group health insurance, please complete the application.

### Producer

X Shane Brodil — Print Full Name

16580645 — Producer Number

## Payment Options: Single Payment or Monthly Payment

Electronic Funds Transfer (EFT) and Credit Card payments will be collected at the time of application. Premium will be verified and may be adjusted up or down during the processing of your application. Please select your payment option and then complete the authorization below. Amounts include monthly $4 FACT fee.

☐ **Single Payment** (one single payment for all months of coverage chosen):

- ☐ **EFT**
- ☐ **Credit Card**

**Amount $**__________

OR

☑ **Monthly Payment**:

- ☐ **EFT**
- ☑ **Credit Card**

**Amount $** 289.19

## Electronic Funds Transfer Authorization - Complete only if paying by EFT

I (we) hereby authorize FACT or Golden Rule Insurance Company to initiate debit entries to the account indicated below. I also authorize the named financial institution to debit the same to such account.

I agree this authorization will remain in effect until you actually receive written notification of its termination from me.




Type of Account: ☐Checking ☐Savings

Nine-digit Routing No. _________ Account No. _________________

Financial Institution's Name ____________________

Address ____________________

City, State, ZIP ____________________

Draft On __________ (Day) __________ (Date Signed)

Only select a draft date between the 1st and 28th of the month.

In Tennessee and Texas, drafts may only be scheduled on 1) the premium due date; or 2) up to 10 days after the due date.

X ____________________

Authorized Account Signature

## Credit Card Authorization - Complete only if paying by Credit Card

I authorize FACT or Golden Rule Insurance Company to bill my American Express/MasterCard/Visa/Discover account for the Single Payment or Monthly Payment above.

Type of Card: ☐ MasterCard ☐ Visa ☐ American Express ☐ Discover Exp. Date: __ (Month) ____ (Year)

Billing ZIP Code: _____ Card Number ________________

X MICHAEL BREWER (esign)Authorized U

Signature of Authorized User

Charge On 12 (Day)

Only select a charge date between the 1st and 28th of the month.

Note: Some card issuers/financial institutions charge cash advance fees on insurance payments.

## Is this short-term health insurance plan right for me?

## **You must read and sign this form.**

**Plan name: Short Term Medical Value**

**$5,000 deductible, 30% coinsurance**

**Offered by: Golden Rule Insurance Company**

This plan does not need to follow federal Affordable Care Act (ACA) rules. Unlike ACA plans, this short-term plan:

- May not cover all injuries or sicknesses, including any you have before applying.
- May not pay for some medical care you might need.
- Doesn't allow you to get federal help with premiums or out-of-pocket costs (tax credits and cost-sharing reductions).

Carefully read the information below so you know this plan's coverage limits and your rights under this plan.

**How long will this plan cover me?**

12 months

**Can I renew or extend this plan?**

No.

**When this plan ends, can I sign up for another insurance plan?**

- **If you want to sign up for another short term health plan or another plan not covered by ACA laws:** You can sign up for another plan at any time. But a short-term health plan can deny you for health reasons. The amount of your premium payment might change.
- **If you want to sign up for a health plan covered by ACA laws:** You can sign up for another plan only during open enrollment or if you have a qualifying life event (like losing coverage from your job or having a baby). To find out if you have a qualifying life event, talk to your insurance agent or go to HealthCare.gov.
    - The next open enrollment dates for ACA plans are:
      **2021**: November 1 – December 15
      **2022**: November 1 – December 15
      **2023**: November 1 – December 15
    - When you sign up for a plan during HealthCare.gov open enrollment dates, your insurance coverage will start January 1.

- **The end of this plan is not a qualifying life event. You may have to wait until the next open enrollment period to sign up for an ACA plan.**

**Am I covered for an injury, illness, or disease I had before I applied for this plan (a preexisting condition)?**

No.

- You must tell the truth when answering questions about your health.
- We can deny claims for any injury, illness, or disease you had before signing up for this plan (whether or not you tell us about your condition).

**What is the most (maximum) this plan will pay for services?**

$ 1 Million per covered person

**What is the deductible (the amount that I must pay for services before this plan starts paying)?**

You must pay $ 5,000 per person (per family for Premier Elite plans), per policy term, (plus your premiums) before the plan will start paying for services.

The following covered expenses are exempt from the deductible amount:

- One digital rectal examination and one prostate specific antigen test per policy term, per covered person, for screening for the early detection of prostate cancer.
- Child immunizations, as defined in the certificate.
- One screening test for hearing loss administered within 30 days of birth and related diagnostic follow-up care for 24 months following birth.

**Does this plan use a network of doctors/providers?**

Yes, the plan is an EPO (exclusive provider benefit plan) and has a network of doctors/providers. Except for emergency care and some other situations, the plan covers care only from in-network providers.

View the plan's list of in-network doctors/providers: Visit UHOne.com and select Find a Doctor to search for network providers in your state.

**What type of care will this plan cover?**

Review the chart below to know which benefits are covered by this plan. ACA plans cover all listed benefits with few limits, but this plan limits coverage for some types of care.

The chart below does not include your coinsurance amount. Your coinsurance may be found at the beginning of this notice along with your Plan name and deductible amount. All benefits under your plan are subject to the deductible amount and coinsurance unless a copay applies or unless specifically stated otherwise.

| Type of Care | Is it covered? |
|---|---|
| **Emergency room visit** | Yes, but there are some limits. Additional $500 emergency room deductible if not admitted to the hospital for further treatment. Then subject to chosen deductible and coinsurance. |
| **Urgent care** | Yes, but there are some limits. Urgent care center charges subject to $50 copay per visit. Exempt from deductible. |
| **Ambulance** | Yes, but there are some limits. Air ambulance limited to $5,000 maximum covered expense, per person, per policy term. |
| **Hospital Stay – facility fee (inpatient overnight stay)** | Yes, coverage is like ACA plans. |
| **Hospital Stay – doctor services (inpatient overnight stay)** | Yes, coverage is like ACA plans. |
| **Day surgery – facility fee (outpatient – no overnight stay)** | Yes, coverage is like ACA plans. Covers surgery in doctor's office in addition to hospital and outpatient surgical center. |
| **Day surgery – doctor services (outpatient – no overnight stay)** | Yes, coverage is like ACA plans. Covers surgery in doctor's office in addition to hospital and outpatient surgical center. |
| **Mental health services (inpatient – overnight stay)** | Yes, coverage is like ACA plans. |
| **Mental health services (outpatient – no overnight stay)** | Yes, coverage is like ACA plans. |
| **Alcohol/drug/substance abuse services (inpatient – overnight stay)** | Yes, coverage is like ACA plans. |
| **Alcohol/drug/substance abuse services (outpatient – no overnight stay)** | Yes, coverage is like ACA plans. |

| | |
|---|---|
| **Preventive care (includes regular checkups, and some screenings and vaccines)** | No. Regular checkups not covered. State mandated screening and vaccines covered under Medical Benefit. |
| **Primary care (office visit to treat an injury or illness)** | Yes, coverage is like ACA plans. |
| **Specialist care office visit (Doctors who treat one type of health issue. Examples: cancer skin issues, allergies, heart issues or kidney issues)** | Yes, coverage is like ACA plans. |

| | |
|---|---|
| **Drugs ordered by your doctor (outpatient prescription drugs)** | Yes, but there are some limits. Coverage is limited to formulary drugs. You can view the formulary and determine the tier status for a prescription drug by accessing your prescription benefits via our website at www.myuhone.com or by calling the telephone number on your identification card.<br>Tier 1 Drugs - $25 Copay<br>Tiers 2-4 Drugs: Subject to deductible and coinsurance.<br>Maximum benefit: $2,500 covered expenses per person. |
| **Services for a pregnant woman: prenatal office visits** | No. Covers complications of pregnancy only. |
| **Services for a pregnant woman: delivery – doctor services** | No. Covers complications of pregnancy only. |
| **Services for a pregnant woman: delivery – facility fee** | No. Covers complications of pregnancy only. |

**You must confirm you read and understand this form:**

Did you read and understand the limited benefits offered by this plan before you applied or paid for coverage?

☑ Yes, I read and understand the benefits and limits of this plan. I was not required to make a payment or apply for this certificate before getting this disclosure form.

Don't sign this document if you don't understand it.

No firme este documento si no lo comprende.

**Type or sign your name:**

| **Signature Information** | **Signature** |
|---|---|
| Proposed Insured<br>(or Parent/Legal Guardian<br>If Proposed Insured is a child) | MICHAEL BREWER (esign) |
| **Date** | 11 05 21 |

### Have a complaint or need help?

To check if an agent has a license or to file a complaint, go to the Texas Department of Insurance's website at **www.tdi.texas.gov** or call 1-800-252-3439.

---

Federal notice: This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your certificate might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

# CONSENT TO RECEIVE ELECTRONIC RECORDS AND TO CONDUCT TRANSACTIONS ELECTRONICALLY

By submitting this consent form or a health insurance application or HMO enrollment form, you hereby consent to presentation, delivery, storage retrieval and transmission of "Communications" related to "Our Transaction" as electronic records instead of in paper form.

For the purposes of this form, "Our Transaction" means the entirety of the business relationship between you and us. "Communications" includes, but is not limited to:

1. Your application or enrollment form, including subsequent amendments;
2. Information related to Our Transaction that we are required to provide or make available in writing such as privacy notices or fraud warnings;
3. Documents related to Our Transaction such as policy, certificate, or evidence of coverage forms, claim forms, explanation of benefit forms, premium notices or privacy policies and notices (e.g., HIPAA Notices or Privacy Practices) or other administrative forms (to the extent permitted by applicable law);
4. Any emails, faxes, recorded telephone calls, or other electronic transmissions of information between you and us and an insurance producer contracted with us, or between us and any third party.

Subject to our obligations to protect your privacy, we may, at our sole discretion, post Communications on a website (in which case they will be sent or received, as the case may be, regardless of whether or not we own, operate or control the website). Or send them in or attached to an email. Please be advised that communication by unencrypted email presents a risk of disclosure to, or interception by, unintended third parties. You must promptly tell us about any change to your electronic or physical mailing address, or other contact information.

You acknowledge that you can receive or access Communications because you have the following:

- A telephone
- A computer and printer
- A device or computer program for listening to audio CDs, mp3, WAV or other common computer audio files
- An Internet browser
- Access to the Internet
- A valid email address
- Adobe Acrobat Reader or other sufficient PDF reader

You can request a free copy of any Communications, or withdraw your consent to receive electronic Communications at any time by sending a written request to:

**Policy Administration**
**PO Box 31372**
**Salt Lake City, UT 84131-0372**

☑ I hereby consent to receive Communications and Transaction Documents electronically, as per the aforementioned conditions. All of the Communications between the time you submit your consent and withdraw your consent will remain valid and binding on both you and us notwithstanding your withdrawal.

☐ I hereby DO NOT consent to receive Communications and Transaction Documents electronically, as per the aforementioned conditions. If you do not consent, we will conduct all future business with you in paper form.

| | |
|---|---|
| X MICHAEL BREWER (esign) | X |
| Primary Applicant *(You)* | Parent/Guardian *(if you are a minor)* Relationship |
| cabie19363@yahoo.com | |
| Primary Applicant *(You)* Email Address | Parent/Guardian (*if you are a minor*) Email address |
| 11 05 21 | 096540158 |
| Date | Policy ID Number |

## Acknowledgement Of Application Completion

**Acknowledgement:**

1. I specifically requested my broker to complete this health insurance application for me as a matter of convenience and efficiency.
2. I acknowledge that the application was completed with information I provided to my broker, and that such action was with my full and actual knowledge and specific consent.
3. I have personally, carefully, and completely reviewed the completed application, and, prior to signing the application, have made any changes necessary to avoid any incomplete or incorrect information.

4. I adopt the completed application as signed by me; and
5. I specifically adopt the Statement of Understanding presented on the last page of the application immediately above my signature.

X____ I understand the above list of acknowledgements.

By entering my name below, I am indicating my intent to electronically sign this ACKNOWLEDGEMENT, and warrant that all of the statements in it are true, correct and accurate. I understand that this has the same effect as signing a paper acknowledgement by hand.

X MICHAEL BREWER (esign)______________________
Signature of Primary Applicant(You)

X________________________________________
Signature of Spouse/Domestic Partner (if to be covered)

X________________________________________
Signature of Parent/Guardian (if You are a minor)

X ________2021-11-05______________________
Date

## SECTION 2
## DEFINITIONS

In the *policy*/certificate, *italicized* words are defined. Words not *italicized* will be given their ordinary meaning.

Wherever used in this the *policy*/certificate:

*"Accident"* or *"accidental"* means an unintended or unforeseeable event that occurs while this *policy* is in force and that is not excluded in the General Exclusions and Limitations section of this the *policy*/certificate.

"*Applied behavioral analysis*" means the design implementation, and evaluation of environmental modifications using behavioral stimuli and consequences to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relations between environment and behavior.

"*Autism spectrum disorder*" means neurobiological disorder including autism, Asperger's syndrome and other pervasive developmental disorders not otherwise specified, caused by genetic, metabolic or other biological factors.

"*Breast tomosynthesis*" means a radiologic mammography procedure that involves the acquisition of projection images over a stationary breast to produce cross-sectional digital three dimensional images of the breast from which applicable breast cancer screening diagnosis may be determined.

"*Caretaker*" means any person who regularly assists a *covered person* who is rendered by age or infirmity unable to manage his or her own *illness*.

"*Child immunizations*" means the specified vaccines when provided between a *covered person's* date of birth and 6th birthday in a manner and frequency conforming to recognized standards of medical practice. *Child immunizations* include vaccines for diphtheria; haemophilus influenzae type b (Hib); hepatitis B; measles; mumps; pertussis; polio; rubella; tetanus; varicella; and any other immunization that is required by law for the child.

*"Children's preventive health care services"* means services which are:

A. Ordered, delivered, or supervised by a *doctor;*
B. Limited to a medical history, physical examination, developmental assessment, anticipatory guidance, and appropriate immunizations and laboratory tests, which are all in keeping with prevailing medical standards; and
C. Provided during periodic preventive care visits.

*Children's preventive health care services* are limited to the following:

A. One visit at each of the following (approximate) age intervals: birth, 2 weeks, 2 months, 4 months, 6 months, 9 months, 12 months, 15 months, 18 months, 2 years, 3 years, 4 years, 5 years, 6 years, 8 years, 10 years, 12 years, 14 years, 16 years and 18 years; and
B. The services of one *doctor* for all of the services provided at each visit shown in (A) above.

*"Coinsurance percentage"* means the percentage of *covered expenses* that a *covered person* must pay after the applicable *deductible amount* or *copayment amount* has been met.

*"Complications of pregnancy"* means conditions whose diagnoses are distinct from pregnancy, but are adversely affected by pregnancy or are caused by pregnancy and not, from a medical viewpoint, associated with a normal pregnancy. This includes:

A. Ectopic pregnancy, spontaneous abortion, severe preeclampsia, eclampsia, missed abortion, and similar medical and surgical conditions of similar severity.
B. *Hospital* confinement required to treat the following: acute nephritis, nephrosis, cardiac decompensation, HELLP syndrome, uterine rupture, amniotic fluid embolism, chorioamnionitis, fatty liver in pregnancy, septic abortion, placenta accreta, gestational hypertension, puerperal sepsis, peripartum cardiomyopathy, cholestasis in pregnancy, thrombocytopenia in pregnancy, placenta previa, placental abruption, acute cholecystitis and pancreatitis in pregnancy, postpartum hemorrhage, septic pelvic thromboplebitis, retained placenta, venous air embolus associated with pregnancy, miscarriage, or an emergency caesarean section required because of: (1) fetal or maternal distress during labor, (2) severe pre-eclampsia, (3) arrest of descent or dilatation, (4) obstruction of the birth canal by fibroids or

ovarian tumors; or (5) the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity that, in the absence of immediate medical attention, will result in placing the life of the mother or fetus in jeopardy.

C. Treatment, diagnosis or care for conditions, including the following, in a pregnant female, when the condition was caused by, necessary because of, or was aggravated by the pregnancy: hyperthyroidism; hepatitis B or C; HIV: human papilloma virus; abnormal Pap; syphilis; chlamydia; herpes; urinary tract infections; thromboembolism; appendicitis; hypothyroidism; pulmonary embolism; sickle cell disease; tuberculosis; migraine headaches; depression; acute myocarditis; asthma; maternal cytomegalovirus; urolithiasis; DVT prophylaxis; ovarian dermoid tumors, biliary atresia and/or cirrhosis, first trimester adnexal mass; hyditiform mole; or ectopic pregnancy.

D. An *emergency* or *non-elective caesarean section.* A Caesarean section is not considered to be an *emergency* if it is for the convenience of a patient or *doctor* or if it is performed solely because a previous pregnancy resulted in a caesarean section.

*Complications of pregnancy* does not include: false labor, mild preeclampsia, edema, prolonged labor, *doctor* prescribed rest during the period of pregnancy, morning sickness, and conditions of similar severity associated with management of a difficult pregnancy, and not constituting a medically classifiable distinct complication of pregnancy.

"*Copayment amount*" means the amount of *covered expenses* that must be paid by a *covered person* for each service that is subject to a *copayment amount* (as shown in Section 1), before benefits are payable for remaining *covered expenses* for that service under this *policy*/certificate.

"*Cosmetic treatment*" means treatments, procedures or services that change or improve appearance without significantly improving physiological function and without regard to any asserted improvement to the psychological consequences or socially avoidant behavior resulting from an *injury, illness* or an anomaly present at birth.

"*Covered expense*" means an expense that is:

A. Incurred while *you* or *your dependent's* insurance is in force under the *policy;*

B. Provided for the purpose of evaluating, diagnosing, testing, or treating an *illness* or *injury;*

C. Covered by a specific benefit provision of the *policy; and*

D. Not excluded anywhere in the *policy.*

"*Covered person*" means *you, your* lawful *spouse,* and each *eligible child* named in the application and not excluded by *us.* A *covered person* must not have reached his or her 65th birthday.

"*Custodial care*" means care which is administered for assistance (rather than for training or education) of the patient in performing the activities of daily living. *Custodial care* also includes non-acute care for a patient who is comatose, semi-comatose, paralyzed or mentally incompetent.

"*Deductible amount*" means the amount of *eligible expenses,* as shown in the Data Page, for which each *covered person* is responsible before any benefits are payable. The *deductible amount* does not include any *copayment amount*.

"*Dental expenses*" means *surgery* or services provided to diagnose, prevent, or correct any ailments or defects of the teeth and supporting tissue and any related supplies or oral appliances. Expenses for such treatment are considered *dental expenses* regardless of the reason for the services.

"*Dependent*" means: (A) *your* lawful *spouse;* or (B) an *eligible child*.

"*Diabetes*" includes Type 1, Type 2, or gestational diabetes, diabetes insipidus, and other specific types of diabetes mellitus.

"*Diabetes self-management training*" means instruction in an *inpatient* or outpatient setting, excluding programs the primary purposes of which are weight reduction, which enables *covered person* and/or his or her *caretaker* to understand the diabetic management process and daily management of diabetic therapy as a method of avoiding frequent hospitalizations and complications, including nutritional counseling and proper use of diabetes equipment and supplies.

*Diabetes self-management training* may be received from:

A. A *diabetes self-management training* program recognized by the American Diabetes Association;

B. A multidisciplinary team consisting of at least a dietitian and a nurse educator,

coordinated by a Certified Diabetes Educator;

C. A Certified Diabetes Educator; or

D. A physician, physician's assistant, registered nurse, licensed or registered dietitian, or a pharmacist, each of whom must be appropriately licensed, registered or certified in Texas, and determined by his or her licensing board to have recent didactic and experiential preparation in diabetes clinical and educational issues.

"*Diagnosis of autism spectrum disorder*" means one or more tests, evaluations, or assessments prescribed, performed or ordered by a *doctor* to diagnose whether an individual has *autism spectrum disorder.*

"*Diagnostic mammogram*" means an imaging examination designed to evaluate the following in a *covered person*:

A. A subjective or objective abnormality detected by a *doctor* in a breast;

B. An abnormality seen by a *doctor* in a *low-dose mammography*;

C. An abnormality previously identified by a *doctor* as probably benign in a breast for which follow-up imaging is recommended by a *doctor*; or

D. A *covered person* with a personal history of breast cancer.

"*Distant site*" means the location of the *medical practitioner* delivering services through telehealth services or *telemedicine medical services* at the time the services are provided.

"*Doctor*" means a duly licensed practitioner of the medical arts, limited to a physician holding an M.D. or D.O. degree, optometrist, dentist, podiatrist, chiropractor, or clinical psychologist. In addition, *doctor* shall include an acupuncturist, advanced practice nurse, audiologist, chemical dependency counselor, dietitian, hearing instrument fitter and dispenser, occupational therapist, psychological associate, speech pathologist and speech therapist. With regard to medical services provided to a *covered person*, a *doctor* must be currently licensed by the state in which the services are provided, and the services must be provided within the scope of that license. With regard to consulting services provided to *us*, a *doctor* must be currently licensed in at least one state of the United States of America.

"*Durable medical equipment*" means items that:

A. Are used to serve a specific diagnostic or therapeutic purpose in the treatment of an *illness* or *injury;*

B. Can withstand repeated use;

C. Are generally not useful to a person in the absence of *illness* or *injury;* and

D. Are appropriate for use in the patient's home.

"*Effective date*" means the applicable date a *covered person* becomes insured for *illness* or *injury* under the *policy*. The applicable *effective date* for initial *covered persons* is shown in the Data Page.

"*Eligible child*" means *your* or *your spouse's* child, if that child is not married and under 26 years of age.

As used in this definition, "child" means:

A. A natural child;

B. A stepchild;

C. A legally adopted child;

D. A child that *you* or *your spouse* are seeking to adopt through court legal proceedings;

E. A child for whom legal guardianship has been awarded to *you* or *your spouse;*

F. A child entitled, by virtue of a court order, to have coverage provided by *you* or *your spouse;* or

G. *Your* grandchild who is considered *your* dependent for federal income tax purposes at the time application for coverage is made.

H. A child that is unmarried and remains chiefly dependent on *you* or *your spouse* for support and maintenance due to mental or physical disability will be considered an *eligible child* under the *policy*/certificate regardless of age. The disabled child's coverage will not terminate due to age. The *dependent* may remain covered for the duration of the *policy term*.

"*Eligible expense*" means a *covered expense* as determined below:

A. For *network providers*: When a *covered expense* is received from a *network provider*, the *eligible expense* is the contracted fee with that provider.

B. For non-*network providers:*

1. **For Non-Network Provider Emergency Services or if a Network**

**Provider is Not Reasonably Available:** When a *covered expense* is received from a non-*network provider*, including a facility-based non-network provider, or a non-network diagnostic imaging or laboratory services provider, as a result of an *emergency* or because a *network provider* was not reasonably available, the *eligible expenses* will be determined based on the higher of:

a. The usual, and customary rate, which is defined as the median amount negotiated with *network providers* for the same service.

b. The amount that would be under Medicare (*part A or part b of title XVII of the Social Security Act, 42 U.S.C. 1395 et seq.*) for the same service.

2. **For Covered Expenses Received From a Non-Network Diagnostic Imaging Provider or Laboratory Service Provider Performed in Connection With a Service Performed by a Network Provider:** The *eligible expense* is based on the usual and customary rate, which is defined as:

   a. For diagnostic imaging services 110% of the published rates allowed by *CMS* for the same or similar service within the geographic market.

   b. For laboratory services: 50% of the published rates allowed by *CMS* for the same or similar service within the geographic market.

   When a rate is not published by *CMS* for the service, we use a gap methodology established by *OptumInsight* and/or a third party vendor that uses a relative value scale. The relative value scale is usually based on the difficulty, time, work, risk and resources of the service. If the relative value scale currently in use becomes no longer available, *we* will use a comparable scale(s). *We* and *OptumInsight* are related companies through common ownership by *UnitedHealth Group*. Refer to our website at www.myuhc.com for information regarding the vendor that provides the applicable gap fill relative value scale information.

   When a rate is not published by *CMS* for the service and a gap methodology does not apply to the service, the Eligible Expense is based on 20% of the provider's billed charge.

   **IMPORTANT NOTICE:** When services for *covered expenses* are performed in connection with a service performed by a *network provider*, non-*network* diagnostic imaging providers or laboratory service providers are not allowed to bill *you* for any difference between the provider's billed charges and the *eligible expense* described here. However, *you* should contact *us* if *you* receive such a bill and *we* will work with the provider so that *you* are only responsible for *your copayment amount, coinsurance percentage* and/or *deductible amount.*

3. **For Non-Emergency Non-Network Facility-Based Physician Services At a Network Facility:** For non-*emergency covered expenses* received at a *network* facility from a non-*network* facility-based physician, the *eligible expense* is based on the usual and customary rate, which is defined as he median amount negotiated with *network providers* for the same service.

4. When the participation of an *assistant surgeon* in a surgical procedure is *medically necessary*, then the services of only one *assistant surgeon* will be reimbursed, and the *eligible expense* for the *covered expenses* provided by a non-*network assistant surgeon* will be the lesser of the *assistant surgeon's* billed charges or 16% of the *eligible expense* paid to the primary surgeon who performed the procedure. An *assistant surgeon* means a licensed practitioner (Physician's assistant, registered nurse, nurse practitioner, or a provider who is a licensed surgical assistant under Texas law), practicing in accordance with the Standards of the Texas Board of Medical Examiners *and/or* Texas Board of Nursing Examiners and meeting the Hospital or Alternate Facility's credentialing criteria for a first assistant.

**IMPORTANT NOTE:** Except as otherwise stated above or when the *eligible expense* is an amount negotiated with the provider, non-*network providers* and non-*network* facility-based physicians may bill

*you* for any difference between the billed charges and the *eligible expense*.

*"Emergency"* means a medical condition of a recent onset and severity, including but not limited to severe pain, that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that the person's condition, sickness, or *injury* is of such a nature that failure to get immediate medical care could result in:

A. Placing the patient's health in serious jeopardy;

B. Serious impairment to bodily functions;

C. Serious dysfunction of any bodily organ or part; or

D. Serious disfigurement; or

E. In the case of a pregnant woman, serious jeopardy to the health of the fetus.

*"Evidence-based treatment"* means treatment subject to research that applies rigorous, systematic, and objective procedures to obtain valid knowledge relevant to *autism spectrum disorders* and shall include any equipment determined necessary to provide the treatment.

*"Experimental or investigational treatment"* means medical, surgical, diagnostic or other health care services, treatments, procedures, technologies, supplies, devices, drug therapies or medications that, after consultation with a medical professional, *we* determine to be one or more of the following:

A. Under study in an ongoing phase I or II clinical trial as set forth in the United States Food and Drug Administration (*"USFDA"*) regulation, whether or not the trial is subject to *USFDA* oversight.

B. An *unproven service*.

C. Subject to *USFDA* approval, and:

   1. It does not have *USFDA* approval;

   2. It has *USFDA* approval only under its Treatment Investigational New Drug regulation or a similar regulation; or

   3. It has *USFDA* approval, but is being used for a use or at a dosage that is not an accepted off-label use. An accepted off-label use of a *USFDA*-approved drug is a use that is:

      a. Included in authoritative compendia as identified from time to time by the Secretary of Health and Human Services;

      b. Safe and effective for the proposed use based on supportive clinical evidence in peer-reviewed medical publications; or

      c. Not an *unproven service*; or

   4. It has *USFDA* approval, but is being used for a use, or to treat a condition, that is not listed on the Premarket Approval issued by the *USFDA* or has not been determined through peer-reviewed medical literature to treat the medical condition of the *covered person*.

D. Experimental or investigational according to the provider's research protocols.

Items C and D above do not apply to phase III or IV *USFDA* clinical trials.

To appeal *our* determination that a treatment is *experimental or investigational treatment*, please refer to the Texas Grievance rider attached to this *policy*/certificate.

*"Gastric pacemaker"* means a medical device that:

A. Uses an external programmer and implanted electrical leads to the stomach; and

B. Transmits low-frequency, high-energy electrical stimulation to the stomach to entrain and pace the gastric slow waves to treat gastroparesis.

*"Hospital"* means an institution that:

A. Operates as a *hospital* pursuant to law;

B. Operates primarily for the reception, care, and treatment of sick or injured persons as *inpatients*;

C. Provides 24-hour nursing service by registered nurses on duty or call;

D. Has a staff of one or more *doctors* available at all times;

E. Provides organized facilities and equipment for diagnosis and treatment of acute medical, surgical, or mental conditions either on its premises or in facilities available to it on a prearranged basis; and

F. Is not primarily a long-term care facility; an *extended care facility*, nursing, rest, *custodial care*, or convalescent home; a place for the aged, drug addicts, alcoholics, or runaways; or a similar establishment.

While confined in a separate identifiable *hospital* unit, section, or ward used primarily as a nursing, rest, *custodial care* or convalescent home, or *extended care facility*, a *covered person* will be deemed not to be confined in a *hospital* for purposes of the *policy*/certificate.

*"Illness"* means a sickness, disease, disorder, or abnormal condition of a *covered person*. *Illness* does not include pregnancy, learning disabilities, attitudinal disorders, or disciplinary problems. All *illnesses* that exist at the same time and which are due to the same or related causes are deemed to be one *illness*. Further, if an *illness* is due to causes that are the same as, or related to, the causes of a prior *illness*, the *illness* will be deemed a continuation or recurrence of the prior *illness* and not a separate *illness*.

*"Immediate family"* means the parents, *spouse*, children, or siblings of any *covered person*, or any person residing with a *covered person*.

*"Injury"* means *accidental* bodily damage sustained by a *covered person*. All *injuries* due to the same *accident* are deemed to be one *injury*.

*"Inpatient"* means that medical services, supplies, or treatment are received by a *covered person* who is an overnight resident patient of a *hospital* or other facility, using and being charged for room and board.

*"Intensive care unit"* means a Cardiac Care Unit or other unit or area of a *hospital* that meets the required standards of the Joint Commission on Accreditation of Hospitals for Special Care Units.

*"Life-threatening disease or condition"* means a disease or condition from which the likelihood of death is probable unless the course of the disease or condition is interrupted.

*"Loss"* means an event for which benefits are eligible for payment under the *policy*. A *loss* must occur while the *covered person* is insured under this *certificate*.

*"Low-dose mammography"* means:

A. The x-ray examination of the breast using equipment dedicated specifically for mammography, including an x-ray tube, filter compression device, and screens with an average radiation exposure delivery of less than one rad mid-breast and with two views for each breast;

B. Digital mammography; or

C. *Breast tomsyntesis.*

*"Medical disorders requiring specialized nutrients or formulas"* means the following:

A. 3-methylcrotonyl CoA carboxylase deficiency;

B. Argininosuccinic acidemia;

C. Carnitine palmitoyl transferase deficiency type II;

D. Citrullinemia;

E. Disorders of creatine metabolism;

F. Glutaric acidemia, type 1;

G. Glutaric aciduria type II;

H. Glycogen storage diseases;

I. Homocystinuria;

J. Isovaleric acidemia;

K. Long-chain 3-hydroxyacyl-CoA dehydrogenase deficiency;

L. Malonic aciduria;

M. Maple syrup urine disease;

N. Methmalonic acidemia due to cobalamin A, B defect;

O. Methylmalonic acidemia due to mutase deficiency;

P. Nitrogen metabolism disorder;

Q. Non-ketotic hyperglycinemia;

R. Orinthine transcarbamylase deficiency;

S. Phenylketonuria;

T. Propionic acidemia;

U. Sulfite oxidase deficiency;

V. Trifunctional protein deficiency;

W. Tyrosinemia, type 1; and

X. Very-long-chain-acyl-CoA dehydrogenase deficiency.

*"Medical foods"* means the following:

A. Low protein modified food products;

B. Amino acid based elemental formulas;

C. Extensively hydrolyzed protein formulas;

D. Formulas with modified vitamin or mineral content; and

E. Modified nutrient content formulas.

*"Medical practitioner"* means a *doctor,* nurse anesthetist, physician's assistant, physical therapist, speech therapist, audiologist, or midwife. In addition, *medical practitioner* shall include a master social worker - advanced clinical practitioner, professional counselor and marriage and family therapist when recommended by a Doctor of Medicine or a Doctor of Osteopathy. The following are examples of providers that are not *medical practitioners,* by definition of the *policy:* acupuncturist, occupational therapist, rolfer, registered nurse, hypnotist, respiratory therapist, X-ray technician, emergency medical technician, social worker, family counselor, marriage counselor, child counselor, naturopath, perfusionist, massage therapist, or sociologist. With regard to medical services provided to a *covered person,* a *medical practitioner* must be licensed or certified by the state in which care is rendered and performing services within the scope of that license or certification. With regard to consulting services provided to *us,* a *medical practitioner* must be licensed or certified by the state in which the consulting services are provided.

*"Medically necessary"* means a treatment, test, procedure or confinement that is necessary and appropriate for the diagnosis or treatment of an *illness* or *injury.* This determination will be made by *us* based on *our* consultation with an appropriate medical professional. A treatment, test, procedure or confinement will not be considered *medically necessary* if:

A. It is provided only as a convenience to the *covered person* or provider;

B. It is not appropriate for the *covered person's* diagnosis or symptoms; or

C. It exceeds (in scope, duration, or intensity) that level of care that is needed to provide safe, adequate, and appropriate diagnosis or treatment to the *covered person.*

The fact that any particular *doctor* may prescribe, order, recommend, or approve a treatment, test, procedure, or confinement does not, of itself, make the treatment, test, procedure or confinement *medically necessary.*

To appeal *our* determination that a treatment, test, procedure or confinement is not *medically necessary*, please refer to the Texas Grievance rider attached to this *policy*/certificate.

*"Mental disorder"* means a mental or emotional disease or disorder that is:

A. A disease of the brain with predominant behavioral symptoms;

B. A disease of the mind or personality, evidenced by abnormal behavior; or

C. A disorder of conduct evidenced by socially deviant behavior.

*Mental disorder* includes psychiatric *illnesses* listed in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.

*"Necessary medical supplies"* means medical supplies that are:

A. Necessary to the care or treatment of an *injury* or *illness;*

B. Not reusable or *durable medical equipment;* and

C. Not able to be used by others.

*Necessary medical supplies* do not include first aid supplies, cotton balls, rubbing alcohol, or like items commonly found in the home.

*"Network"* means a group of *doctors* and providers who have contracts with *us* or *our* affiliates that include an agreed upon price for health care expenses

*"Network eligible expense"* means the *eligible expense* for services or supplies that are provided by a *network provider.* For facility services, this is the *eligible expense* that is provided at and billed by a *network* facility for the services of either a *network* or non-*network provider. Network eligible expense* includes benefits for *emergency* health services even if not provided by a *network provider.*

*"Network provider"* means a *doctor,* provider or member pharmacy who is identified in the most current list for the *network* shown on *your* health insurance identification card.

*"Non-elective caesarean section"* means a caesarean section where vaginal delivery is not a medically viable option.

*"Non-network eligible expense"* means the *eligible expense* for services or supplies that are provided and billed by a non-*network provider.*

*"Originating site"* means a site at which a patient is located at the time *telehealth service* or *telemedicine medical service* are provided to him or her.

*"Orthotic device"* means a custom-fitted or custom-fabricated medical device that is applied to a part of

the human body to correct a deformity, improve function, or relieve symptoms of a disease.

*"Outpatient surgical facility"* means any facility with a medical staff of *doctors* which operates pursuant to law for the purpose of performing *surgical procedures;* and which does not provide accommodations for patients to stay overnight. This does not include facilities such as: acute-care clinics, urgent-care clinics, ambulatory care clinics, urgecenters, free-standing emergency facilities and *doctor* offices.

*"Periodic preventive care visits"* means the routine tests and procedures for the purpose of detection of abnormalities or malfunctions of bodily systems and parts according to accepted medical practice.

"*Platform*" means the technology, system, software, application, modality, or other method through which a health professional remotely interfaces with a *covered person* when providing health care service or procedure as a *telemedicine medical service* or *telehealth service.*

*"Policy,"* when italicized, means the master policy issued and delivered to the *policyholder.* It includes the attached pages, the applications, and any amendments.

*"Policyholder"* means the entity shown as the *policyholder* on the Data Page of the *policy* and certificate.

*"Policy term"* means the period that this certificate is to be in force. The *policy term* cannot be extended.

*"Preexisting condition"* means an *injury* or *illness* for which the *covered person* received medical advice or treatment within the 12 months immediately preceding the applicable effective date the *covered person* became insured under the *policy*:

*"Primary insured"* means a member who satisfies the eligibility requirements of the *policy,* and who is identified as the primary insured on the front of the certificate.

*"Proof of loss"* means information required by *us* to decide if a claim is payable and the amount that is payable. It includes, but is not limited to, claim forms, medical bills or records, other plan information, and network repricing information. *Proof of loss* must include a copy of all Explanation of Benefit forms from any other insurance, including Medicare.

*"Prosthetic device"* means an artificial device designed to replace, wholly or in part, an arm or leg.

*"Reconstructive surgery"* means *surgery* performed on an abnormal body structure caused by birth defects, developmental abnormalities, trauma, infection, tumors, or disease in order to improve function or to improve the patient's appearance, to the extent possible.

*"Remote patient monitoring"* means the use of synchronous or asynchronous electronic information and communication technology to collect personal health information and medical data from a patient at an *originating site* that is transmitted to a *medical practitioner* at a *distant site* for use in the treatment and management of medical conditions that require frequent monitoring.

*"Residence"* means the physical location where *you* live. If *you* live in more than one location, and *you* file a United States income tax return, the physical address (not a P.O. Box) shown on *your* United States income tax return as *your* residence will be deemed to be *your* place of *residence.* If *you* do not file a United States income tax return, the residence where *you* spend the greatest amount of time will be deemed to be *your* place of *residence.*

*"Routine-in-hospital newborn infant care expenses"* means expenses actually incurred by or on behalf of a *covered person* born while the *policy* is in force for those services and supplies which are:

A. Administered or ordered by a *doctor;*
B. Routinely provided for the care of the newborn infant; and
C. Provided while an *inpatient* of a *hospital* within the first five days following the *covered person's* birth or before the mother ceases to be an *inpatient,* whichever occurs first.

"*Routine patient care costs*" means the costs of *medically necessary* health care services or supplies which are considered *covered expenses* under this plan regardless of whether the *covered person* is participating in a clinical trial.

*Routine patient care costs* do not include:

A. The cost of an investigational new drug or device that is not approved for any indication by the United States Food and Drug Administration, including a drug or device that is the subject of the clinical trial;
B. The cost of a service that is not a health care service, regardless of whether the service is the subject of the clinical trial;
C. The cost of a service that is clearly inconsistent with widely accepted and

established standards of care for a particular diagnosis;

D. The cost of managing the clinical trial; or

E. The cost of any health care service specifically excluded from coverage under this plan.

In addition, *covered expenses* will not include:

A. *Routine patient care costs* provided through the research institution, person or entity conducting the clinical trial unless the institution and each health care provider agrees to accept reimbursement at the rate established under this plan as payment in full; or

B. Any costs incurred for services that are a part of the subject matter of the clinical trial and that are customarily paid for by the institution, person or entity conducting the clinical trial.

*"Spouse"* means *your* lawful wife or husband.

*"Store-and-forward technology"* means technology that stores and transmits or grants access to a *covered person's* clinical information and review by a health care professional at a different location than the *covered person.*

*"Substance-related and addictive disorders* means alcoholism and *substance-related and addictive disorders* that are listed in the current edition of the International Classification of Diseases section on Mental and Behavioral Disorders or the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. The fact that a disorder is listed in either of these reference manuals does not mean that treatment of the disorder is a *covered expense.*

*"Surgery"* or *"surgical procedure"* means an invasive diagnostic procedure or the treatment of a *covered person's illness* or *injury* by manual or instrumental operations, performed by a *doctor* while the *covered person* is under general or local anesthesia or conscious sedation.

"*Telehealth service*" means a health service, other than a *telemedicine medical service*, delivered by a health professional licensed, certified, or otherwise entitled to practice in Texas and acting within the scope of that license to a patient at a different physical location than the health professional using telecommunications or information technology.

"*Telemedicine medical service*" means a health care service delivered by a *doctor* licensed in Texas, or other health professional acting under the delegation and supervision of a *doctor* licensed in Teas, and acting within the scope of the health care professional's license to a patient in a different physical location using telecommunications of information technology the use of electronic information and communication technology to deliver healthcare services, including without limitation the assessment, diagnosis, consultation, treatment, education, care management or self-management of a patient.

*Telemedicine medical services* includes *store-and-forward technology* and *remote patient monitoring.*

Benefits do not include *telemedicine medical services* or *telehealth services* provided by only synchronous or asynchronous audio interaction, including:

A. Audio-only telephone conversation;

B. A facsimile transmission; or

C. A text only e-mail.

D. *Virtual care services* provided by a *designated virtual network provider,* as described in the Virtual Care Rider if selected and attached to this *policy/*certificate.

"*Treatment for autism spectrum disorder*" means care, treatments, interventions, services or items which are reasonably expected to: (A) prevent the onset of an *autism spectrum disorder;* (B) reduce or ameliorate the physical, mental, or developmental effects of an *autism spectrum disorder;* or (C) assist to achieve or maintain maximum functional activity in performing daily activities after being diagnosed with an *autism spectrum disorder.*

*Treatment for autism spectrum disorder* shall include the following care when prescribed, provided or ordered by a *doctor*:

A. *Evidence-based treatments;*

B. Psychiatric care, meaning direct, consultative, or diagnostic services provided by a licensed psychiatrist;

C. Psychological care, meaning direct or consultative services provided by a licensed psychologist;

D. Pharmacy care, meaning prescription medications and any health-related services necessary to determine the need of effectiveness of the medications;

E. Habilitative or rehabilitative care, meaning professional, counseling, and guidance

services and treatment programs, including *applied behavioral analysis*, that are intended to develop, maintain, and restore the functioning of an individual; and

F. Therapeutic care, including behavioral speech, occupational, and physical therapies that provide treatment in the areas of: (1) self-care and feeding; (2) pragmatic, receptive, and expressive language; (3) cognitive functioning; (4) *applied behavioral analysis*, intervention, and modification; (5) motor planning; and (6) sensory processing.

Therapeutic care, including behavioral speech, occupational, and physical therapies that provide treatment for *autism spectrum disorder* in the area of *applied behavioral analysis,* intervention, and modification is limited to those services provided or supervised by a board-certified behavior analyst.

*"Unproven service(s)"* means services, including medications, that are determined not to be effective for treatment of the medical condition, and/or not to have a useful effect on health outcomes, due to insufficient and inadequate clinical evidence from *well-conducted randomized controlled trials* or *well-conducted cohort studies* in the prevailing published peer-reviewed medical literature.

A. *"Well-conducted randomized controlled trials"* means that two or more treatments are compared to each other, the patient is not allowed to choose which treatment is received, and neither the provider nor the patient is informed as to which treatment the patient is receiving.

B. *"Well-conducted cohort studies"* means patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.

"*Urgent care center*" means a facility, not including a *hospital emergency* room or a *doctor's* office that provides treatment or services that are required:

A. To prevent serious deterioration of a *covered person's* health; and

B. As a result of an unforeseen *illness* or *injury*, or the onset of acute or severe symptoms.

## SECTION 3
## POLICYHOLDER PROVISIONS

**POLICYHOLDER AUTHORITY:** The *policyholder* will act on behalf of all members in all matters pertaining to the *policy*, and every.

A. Act done by the *policyholder;* or

B. Agreement between *us* and the *policyholder,*

will be binding on the member.

**NOTICE:** Written notice to the *policyholder* or *you* will be effective on the date it is placed in the United States Mail. Notice will be deemed to be properly addressed if it reflects the last address shown in *our* records.

## SECTION 4
## ELIGIBILITY

**CLASSIFICATION OF ELIGIBLE PERSONS:** All persons in the following class are eligible for insurance under the *policy:*

| CLASS | CLASS DEFINITION |
|---|---|
| I | All contributing members of the *policyholder* association |

**DATE OF ELIGIBILITY:** The *primary insured* is eligible for insurance on the date the *primary insured* becomes a member of one of the classes defined above.

**DEPENDENT ELIGIBILITY:** The eligibility of the *primary insured's dependents* is tied to the eligibility of the *primary insured*. All *dependents* of the *primary insured* on the *primary insured's* date of eligibility are also eligible for coverage as of that date.

A newborn child or adopted child of a *covered person* may become insured under the *policy* according to the provisions entitled Adding a Newborn Child or Adding an Adopted Child in Section 5.

With the exception of a child covered under a medical support order, no other person may be added as a *covered person* under this certificate.

## SECTION 5
## EFFECTIVE DATE OF INSURANCE

**EFFECTIVE DATE OF INSURANCE:** The effective date of insurance for initial *covered persons* is shown on the Data Page of the certificate.

**ADDING A NEWBORN CHILD:** An *eligible child* born to *you* or *your spouse* while this plan is in force will be a *covered person* from the time of birth. The newborn child will be covered from the time of birth for *loss* due to *Injury* and *Illness*, including *loss* from complications of birth, premature birth, and medically diagnosed defects present at birth.

No change in premium is needed for the newborn child to continue as a *covered person.*

**ADDING AN ADOPTED CHILD:** If *you* notify *us* within 60 days of filing for adoption, an *eligible child* will be a *covered person* from the date *you* or *your spouse* became party to a suit seeking to adopt the child. A newborn adopted child for which petition to adopt was filed within 60 days of birth will be covered from the date of birth. The adopted child will be covered for loss due to *injury* and *illness*, including loss from complications of birth, premature birth, and congenital defects.

No change in premium is needed for the adopted child to continue as a *covered person.*

## TERMINATION OF INSURANCE

**TERMINATION OF CERTIFICATE:** Insurance for all *covered persons* will automatically terminate on the earliest of:

A. The date the *policy* is terminated;

B. The termination date shown on the Data Page, subject to cancellation for fraud;

C. Nonpayment of premiums when due, subject to the Grace Period provision;

D. The end of the premium period on or after the date the *primary insured* turns 65, if the *primary insured* is the only *covered person*; or

E. The date of the *primary insured's* death, if the *primary insured* is the only *covered person.*

*We* will refund any premium paid and not earned due to automatic termination of the certificate.

*You* may also terminate this certificate by giving written notice to *us.* Termination by *you* will be effective on the last day for which premium has been paid.

**TERMINATION OF COVERED PERSON**: A *covered person's* coverage under this certificate will terminate at the end of the premium period on or after the date of his or her 65th birthday.

**CONTINUATION OF COVERAGE DUE TO DIVORCE OR TERMINATION OF MEMBERSHIP IN THE POLICYHOLDER ASSOCIATION GROUP:** If a person ceases to be a *covered person* due to divorce or termination of membership in the policyholder association group, the person will be eligible for continuation of coverage for the remainder of the original *policy term* selected. *We* will offer to continue the person's coverage by issuing an individual certificate if the person resides in a state where *we* offer this type of coverage. If the person resides in a state where *we* do not offer this type of coverage, then a continuation certificate cannot be issued. The premium rate applicable to the new certificate will be determined based on the current residence of the *covered person.* All other terms and conditions of the new certificate will be the same as the original coverage. *Preexisting conditions* will be determined from the original effective date of coverage. The termination date of coverage will remain the same as the termination date of the original certificate. *Deductible amounts*, waiting periods and maximum benefit limits will be satisfied under the new certificate to the extent satisfied under this certificate at the time that the continuation of coverage is issued.

**Notification Requirements:** It is the responsibility of *you* or *your* former *spouse* to notify *us* within 31 days of the termination of your membership or *your* legal divorce. *You* must provide the address to which their continuation of coverage should be issued.

**Continuation of Coverage:** *We* will issue the continuation of coverage within 30 days after the date *we* receive timely notice of *your* ineligibility for coverage.

*Your* former *spouse* must pay the required premium within 31 days following notice from *us* or the new certificate will be void from its beginning.

**BENEFITS AFTER THE MASTER POLICY TERMINATES** In the event that the master *policy* terminates, coverage under any existing certificates will not be affected. Coverage under such certificates will remain in force for the duration of

the *policy term* selected and any benefit period established during the *policy term*.

**CANCELLATION FOR FRAUD:** *We* may cancel coverage under the *policy* if there is fraud or intentional material misrepresentation made by or with the knowledge of a *covered person* in filing a claim for *policy* benefits. If coverage is terminated under these circumstances, *we* will refund any unearned premium and there will be no benefits after coverage terminates.

**CONTINUATION UPON THE PRIMARY INSURED'S DEATH:** If more than one person is covered under this certificate, it may be continued after a *primary insured's* death by the *primary insured's spouse* if a *covered person;* otherwise, by the youngest child who is a *covered person*.

The certificate will be changed to a plan appropriate, as determined by *us*, to the *covered person(s)* that continue to be covered under it. The *primary insured's spouse* or youngest child will replace the *primary insured*. A proper adjustment will be made in the premium required for the certificate to be continued. *We* will also refund any premium paid and not earned due to the *primary insured's* death. The refund will be based on the number of full months that remain to the next premium due date.

**EXTENSION OF BENEFITS UPON TERMINATION OF THE MASTER POLICY:** If a *covered person* is an *inpatient* in a *hospital* on the date that the master *policy* is terminated and the master *policy* is replaced without any gap in coverage by a group health insurance policy with another insurer or by a self-funded health care plan, benefits for *covered expenses* for the continuous *hospital* confinement will be extended. These extended benefits will be paid solely for *covered expenses* incurred during the *inpatient hospital* confinement. Any extended benefit will cease on the earliest of:

A. The date the *covered person's hospital* confinement ends, or

B. The date the benefits for the *hospital* confinement would have ceased under any other provision of the *policy*/certificate.

## PREMIUMS

**PREMIUM PAYMENTS:** The *primary insured* is solely responsible for the premium payments for this *policy*/certificate. Monthly premium, if the *primary insured* elected to pay on a monthly basis, is due the last day of the period for which the preceding premium was paid. Monthly premiums must be paid through a pre-authorized charge to a bank account or credit card.

**GRACE PERIOD:** *You* have until the 31st day following each premium due date to pay all premiums due. This certificate will remain in force during the grace period. However, the grace period will never extend coverage under the *policy* beyond the termination date shown in the Data Page.

*We* will pay benefits for *your covered expenses* incurred during the 31 day grace period. Any such benefit payment is made in reliance on the receipt of the full premium due from *you* by the end of the grace period.

**REINSTATEMENT:** If coverage under the *policy* lapses due to nonpayment of premium, *we* may require an application to reinstate coverage. If an application is not required, coverage will be reinstated when premium is accepted.

If *we* require an application, coverage will be reinstated upon our approval. If *we* do not approve the application for reinstatement, but fail to notify the *primary insured* in writing of the disapproval, coverage will be reinstated on the 45th day after the date of *our* receipt of the application.

The reinstated coverage will cover *loss* from *illness* and *injury*. However, the reinstated coverage will not cover *loss* from:

A. *Injury* sustained between the date the coverage lapsed and the date it was reinstated; or

B. *Illness* first manifested, for which *you* received medical advice or treatment, between the date coverage lapsed and the date it was reinstated.

The reinstated coverage will still have the same termination date shown in the Data Page.

**BILLING/ADMINISTRATIVE FEES:** Upon prior written notice, *we* may impose an administrative fee for credit card payments. This does not obligate *us* to accept credit card payments. *We* may charge a $20 fee for any check or automatic payment deduction that is returned unpaid.

## SECTION 6
## GENERAL BENEFIT PROVISIONS

**AMOUNT PAYABLE:** The total amount payable for each *covered person* per *policy term* will not exceed

the maximum benefit limit as shown in the Data Page.

*We* will pay *our* portion of the applicable coinsurance in excess of the applicable *deductible amount(s)* and *copayment amount(s)* for a service or supply that:

A. Qualifies as a *covered expense* under one or more benefit provision(s); and

B. Is received while the *covered person's* insurance is in force under the *policy* if the charge for the service or supply qualifies as an *eligible expense.*

The amount payable will be subject to:

A. Any specific benefit limits stated in the *policy*;

B. A determination of *eligible expenses;* and

C. Any exclusion for expenses incurred at a non-*network provider.*

The applicable *deductible amount(s), coinsurance percentage* and *copayment amount(s)* are shown in the Data Page.

**TRANSPLANT BENEFITS:** For expenses incurred for or related to organ or tissue transplants, the *eligible expense* is stated under the Transplant Expense Benefits provision in the *policy/*certificate.

## MEDICAL BENEFITS

**COVERED EXPENSES:** For the purposes of these benefits, the term "*covered expenses*" means expenses actually incurred by a *covered person* for those services and supplies listed below which are:

A. Administered or ordered by a *doctor;*

B. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness*; and

C. Not excluded anywhere in the *policy.*

**COVERED EXPENSES:** *Covered expenses* are limited to charges:

A. Made by a *hospital* for:

1. Daily room and board and nursing services, not to exceed the *hospital's* most common semi-private room rate;

2. Daily room and board and nursing services while confined in an *intensive care unit,* not to exceed the applicable maximum limits shown on the Data Page;

3. *Inpatient* use of an operating, treatment or recovery room;

4. Outpatient use of an operating, treatment or recovery room for *surgery*;

5. Services and supplies, including drugs and medicines, which are routinely provided by the *hospital* to persons for use only while they are *inpatients;*

6. *Emergency* treatment of an *injury* or *illness*, even if confinement is not required. However, charges for the use of the *emergency* room itself for treatment of an *injury* or *illness* will be subject to the additional *emergency* room deductible shown in the Data Page if the *covered person* is not directly admitted to the *hospital* for *inpatient* treatment of that *injury* or *illness*.

   *Emergency* treatment shall include:

   a. A medical screening examination or other evaluation required by state or federal law to be provided in a *hospital emergency* room, freestanding *emergency* medical care facility, or comparable facility that is necessary to determine whether a medical *emergency* condition exists.

   b. Necessary *emergency* care services, including treatment and stabilization of an *emergency* medical condition; and

   c. Following treatment or stabilization of an *emergency* medical condition, services originating in a *hospital emergency* facility or freestanding *emergency* medical care facility or comparable *emergency* facility until the insured can reasonably be expected to transfer to a *network provider.*

B. For *surgery* in a *doctor's* office or at an *outpatient surgical facility*, including services and supplies;

C. Made by a *doctor* for professional services, including *surgery*;

D. Made by a *medical practitioner* for professional services;

E. For dressings, crutches, orthopedic splints and braces, casts, or other *necessary medical supplies;*

F. For diagnostic testing using radiologic, ultrasonographic, or laboratory services (psychometric, behavioral and educational testing are not included);

G. For chemotherapy whether administered orally, intravenously or by injection;

H. For radiation therapy or treatment;

I. For the cost and administration of an anesthetic;

J. For oxygen and its administration;

K. For the rental of a standard hospital bed, a standard walker, a standard or non-motorized wheelchair, a wheelchair cushion and a ventilator;

L. For expenses incurred by *covered persons* who have been diagnosed with insulin dependent or non-insulin dependent diabetes, elevated blood glucose levels induced by pregnancy, or any other medical condition associated with elevated blood glucose levels limited to:

   1. The following equipment and supplies

      a. Blood glucose monitors;

      b. Blood glucose monitors for the legally blind;

      c. Test strips for glucose monitors, including glucose control solutions, lancets, and lancing devices;

      d. Visual reading and urine test strips, and tablets that test for glucose, ketones and protein;

      e. Insulin;

      f. Syringes, needles, insulin analogs and injection aids, including devices used to assist with insulin injection and needleless systems;

      g. Batteries, skin preparation items, adhesive supplies, infusion sets, insulin cartridges, and durable and disposable devices to assist in the injection of insulin;

      h. Insulin pumps, insulin infusion devices, and related supplies;

      i. Repairs and maintenance of insulin pumps to the extent not covered under a manufacturer's warranty, and rental fees for replacement pumps during a period of repair, both of which are limited to the purchase price of a similar new pump;

      j. Prescription and non-prescription medications for controlling blood sugar level;

      k. Podiatric appliances for the prevention of complications associated with diabetes, including no more than 2 pairs of therapeutic footwear per *covered person*, per calendar year;

      l. Glucagon emergency kits and injectable glucagon.

      m. Immunizations for influenza and pneumococcus;

      n. Daily room and board, nursing services, and routinely provided inpatient services while confined in an *extended care facility* or a *rehabilitation facility*, subject to the same limits as if the *covered person* were confined in a *hospital*;

      o. Biohazard disposal containers;

      p. Any new or improved treatment or monitoring equipment or supplies approved by the United States Food and Drug Administration and available to the public on or after the *covered person's effective date*; and

   2. *Diabetes self-management training* provided to a *covered person* or a *covered person's caretaker*: (1) after the initial diagnosis of diabetes; (2) for additional training authorized on the written order of a *medical practitioner* after a significant change in symptoms that requires changes in the self-management regime; and (3) for periodic or episodic continuing education when prescribed by a *medical practitioner* as needed due to the development of new techniques and treatments for diabetes.

M. For *dental expenses* when a *covered person* suffers an *injury*, after the *covered person's effective date* of coverage, which results in:

   1. Damage to his or her natural teeth; and

   2. Expenses which are incurred within six months of the accident or as part of a treatment plan which was prescribed by a *doctor* and began within six months of the accident.

*Injury* to the natural teeth will not include any injury as a result of chewing;

Information for dental procedures may be found by visiting www.myuhc.com.

N. For hemodialysis and the charges by a *hospital* for processing and administration of blood or blood components;

O. For the treatment of breast cancer, a minimum of:

1. 48 hours of *inpatient* care following a mastectomy; and
2. 24 hours of *inpatient* care following a lymph node dissection.

P. For the following, when provided to a *covered person* who is receiving benefits for *covered expenses* in connection with a mastectomy and who elects breast reconstruction:

1. All stages of reconstruction of the breast on which the mastectomy has been performed;
2. *Surgery* and reconstruction of the other breast to produce a symmetrical appearance; and
3. Prosthesis and treatment for physical complications of mastectomy, including lymphedemas.

Q. For colorectal cancer examinations and laboratory tests for colorectal cancer in accordance with the published American Cancer Society guidelines.

R. For *reconstructive craniofacial surgery* and related services:

1. For a *covered person* of any age who is diagnosed as having a craniofacial anomaly if the *surgery* is *medically necessary* to improve functional impairment that results from the craniofacial anomaly, as determined by a nationally approved cleft-craniofacial team, approved by the American Cleft Palate-Craniofacial Association in Chapel Hill, North Carolina.
2. To attempt to create a normal appearance of a craniofacial abnormality of a *dependent* less than 18 years of age which was caused by congenital defects, developmental abnormalities, trauma, tumors, infection, or disease.

When part of a written treatment plan, *covered expenses* for treatment of a craniofacial anomaly include *reconstructive craniofacial surgery,* dental care, vision care, and the use of at least (1) hearing aid.

*"Reconstructive craniofacial surgery"* as used in this benefit provision means the use of *surgery* to alter the form and function of the cranial facial tissues due to a congenital or acquired musculoskeletal disorder.

S. Made by an assistant surgeon, limited to 16 percent of the *eligible expense* for the *surgical procedure.*

T. For diagnosis or treatment of a spine and back disorder, subject to the limit(s) stated in the Data Page.

U. For artificial eyes or larynx.

V. For the most appropriate model of *prosthetic device* or *orthotic device* that adequately meets the medical needs of the *covered person*, as recommended by the *covered person's* physician, podiatrist, prosthetist or orthotist.

*Covered expenses* shall include:

1. Professional services related to the fitting and use of the device.
2. Repair and replacement of the device unless necessitated by the misuse or loss of the device by the *covered person.*

W. For screening for *autism spectrum disorder* for an *eligible child* at 18 and 24 months of age.

X. For generally recognized services prescribed for the diagnosis and treatment of *autism spectrum disorder* for *covered persons*, including: (1) *evidence–based treatments*; (2) evaluation and assessment services; (3) applied behavior analysis; (4) behavior training and behavior management; (5) speech therapy; (6) occupational therapy; (7) physical therapy; and (8) medications or nutritional supplements used to address symptoms of *autism spectrum disorder*.

For *covered persons* 10 years of age or older, outpatient applied behavior analysis for the treatment of *autism spectrum disorders* shall be limited to a maximum of $50,000 per *policy term*.

Y. For *medically necessary care* and treatment of *loss* or impairment of speech or hearing, including communicative disorders.

Z. For *medically necessary* amino acid modified preparations, low protein modified food products, and any other special dietary products and formulas prescribed by a *doctor* for the therapeutic treatment of phenylketonuria (PKU), galactosemia, organic adicdemias and disorders of amino acid metabolism.

AA. For *medically necessary* hearing aids or cochlear implants for a covered *eligible child* up to age 18 years. This benefit includes the following:

1. Fitting and dispensing services and the provision of ear molds as necessary to maintain optimal fit of hearing aids;
2. Any treatment related to hearing aids and cochlear implants, including coverage for habilitation and rehabilitation as necessary for education gain; and
3. Any treatment related to hearing aids and cochlear implants, including coverage for habilitation and rehabilitation as necessary for education gain.

*Covered expenses* are limited to

1. One hearing aid in each ear every three years; and
2. One cochlear implant in each ear with internal replacement as audiologically or *medically necessary.*

BB. For *routine-in-hospital newborn infant care expenses.*

CC. For newborn screening tests for hypothyroidism, phenylketonuria, galactosemia, sickle-cell anemia, and other genetic disorders as mandated by state law. This will include the cost of test kits, in the amount provided by the Department of State Health Services on its internet website under 33.019 as of the date the test was administered,

DD. For *children's preventive health care services* for any *covered person* eligible by reason of age. Immunization services that qualify as *children's preventive health care services* are exempt from any *deductible amounts,* coinsurance provisions, or *copayment amounts*.

EE. For *child immunizations*, exempt from any *deductible amounts*, copayment amounts and coinsurance requirements.

FF. For medically accepted bone mass measurement for the detection of low bone mass and to determine the risk of osteoporosis and fractures associated with osteoporosis for a *covered person* who is:

1. A postmenopausal woman who is not receiving estrogen replacement therapy;
2. An individual with vertebral abnormalities, primary hyperparathyroidism, or a history of bone fractures; or
3. An individual who is receiving long-term glucocorticoid therapy or being monitored to assess the response to or efficacy of an approved osteoporosis drug therapy.

GG. For one digital rectal exam and one prostate specific antigen test per *policy term* per *covered person* for screening for the early detection of prostate cancer. Benefits shall be exempt from the *deductible amount.* Coverage for screenings does not diminish or limit diagnostic benefits otherwise available under the *policy*/certificate.

HH. For a *medically necessary gastric pacemaker.*

II. For treatment of *medical disorders requiring specialized nutrients and formulas,* including treatment with *medical foods,* regardless of whether the delivery method is enteral or oral.

JJ. For *telemedicine medical* services to the same extent that those services provided, regardless of the *platform* used, would otherwise be *covered expenses* under the *policy*/certificate.

*Covered expenses* shall include a facility fee to the *originating site*. The combined reimbursement to the *originating site* and *distant site* shall be limited to the *covered expense* for the service when provided in person.

KK. For one screening test for hearing loss administered within the first 30 days after birth, and related necessary diagnostic follow-up care during the first 24 months after birth. Charges incurred for the

screening test and follow-up care shall be exempt from the *deductible amount*.

LL. For charges incurred for cognitive rehabilitation therapy, cognitive communication therapy, neurocognitive therapy and rehabilitation, neurobehavioral, neurophysiological, neuropsychological, and psychophysiological testing or treatment, neurofeedback therapy, remediation, post-acute transition services, or community reintegration services necessary as a result of and related to an acquired brain injury.

MM. For diagnostic and surgical treatment of temporomandibular joint disorders and craniomandibular joint disorders.

NN. For up to $200 every five years for one of the following noninvasive screening tests for atherosclerosis and abnormal artery structure and function:

1. Computerized tomography (CT) scanning measuring coronary artery calcification; or
2. Ultrasonography measuring carotid intima-media thickness and plaque.

Benefits are limited to male *covered persons* between the ages of 45 and 76 and female *covered persons* between the ages of 55 and 76 who:

1. Are diabetic; or
2. Have an intermediate or high risk of developing coronary heart disease based on the Framingham Health Study Coronary Prediction algorithm.

OO. For *routine patient care costs* for services, items or drugs provided in connection with a Phase I, II, III or IV clinical trial if the clinical trial is conducted in relation to the prevention, detection or treatment of a *life-threatening disease or condition* and is approved by:

1. The Centers for Disease Control and Prevention;
2. The National Institutes of Health;
3. The United States Food and Drug Administration (USFDA);
4. The United States Department of Defense;
5. The United States Department of Veterans Affairs; or
6. An institutional review board of an institution in the state of Texas that has an agreement with the Office for Human Research Protections of the United States Department of Health and Human Services.

PP. For an annual screening for the early detection of ovarian cancer and cervical cancer for *covered persons* 18 years of age or older, including:

1. A CA 125 blood; and
2. A conventional Pap smear screening or a screening using liquid-based cytology methods, as approved by the United States Food and Drug Administration for the detection of the human papillomavirus.

QQ. For an annual screening by *low-dose mammography* for the presence of occult breast cancer for *covered persons* 35 years of age or older. This age limit does not apply to *diagnostic mammogram*.

RR. For *diagnostic mammogram*

SS. For diagnosis and treatment of *mental disorders, substance-related and addictive disorders* the same as any other *illness*, including services received in:

1. A *psychiatric day treatment facility;*
2. A *residential treatment center for children or adolescents*;
3. A *crisis stabilization unit; and*
4. A *chemical dependency treatment center.*

**Definitions:** As used in this provision, the following terms have the meanings set forth below.

A. "*Crisis stabilization unit*" means a 24-hour residential program that is usually short-term in nature and that provides intensive supervision and highly structured activities to persons who are demonstrating an acute demonstrable psychiatric crisis of moderate to severe proportions.

B. "*Chemical dependency treatment center*" means a facility that provides a program for the treatment of chemical dependency under a written treatment plan approved and monitored by a physician that is:

1. Affiliated with a *hospital* under a contractual agreement with an established system for patient referral;

2. Accredited as a *chemical dependency treatment center* by the Joint Commission on Accreditation of Healthcare Organizations;
3. Licenses as a chemical dependency treatment program by the Texas Commission of Alcohol and Drug Abuse; or
4. Licensed, certified, or approved as a chemical dependency treatment program or center by another state agency

C. *Psychiatric day treatment facility"* means a mental health facility which:

1. Provides treatment for individuals suffering from acute *mental disorders* in a structured psychiatric program utilizing individualized treatment plans with specific attainable goals and objectives appropriate both to the patient and the treatment modality of the program; and
2. Is clinically supervised by a *doctor* of medicine who is certified in psychiatry by the American Board of Psychiatry and Neurology.

The facility must be accredited by the Joint Commission on Accreditation of Hospitals and must not treat a patient for more than eight hours in any 24-hour period.

D. *"Residential treatment center for children and adolescents"* means a child-care institution that provides residential care and treatment for emotionally disturbed children and adolescents and that is accredited as a residential treatment center by the Council on Accreditation of Hospitals, or the American Association of Psychiatric Services for Children.

**AMBULANCE SERVICE BENEFITS:** *Covered expenses* will include ambulance services for local transportation:

A. To the nearest *hospital* that can provide services appropriate to the *covered person's illness* or *injury;* or
B. To the nearest neonatal special care unit for newborn infants for treatment of *illnesses*, *injuries*, birth defects, or complications of premature birth that require that level of care.

Benefits for air ambulance services are limited to:

A. Services requested by police or medical authorities at the site of an *emergency*; or
B. Those situations in which the *covered person* is in a location that cannot be reached by ground ambulance.

*Covered expenses* for air ambulance services are limited to the maximum amount shown in the Data Page.

**Exclusions:** No benefits will be paid for:

A. Expenses incurred for ambulance services covered by a local governmental or municipal body, unless otherwise required by law;
B. Non-*emergency* air ambulance;
C. Air ambulance outside of the 50 United States; and
D. Ambulance services provided for a *covered person's* comfort or convenience.

## HOME HEALTH CARE EXPENSE BENEFITS

**HOME HEALTH CARE EXPENSES:** Under this clause, *covered expenses* for *home health care* are limited to the following charges:

A. *Home health aide services*;
B. Services of a private duty registered nurse rendered on an *outpatient* basis;
C. Professional fees of a licensed respiratory, physical, occupational or speech therapist required for *home health care*;
D. I.V. medication and pain medication to the same extent as it would have been covered during an *inpatient hospital* stay;
E. Hemodialysis, and for the processing and administration of blood or blood components;
F. *Necessary medical supplies*; and
G. Rental of the *durable medical equipment* set forth below to the same extent as it would have been covered during an *inpatient hospital* stay:

1. I.V. Stand and I.V. Tubing;
2. Infusion Pump or Cassette;
3. Portable Commode;
4. Patient Lift;
5. Bili-lights; and

6. Suction Machine and Suction Catheters.

(At *our* option, *we* may approve the purchase of the equipment in lieu of its rental if the rental price is projected to be more than the equipment purchase price, but only from a provider *we* approve before the purchase. If the equipment is purchased, the *covered person* must return the equipment to *us* when it is no longer in use.)

**DEFINITIONS:**

*"Home health aide services"* means those services provided by a home health aide employed by a *home health care agency* and supervised by a registered nurse, which are for the personal care of a *covered person*.

*"Home health care"* means care or treatment of an *illness* or *injury* at the *covered person's* home that is: (A) provided by a *home health care agency;* and prescribed and supervised by a *doctor.*

*"Home health care agency"* means a public or private agency or one of its subdivisions, which:

A. Operates pursuant to law as a *home health care agency;*

B. Is regularly engaged in providing *home health care* under the regular supervision of a registered nurse;

C. Maintains a daily medical record on each patient; and

D. Provides each patient with a planned program of observation and treatment by a *doctor,* in accordance with existing standards of medical practice for the *injury* or *illness* requiring the *home health care.*

An agency which is approved to provide *home health care* to those receiving Medicare benefits will be deemed to be a *home health care agency.*

**LIMITATIONS:** *Covered expenses* for *home health aide services* will be limited to 7 visits per week. Each eight-hour period of *home health aide services* will be counted as one visit.

*Covered expenses* for intermittent private duty registered nurse visits (not more than 4 hours each) will be limited to $75 per visit.

**EXCLUSION:** No benefits will be payable for charges related to respite care, *custodial care* or educational care.

## REHABILITATION AND EXTENDED CARE FACILITY EXPENSE BENEFITS

*Covered expenses* include expenses incurred for *rehabilitation services* or confinement in an *extended care facility,* subject to the following limitations:

A. *Covered expenses* available to a *covered person* while confined primarily to receive *rehabilitation* are limited to those specified in this provision.

B. *Rehabilitation* services or confinement in a *rehabilitation facility* or *extended care facility* must begin within 14 days of a *hospital* stay of at least 3 consecutive days and be for treatment of, or *rehabilitation* related to, the same *illness* or *injury* that resulted in the *hospital* stay.

C. *Covered expenses* for *rehabilitation* and *extended care facility* expenses are limited to a combined maximum of 60 days per *policy term* for each *covered person.*

D. *Covered expenses* for *provider facility services* are limited to charges made by a *hospital, rehabilitation facility,* or *extended care facility* for:

   1. Daily room and board and nursing services;
   2. Drugs and medicines that:
      a. Are prescribed by a *doctor;*
      b. Must be filled by a licensed pharmacist; and
      c. Are approved by the U.S. Food and Drug Administration; and
   3. Diagnostic testing.

E. *Covered expenses* for non-*provider facility* services are limited to charges incurred for the professional services of *rehabilitation medical practitioners.*

**Maximum Benefits:** Subject to the limitations stated in this Rehabilitation and Extended Care Facility Expense Benefits provision, benefits for *covered expenses* under this provision are limited to 60 days per *policy term* for each *covered person.*

Care ceases to be *rehabilitation* upon *our* determination of any of the following:

A. The *covered person* has reached maximum therapeutic benefit;

B. Further treatment cannot restore bodily function beyond the level the *covered person* already possesses;

C. There is no measurable progress toward documented goals; or

D. Care is primarily *custodial care.*

For the purposes of this provision, *provider facility* means a *hospital, rehabilitation facility,* or *extended care facility.*

**DEFINITIONS:**

*"Acute rehabilitation"* means two or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for three or more hours per day, five to seven days per week, while the *covered person* is confined as an *inpatient* in a *hospital, rehabilitation facility,* or *extended care facility.*

*"Extended care facility"* means an institution, or a distinct part of an institution, which:

A. Is licensed as a *hospital, extended care facility* or *rehabilitation facility* by the state in which it operates;

B. Is regularly engaged in providing 24-hour skilled nursing care under the regular supervision of a *doctor* and the direct supervision of a registered nurse;

C. Maintains a daily record on each patient;

D. Has an effective utilization review plan;

E. Provides each patient with a planned program of observation prescribed by a *doctor;* and

F. Provides each patient with active treatment of an *illness* or *injury,* or related *rehabilitation,* in accordance with existing standards of medical practice for that condition.

*Extended care facility* does not include a facility primarily for rest, the aged, the treatment of *substance-related and addictive disorders*, *custodial care,* nursing care, or for care of *mental disorders* or the mentally incompetent.

*"Intensive day rehabilitation"* means two or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for three or more hours per day, five to seven days per week.

*"Maximum therapeutic benefit"* means the point in the course of treatment where no further improvement in a *covered person's* medical condition can be expected, even though there may be fluctuations in levels of pain and function.

*"Medically stabilized"* means that the person is no longer experiencing further deterioration as a result of prior *injury* or *illness* and there are no acute changes in physical findings, laboratory results or radiologic results which necessitate acute medical care. Acute medical care does not include *acute rehabilitation.*

*"Pain management program"* means a program using interdisciplinary teams providing coordinated, goal-oriented services to a *covered person* who has chronic pain that significantly interferes with physical, psychosocial, and vocational functioning, for the purpose of reducing pain, improving function, and decreasing dependence on the health care system. A *pain management program* must be individualized and provide physical rehabilitation, education on pain, relaxation training, and medical evaluation.

"*Rehabilitation*" means care for restoration (including by education or training) of one's prior ability to function at a level of *maximum therapeutic benefit.* This type of care must be *acute rehabilitation, subacute rehabilitation,* or *intensive day rehabilitation,* and it includes *rehabilitation therapy,* and *pain management programs.* An *inpatient* hospitalization will be deemed to be for *rehabilitation* at the time the patient has been *medically stabilized* and begins to receive *rehabilitation therapy* or treatment under a *pain management program.*

*"Rehabilitation facility"* means an institution or a separate identifiable *hospital* unit, section, or ward that: (A) is licensed by the state as a *rehabilitation facility;* and (B) operates primarily to provide 24-hour primary care or *rehabilitation* of sick or injured persons as *inpatients.*

*Rehabilitation facility* does not include a facility primarily for rest, the aged, long term care, assisted living, *custodial care,* nursing care or for care of the mentally incompetent.

*"Rehabilitation medical practitioner"* means a *doctor,* physical therapist, speech therapist, occupational therapist, or respiratory therapist. A *rehabilitation medical practitioner* must be licensed or certified by the state in which care is rendered and performing services within the scope of that license or certification.

*"Rehabilitation therapy"* means physical therapy, occupational therapy, speech therapy, or respiratory therapy.

*"Subacute rehabilitation"* means one or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for one-half hour to two hours per day, five to seven days per week, while the *covered person* is confined as an *inpatient* in a *hospital, rehabilitation facility,* or *extended care facility.*

**Exclusion:** No benefits will be paid under this Rehabilitation and Extended Care Facility benefit provision for charges for services or confinement related to treatment or therapy for *mental disorders* or *substance-related and addictive disorders.*

## TRANSPLANT EXPENSE BENEFITS

**TRANSPLANT EXPENSES COVERED UNDER MEDICAL BENEFITS:** The following types of tissue transplants are *covered expenses* under the Medical Benefits provision:

A. Cornea transplants;

B. Artery or vein grafts;

C. Heart valve grafts;

D. Prosthetic tissue replacement, including joint replacements; and

E. Implantable prosthetic lenses, in connection with cataracts.

**ALL OTHER COVERED EXPENSES FOR TRANSPLANT EXPENSES:**

**COVERED EXPENSES:** For the purposes of these benefits, the term "*covered expenses*" means expenses actually incurred by a *covered person* for those services and supplies listed below which are:

A. Administered or ordered by a *doctor;*

B. Provided in connection with a *listed transplant;*

C. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness;* and

D. Not excluded anywhere in the *policy.*

These *covered expenses* will be paid as a limited expansion of the Medical Benefits. They will be subject to the terms of that provision, including deductibles, coinsurance, exclusions and limitations.

If *we* determine that a *covered person* is an appropriate candidate for a *listed transplant,* Medical Benefits *covered expenses* will be provided for:

A. Pre-transplant evaluation;

B. Pre-transplant harvesting;

C. Pre-transplant stabilization, meaning an *inpatient* stay to medically stabilize a *covered person* to prepare for a later transplant, whether or not the transplant occurs;

D. High dose chemotherapy;

E. Peripheral stem cell collection;

F. The transplant itself, not including the acquisition cost for the organ or bone marrow; and

G. Post transplant follow-up.

**DEFINITIONS:** As used in this provision, the following terms have the meanings indicated:

*"Allogeneic bone marrow transplant"* or *"BMT"* means a procedure in which bone marrow from a related or non-related donor is infused into the transplant recipient and includes peripheral blood stem cell transplants.

*"Autologous bone marrow transplant"* or *"ABMT"* means a procedure in which the bone marrow infused is derived from the same person who is the transplant recipient and includes peripheral blood stem cell transplants.

*"Center of Excellence"* means a *hospital* that: (A) specializes in a specific type or types of *listed transplants;* and (B) has agreed with *us*, to provide quality care on a cost efficient basis.

*"Listed transplant"* means one of the following procedures and no others:

A. Heart transplants;

B. Lung transplants;

C. Heart/lung transplants;

D. Kidney transplants;

E. Liver transplants; and

F. Bone marrow transplants for the following conditions:

   1. *BMT* or *ABMT* for Hodgkin's lymphoma;

   2. *BMT* or *ABMT* for non-Hodgkin's lymphoma;

3. *BMT* for severe Aplastic Anemia;
4. *BMT* or *ABMT* for Acute Lymphocytic and Nonlymphocytic Leukemia;
5. *BMT* for Chronic Myelogenous Leukemia;
6. *ABMT* for Testicular Cancer;
7. *BMT* for Severe Combined Immunodeficiency;
8. *BMT* or *ABMT* for Stage III or IV Neuroblastoma;
9. *BMT* for Myelodysplastic Syndrome;
10. *BMT* for Wiskott-Aldrich Syndrome;
11. *BMT* for Thalassemia Major;
12. *BMT* or ABMT for Multiple Myeloma;
13. *ABMT* for pediatric Ewing's sarcoma and related primitive neuroectodermal tumors, Wilm's tumor, rhabdomyosarcoma, medulloblastoma, astrocytoma and glioma;
14. *BMT* for Fanconi's anemia;
15. *BMT* for malignant histiocytic disorders; and
16. *BMT* for juvenile myelo-monocytic leukemia.

**TRANSPLANT DONOR EXPENSES:** *We* will cover the medical expenses incurred by a live donor as if they were medical expenses of the *covered person* if:

A. The *covered person* received an organ or bone marrow of the live donor;

B. The transplant was a *listed transplant;* and

C. They would otherwise be considered *covered expenses* under the *policy.*

**EXCLUSIONS:** No benefits will be paid under these Transplant Expense Benefits for charges:

A. For search and testing in order to find a suitable donor;

B. For a prophylactic bone marrow harvest or peripheral blood stem cell collection when no *listed transplant* occurs;

C. For animal to human transplants;

D. For artificial or mechanical devices designed to replace a human organ temporarily or permanently;

E. For obtaining or transporting the organ or tissue unless expressly provided for in this provision;

F. To keep a donor alive for the transplant operation;

G. For a live donor where the live donor is receiving a transplanted organ to replace the donated organ;

H. Related to transplant not included under this provision as a *listed transplant*; or

I. For a *listed transplant* under study in an ongoing phase I or II clinical trial as set forth in the United States Food and Drug Administration ("*USFDA*") regulation, whether or not the trial is subject to *USFDA* oversight.

J. Which are excluded in the General Exclusions and Limitations section of the *policy.*

**LIMITATIONS ON TRANSPLANT EXPENSE BENEFITS:** In addition to the exclusions and limitations specified elsewhere in this section:

A. *Covered expenses* for *listed transplants* will be limited to two transplants for each *covered person.*

B. If a designated *Center of Excellence* is not used, *covered expenses* for a listed transplant will be reduced by 25% after application of any *deductible amounts* coinsurance provisions or copayment amounts.

C. Benefits may be limited by the Coordination of Benefits Provision, the exclusions and limitations stated in the General Exclusions and Limitations section of the *policy* or other terms and conditions of the *policy.*

## SECTION 7
## GENERAL EXCLUSIONS AND LIMITATIONS

A. No benefits will be paid for: Any service or supply which would be provided without cost to *you* or *your* covered *dependent* in the absence of insurance covering the charge.

B. Expenses/surcharges imposed on *you* or *your* covered *dependent* by a provider (including a *hospital*) but which are actually the responsibility of the provider to pay.

C. Any services performed by a member of the *covered person's immediate family,* other than a dentist.

D. Any services not identified and included as *covered expenses* under the *policy*/certificate. *You* will be fully responsible for payment for any services that are not *covered expenses.*

E. Any part of the charges that are in excess of *eligible expenses.*

Even if not specifically excluded by the *policy*, no benefit will be paid for a service or supply unless it is:

A. Administered or ordered by a *doctor*; and

B. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness.*

No benefits will be paid for any services not identified and included as *covered expenses* under the *policy*. *You* will be fully responsible for payment for any services which are not *covered expenses.*

*Covered expenses* will not include, and no benefits will be paid for any charges which are incurred:

A. For non-*emergency* services or supplies received from a provider who is not a *network provider*, except as specifically provided for by this *policy*.

B. For weight modification, or for surgical treatment of obesity, including wiring of the teeth and all forms of intestinal bypass *surgery*;

C. For breast reduction or augmentation;

D. For any drug, treatment or procedure that promotes conception, including but not limited to:

1. Artificial insemination; or
2. Treatment for infertility or impotency;

E. Sterilization or reversal of sterilization;

F. Abortion (unless the life of the mother would be endangered if the fetus were carried to term);

G. For treatment of malocclusions, disorders of the temporomandibular joint or craniomandibular disorders except as described in *covered expenses* of the Medical Benefits provision;

H. For expenses for television or telephone, or for expenses for other persons;

I. For marriage, family, or child counseling for the treatment of premarital, marriage, family or child relationship dysfunctions;

J. For stand-by availability of a *medical practitioner* when no treatment is rendered;

K. For telephone consultations or failure to keep a scheduled appointment;

L. Made by a *hospital* for room and board and nursing services for the first Friday or Saturday of an *inpatient* stay which begins on one of those days, unless:

1. It is an *emergency*; or
2. *Medically necessary inpatient surgery* is scheduled for the day after the date of admission;

M. For services or supplies which are not actually provided while the *policy*/certificate is in force;

N. For *dental expenses*, including braces for any medical or dental condition, surgery and treatment for oral surgery, except as expressly provided for under Medical Expense Benefits;

O. For *cosmetic treatment*, except for *reconstructive surgery* which is incidental to or follows surgery or an *injury* which was covered under the *policy,* or is performed to correct a birth defect in a child who has been a *covered person* from its birth until the date *surgery* is performed;

P. For diagnosis or treatment of learning disabilities, attitudinal disorders, or disciplinary problems;

Q. For diagnosis or treatment of nicotine addiction.

R. For charges related to, or in preparation for, tissue or organ transplants, except as expressly provided for under the Transplant Expense Benefits.

S. For high-dose chemotherapy prior to, in conjunction with, or supported by *ABMT/BMT*, except as specifically provided under the Transplant Expense Benefits provision;

T. For eye refractive *surgery*, when the primary purpose is to correct nearsightedness, farsightedness, or astigmatism;

U. While confined primarily to receive *rehabilitation, custodial care,* educational care or nursing services (unless expressly provided for by the *policy*);

V. For eyeglasses, contact lenses, hearing aids, eye refraction, visual therapy, or for any exam or fitting related to these devices, except as expressly provided for under the *policy*;

W. Due to *pregnancy* (except for *complications of pregnancy*);

X. For any expenses, including expenses for diagnostic testing, incurred while confined primarily for well-baby care, except as expressly provided for under the *policy*;

Y. For preventive care or prophylactic care, including routine physical exams, premarital exams and educational programs, except as expressly provided for by the *policy*;

Z. For expenses incurred outside of the United States, except for expenses incurred for *emergency* treatment of a *covered person*;

AA. As a result of:

1. Intentionally self-inflicted bodily harm (whether the *covered person* is sane or insane);
2. *Injury* or *illness* caused by an act of declared or undeclared war; or
3. The *covered person* taking part in a riot; or
4. The *covered person's* commission of a felony, whether or not charged;

BB. For or related to *durable medical equipment* or for its fitting, implantation, adjustment or removal or for complications therefrom, except as expressly provided for under the *policy;*

CC. For or related to surrogate parenting;

DD. For or related to treatment of hyperhidrosis (excessive sweating);

EE. For fetal reduction *surgery*;

FF. As a result of an *injury* or *illness* arising out of, or in the course of, employment for wage or profit, if the *covered person* is insured, or is required to be insured, by worker's compensation insurance pursuant to applicable state or federal law. If *you* enter into a settlement that waives a *covered person's* right to recover future medical benefits under a worker's compensation law or insurance plan, this exclusion will still apply.

GG. Except as specifically identified as a *covered expense* under the *policy*/certificate, expenses for alternative treatments including acupressure; acupuncture; aroma therapy; hypnotism; massage therapy; rolfing; and other forms of alternative treatment as defined by the Office of Alternative Medicine of the National Institutes of Health.

HH. For any *illness* incurred as a result of the *covered person* being intoxicated, as defined by applicable state law in the state in which the *loss* occurred, or under the influence of illegal narcotics or controlled substance unless administered or prescribed by a *doctor;*

II. For joint replacement, unless related to an *injury* that is covered under the *policy;*

JJ. For non-*emergency* treatment of tonsils, adenoids, hemorrhoids, or hernia;

KK. For modification of the physical body in order to improve the psychological, mental or emotional well-being of the *covered person*, such as sex-change *surgery*;

LL. As a result of any *injury* sustained during or due to participating, instructing, demonstrating, guiding, or accompanying others in any of the following:

1. Professional or semi-professional sports;
2. Intercollegiate sports (not including intramural sports);
3. Parachute jumping;
4. Hang-gliding;
5. Racing or speed testing any motorized vehicle or conveyance;
6. Scuba/skin diving (when diving 60 or more feet in depth);
7. Skydiving;
8. Bungee jumping; or
9. Rodeo sports.

MM. As a result of any *injury* sustained during or due to participating, instructing, demonstrating, guiding, or accompanying others in any of the following if the *covered person* is paid to participate or instruct:

1. Operating or riding on a motorcycle;
2. Racing or speed testing any non-motorized vehicle or conveyance;
3. Horseback riding;
4. Rock or mountain climbing; or
5. Skiing.

NN. As a result of any *injury* sustained while operating, riding in, or descending from any type of aircraft if the *covered person* is a pilot, officer, or member of the crew of such aircraft or is giving or receiving any kind of training or instructions or has any duties that require him or her to be aboard the aircraft;

OO. For vocational or recreational therapy, vocational rehabilitation, or occupational therapy, except as expressly provided for by the *policy*

PP. For a service for which a non-*network provider* waives, does not pursue, or fails to collect any applicable *copayment amount, deductible amount,* or *coinsurance percentage* owed.

QQ. For any portion of the charges which are in excess of the *eligible expense.*

**EXPERIMENTAL OR INVESTIGATIONAL TREATMENT OR UNPROVEN SERVICES:** *Covered expenses* will not include, and no benefits will be paid for any charges which are incurred for *experimental or investigational treatment(s)* or *unproven services*. The fact that an *experimental or investigational treatment* or *unproven service* is the only available treatment for a particular condition will not result in benefits if the procedure is considered to be an *experimental or investigational treatment* or *unproven service* for the treatment of that particular condition.

## SECTION 8
## PREEXISTING CONDITIONS

*Preexisting conditions,* and complications resulting from a *preexisting condition*, will not be covered under the *policy*/certificate.

## COORDINATION OF BENEFITS ("COB")

This Coordination of Benefits ("COB") provision applies to this *plan* when a *covered person* has health care coverage under more than one *plan*. "*Plan*" is defined under Definitions below.

The order of benefit determination rules govern the order in which each *plan* will pay a claim for benefits. The *plan* that pays first is called the *primary plan*. The *primary plan* must pay benefits in accordance with its policy terms without regard to the possibility that another *plan* may cover some expenses. The *plan* that pays after the *primary plan* is the *secondary plan*. The *secondary plan* may reduce the benefits it pays so that payments from all *plans* equal 100 percent of the total *allowable expense.*

**DEFINITIONS:** As used in this provision, the following terms have the meanings set forth below.

"*Allowable expense*" means a health care expense, including deductibles, coinsurance, and copayments, that is covered at least in part by any of the *plans* covering the person.

When a *plan* provides benefits in the form of service, the reasonable cash value of each service will be considered as both an *allowable expense* and a benefit paid.

If all *plans* covering the person are *high-deductible health plans* and the person intends to contribute to a health savings account, the primary *high-deductible health plan's* deductible is not an *allowable expense*, except for any health care expense incurred that may not be subject to the deductible.

The following are examples of expenses that are not *allowable expenses.*

A. An expense or portion of an expense that is not covered by any of the *plans.*

B. Any expense that a health care provider or physician is prohibited from charging a *covered person* by law or in accordance with a contractual agreement.

C. The difference between the cost of a semi-private room in the *hospital* and a private room, unless one of the *plans* routinely provides coverage for private *hospital* room expenses.

D. If a person is covered by two or more *plans* that do not have negotiated fees and that compute their benefit payments based on *usual and customary fees,* allowed amounts, relative value schedule reimbursement methodology, or other similar reimbursement methodology, any amount in excess of the highest reimbursement amount for a specific benefit.

E. If a person is covered by two or more *plans* that provide benefits or services based on negotiated fees, any amount in excess of the highest of the negotiated fees.

F. If a person is covered by one *plan* that does not have negotiated fees and that calculates its benefits or services based on *usual and customary fees*, allowed amounts, relative value schedule

reimbursement methodology, or other similar reimbursement methodology and another plan that provides its benefits or services based on negotiated fees, the *primary plan's* payment arrangement shall be the *allowable expense* for all *plans*. However, if the health care provider is contracted with the *secondary plan* to provide the benefit or service for a specific negotiated fee or payment amount that is different than the *primary plan's* arrangement and if the health care provider's or physician's contract permits, that negotiated fee or payment shall be the *allowable expense* used by the *secondary plan* to determine benefits.

G. The amount of any benefit reduction by the *primary plan* because a *covered person* has failed to comply with plan provisions. Examples of these types of plan provisions include second surgical opinions, prior authorization of admissions or services, and network provider arrangements.

*"Closed panel plan"* is a *plan* that provides health benefits to *covered persons* primarily in the form of services through a panel of providers that have contracted with or are employed by the *plan*, and that limits or excludes benefits for services provided by other providers, except in cases of emergency or referral by a panel member.

*"Custodial parent"* means a parent with the right to designate the primary residence of a child by a court order. In the absence of a court order–the parent with whom the child resides more than one half of the calendar year without regard to any temporary visitation.

*"High deductible health plan"* means a high deductible health plan, as determined by the Internal Revenue Service and Insurance Code Chapter 1653.

*"Plan"* is any of the following that provides benefits or services for medical or dental care or treatment. However, if separate contracts are used to provide coordinated coverage for members of a group, the separate contracts are considered parts of the same *plan* and there is no COB among those separate contracts.

*"Plan"* includes:

A. Group blanket or franchise accident and health insurance policies, excluding disability income protection coverage;

B. Individual and group health maintenance organization evidences of coverage;

C. Individual accident and health insurance policies;

D. Individual and group preferred provider benefit plans and exclusive provider benefit plans;

E. Group insurance contracts, individual insurance contracts, and subscriber contracts that pay or reimburse for the cost of dental care;

F. Medical care components of individual and group long-term care contracts;

G. Limited benefit coverage that is not issued to supplement individual or group in-force policies;

H. Uninsured arrangements of group or group-type coverage;

I. Medical benefits under automobile insurance_contracts; and

J. *Medicare* or other governmental benefits, as permitted by law.

*"Plan"* does not include:

A. Disability income protection coverage;

B. The Texas Health Insurance Pool;

C. Workers' compensation insurance coverage;

D. Hospital indemnity coverage benefits or other fixed indemnity coverage;

E. Specified disease coverage;

F. Supplemental benefit coverage;

G. Accident only coverage;

H. Specified accident coverage;

I. School accident-type coverages that cover students for accidents only, including athletic injuries, either on a "24-hour" or a "to and from school" basis;

J. Benefits for non-medical components of group long-term care policies;

K. Medicare supplement policies,

L. A state plan under Medicaid;

M. A governmental plan, which, by law, provides benefits that are in excess of those of any private insurance plan or other non-governmental plan;

N. An individual accident and health insurance policy that is designed to fully integrate with other policies through a variable deductible.

Each contract for coverage is a separate *plan*. If a *plan* has two parts and COB rules apply only to one of the two, each of the parts is treated as a separate *plan.*

*Plan* means the part of the contract providing the health care benefits to which the COB provision applies, and which may be reduced because of the benefits of other *plans*. Any other part of the contract providing health care benefits is separate from this *plan*. A contract may apply one COB provision to certain benefits, such as dental benefits, coordinating only with like benefits, and may apply other separate COB provisions to coordinate other benefits.

*"Primary plan"* is the *plan* that pays first without regard to the possibility that another *plan* may cover some expenses.

*"Secondary plan"* is the *plan* that pays after the *primary plan*. The *secondary plan* may reduce the benefits it pays so that payments from all *plans* do not exceed 100% of the total *allowable expenses.*

*"Usual and customary fees"* means the amount paid for a medical service in a geographic area based on the what providers in the area usually charge for the same or similar medical service, so long as those charges are reasonable.

**ORDER OF BENEFIT DETERMINATION RULES:** When two or more *plans* pay benefits, the rules for determining the order of payment are as follows:

A. The *primary plan* pays or provides its benefits as if the *secondary plan* or *plans* did not exist.

B. A *plan* which does not have a COB provision that is consistent with this regulation will always be the *primary plan*. There is one exception: coverage that is obtained by virtue of membership in a group that is designated to supplement a part of a basic package of benefits may provide that the supplementary coverage shall be excess to any other parts of the *plan* provided by the *policyholder*. Examples of these types of situations are major medical coverages that are superimposed over base *plan* hospital and surgical benefits, and insurance type coverages that are written in connection with a *closed panel plan* to provide out-of-network benefits.

C. A *plan* may consider the benefits paid or provided by another plan in determining its benefits only when it is *secondary* to that other *plan*.

D. If the *primary plan* is a *closed panel plan* and the *secondary plan* is not, the *secondary plan* shall pay or provide benefits as if it were the *primary plan* when a *covered person* uses a noncontracted provider, except for *emergency* services or authorized referrals that are paid by the *primary plan*.

E. When multiple contracts providing coordinated coverage are treated as a single *plan*, this section applies only to the *plan* as a whole, and coordination among the component contracts is governed by the terms of the contracts. If more than one carrier pays or provides benefits under the *plan*, the carrier designated as primary within the *plan* must be responsible for the *plan's* compliance with this provision.

F. If a person is covered by more than one *secondary plan*, the order of benefit determination rules decides the order in which *secondary plans'* benefits are determined in relation to each other. Each *secondary plan* must take into consideration the benefits of the *primary plan* or *plans* and the benefits of any other *plan* that, under these rules, has its benefits determined before those of the *secondary plan.*

G. The first of the following rules that describes which *plan* pays its benefits before another *plan* is the rule to use.

1. **Non-Dependent/Dependent -** The *plan* that covers the person other than as a dependent, for example as an employee, member, subscriber or retiree is *primary* and the *plan* that covers the person as a dependent is *secondary*. However, if the person is a *Medicare* beneficiary and, as a result of federal law, *Medicare* is:

   a. *secondary* to the *plan* covering the person as a dependent; and

   b. *primary* to the *plan* covering the insured person as other than a dependent;

   then the order of benefits between the two *plans* is reversed so that the *plan* covering the person as an employee, member, policyholder, subscriber or

retiree is *secondary* and the other *plan* is *primary plan*. An example includes a retired employee.

2. **Dependent Child Covered Under More Than One Plan -** Unless there is a court decree stating otherwise, the order of benefits when a child is covered by more than one *plan* is as follows:

   a. For a dependent child whose parents are married or living together, whether or not they have ever been married:

      i. The *plan* of the parent whose birthday falls earlier in the calendar year is the *primary plan;*

      ii. If both parents have the same birthday, the *plan* that has covered the parent the longest is the *primary plan*.

   b. For a dependent child whose parents are divorced or separated or not living together, whether or not they have been married.

      i. If a court decree states that one of the parents is responsible for the dependent child's health care expenses or health care coverage and the *plan* of that parent has actual knowledge of those terms, that is the *primary plan*. That rule applies to the plan years commencing after the *plan* is given notice of the court decree;

      ii. If a court decree states that both parents are responsible for the dependent child's health care expenses or health care coverage, the provisions of subparagraph a. above shall determine the order of benefits;

      iii. If a court decree states that the parents have joint custody without specifying that one parent has responsibility for the health care expenses or health care coverage of the dependent child, the provisions of subparagraph a. above shall determine the order of benefits;

      iv. If there is no court decree allocating responsibility for the dependent child's health care expenses or health care coverage, the order of benefits for the child are as follows: the *plan* covering the *custodial parent*; the *plan* covering the spouse of the *custodial parent*, the *plan* covering the non-*custodial parent*; and then the *plan* covering the spouse of the non-*custodial parent.*

   c. For a dependent child covered under more than one *plan* of individuals who are not the parents of the child, the order of benefits shall be determined, as applicable, under paragraphs a and b above as if those individuals were parents of the child.

   d. For a dependent child who has coverage under either or both parents' plans and has his or her own coverage as a dependent under a spouse's *plan*, G.5. below applies.

   e. In the event the dependent child's coverage under the spouse's *plan* began on the same date as the dependent child's coverage under either or both parents' *plans*, the order of benefits must be determined by applying the birthday rule in a. above to the dependent child's *parent(s) and the dependent's spouse.*

3. **Active/Retired or Laid Off Employee -** The *plan* that covers a person as an active employee who is neither laid off nor retired, is *primary*. The *plan* the covers that same person as a retired or laid-off employee is the *secondary plan*. The same would hold true if a person is a dependent of an active employee and that same.

4. **Continuation Coverage -** If a person whose coverage is provided pursuant to COBRA or under a right of continuation pursuant to federal or state law is covered under another *plan*, the *plan* covering the person as an employee, member, subscriber, or retiree (or as that person's dependent) is *primary*, and the continuation coverage is *secondary*. If the other *plan* does not have this rule, and if, as a result, the

*plans* do not agree on the order of benefits, this rule is ignored.

5. **Longer/Shorter Length of Coverage -** The *plan* that covered the person as an employee, member, subscriber or retiree longer is *primary.*
6. If the preceding rules do not determine the *primary plan*, the *allowable expenses* shall be shared equally between the *plans* meeting the definition of *plan*. In addition, this *plan* will not pay more than it would have paid had it been *primary.*

**EFFECT ON THE BENEFITS OF THIS PLAN:** When this *plan* is *secondary* it will calculate the benefits it would have paid in the absence of other health care coverage and apply that calculated amount to any *allowable expense* under its plan that is unpaid by the primary plan. Payments may be reduced by an amount so that, when combined with the amount paid by the *primary plan*, the total benefits paid or provided by all plans for the claim do not exceed 100 percent of the total *allowable expense* for that claim. The *plan* deductible will be credited any amounts it would have credited in the absence of other health care coverage.

If a *covered person* is enrolled in two or more *closed panel plans* and if, for any reason, including the provision of service by a nonpanel provider, benefits are not payable by one *closed panel plan*, COB must not apply between that *plan* and the other *closed panel plan.*

**COMPLIANCE WITH FEDERAL AND STATE LAWS CONCERNING CONFIDENTIAL INFORMATION:** Certain facts about health care coverage and services are needed to apply these COB rules and to determine benefits payable under this *plan* and other *plans*. Claims Administration will comply with federal and state law concerning confidential information for the purpose of applying these rules and determining benefits payable under this *plan* and other *plans* covering the person claiming benefits. Each person claiming benefits under this *plan* must give Claims Administration any facts it needs to apply those rules and determine benefits.

**FACILITY OF PAYMENT:** A payment made under another *plan* may include an amount that should have been paid under this *plan*. If it does, Claims Administration may pay that amount to the organization that made that payment. That amount will be treated as though it were a benefit paid under this *plan*. Claims Administration will not have to pay that amount again. The term "payment made" includes providing benefits in the form of services, in which case "payment made" means reasonable cash value of the benefits provided in the form of services.

**RIGHT OF RECOVERY:** If the amount of payments made by Claims Administration is more than it should have paid under this COB provision, it may recover the excess from one or more of the persons it has paid or for whom it has paid; or any other person or organization that may be responsible for the benefits or services provided for the *covered person*. The "amount of the payments made" includes the reasonable cash value of any benefits provided in the form of services.

**CONFORMITY WITH STATE LAW:** This Coordination of Benefits provision complies with the current laws of the state in which this certificate was issued. If the law changes, or if *you* move *your residence*, *your* certificate will be considered to be amended to reflect applicable state law.

## REIMBURSEMENT

If a *covered person's illness* or *injury* is caused by the acts or omissions of a *third party, we* will not cover a *loss* to the extent that it is paid as part of a settlement or judgment by any *third party*. But, if payment by or for the *third party* has not been made by the time *we* receive acceptable *proof of loss. We* will have the right to be reimbursed to the extent of benefits *we* paid for the *illness* or *injury* in accordance with Chapter 140 of the Texas Civil Practices and Remedies Code if the *covered person* subsequently receives any payment from any *third party*. The *covered person* (or the guardian, legal representatives, estate, or heirs of the *covered person*) shall promptly pay *us* back from the settlement, judgment, or any payment received from any *third party.*

As a condition for *our* payment, the *covered person* or anyone acting on his or her behalf (including, but not limited to, the guardian, legal representatives, estate, or heirs) agrees:

A. To fully cooperate with *us* in order to obtain information about the *loss* and its cause;
B. To immediately tell *us* in writing of any claim made or lawsuit filed on behalf of a *covered person* in connection with the *loss*;
C. To include the amount of benefits paid by *us* on behalf of a *covered person* in any claim made against any *third party*;
D. That *we*:

1. Will have a lien on all money received by a *covered person* in connection with the *loss* equal to the amount *we* have paid;

2. May give notice of that lien to any *third party* or *third party's* agent or representative;

3. Will have the right to intervene in any suit or legal action to protect *our* rights;

4. Are subrogated to all of the rights of the *covered person* against any *third party* to the extent of the benefits paid on the *covered person's* behalf; and

5. May assert that subrogation right independently of the *covered person*.

E. To take no action that prejudices *our* reimbursement and subrogation rights;

F. To sign, date and deliver to *us* any documents *we* request which protect *our* reimbursement and subrogation rights;

G. To not settle any claim or lawsuit against a *third party* without providing *us* with written notice of the intent to do so;

H. To pay *us* back from any money received from any *third party*, to the extent of benefits *we* paid for the *illness* or *injury*, whether obtained by settlement, judgment, or some other way, and whether or not the *third party's* payment is expressly designated as a payment for medical expenses; and

I. That *we* may reduce other benefits under the *policy* by the amounts a *covered person* has agreed to pay *us* back.

Furthermore, as a condition of *our* payment, *we* may require the *covered person* or the *covered person's* guardian (if the *covered person* is a minor or legally incompetent) to execute a written reimbursement agreement. But, the terms of this provision remain in effect whether or not an agreement is actually signed.

*We* have a right to be reimbursed in full regardless of whether or not the *covered person* is fully compensated by any recovery received from any *third party* by settlement, judgment, or some other way.

Should *we* recover all or part of the benefits *we* paid, *we* will pay *our* share of attorney fees and costs associated with the *covered person's* claim or lawsuit in accordance with Chapter 140 of the Texas Civil Practice and Remedies Code.

If a dispute arises as to the amount a *covered person* must pay *us* back, the *covered person* (or the guardian, legal representatives, estate, or heirs of the *covered person*) agrees to place sufficient funds in an escrow or trust account to satisfy the maximum lien amount asserted by *us* until the dispute is resolved.

Definition: As used in this provision, the following term has the meaning indicated:

"*Third party*" means a person or other entity which is or may be obligated or liable to the *covered person* for payment of any of the *covered person's* expenses for *illness* or *injury*. The term "*third party*" includes, but is not limited to, an individual person; a for-profit or non-profit business entity or organization; a government agency or program; and an insurance company. But, the term "*third party*" will not include any insurance company with a *policy* under which the *covered person* is entitled to benefits as a named insured person or an insured *dependent* of a named insured person except in those jurisdictions where statutes or common law does not specifically prohibit our right to recover from these sources.

## SECTION 9
## CLAIMS

**NOTICE OF CLAIM:** *We* must receive notice of claim within 30 days of the date the *loss* began or as soon as reasonably possible.

**CLAIM FORMS:** *We* will furnish claim forms after *we* receive notice of a claim. If *our* usual claim forms are not furnished within 15 days *you* or *your* covered *dependent* may file a claim without them. The claim must contain written *proof of loss*.

**PROOF OF LOSS:** *You* or *your* covered *dependent* must give *us* written *proof of loss* within 90 days of the *loss*.

Failure to provide written *proof of loss* within 90 days of the date of the *loss* will not invalidate or reduce a claim if:

A. It was not reasonably possible to provide written *proof of loss* within that time;

B. Written *proof of loss* is provided as soon as reasonably possible; and

C. Unless the claimant does not have the legal capacity to provide *proof of loss*, *proof of loss* is provided not later than the first anniversary of the date the *proof of loss* is otherwise required.

**COOPERATION PROVISION:** When a *loss* occurs, each *covered person* or their representative must promptly:

A. Sign, date and deliver to *us* an authorization which may be needed to obtain relevant information from *doctors, hospitals* and other *third parties*;

B. Answer any relevant questions, under oath, which *we* may ask about the *loss*;

C. Give *us* a copy of any relevant document that pertains to the *loss*; and

D. Give *us* any other assistance which *we* may reasonably require to process the claim.

**CUSTODIAL PARENT:** This provision applies if the parents of a covered *eligible child* are divorced or legally separated and both the custodial parent and the non-custodial parent are subject to the same court or administrative order establishing custody. The custodial parent, who is not a *covered person*, will have the rights stated below if we receive a copy of the order establishing custody.

Upon request by the custodial parent, *we* will:

A. Provide the custodial parent with information about the terms, conditions benefits, exclusions and limitations of the *policy*;

B. Accept claim forms and requests for claim payment from the custodial parent; and

C. Make claim payments directly to the custodial parent for claims submitted by the custodial parent. Payment of claims to the custodial parent, which are made under this provision, will fully satisfy *our* obligations.

A custodial parent may, with *our* approval, assign claim payments to the *hospital* or *medical practitioner* providing treatment to an *eligible child*.

**TIME FOR PAYMENT OF CLAIMS:** Benefits will be paid as soon as *we* receive proper *proof of loss.* All benefits payable under the *policy*/certificate will be paid no later than the 60th day after the date the *proof of loss* is received.

**PAYMENT OF CLAIMS:** Except as set forth in this provision, all benefits are payable to *you* or to *your* assignee. Any accrued benefits unpaid at *your* death or *your dependent's* death may, at *our* option, be paid either:

A. To the beneficiary; or

B. To the estate.

If any benefit is payable:

A. To *your* or *your dependent's* estate; or

B. To a beneficiary who:

1. Is a minor; or
2. Is not able to give valid release;

*we* may pay up to $1,000 to any relative who, in *our* opinion, is entitled to it.

*We* may pay all or any part of the benefits provided by the *policy* for *hospital*, surgical, nursing or medical services, directly to the *hospital* or other person rendering such services.

Any payment made by *us* in good faith under this provision shall fully satisfy *our* obligation to the extent of the payment. *We* reserve the right to deduct any overpayment made under the *policy* from any future benefits payable under the *policy.*

**FOREIGN CLAIMS INCURRED FOR EMERGENCY CARE:** Claims incurred outside of the United States for *emergency* care and treatment of a *covered person* must be submitted in English or with an English translation. Foreign claims must include the applicable medical records in English to show proper *proof of loss.*

**PHYSICAL EXAMINATION:** *We* have the right to have *you* or *your* covered *dependent* examined at *our* own expense when and as often as *we* may reasonably require while a claim is pending. *We* also have the right to have an autopsy made where it is not prohibited by law.

**ASSIGNMENT:** *We* will reimburse a *hospital* or health care provider if:

A. *Your* health insurance benefits are assigned by *you* in writing; and

B. Verified by *us.*

Any assignment to a *hospital* or person providing the treatment, whether with or without *our* approval, shall not give such *hospital* or person, any right or privilege granted to *you* under the *policy* except for the right to receive benefits, if any, which *we* have determined to be due and payable.

**MEDICAID REIMBURSEMENT:** *We* will pay the benefits of the *policy* to the state if *we* receive notice that payment has been made under Medicaid for *covered expenses* incurred by a *covered person.*

*Our* payment to the state will be limited to the amount payable under the *policy* for the *covered*

*expenses* for which reimbursement is due. Payment under this provision will be made in good faith. It will satisfy *our* responsibility to the extent of that payment.

The amount payable under the *policy* will not be changed or limited for reason of a *covered person's* being eligible for coverage under the Medicaid program of the state in which he or she lives.

**CONSERVATORS:** If this certificate is a Family or One-Parent Family Plan, benefits paid on behalf of any *eligible child* will be paid to the Texas Department of Human Services after written notice to *us* at *our* home office if the parent is:

A. A possessory conservator of the *eligible child* under an order issued by a court in the state of Texas or is not entitled to possession of or access to the child; and

B. Is required by court order or court-approved agreement to pay child support.

Benefits will also be paid to the Texas Department of Human Services if the Department is:

A. Paying benefits on behalf of the *eligible child* under Chapter 31 or Chapter 32 of the Human Resources Code; and

B. *We* are notified through an attachment to the claim for benefits when the claim is first submitted to *us* that the benefits must be paid directly to the Texas Department of Human Services.

*We* may pay benefits on behalf of any *eligible child* to a non-*covered person* if a court order providing for the managing conservator of the *eligible child* has been issued by a court of competent jurisdiction.

Before any benefits will be paid to a managing conservator, *we* must receive a certified copy of the court order establishing the person as managing conservator, or evidence designated by the Texas State Board of Insurance that the non-*covered person* qualifies to be paid benefits.

**CONTINUITY OF CARE:** If a *covered person* receives treatment for *special circumstances* from a provider who ceases to be a *network provider* during the course of treatment, the *covered person* and/or the provider may request that benefits for the treatment for those *special circumstances* continue to be paid as if that provider were still a *network provider. Covered expenses* for treatment of the *special circumstances* will continue to be paid only while coverage remains in force during the *policy term* as follows:

A. For the first 90 days after the date the provider ceases to be a *network provider*; or

B. For a *covered person* who has been diagnosed as *terminally ill*, for 9 months after the date the provider ceases to be a *network provider.*

C. For a pregnancy that is past the 24th week at the time of termination, will extend through delivery of the child, for immediate postpartum care, and the follow-up checkup within the six-week period after delivery.

As used in this provision, "*special circumstances*" means a condition regarding the treating physician or *network provider* reasonably believes that discontinuing care by the treating physician or provider could cause harm to the *covered person*. Examples of an insured who has a *special circumstance* include a *covered person* with a disability, acute condition, or life-threatening *illness*, or a female *covered person* is past the 24th week of pregnancy.

## UNIFORM PROVISIONS

**CONTRACT:** The entire contract between the *policyholder* and *us* consists of:

A. The *policy*;

B. The applications of the *policyholder* and the persons insured; and

C. Riders issued to certificateholders.

All statements contained in the applications will, in the absence of fraud, be deemed representations and not warranties. No statement made by an applicant for insurance will be used to void the insurance or reduce the benefits, unless contained in a written application which is signed by the applicant.

No agent may:

A. Change the *policy*;

B. Waive any provisions of the *policy*;

C. Extend the time for payment of premiums; or

D. Waive any of *our* rights or requirements.

**NON-WAIVER:** If *we* or *you* fail to enforce or to insist on strict compliance with any of the terms, conditions, limitations or exclusions of the *policy*, that will not be considered a waiver of any rights under the *policy*. A past failure to strictly enforce

the *policy* will not be a waiver of any rights in the future, even in the same situation or set of facts.

**MISSTATEMENT IN APPLICATION:** A misstatement in the written application for coverage signed by the *primary insured* may be used to void coverage and/or deny or reduce a claim for loss incurred within 24 months of the effective date of coverage under the *policy.*

After 24 months following the effective date of coverage under the *policy*, no misstatement, except for a fraudulent misstatement, may be used to void or reduce *your* coverage and/or deny a claim for loss incurred under the *policy.*

**CONDITIONS PRIOR TO LEGAL ACTION:** On occasion, *we* may have a disagreement related to coverage, benefits, *premiums*, or other provisions under this *policy*. Litigation is an expensive and time-consuming way to resolve these disagreements. Therefore, with a view to avoiding litigation, *we* request that *you* give written notice to *us* of *your* intent to sue *us* prior to bringing any legal action. *Your* notice must:

A. Identify the coverage, benefit, premium, or other disagreement;

B. Refer to the specific policy provision(s) at issue; and

C. Include all relevant facts and information that support your position.

**LEGAL ACTION:** No action at law or in equity may be brought to recover reimbursement under the *policy* before the 61st days after written *proof of loss* has been furnished. No such action may be brought after the end of three years after the time written *proof of loss* is required to be furnished.

**CONFORMITY WITH STATE STATUTES:** The *policy* will be interpreted by the laws of the state in which it is delivered. Any part of the *policy* which is in conflict with the laws of the state in which it is delivered is changed to conform to the minimum requirements of that state's laws.

# OUTPATIENT PRESCRIPTION DRUG EXPENSE BENEFITS RIDER

This rider is effective at the same time as the *policy*/certificate.

By attachment of this rider, *covered expenses* under the *policy*/certificate are expanded to include the charges incurred by a *covered person* for outpatient *prescription drugs* as stated in this rider.

**COVERED EXPENSES:** *Covered expenses* for outpatient *prescription drugs* are limited to charges from a licensed pharmacy for drugs that, under applicable state law, may be dispensed only upon the written prescription of a *doctor*.

**Off-Label Drugs for the Treatment of Cancer:** *Covered expenses* shall include any drug approved by the United States Food and Drug Administration (*USFDA*) for the treatment of cancer, even if not approved for the specific type of cancer for which the drug has been prescribed if:

A. The drug has been recognized as safe and effective for treatment of that specific type of cancer in any of the following standard reference compendia, unless the use is identified as not indicated in one or more of these standard reference compendia:
   1. The American Hospital Formulary Services Drug Information;
   2. The National Comprehensive Cancer Network Drugs and Biologics Compendium;
   3. The Elsevier Gold Standard's Clinical Pharmacology; or
   4. Other authoritative compendia as identified by the Secretary of the United States Department of Health and Human Services or the Commissioner, at our discretion.

B. The drug has been recognized as safe and effective for treatment of that specific type of cancer in two articles from medical literature that have not had their recognition of the drug's safety and effectiveness contradicted by clear and convincing evidence presented in another article from medical literature.

If the drug is deemed to have met this criteria, the drug will be considered a *covered expense,* regardless of whether administered orally, intravenously or by injection.

*Covered expenses* shall not include the charges for any drug for which the *USFDA* has determined its use to be contraindicated for the treatment of the specific type of cancer for which the drug has been prescribed.

**INSURED'S RESPONSIBILITY:** for a covered *prescription drug*, the insured will be required to pay the lesser of:

A. The applicable prescription drug copayment amount, if any;

B. The allowable claim amount; or

C. The amount an individual would pay if purchasing without health benefits or discounts.

**MEMBER PHARMACIES:** For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is used, *we* will pay the charges at the negotiated rate, subject to the *prescription drug copayment amount* or the *deductible amount* and *coinsurance percentage* shown in the Data Page, whichever is applicable. For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is not used, charges will be treated the same as any other medical *covered expense* incurred at a non-*network provider*. This may be less than the expense incurred by the *covered person* for the *prescription order*.

**NON-MEMBER PHARMACIES:** *Covered expenses* do not include charges incurred at a non-*member pharmacy* or at a *member pharmacy* when *your* health insurance card is not used, unless as a result of an *emergency*.

**NOTICE AND PROOF OF LOSS:** In order to obtain payment for *covered expenses* incurred as a result of an *emergency* at a non-*member pharmacy* or at a *member pharmacy* when *your* health insurance card is not used, notice of claim and *proof of loss* must be submitted directly to *us*. For *covered expenses* incurred at a *member*

*pharmacy* when *your* health insurance card is used, the *member pharmacy* has agreed to file necessary notice of claim and *proof of loss* with *our* pharmacy benefits manager.

**TIER ASSIGNMENTS:** The cost sharing for a *prescription drug* is determined by the tier to which the *prescription drug* is assigned. United Healthcare's Prescription Drug List Management Committee (*"PDLMC"*) assigns each *prescription drug* to a tier. *You* can find the tier status for a *prescription drug* by accessing *your* prescription benefits on *our* website or by calling the telephone number on *your* health insurance identification card.

**TIER CHANGES:** The *PDLMC* determines changes in tier placement over time. They consider multiple factors including, but not limited to, clinical and economic factors. Clinical factors may include, but are not limited to, evaluation of the place in therapy, relative safety or relative efficacy of the *prescription drug,* as well as whether supply limits should apply. Economic factors may include, but are not limited to, the *prescription drug's* acquisition cost including, but not limited to, available rebates and assessments on the cost effectiveness of the *prescription drug*. The tier to which a *prescription drug* is assigned may change periodically. These changes generally occur quarterly. If a *prescription drug's* tier changes, the cost sharing may change and *you* may be required to pay more or less for the *prescription drug*.

Some *prescription drugs* are more cost effective for treatment of specific indications as compared to others. So, a *prescription drug* may be listed on multiple tiers, depending on the condition for which the *prescription drug* was prescribed.

**PRESCRIPTION DRUG LIST:** *Covered expenses* for *prescription drugs* are limited to those included in the Prescription Drug List (*"PDL"*) provided by *our* pharmacy benefits manager, OptumRx, at the time *your prescription order* is filled (formulary drugs). The *PDL* is determined by the UnitedHealthcare Prescription Drug List Management Committee comprised of senior level UnitedHealth Group physicians and business leaders. Their goal is to help ensure access to a wide range of medications while helping to control health care costs. As affiliates of UnitedHealthcare, both *we* and OptumRx use this *PDL* to administer *prescription drug* benefits.

*You* may be entitled to benefits for a *prescription drug* not included in the *PDL* (non-formulary drugs) without any added cost sharing beyond that required of formulary drugs if:

A. After consultation with *your doctor, we* determine that the formulary drugs are inappropriate therapy for *your* condition; or

B. *You* have been using the non-formulary drug for 6 months prior to its exclusion from the *PDL*, and *your doctor* determines that either the formulary drug is inappropriate therapy for *your* condition or that changing the drug therapy presents a significant health risk.

**PRESCRIPTION CONTRACEPTIVES:** *Covered expenses* include *prescription drugs* and devices approved by the United State Food and Drug Administration *(USFDA)* for use as a contraceptive. *Covered expenses* shall also include *outpatient contraceptive services*.

For purposes of these benefits, *outpatient contraceptive services* means a consultation, examination, procedure, or medical services that is provided on an outpatient basis and that is related to the use of a drug or device intended to prevent pregnancy.

**PRESCRIPTION EYE DROPS:** *Covered expenses* include prescription eye drops and refills of prescription eye drops to treat chronic eye disease when:

A. The *doctor* prescribing the original prescription indicated that additional quantities are needed;

B. The refill does not exceed the total quantity of dosage units authorized by the *doctor* prescribing the original prescription, including refills; and

C. The refill does not exceed the total quantity of dosage period and is:

   1. Not earlier than the 21 days after the date a prescription for a 30-day supply of eye drops is dispensed;

2. Not earlier than the 42 days after the date a prescription for a 60-day supply of eye drops is dispensed; or

3. Not earlier than the 63 days after the date a prescription for a 90-day supply of eye drops is dispensed.

**MEDICATION SYNCHRONIZATION PLAN: Covered expenses includes outpatient prescription drugs dispensed according to a medication synchronization plan for chronic illness if the medications:**

A. Are covered under the policy/certificate;

B. Are being used for treatment or management of chronic illness and are prescribed by a doctor or health care provider with refills;

C. Are not Schedule II controlled substances, or Schedule III controlled substances that contain hydrocodone; or

D. Can be effectively dispensed due to its formulation for the purpose of synchronizing fills and refills.

**SUPPLY LIMITS:** *Prescription drugs* are subject to supply limits, which may restrict the amount dispensed per *prescription order* or the amount dispensed per month's supply. For the stated cost sharing amount, *you* may receive a *prescription drug* in quantities up to the stated supply limit. Supply limits are subject to review and may change periodically. *You* may determine the supply limits applicable to a particular *prescription drug* by calling the telephone number on *your* health insurance identification card.

**DESIGNATED PHARMACIES:** For certain *prescription drugs*, including, but not limited to, *specialty prescription drugs*, *we* may direct *you* to a *designated pharmacy*. If *you* choose not to obtain *your prescription drug* from the *designated pharmacy* to which *you* are directed, no benefits will be payable for that *prescription drug*.

**THERAPEUTIC CLASS/THERAPEUTIC EQUIVALENT MAXIMUM ALLOWABLE CHARGE:** *We* may determine a maximum allowable charge for *prescription drugs* in a particular *therapeutic class* or that are *therapeutically equivalent*. If *you* or *your medical practitioner* elect a *prescription drug* included in the same class that is more than the maximum allowable charge assigned, *you* will be responsible for the costs in excess of the maximum allowable charge, in addition to *your* applicable cost sharing amount.

**LIMITATION ON SELECTION OF PHARMACIES:** If *we* determine that *you* may be using *prescription drugs* in a harmful or abusive manner, or with harmful frequency, *we* may require *you* to select a *member pharmacy* to provide and coordinate all future prescription services. If *you* do not make a selection within 31 days of the date that *we* notify *you*, *we* will assign *you* a single *member pharmacy*. Benefits will be paid only when *you* use the assigned pharmacy.

**NO ASSIGNMENT OF BENEFITS:** Benefits payable for drugs dispensed by a non-*member pharmacy*, or by a *member pharmacy* without using a *prescription drug card*, will not be assignable unless *we* are required by the laws of the state where *you* live to accept all benefit assignments. Otherwise, any assignment or attempted assignment of these benefits will be void.

**COUPONS:** The value of any manufacturer coupons may not apply to the applicable *prescription drug copayment amount, deductible amount, coinsurance percentage*, and/or *network* out-of-pocket maximum. *You* may access information on which coupons or offers are not permitted through the Internet at www.myuhone.com or by calling the telephone number on *your* health insurance identification card.

**EXCLUSIONS AND LIMITATIONS:** No benefits will be paid under this rider for expenses incurred:

A. For any medication that is used for the treatment of erectile dysfunction or sexual dysfunction, unless *medically necessary*.

B. For immunization agents, blood, or blood plasma.

C. For medication that is to be taken by the *covered person*, in whole or in part, at the place where it is dispensed.

D. For medication received while the *covered person* is a patient at an institution that has a facility for dispensing pharmaceuticals.

E. For a refill dispensed more than 12 months from the date of a *doctor's* order.

F. Due to a *covered person's* addiction to, or dependency on, tobacco or foods.

G. For more than the predetermined *managed drug limitations* assigned to certain drugs or classification of drugs.

H. For a *prescription order* that is available in over-the-counter form, or comprised of components that are available in over-the-counter form, and is *therapeutically equivalent*.

I. For drugs labeled "Caution - limited by federal law to investigational use," or for investigational or experimental drugs.

J. For a *prescription drug* that has (an) active ingredient(s) that is/are:

1. Available in and *therapeutically equivalent* to another covered *prescription drug*; or

2. A modified version of and *therapeutically equivalent* to another covered *prescription drug*.

Such determinations may be made up to six times during a calendar year, and *we* may decide at any time to reinstate benefits for a *prescription drug* that was previously excluded under this paragraph.

K. For *ancillary charges*.

L. In excess of the maximum allowable charge paid for a *therapeutic class* of/*therapeutically equivalent prescription drugs*.

M. For *prescription drugs* dispensed in excess of the supply limit assigned.

N. For compounded drugs that:

1. Do not contain at least one ingredient that has been approved by the U.S. Food and Drug Administration (FDA) and require a *prescription order* or refill.

2. Contain a non-FDA approved bulk chemical.

3. Are available as a similar commercially available *prescription drug*.

O. For a *prescription drug* with an approved *biosimilar* or a *biosimilar* and *therapeutically equivalent* to another covered *prescription drug*. Such determinations may be made up to six times during a calendar year.

P. For certain *prescription drugs* for which there are *therapeutically equivalent* alternatives available, unless required by law or approved by *us*. Such determinations may be made up to six times during a calendar year.

Q. For diagnostic kits and products.

R. For publicly available software applications and/or monitors that may be available with or without a *prescription order* or refill.

S. For any product for which the primary use is as a source of nutrition, nutritional supplement, or dietary management of disease; and for prescription medical food products even when used for the treatment of *illness* or *injury*, except as required by state law.

T. For dental products, including but not limited to, prescription fluoride topicals.

U. For a *prescription drug* received from a non-*member pharmacy*, or from a *member pharmacy* when *your* health insurance card is not used, unless as a result of an *emergency*.

**DEFINITIONS:**

*"Ancillary charge"* means the additional charge incurred by the *covered person* when two drugs are *chemically equivalent* and the higher-tiered drug of the two is dispensed. In addition to the *prescription drug copayment amount,* if any, that applies to the lower-tiered drug, the *covered person* is responsible for an ancillary charge of

the difference between the cost of the lower-tiered drug and the higher-tiered drug dispensed. The *ancillary charge* does not apply to the *network* out-of-pocket maximum.

*"Biosimilar"* means a biological *prescription drug* approved by the U.S. Food and Drug Administration (FDA) based on showing that it is highly similar to a reference product (a biological *prescription drug)* and has no clinically meaningful differences in terms of safety and effectiveness from the reference product.

*"Brand-name drug"* means a *prescription drug* that:

A. Is manufactured and marketed under a trademark or name by a specific drug manufacturer; or

B. *We* identify as a brand-name product based on available data resources including, but not limited to, Medi-Span, that classify drugs as either brand or generic based on a number of factors. A drug identified as a "brand-name" by the manufacturer, pharmacy, or *your* physician may not be classified as a *brand-name drug* by *us*.

*"Chemically equivalent"* means that *prescription drugs* contain the same active ingredient.

"*Chronic illness*" means an *illness* or physical condition that may be reasonably expected to continue for an uninterrupted period of at least three months, and that may be controlled bunt not cured by medical treatment.

*"Designated pharmacy"* means a pharmacy that has entered into an agreement with *us* or with *our* pharmacy benefits manager to provide specific *prescription drugs*, including, but not limited to, *specialty prescription drugs*. The fact that a pharmacy is a *member pharmacy* does not mean that it is a *designated pharmacy*.

*"Generic drug"* means a *prescription drug* that:

A. Is *chemically equivalent* to a *brand-name drug;* or

B. *We* identify as a generic product based on available data resources including, but not limited to, Medi-Span, that classify drugs as either brand or generic based on a number of factors. A drug identified as a "generic" by the manufacturer, pharmacy, or *your* physician may not be classified as a *generic drug* by *us*.

*"Managed drug limitations"* means limits in coverage based upon time period, amount, or dose of a drug, or other specified predetermined criteria.

"*Medication synchronization plan*" means a plan established for the purpose of synchronizing the filing or reviling of multiple prescriptions.

*"Member pharmacy"* means a licensed pharmacy that has entered into a contract with *our* pharmacy benefits manager to provide *prescription drugs* to *covered persons* at a negotiated rate.

*"Prescription drug"* means any medicinal substance whose label is required to bear the legend "RX only."

*"Prescription drug copayment amount"* means the amount to be deducted from the total *covered expense* incurred for each separate *prescription order*.

*"Prescription order"* means the request for each separate drug or medication by a *doctor* or each authorized refill of such requests.

*"Specialty prescription drug"* means *prescription drugs* that are generally high cost, self-injectable biotechnology drugs used to treat patients with certain *illnesses. You* may access a complete list of *specialty prescription drugs* by accessing *your prescription drug* benefits on *our* website or by calling the telephone number on *your* health insurance identification card.

*"Therapeutic class"* means a group or category of *prescription drugs* with similar uses and/or actions.

*"Therapeutically equivalent"* means that two or more *prescription drugs* can be expected to produce essentially the same therapeutic outcome and toxicity.

This rider will not change, waive or extend any part of the *policy*/certificate, other than as stated herein.

**Golden Rule Insurance Company**

Patrick F. Carr

**President**

# GOLDEN RULE INSURANCE COMPANY
# TEXAS GRIEVANCE PROCEDURES RIDER

This rider replaces any grievance/appeal procedure(s) previously included in the *policy*/certificate.

By the attachment of this rider, the *policy*/certificate is amended to the extent of any conflict with the following:

A. **DEFINITIONS**: As used in this rider, the following terms have the meanings indicated:

1. "*Acquired brain injury*" means a neurological insult to the brain, which is not hereditary, congenital, or degenerative. The injury to the brain has occurred after birth and results in a change in neuronal activity, which results in an impairment of physical functioning, sensory processing, cognition, or psychosocial behavior.

2. "*Adverse determination*" means a determination by a utilization review agent made on behalf of any payor that the health care services provided or proposed to be provided to an *enrollee* are not *medically necessary* or appropriate or are *experimental or investigational*. The term does not include a denial of health care services due to the failure to request prospective or concurrent *utilization review*.

3. "*Complaint*" means:

   a. An oral or written expression of dissatisfaction with a utilization review agent concerning the utilization review agent's process in conducting *utilization review*. The term "*complaint*" does not include:

      i. An expression of dissatisfaction or disagreement with an *adverse determination* (it would constitute an appeal of that *adverse determination*); or

      ii. A misunderstanding or misinformation that is resolved promptly by supplying the appropriate information or by clearing up the misunderstanding to the satisfaction of the complaining party; or

   b. Any written communication, including communication by facsimile or electronic mail, to a health plan, not solicited by such health plan, concerning coverage offered or issued by such health plan in this state and primarily expressing a grievance. A *complaint* is not a misunderstanding or a problem of misinformation that is resolved promptly by clearing up the misunderstanding and/or supplying the appropriate information to the satisfaction of the person submitting the written communication, as applicable.

4. "*Emergency care*" means health care services provided in a hospital emergency facility or comparable facility to evaluate and stabilize medical conditions of a recent onset and severity, including severe pain, that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that the individual's condition, *illness*, or *injury* is of such a nature that failure to get immediate medical care could

   a. Place the individual's health in serious jeopardy;

   b. Result in serious impairment to bodily functions;

   c. Result in serious dysfunction of any bodily organ or part;

   d. Result in serious disfigurement; or

   e. For a pregnant woman, result in serious jeopardy to the health of the fetus.

5. "*Enrollee*" means an individual covered by a health insurance policy or health benefit plan. The term includes an individual who is covered as an eligible dependent of another individual. For the purposes of these procedures, references to *enrollee* include a person acting on behalf of the *enrollee* or the *enrollee's provider of record*.

6. "*Experimental or investigational*" means a health care treatment, service, or device for which there is early, developing scientific or clinical evidence demonstrating the potential efficacy of the treatment, service, or device, but that is not yet broadly accepted as the prevailing standard of care.

7. "*Legal holiday*" means:

a. A holiday as provided in Government Code § 662.003 (a);

b. The Friday after Thanksgiving Day;

c. December 24; and

d. December 26.

8. "*Life-threatening*" means a disease or condition from which the likelihood of death is probable unless the course of the disease or condition is interrupted. The existence of a *life-threatening* condition shall be determined by an *enrollee* on the basis that a prudent layperson possessing an average knowledge of medicine and health would believe that his or her disease or condition is a *life-threatening* condition.

9. "*Provider of record*" means the physician, *doctor*, or other health care provider that has primary responsibility for the health care services rendered or requested on behalf of the *enrollee* or the physician, *doctor*, or other health care provider that has rendered or has been requested to provide the health care services to the *enrollee*. This definition includes any health care facility where health care services are rendered on an inpatient or outpatient basis.

10. "*Reasonable opportunity*" means at least one documented good faith attempt to contact the *provider of record* that provides an opportunity for the *provider of record* to discuss the services under review with the Utilization Review Agent (URA) during normal business hours prior to issuing a prospective, concurrent, or retrospective *utilization review adverse determination*:

    a. No less than one *working day* prior to issuing a prospective *utilization review adverse determination*;

    b. No less than five *working days* prior to issuing a retrospective *utilization review adverse determination*; or

    c. Prior to issuing a concurrent or post-stabilization review *adverse determination*.

11. "*Step therapy protocol*" means a protocol that requires an *enrollee* to use a prescription drug or sequence of prescription drugs other than the drug that the *enrollee's* physician recommends for the *enrollee's* treatment before the health benefit plan provides coverage for the recommended drug.

12. "*Utilization review*" means a system for prospective, concurrent, or retrospective review of the medical necessity and appropriateness of health care services and a system for prospective, concurrent, or retrospective review to determine the *experimental or investigational* nature of health care services. The term does not include a review in response to an elective request for clarification of coverage.

13. "*Working day*" means a weekday that is not a *legal holiday*.

B. **INITIAL ADVERSE DETERMINATIONS**

1. The health plan certified as a URA or the URA will provide notice of a determination made in a *utilization review* to the *enrollee's provider of record*; and the *enrollee* or a person acting on the *enrollee's* behalf.

2. The health plan certified as a URA or the URA must provide notice of an *adverse determination* as follows:

    a. With respect to an *enrollee* who is hospitalized at the time of the *adverse determination*, within 24 hours by either telephone or electronic transmission to the *provider of record*, followed by a letter within three *working days* notifying the *enrollee* and the *provider of record* of the *adverse determination*;

    b. With respect to an *enrollee* who is not hospitalized at the time of the *adverse determination*, within three calendar days in writing to the *provider of record* and the *enrollee*;

    c. With respect to determinations regarding an *acquired brain injury* or a request for an extension of coverage based on medical necessity or appropriateness, the URA must provide notification of the determination through a direct telephone contact to the individual making the request.

d. Within the time appropriate to the circumstances relating to the delivery of the services to the *enrollee* and to the *enrollee's* condition, provided that when denying poststabilization care subsequent to emergency treatment as requested by a treating physician or other health care provider, the agent shall provide the notice to the treating physician or other health care provider not later than one hour after the time of the request;

e. With respect to *step therapy protocol* exception requests:

   i. Within 24 hours of receipt of the request, if the prescribing provider's request states that he/she believes that denial of the request makes the death of or serious harm to the *enrollee* probable; or

   ii. Within 72 hours of all other receipts.

f. With respect to a concurrent review of the provision of prescription drugs or intravenous infusions for which the *enrollee* is receiving health benefits under the health plan, not later than the 30th day before the date on which the provision of prescription drugs or intravenous infusions will be discontinued; or

g. For retrospective *adverse determinations*:

   i. Within a reasonable period, but not later than 30 days after the date on which the claim is received.

   ii. This may be extended once by the utilization review agent for a period not to exceed 15 calendar days, if the utilization review agent:

      a. Determines that an extension is necessary due to matters beyond the utilization review agent's control; and

      b. Notifies the *provider of record* and the *enrollee* before the expiration of the initial 30-day period of the circumstances requiring the extension and the date by which the utilization review agent expects to make a determination.

   iii. If the extension is required because of the failure of the *provider of record* or the *enrollee* to submit information necessary to reach a determination on the request, the notice of extension must:

      a. Specifically describe the required information necessary to complete the request; and

      b. Give the *provider of record* and the *enrollee* at least 45 days from the date of receipt of the notice of extension to provide the specified information.

   iv. If the period for making the determination under this section is extended because of the failure of the *provider of record* or the *enrollee* to submit the information necessary to make the determination, the period for making the determination is tolled from the date on which the utilization review agent sends the notification of the extension to the *provider of record* or the *enrollee* until the earlier of:

      a. The date on which the *provider of record* or the *enrollee* responds to the request for additional information; or

      b. The date by which the specified information was to have been submitted.

3. The written notice must include:

   a. The principal reasons for the *adverse determination*;

   b. The clinical basis for the *adverse determination*;

   c. A description of or the source of the screening criteria used as guidelines in making the *adverse determination*;

   d. The professional specialty of the physician who made the determination;

   e. A description of the procedure for the *complaint* and appeal process, including notice to the *enrollee* of the *enrollee's* right to appeal an *adverse determination* to *us* and of the procedures to obtain that review;

f. Notice of the independent review process, including the Request for Review by an Independent Review Organization form and instructions that:

   i. The form must be completed by the *enrollee*, an individual acting on behalf of the *enrollee*, or the *enrollee's provider of record* and be returned to *us* or the utilization review agent that made the *adverse determination* to begin the independent review process; and

   ii. The release of medical information to the IRO, which is included as part of the form, must be signed by the *enrollee* or the *enrollee's* legal guardian; and

g. If involving a *life-threatening* condition, a description of the *enrollee's* right to an immediate review by an independent review organization (IRO) and of the procedures to obtain that review;

h. If involving a denial of prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan, a description of the *enrollee's* right to an immediate review by an IRO and of the procedures to obtain that review; and

i. The right to file a *complaint* with the TDI by contacting the TDI at the following address, telephone numbers, or website:

   Texas Department of Insurance (TDI)
   Consumer Protection (111-1A)
   PO Box 149091
   Austin, TX 78714-9091
   **Toll Free Consumer Help Line:** (800) 252-3439
   Fax: (512) 490-1007
   E-mail: ConsumerProtection@tdi.texas.gov
   Online: www.texashealthoptions.com

C. **INTERNAL REVIEW OF A DENIED STEP THERAPY PROTOCOL EXCEPTION REQUEST**

1. **Request**: A prescribing provider may appeal a denial of a *step therapy protocol* exception request orally or in writing.

2. **Reviewer's Requirements:**

   a. The physician deciding the appeal must consider atypical diagnoses and the needs of atypical patient populations.

   b. A *step therapy protocol* exception should be granted if the request includes the prescribing provider's written statement, with supporting documentation, stating:

      i. The drug required under the *step therapy protocol*:

         a. Is contraindicated; or

         b. Will likely cause an adverse reaction in or physical or mental harm to the *enrollee*; or

         c. Is expected to be ineffective based on the known clinical characteristics of the *enrollee* and the known characteristics of the prescription drug regimen; or

      ii. The *enrollee* previously discontinued taking the drug required under the *step therapy protocol*, or another prescription drug in the same pharmacologic class or with the same mechanism of action as the required drug, while under the health plan currently in force or while covered under another health plan because the drug was not effective or had a diminished effect or because of an adverse event; or

      iii. The drug required under the *step therapy protocol* is not in the best interest of the *enrollee*, based on clinical appropriateness, because the *enrollee's* use of the drug is expected to:

         a. Cause a significant barrier to the *enrollee's* adherence to or compliance with the *enrollee's* plan of care; or

         b. Worsen a comorbid condition of the *enrollee*; or

c. Decrease the *enrollee's* ability to achieve or maintain reasonable functional ability in performing daily activities; or

iv. All of the following:

a. The drug that is subject to the *step therapy protocol* was prescribed for the *enrollee's* condition;

b. The *enrollee* received benefits for the drug under the health plan currently in force or a previous health plan; and is stable on the drug; and

c. The change in the *enrollee's* prescription drug regimen required by the *step therapy protocol* is expected to be ineffective or cause harm to the *enrollee* based on the known clinical characteristics of the *enrollee* and the known characteristics of the required prescription drug regimen.

3. **Resolution Timeframe:**

a. If the exception request also states that the prescribing provider reasonably believes that denial of the request makes the death of or serious harm to the *enrollee* probable, review of the appeal must be completed before 24 hours after *we* receive the request. If *we* fail to approve or deny the request before 24 hours after receipt, the request is considered granted.

b. For all other exception requests:

i. Review of the appeal must be completed as expeditiously as possible based on the medical or dental immediacy of the medical or dental condition or treatment under review, but no later than the earlier of:

a. Within **one *working day*** from the date all information necessary to complete the appeal is received; or

b. Within **72 hours** of the receipt of the request.

ii. If *we* fail to approve or deny the request before 72 hours after receipt, the request is considered granted.

4. **Notification of Determination:**

a. The determination may be provided by telephone or electronic transmission, but must be followed with a letter within **three *working days*** of the initial telephonic or electronic notification.

b. Written notice of the determination must be sent to the *enrollee* and the prescribing provider.

c. If the decision is upheld of modified, the written notice of the determination must include:

i. A statement of the specific medical, dental, or contractual reasons for the resolution (the principle reasons for the *adverse determination*);

ii. The clinical basis for the decision;

iii. A description of or the source of the screening criteria that were utilized in making the determination;

iv. The professional specialty of the physician who made the determination; and

v. The procedure for filing a *complaint* with the URA/health plan concerning the determination;

vi. The Request for Review by an Independent Review Organization form;

vii. Notice of the independent review process with instructions;

viii. The right to file a *complaint* with the TDI by contacting the TDI at the following address, telephone numbers, or website:

Texas Department of Insurance (TDI)
Consumer Protection (111-1A)

PO Box 149091
Austin, TX 78714-9091
**Toll Free Consumer Help Line:** (800) 252-3439
Fax: (512) 490-1007
E-mail: ConsumerProtection@tdi.texas.gov
Online: www.texashealthoptions.com

ix. Reference to the specific plan provision on which the determination is based;

x. A statement that the *enrollee* is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the *enrollee's* claim for benefits;

xi. A statement that the *enrollee* may have a right to bring a civil action under state or federal law;

xii. A description of any standard used, if any, in denying the claim;

xiii. That assistance is available by contacting the specific state's consumer assistance department, if applicable;

xiv. A culturally linguistic statement based upon the *enrollee's* county or state of residence that provides for oral translation of the determination, if applicable

D. **INTERNAL REVIEW OF ADVERSE DETERMINATIONS (NOT INCLUDING STEP THERAPY PROTOCOL DENIALS)**

1. **Standard Review:**

a. Request: An *enrollee,* a person acting on behalf of the *enrollee,* or the *enrollee's provider of record* may appeal an *adverse determination* orally or in writing. For prospective or concurrent review *adverse determinations*, the appeal must be received within 30 calendar days after the date of issuance of written notification of the *adverse determination*. There is not a lime limit for the submission of an appeal regarding retrospective *adverse determinations*. If the appeal includes a request from the *enrollee's* health care provider for a particular type of specialty provider to review the case or if, within **10 *working days*** from the appeal request, the *enrollee's* health care provider requests a particular type of a specialty provider review the case, the request will be handled according to D.3.

b. Acknowledgment: The utilization review agent must send the appealing party a letter acknowledging the receipt of the appeal within **five *working days*** from the date the utilization review agent receives the appeal. The acknowledgment letter must include:

i. The date the utilization review agent received the appeal;

ii. A list of relevant documents that must be submitted by the appealing party to the utilization review agent for the completion of the appeal;

iii. A description of the appeal process; and

iv. A statement that, in circumstances involving an *enrollee's life-threatening* condition, the *enrollee* is entitled to an immediate appeal to an independent review organization (IRO) and is not required to comply with procedures for an internal review of the utilization review agent's *adverse determination*.

c. Reviewer's Requirements:

i. The appeal will be reviewed by a physician licensed to practice medicine and who has not previously reviewed the case.

ii. Prior to issuance of an *adverse determination,* the utilization review agent must afford the *provider of record* a *reasonable opportunity* to discuss the plan of treatment for the *enrollee* with a physician. The discussion must include, at a minimum, the clinical basis for the utilization review agent's decision.

d. Resolution Timeframe:

i. A decision regarding an appeal concerning an *acquired brain injury* or a request for an extension of coverage based on medical necessity or appropriateness must be provided

through a direct telephone contact to the individual making the request not later than **3 *working days*** after the date on which the request is made.

ii. A decision must be made as soon as practical, but in no case later than **30 calendar days** after the date the utilization review agent receives the appeal.

e. Notification of Determination:

i. Written notice of the determination must be sent to the *enrollee*, or a person acting on the *enrollee's* behalf, and the *enrollee's* physician or health care provider.

ii. For prospective, concurrent, or retrospective reviews, if the initial decision is upheld or modified, the written notice of the determination must include:

a. A statement of the specific medical, dental, or contractual reasons for the resolution (the principle reasons for the *adverse determination*);

b. The clinical basis for the decision;

c. A description of or the source of the screening criteria that were utilized in making the determination;

d. The professional specialty of the physician who made the determination;

e. The procedure for filing a *complaint* with the URA/health plan concerning the *utilization review*;

f. The Request for Review by an Independent Review Organization form;

g. Notice of the independent review process with instructions that:

i. Request for a review by an IRO form must be completed by the *enrollee*, an individual acting on behalf of the *enrollee*, or the *enrollee's provider of record* and be returned to *us* or the utilization review agent that made the *adverse determination* to begin the independent review process; and

ii. The release of medical information to the IRO, which is included as part of the independent review request for a review by an IRO form, must be signed by the *enrollee* or the *enrollee's* legal guardian; and

h. A description of the *enrollee's* right to an immediate review by an IRO and of the procedures to obtain that review for an *enrollee* who has a *life-threatening* condition;

i. If involving a denial of prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan, a description of the *enrollee's* right to an immediate review by an IRO;

j. The right to file a *complaint* with the TDI by contacting the TDI at the following address, telephone numbers, or website:

Texas Department of Insurance (TDI)
Consumer Protection (111-1A)
PO Box 149091
Austin, TX 78714-9091
**Toll Free Consumer Help Line:** (800) 252-3439
Fax: (512) 490-1007
E-mail: ConsumerProtection@tdi.texas.gov
Online: www.texashealthoptions.com

2. **Expedited Review:**

a. Request: An *enrollee* or a person acting on behalf of the *enrollee* may request an expedited review of an *adverse determination*, orally or in writing, for appeals regarding:

i. *Emergency care*;

ii. Care for *life-threatening* conditions; if the requesting health care provider includes a written statement with supporting documentation that the service is necessary to treat a

*life-threatening* condition or prevent serious harm to the *enrollee*, this is to be considered expedited;

iii. Continued stays for hospitalized *enrollees*; and

iv. Prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan.

b. Right to Proceed to Independent Review: The *enrollee* is entitled to an immediate appeal to an IRO and is not required to comply with procedures for an internal review of the utilization review agent's *adverse determination* in circumstances involving:

i. A *life-threatening condition*; or

ii. Prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan.

c. Reviewer's Requirements: The review will be conducted by a health care provider who has not previously reviewed the case and who is of the same or a similar specialty as the health care provider who would typically manage the medical condition, procedure, or treatment under review.

d. Resolution Timeframe: The expedited appeal must be completed as expeditiously as possible based on the immediacy of the medical or dental condition, procedure, or treatment under review, but no later than within **one *working day*** from the date all information necessary to complete the appeal is received.

e. Notification of Determination:

i. An expedited appeal determination may be provided by telephone or electronic transmission, but must be followed with a letter within **three *working days*** of the initial telephonic or electronic notification.

ii. Written notice of the determination must be sent to the *enrollee*, or a person acting on the *enrollee's* behalf, and the *enrollee's* physician or health care provider. If the initial decision is upheld or modified, the written notice of the determination must include:

a. A statement of the specific medical, dental, or contractual reasons for the resolution (the principle reasons for the *adverse determination*);

b. The clinical basis for such decision;

c. A description of or the source of the screening criteria that were utilized in making the determination;

d. The professional specialty of the physician who made the determination;

e. Notice of the appealing party's right to seek review of the *adverse determination* by an IRO, including:

i. Notice of the independent review process; and

ii. The Request for Review by an Independent Review Organization; and

f. The procedure for filing a *complaint* with the URA/health plan concerning the *utilization review*.

g. A description of the *enrollee's* right to an immediate review by an IRO and of the procedures to obtain that review for an *enrollee* who has a *life-threatening* condition;

h. If involving a denial of prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan, a description of the *enrollee's* right to an immediate review by an IRO;

i. The right to file a *complaint* with the TDI by contacting the TDI at the following address, telephone numbers, or website:

Texas Department of Insurance (TDI)
Consumer Protection (111-1A)

PO Box 149091
Austin, TX 78714-9091
**Toll Free Consumer Help Line:** (800) 252-3439
Fax: (512) 490-1007
E-mail: ConsumerProtection@tdi.texas.gov
Online: www.texashealthoptions.com

3. **Specialty Review:**

   a. Request: A specialty review may be requested if:

      i. An internal appeal is submitted with a request from the *enrollee's* health care provider requesting a particular type of a specialty provider review the case;

      ii. An internal appeal is submitted and within **10 *working days*** from the appeal request, the *enrollee's* health care provider requests a particular type of a specialty provider review the case; or

      iii. The appeal is denied, and within **10 *working days*** from the denial, the *enrollee's* health care provider requests a particular type of a specialty provider review the case.

   b. Reviewer's Requirements: The denial must be reviewed by a health care provider in the same or similar specialty as requested by the *enrollee's* health care provider.

   c. Resolution Timeframe: This specialty review must be completed within **15 *working days*** of receipt of the request.

   d. Notification of Determination:

      i. Written notice of the determination must be sent to the *enrollee*, or a person acting on the *enrollee's* behalf, and the *enrollee's* physician or health care provider.

      ii. For prospective, concurrent, or retrospective reviews, if the initial decision is upheld or modified, the written notice of the determination must include:

         a. A statement of the specific medical, dental, or contractual reasons for the resolution (the principle reasons for the *adverse determination*);

         b. The clinical basis for the decision;

         c. A description of or the source of the screening criteria that were utilized in making the determination;

         d. The professional specialty of the physician who made the determination;

         e. The procedure for filing a *complaint* with the URA/health plan concerning the *utilization review*;

         f. The Request for Review by an Independent Review Organization form;

         g. Notice of the independent review process with instructions that:

            i. Request for a review by an IRO form must be completed by the *enrollee*, an individual acting on behalf of the *enrollee*, or the *enrollee's provider of record* and be returned to *us* or the utilization review agent that made the *adverse determination* to begin the independent review process; and

            ii. The release of medical information to the IRO, which is included as part of the independent review request for a review by an IRO form, must be signed by the *enrollee* or the *enrollee's* legal guardian; and

         h. A description of the *enrollee's* right to an immediate review by an IRO and of the procedures to obtain that review for an *enrollee* who has a *life-threatening* condition;

         i. If involving a denial of prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan, a description of the *enrollee's* right to an immediate review by an IRO;

         j. The right to file a *complaint* with the TDI by contacting the TDI at the following address, telephone numbers, or website:

Texas Department of Insurance (TDI)
Consumer Protection (111-1A)
PO Box 149091
Austin, TX 78714-9091
**Toll Free Consumer Help Line:** (800) 252-3439
Fax: (512) 490-1007
E-mail: ConsumerProtection@tdi.texas.gov
Online: www.texashealthoptions.com

E. **INTERNAL REVIEW OF COMPLAINTS NOT INVOLVING ADVERSE DETERMINATIONS**

All *complaints* from an *enrollee* or a person acting on behalf of the *enrollee* that do not involve an *adverse determination* will be handled according to the Texas Claimant Complaint Procedures.

F. **INDEPENDENT REVIEW OF ADVERSE DETERMINATIONS**

1. **Request:**
   a. Any party who has exhausted the internal appeal process of an *adverse determination*, and such appeal resulted in a denial by the utilization review agent, may request an independent review conducted by an IRO.
   b. The internal *adverse determination* appeal process is not required to be exhausted for:
      i. *Life-threatening* conditions; or
      ii. Prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan.
   c. The request shall be made on the Request for a Review by an Independent Review Organization form (Form).
   d. The Form authorizing release of medical information to the IRO must be signed by the *enrollee* or the *enrollee's* legal guardian.
2. **Process**:
   a. *We*, or the utilization review agent that made the *adverse determination*, must notify the Department within **1 *working day*** from the date the request for an independent review is received. The utilization review agent must submit the completed Form to the Department through the Department's Internet website.
   b. Within one *working day* of receipt of a complete request, the Department will randomly assign an IRO to conduct an independent review and notify the utilization review agent, payor, IRO, the *enrollee*, and any other providers listed by the utilization review agent as having records relevant to the review of the assignment.
   c. Within **three *working days*** after the date the utilization review agent receives a request for independent review, the utilization review agent must provide to the assigned IRO a copy of:
      i. Any medical records of the *enrollee* in the possession of the utilization review agent that are relevant to the review;
      ii. Any documents used by *us* in making the determinations to be reviewed by the organization;
      iii. The written notification of the internal appeal determination, if applicable;
      iv. Any documentation and written information submitted to the utilization review agent in support of the appeal; and
      v. A list containing the name, address and phone number of each physician or health care provider who has provided care to the *enrollee* and who may have medical records relevant to the appeal.
3. **Resolution Timeframe and Notification of Determination**: The IRO shall notify the *enrollee*, the *enrollee's provider of record*, the utilization review agent, the payor, and the Department of the determination:

a. For a *life-threatening* condition, the provision of prescription drugs or intravenous infusions for which the *enrollee* is receiving benefits under the health plan, or a *step therapy protocol* exception request, by telephone to be followed by facsimile, electronic mail, or other method of transmission not later than the 3rd day after the IRO receives the request that the determination be made; or

b. For a condition other than a *life-threatening* condition, in writing and sent via mail or otherwise transmitted not later than the earlier of:

   i. The 15th day after the date the IRO receives the information necessary to make the determination; or

   ii. The 20th day after the date the organization receives the request for independent review.

4. **General Information:**

   a. The payor and utilization review agent must comply with the IROs determination.

   b. The utilization review agent must pay for the independent review and may recover costs associated with the independent review from the payor.

This rider applies to *covered persons* who reside in the state of Texas.

This rider will not change, waive, or extend any part of the *policy*/certificate, other than as stated herein.

**Golden Rule Insurance Company**

Patrick F. Carr

**President**

**GOLDEN RULE INSURANCE COMPANY**
**TEXAS PLAN DESCRIPTION OF COVERAGE**

**The following is a general description of the important aspects of your Short Term Medical Expense health insurance plan. This is not the insurance contract. If there is a conflict between this plan description and the policy/certificate, the terms of the policy/certificate will control.**

This plan description applies to covered persons who reside in the state of Texas and who are insured under the health insurance plan described below.

A. The policy/certificate described in this plan description is provided by Golden Rule Insurance Company. For questions, or to obtain additional information, about your policy/certificate, you may contact us at: Golden Rule Insurance Company, 7440 Woodland Drive, Indianapolis, IN 46278-1719, or you may call us toll-free at 1-800-657-8205.

B. The policy contains network provider benefits. Network providers have contracts with the network, which contain per diem rates by specialty, fee schedule rates, and discounts of billed charges. The physicians in the network are paid on a fee for service basis for specific procedures and services. Other ancillary providers have individual contracts with the network for applicable services. Network providers may not balance bill the covered person for the difference between the contract rate and the billed charges.

   Non-network providers do not have contracts with the network. The services of non-network providers are not covered by the policy, except for emergencies.

C. The policy covers general medical and surgical health care services of a non-experimental nature, if they are medically necessary and are delivered during the period of coverage. In general, the policy covers: daily hospital room and board and nursing services at the most common semi-private rate; eligible expenses for intensive care; hospital emergency treatment of an injury or illness, subject to a copayment amount; outpatient surgery in a doctor's office or outpatient surgical facility; professional fees charged by doctors and medical practitioners; necessary medical supplies; diabetes management; diagnostic testing; chemotherapy and radiation therapy; hemodialysis; anesthetics; oxygen; dental injuries to the natural teeth; prostheses; durable medical equipment; acquired brain injury; clinical trials; mammography screenings and tests for prostate cancer, ovarian cancer, and cervical cancer; breast reconstructive surgery following a covered mastectomy; reconstructive surgery that is incidental to or follows surgery or an injury that was covered under the policy or is performed to correct a birth defect in a child who has been a covered person from birth; ambulance service for emergencies; transplants; home health care; rehabilitation services or confinement in an extended care facility; outpatient prescription drugs; and other treatments and services identified in the policy. Treatments and services are subject to the limitations and exclusions stated in the policy.

D. Emergency services may be provided by a network or non-network provider at any time without any financial penalty. Emergency room charges are covered for emergency treatment of an injury or illness, subject to a copayment amount.

E. Urgent care services, including professional services, received from network providers are eligible for benefits under the policy/certificate for after-hours care.

F. Medical services received only from network providers are eligible for benefits under the policy/certificate. Non-emergency services received from non-network providers are not covered under the policy/certificate. You may seek emergency services outside the network without any financial penalty.

G. In addition to the premiums for the policy/certificate, a covered person is expected to pay any applicable copayments, deductible, and/or other out-of-pocket expenses in accordance with the terms of the policy/certificate. In general these include, but are not limited to, the following: (1) a copayment for the following if identified in the policy/certificate Data Page as applicable to the type of product selected and purchased by you: prescription drugs and other pharmacy products; physician office visits; urgent care center visits; (2) a specific annual deductible; (3) a coinsurance percentage, if identified in the policy/certificate Data Page as applicable to the type of product selected and purchased by you; and (3) expenses not covered by the policy/certificate (which includes non-emergency services received from non-network providers). The exact copayment amounts, deductible amounts, and coinsurance percentages are found in your health insurance policy/certificate.

H. All health care services must be medically necessary and appropriate in order to be covered. There are specific limitations on covered expenses for assistant surgeon services, which are more particularly described in your policy/certificate. The policy does not cover preexisting conditions. No benefits will be paid for: (1) a service or supply that would be provided at no cost in the absence of insurance; (2) charges that are the responsibility of the provider to pay; (3) services not identified as covered expenses by the policy/certificate; (4) For non-emergency services or supplies received from a provider who is not a network provider, except as specifically provided for by the policy/certificate. Covered expenses do not include any charges that are incurred for: (1) services and supplies received prior to the effective date or after the termination date; (2) charges that are in excess of the eligible expense; (3) weight modification or surgical treatment of obesity, including wiring of the teeth, and all forms of intestinal by-pass surgery; (4) breast reduction or augmentation; (5) modification of the body to improve the psychological, mental, or emotional well-being, such as sex-change surgery; (6) any drug, treatment, or procedure that promotes conception, including, but not limited to, artificial insemination or treatment for infertility or impotency; (7) sterilization or reversal of sterilization; (8) abortion (unless the life of the mother would be endangered if the fetus were carried to term); (9) for television, telephone, or expenses for other persons; (10) marriage, family, or child counseling for the treatment of premarital, marriage, family, or child relationship dysfunctions; (11) telephone consultations or for failure to keep a scheduled appointment; (12) hospital room and board and nursing services for the first Friday or Saturday of an inpatient stay that begins on one of those days, unless it is an emergency, or medically necessary inpatient surgery is scheduled for the day after admission; (13) stand-by availability of a medical practitioner when no treatment is rendered; (14) dental expenses, including braces for any medical or dental condition, surgery and treatment for oral surgery, except as expressly provided by the policy/certificate; (15) cosmetic procedures; (16) learning disabilities, attitudinal disorders, or disciplinary problems; (17) nicotine addiction; (18) eye refractive surgery when the primary purpose is to correct nearsightedness, farsightedness, or astigmatism; (19) confinement for rehabilitation, custodial care, educational care, or nursing services (unless expressly provided for by the policy/certificate); (20) vocational or recreational therapy, vocational rehabilitation, or occupational therapy, except as expressly provided for by the policy/certificate; (21) alternative or complementary medicine using non-orthodox therapeutic practices that do not follow conventional medicine; (22) eyeglasses, contact lenses, hearing aids, eye refraction, visual therapy, or for any examination or fitting related to these devices, except as specifically provided for by the policy/certificate; (23) due to pregnancy (except complications of pregnancy; (24) confinement primarily for well- baby care; (25) preventive or prophylactic care, except as required under applicable state and federal law and expressly provided for in the policy/certificate; (26) experimental or investigational treatment(s) or unproven services; (27) treatment received outside of the United States, except for emergencies; (28) services for employment related injuries and illnesses; (29) treatment as a result of injury or illness caused by intentionally self-inflicted bodily harm, an act or war, taking part in a riot, or commission of a felony whether or not charged; (30) related to durable medical equipment, except as expressly provided for by the policy/certificate; (31) an illness or injury incurred as a result of being intoxicated or under the influence of illegal narcotics or controlled substance unless administered or prescribed by a doctor; (32) surrogate parenting;(33) fetal reduction surgery; (34) treatment of hyperhidrosis; (35) joint replacement, unless related to an injury that is covered by the policy/certificate; (36) non-emergency treatment of tonsils, adenoids, hemorrhoids, or hernia; (37) treatment of mental disorders, substance abuse, or court-ordered treatment programs for substance abuse; (38) treatment of an injury sustained during or due to participating, instructing, demonstrating, guiding, or accompanying others in any of the hazardous activities named in the policy/certificate; (39) outpatient prescription drugs, except as expressly provided under the policy/certificate; and (40) mental disorders and substance-related and addictive disorders, except as expressly provided for by the policy/certificate; (41) outpatient diagnosis and treatment of a spine and back disorder, except as expressly provided by the policy/certificate; and (42) other treatments and services that are specified as excluded or limited in the policy/certificate.

I. If a covered person receives treatment from a provider who ceases to be a network provider during the course of treatment, the covered person may request that benefits continue to be paid as if that provider were still a network provider while coverage remains in force during the policy term: (1) for the first 90 days after the date the provider ceases to be a network provider; (2) for 9 months after the date the provider ceases to be a network provider, for a covered person diagnosed as terminally ill; and (3) through delivery of the child, for immediate postpartum care, and the follow-up checkup within the six-week period after delivery for covered persons past the 24th week of pregnancy.

J. As a current or prospective insured, your satisfaction is very important to us. If you have a complaint, you may write to us at the address shown in paragraph A of this plan description. We will provide a response to your written complaint. The response will be provided within 24 working days of the date

your written complaint is received by us at the address shown in paragraph A of this plan description. If we are not able to respond within 24 working days, we will advise you, in writing or by telephone, why more time is needed to respond to your complaint. We may not retaliate against a covered person because he or she, or a provider or other person on his or her behalf, filed a complaint.

K. To obtain a list of network providers, including which network providers are accepting new patients, go to www.unitedhealthone.com or call the telephone number on your health insurance identification card. Golden Rule Insurance Company has access to UnitedHealthcare networks. Network providers may be found in most areas in the state of Texas and in most other states.

| Network Name | Availability |
| --- | --- |
| UnitedHealthcare Choice | Entire state of Texas |

A list of network providers can be obtained by contacting us at the address or telephone number in paragraph A. (or you may go to www.unitedhealthone.com.

L. Network demographics and information regarding local market access plans may be found at https://www.uhone.com/legal/texas-insureds or you may contact us at the address or telephone number in paragraph A.

M. You may keep your certificate in force by timely payment of the required premiums. However, we may refuse to renew or terminate the policy/certificate if: (A) you fail to pay premiums as required under the policy/certificate; (B) a person covered under your certificate performs an act or practice that constitutes fraud or an intentional material misrepresentation relating in any way to the policy/certificate, including a claim for benefits.

N. Premiums will be based on the rate table in effect on that premium's due date. The policy plan, age and sex of covered persons, type and level of benefits, time the policy/certificate has been in force, and place of residence on the premium due date are some of the factors used in determining your premium rates.