IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BREWER, | § | |
| | § | |
| VS. | § | C.A. NO. 4:22-CV-00969 |
| | § | |
| GOLDEN RULE INSURANCE | § | |
| COMPANY AND TOBIAS & | § | |
| ASSOCIATES, INC. D/B/A | § | |
| GETMEHEALTHCARE | § | |

---

VIDEOTAPED ORAL DEPOSITION
OF MICHAEL BREWER
TAKEN ON FEBRUARY 20, 2023

---

ORAL DEPOSITION of MICHAEL BREWER, produced as a witness at the instance of the Defendants, was duly sworn, was taken in the above-styled and numbered cause on the 20th of February, 2023, from 10:00 o'clock a.m. to 02:41 o'clock p.m., before Angela Steele, Shorthand Reporter, Notary, in and for the State of Texas, reported by machine shorthand at, The Cobos Law Firm, 711 W. Alabama Street, Houston, Texas, pursuant to the Federal Rules and the provisions states on the record or attached hereto.



A P P E A R A N C E S:

FOR THE PLAINTIFF(S):

Mr. Nicholas Kacal
THE COBOS LAW FIRM
711 W. Alabama Street
Houston, Texas 77006
713-234-5860
nicholas@cobos.law

FOR THE DEFENDANT(S):

Ms. Leida Prieto
RYMER, ECHOLS, SLAY & NELSON-ARCHER, P.C.
2801 Post Oak Boulevard
Suite 250
Houston, Texas 77056
713-626-1550
lprieto@renlaw.com
Counsel for Tobias & Associates

Mr. Lance Clack
FIGARI DAVENPORT LLP
901 Main Street
Suite 3400
Dallas, Texas 75202
Counsel for Golden Rule

Also present: Amy Hoang, Videographer



I N D E X


| | PAGE |
|---|---|
| Appearances ........................... | 2 |
| MICHAEL BREWER | |
| Examination by Ms. Prieto.......... | 6 |
| Examination by Mr. Clack........... | 34 |
| Examination by Ms. Prieto.......... | 168 |
| Reporter's Certificate ................ | 172 |




EXHIBITS MARKED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 1st Application for Coverage | 11 |
| Exhibit 2 | Pathology Report | 23 |
| Exhibit 3 | E-mail from Christopher Davis | 25 |
| Exhibit 4 | 2nd Application for Coverage | 26 |
| Exhibit 5 | ID Cards and Welcome Letter | 54 |
| Exhibit 6 | 1st Golden Rule Policy | 58 |
| Exhibit 7 | Medical Records | 64 |
| Exhibit 8 | Phone Log | 82 |
| Exhibit 9 | 2nd Welcome Letter | 86 |
| Exhibit 10 | 2nd Golden Rule Policy | 88 |
| Exhibit 11 | Medical records affidavit, notices | 101 |
| Exhibit 12 | Claimant's Statement and Authorization | 113 |
| Exhibit 13 | Medical Records | 114 |
| Exhibit 14 | Diagnosis List and Dates | 123 |
| Exhibit 15 | Golden Rule Letter with handwritten notes | 124 |
| Exhibit 16 | Diagnoses list with more notes | 127 |
| Exhibit 17 | Phone Log with three calls | 129 |
| Exhibit 18 | Chase for Business document submitted by Plaintiff | 131 |
| Exhibit 19 | Letter from Plaintiffs to Golden Rules and Tobias | 132 |
| Exhibit 20 | Plaintiff's First Amended Complaint | 162 |

P R O C E E D I N G S

**********************

THE VIDEOGRAPHER: We are now on the record at 10:00 a.m. on February 20th, 2023. This begins the videotaped deposition of Michael Brewer in the matter of Michael Brewer vs. Golden Rule Insurance Company and Tobias & Associates, Inc. doing business as GETMEHEALTHCARE.

Counsel, please state your appearances for the record and the witness will be sworn.

MR. KACAL: Yes, I'm Nicholas Kacal with the Cobos Law Firm on -- here on behalf of the plaintiff Michael Brewer.

MR. CLACK: Lance Clack for Golden Rule Insurance Company.

MS. PRIETO: Leida Prieto for Tobias & Associates, Inc.

THE COURT REPORTER: Raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give in this action will be the truth, the whole truth, and nothing but the truth under the penalties of perjury?

THE WITNESS: Yes, ma'am.

THE COURT REPORTER: Thank you.

E X A M I N A T I O N



BY MS. PRIETO:

Q. Good morning. Can you please state your full name for the record.

A. Yes, Michael Arthur Brewer.

Q. Okay. I represent Tobias & Associates. Do you understand who I am and who I represent?

A. Yes.

Q. Have you ever given a deposition before?

A. No.

Q. So I'm going to go through a couple of just ground rules so that we can have a clean record. The court reporter who is to your right is writing down everything we say, and so in order for her to be able to get -- answer you, I would ask that you provide a verbal response so no nodding or no un-uh or uh-huhs. And so if I reiterate and say, "was that a yes," I'm not trying to be rude, I just want to make sure that we have a clean record.

If you didn't hear my question or you didn't understand me, please answer me to restate it or rephrase it. I -- I'm not here to trick you so I want to make sure that you understand what I'm asking. If you need a break, that's completely fine. I would just ask that you answer the last question that was posed before we take that break. And it may be kind of hard sometimes, in a



deposition you think about it like having a conversation with somebody, and so I would ask that you let me finish my question before you answer, and I will try to do the same, let you finish your answer before I ask another question just so it's easier for the court reporter.

Are you under the influence of any alcohol or drugs that might impair your ability to give testimony today?

A. No.

Q. Okay. Did you have a chance to meet with your attorney prior to your deposition?

A. Yes.

Q. Okay. I don't want to know what you guys talked about, I just want to know about how long you met for?

A. Just recently about 40 minutes.

Q. Did you review any documents in preparation for your deposition?

A. Yes.

Q. Do you remember what those are?

A. I don't remember all of them, but I remember it was me versus Golden Rule and what my policy was about.

THE COURT REPORTER: Keep your voice up, please.

THE WITNESS: Yes. Yes, ma'am.

BY MS. PRIETO:



Q. When you say "your policy," did you look at the first policy and the second policy or just one of them?

A. Just the information that was provided in the packet.

Q. Okay. What is your current address?

A. , League City, Texas .

Q. Okay. Who do you reside with?

A. With my wife, Miriam Quiroz, my two stepchildren Daysi Huerta and Gianlucan Huerta and my son Tenoch Brewer.

Q. Alright. Are any of those kids over the age of 18?

A. Yes.

Q. Okay, which one?

A. Gianlucan and --

THE COURT REPORTER: Spell that.

THE WITNESS: G-i-a-n-l-u-c-a-n.

A. And, yes, ma'am, they are -- Daysi Huerta and Gianlucan are both over 18.

BY MS. PRIETO:

Q. Okay. Do you have any other family that currently resides in Harris County that's over the age of 18?

A. No.

Q. Okay. What is your highest level of education?
A. Associates degree.
Q. What did you obtain your associates in?
A. Applied science -- or it's a science degree that was culinary -- a culinary arts degree.
Q. Where did you obtain your associates from?
A. It was the Art Institute of Houston.
Q. Are you currently employed?
A. Yes.
Q. Okay. Where are you employed at?
A. Self-employed at Main St Bistro.
Q. And who do you do at Main St Bistro?
A. Run the business and the chef.
Q. Okay. About how many days a week do you currently work?
A. Six.
Q. Okay. And how many hours do you think you work in those six days?
A. Maybe 40.
Q. Okay. Have you ever been convicted or arrested for a crime?
A. No.
Q. Okay. Have you ever been a party to another civil lawsuit?
A. I don't recall any that I have. For a personal,


I don't believe so, no.
Q. What about for your business?
A. The business there was one with Gordon Food Service.
Q. What was the nature of that lawsuit?
A. Old invoice. An old invoice that needed to be paid.
Q. You sued Gordon Food Service or Gordon Food Service sued --
A. Gordon Food Service sued me.
Q. Okay. When did you first reach out to Tobias & Associates?
A. I actually was going through chemotherapy, that was all pretty much set up by my mother who represented me for that, so...
Q. Okay. How long had you been going through chemo before, I guess, your mom reached out to Tobias?
A. I don't recall exactly, but I know that on the 15th around there I was notified that I had testicular cancer, but I was already on Golden Rule's plan and, I guess, started treatment, I believe, around that time as well.
Q. Okay. The 15th of what? What month?
A. November.
Q. Okay. I have that you had -- that you reached


out to Tobias before -- before then. So let's see. I have that you did one application with them in June of 2021. Do you recall that?
A. I don't. That was set up by my mother who did that.
Q. Okay. Do you know how your mother found out about Tobias & Associates?
A. I do not.
Q. So in June of 2021 you never spoke to anybody at Tobias?
A. No, ma'am.
Q. So I'm going to show you what's going to be marked as Exhibit 1.
(Exh bit 1 was marked for identification.)
Q. So this is on the bottom Bates labeled as Tobias 37, it's the first page. Do you see your name under applicant?
A. Yes.
Q. Okay. And the title of the document is Application For short-term Medical Insurance Golden Rule Insurance Company. Do you see that?
A. Yes.
Q. Okay. If you turn the page, do you remember seeing this at all, this -- this application at all?


A. No, I cannot recall. I don't remember seeing that.
Q. Do you know when your mom called Tobias about the first policy that you had what she asked for?
A. No, ma'am.
Q. Before reaching out to Tobias what kind of -- did you have insurance?
A. No.
Q. Okay. When was the last time before reaching out to Tobias that you had insurance?
A. I can't remember, but it had been years. I don't remember.
Q. Okay. So if you turn to page -- it's going to say 4 at the bottom. Do you see where it says signature and it has your name and it says esign?
A. Yes.
Q. And it's dated June 9th, 2021?
A. Yes.
Q. Okay. You don't remember signing this page online?
A. I'm sorry, did you say June 9th?
Q. Yes, June 9th, 2021.
A. Okay. I honestly -- I might have gotten something to esign, but I don't remember. Like I said, I was -- it was a different time back then, I was getting

treatment, and I can't remember.
Q. So this -- this would have been -- you told me you got treatment in November of, right --
A. Yeah.
Q. -- of 2021? This would have been before then. So --
A. I don't remember.
Q. -- like the summer.
A. I believe I -- I don't -- I don't remember. I honestly don't because of the time frame and that was a long time ago.
Q. Do you know if your mom might have signed this for you?
A. I don't believe so. Anything that I would have needed to sign I get a link and then just told to sign it.
Q. Okay. So I want to go through this application with you, so let's go back to page No. 2. So under -- it's up on the last or the side of the block there's a state -- there's a specific area that says medical history and then it'll say M2. Do you see where I'm at?
A. Medical history.
Q. Yeah, it will be l ke application questions then medical history information.
A. Um-hmm.
Q. And then under that you'll see M2.



A. Yes, I do.
Q. Okay. So on here it says: Within the last five years has any applicant received medical or surgical consultation, advise or treatment including medication for any of the following. And then one of things that it includes is cancer. Do you see that?
A. Yes.
Q. Okay. And then it's checked off no, right?
A. Okay.
Q. Do you see that?
A. Yes.
Q. Okay. And then on Page 3 what's listed as -- wait -- sorry, on Page 4 it's -- it tells you at the top: This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Do you see that?
A. Yes.
Q. And it says: Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits. Do you see that?
A. Yes.
Q. And then there's like a list and it says: Statement of Understanding. Can you read No. 2 for me?



A. No benefits will be paid for a health condition that exist prior to the date of insurance takes effect.
Q. Okay. And can you read No. 3 for me?
A. If coverage is issued, the coverage will not be a continuation of any prior coverage.
Q. Okay. And then at the bottom where it says Signature Information, it has your name and it says esign and it's dated, correct?
A. It's dated 06/09/21.
Q. Okay. Then moving on at the bottom it's listed as Tobias 43, it will be two pages over. At the top it starts with: Is this short-term health insurance plan right for me. Do you remember reading this page?
A. No.
Q. Okay. On this page it start -- under the bold lettering it says: This plan does not need to follow federal Affordable Care Act rules. Unlike ACA plans, this short-term plan may not cover all injuries or sickness including any you have before applying. Do you see that?
A. Yes.
Q. Do you remember being told anything to that effect?
A. No, I do not remember being told that.
Q. And then if you pass two more pages at the bottom it will say Tobias 46. And towards the bottom it will



say: You must confirm you read and understand this form. Do you see that?
A. Yes.
Q. Okay. And then it says: Did you read and understand the limited benefits offered by this plan before was applied or paid for coverage. What's marked?
A. It's marked, yes, I read and understand the benefits and the limits of this plan. I was not required to make a payment or apply for the certificate before getting the disclosure form.
Q. Okay. And then it's signed at the bottom, correct?
A. It is signed.
Q. And it has your name and then it's dated June 9, 2021?
A. Yes.
Q. Do you remember signing this page?
A. I don't remember signing it.
Q. So if you go two more pages it will be Tobias 50. I have that you received an e-mail that told you that the effective date for this first policy would be June 15, 2021. Do you remember getting insurance at that point in time?
A. No, I don't remember this e-mail as well.
Q. Okay. I guess let's go through kind of like your

medical history. So when did you start -- so going from this date, from June 15, 2021, went did you start having medical problems?
A. It was a little shortly after being told the 15th it started to happen. All I remember is I started urinating blood and went into the doctor and, yeah, there was kidney failure. I don't remember the time of that.
Q. Okay. I have that you visited Dr. Dirh, D-i-r-h [sic]. Does that sound familiar?
A. Yes.
Q. Okay. What kind of doctor is Dr. Dhir?
A. He's a urologist I believe. Dirh I believe it is.
THE COURT REPORTER: I'm sorry?
THE WITNESS: Di hr, it's D-i-h-r [sic]. Yes, sorry.
BY MS. PRIETO:
Q. Okay. Do you -- had you treated with Dr. Dhir before?
A. No. He was just a specialist in the area that was close by.
Q. In your petition it says that at -- at the beginning of July 2021 there was a suspected UTI infection. Does that sound familiar to you?
A. It was his -- he suspected some sort of



infection. I was taking at that time antibiotics. I was on that for several weeks. Actually two sessions of it for several weeks.
Q. When you first visited Dr. Dhir, what symptoms did you have that caused you to go to this urologist?
A. Just a little bit of swelling.
Q. Okay. Anything in color?
A. No.
Q. Any discharge?
A. No.
Q. Any pain?
A. No.
Q. Okay. And so you told me that you did two rounds of antibiotics?
A. Yes.
Q. Do you remember when the first one ended?
A. I don't. I don't, I apologize. I don't remember.
Q. Do you know if you had to take a urine test or a blood test --
A. Yes.
Q. -- on the first visit?
A. I don't remember on the first visit, but I was taking a urine test and a blood -- I don't know -- I don't know if I took a blood test but a urine test I believe so.



Q. Do you know when it might have been the second time you went to visit Dr. Dhir?
A. I don't.
Q. After the two rounds of ant biotics, did he recommend any additional treatment?
A. They did ultrasounds.
Q. Where did you obtain the ultrasound?
A. On my testicle.
THE COURT REPORTER: I'm sorry?
THE WITNESS: On my testicle.
THE COURT REPORTER: Thank you.
THE WITNESS: Yes, ma'am.
BY MS. PRIETO:
Q. Okay. Do you know about when you had that ultrasound?
A. Once again I apologize I can't remember exactly.
Q. Had your symptoms changed when you obtain -- l ke when you went to go get that ultrasound?
A. No.
Q. After you obtained the ultrasound what were you told?
A. That he believes it was infected and that he would go and go through surgery, have the infected part removed. If it was completed all infected he would probably have to just remove the testicle.



Q. Okay. Do you know when you had that procedure, the either the removal or the partial or total?
A. I believe it was in October.
Q. Did Dr. Dhir -- was that the doctor that actually did the removal?
A. I don't believe so.
Q. Do you remember where you went to get that procedure done?
A. Clear Lake Regional.
Q. Okay. Were you told that they would take a sample of whatever material they removed to get it tested?
A. No. No, I wasn't told that. I -- yeah, I didn't know if they would or not, no. They just said that they were going to remove it if they needed to. But it would -- they were going to try to do it just a little bit. If they did more than they actually would have to go through another procedure, so.
And they actually ended up doing it and kind of messed it up just for the little bit because it should have done another way. I don't know the whole gist of it, but when he went in there and removed it, that's when -- that's all I know. I don't know if they took a sample of it or when it was after that, but I wasn't told anything with the sample.
Q. Okay. Did he do a total removal or a partial

removal?
A. Total removal.
Q. Okay. And so I guess after you come to did he tell you, Hey, I had to remove the entire testicle or how did -- how did that go down? Like how did they explain that to you?
A. No, actually the way it looked I -- because of the swelling and the way they stitched it, I thought that I still had it. And it was kind of bolus (phonetic) in there for a little bit, so it wasn't until later that I talked to him that he said he removed it.
Q. Do you know about how long after the procedure you went back to him for him to tell you that he had removed it completely.
A. I don't remember the exact date, but I believe it was around three weeks after the removal.
Q. Okay. And then after the removal did you feel fine or did you still have symptoms?
A. I just felt discomfort after the surgery because it hurt, but other than after they're healed, no, I didn't feel anything. It was fine and it was back to normal.
Q. Okay. And then when is it that you started seeing blood in your urine?
A. I don't remember but it was kind of a little bit after that, not too long or -- but it was -- it was slight



discoloration, it started to get darker in color, and then one day a little after that, a couple days after that, it was very, very bloody. And so that's when I said just went and said, Okay, I need to make an appointment and find out what's going. And then it happened one more and then that's when we went into the emergency room.
Q. So did you go to that appointment or did you --
A. Rescheduled. Yeah, I couldn't -- I rescheduled it to go to the appointment, but we didn't have time after it. And, again, we decided to immediately get it looked at in an emergency room.
Q. Okay. Do you know what hospital you went to, what emergency room you went to?
A. I believe we went to MD Anderson but I don't remember.
Q. MD Anderson Cancer Center?
A. Yes.
Q. Why -- why the cancer center?
A. I don't remember, but I think because after that I was told, but when -- the three weeks when I was finally told after my operation that it was cancerous.
Q. So help me, so let me make sure I understand. So you have the removal, about three -- three weeks passed by, you go back to Dr. Dhir, he tells you, Yeah, I had to remove the entire testicle?



A. Yes.
Q. And then at that point you're told you have cancer?
A. Yes.
Q. And so whenever you see blood in your urine you decide to go to MD Anderson Cancer Center?
A. He said if it is they already started to do -- before that Dr. Dhir also did a, I think, it was like a CT scan -- not a CAT scan, I think it was a CT scan, and that's when he said he saw some cancerous stuff and then it would probably be a good idea to go to MD Anderson for any treatment.
Q. And would that have been in November?
A. Yes.
Q. I actually have a pathology report, so let me mark that as Exhibit No. 2 --
A. Okay.
Q. -- to your deposition.
(Exhibit 2 was marked for identification.)
Q. So at the top of the page you'll see that it says that it's from MD Anderson Cancer Center?
A. Um-hmm.
Q. And it says that a sample was collected 10/21/2021 from your left testicle. Do you see that?



A. Yes.
Q. Okay. And so do you remember either Dr. Dhir or somebody else telling you the results of this pathology report?
A. Dr. Dhir told me later, it was about three weeks after the surgery about this.
Q. Okay. After he does the imagining and you go to the cancer center, what did they tell you at that point?
A. He just mentioned that we go to the cancer center. At that point I was told to, you know, one, we had to make sure that we could get accepted, they just don't accept everybody, and that we would have to meet with one of the head urologist, which I believe was Matthew Campbell at that time, to find out exactly what form of treatment or how severe it was if even if that. I think they wanted to -- I believe they first wanted to see how severe it was.
Q. Did you spend -- were you hospitalized after you get admitted that first time whenever you see blood in your urine?
A. I believe -- I don't remember if I was or not actually. I don't remember.
Q. Okay. When -- when did they tell you that you would -- you would have to start chemo?
A. I don't remember that at all either. I would

have to look at some of the reports.
Q. Okay. Let me show you what's going to be marked as Exhibit No. 3 to your deposition.
(Exh bit 3 was marked for identification.)
Q. Take a minute to read it and then let me know if you remember getting this e-mail.
A. No, I don't remember.
Q. Okay. So this is dated November 3rd, 2021. Do you know by the time that you received this e-mail you knew you had cancer?
A. I did not know I had cancer until later when I was told when I met with Dr. Dhir, so if this was November 3rd I did not know.
Q. Okay. Do you remember calling anybody at the Tobias & Associates?
A. I don't remember.
Q. Did you talk to anybody at Tobias & Associates to get an insurance policy after November 3rd?
A. No, my mother mainly handled all that for me.
Q. Okay. Do you know if your mom told anybody at Tobias that you had a testicle removal?
A. I don't know if she said anything, no.
Q. Do you know if your mom might have told anybody at Tobias & Associates that you had cancer?



A. I don't know if she did or not either.
Q. Do you know if your mom told anybody at Tobias & Associates anything related to your health?
A. I don't know what she had spoke to them about at all.
Q. Okay. And you never spoke to anybody at Tobias personally?
A. No.
Q. I have that there was another application that was submitted, this one was submitted on November 5th, 2021. This is going to be marked as exhibit -- I think I'm on --
THE COURT REPORTER: Four.
(Exhibit 4 was marked for identification.)
BY MS. PRIETO:
Q. Do you remember filling out this application?
A. I don't remember. I don't recall.
Q. Again, if we go to what's Page 4, do you see a signature block there?
A. I do.
Q. And who does it says it's signed by?
A. Michael Brewer.
Q. And the date it was signed?
A. 11/5/21.



Q. Do you know if you filled this out?
A. I don't know who filled it out. I don't know. I don't remember.
Q. I just want to go over and it's on Page 2, again, your medical history, M2. Does that look like the same question that we spoke about earlier talking about medical treatment related to cancer?
A. Yes, it looks the same.
Q. Okay. And what's marked there?
A. No.
Q. Okay. Back to Page 4. Does this page look like the one that we discussed earlier in the prior application?
A. Yes, it does.
Q. Okay. And similarly it tells you on No. 2 that it's not -- that no benefits would be paid for a health condition that exist prior to the date of insurance?
A. Correct.
Q. And it tells you on No. 3, again, that the coverage is not to be a continuation of any prior coverage?
A. I see that, yes.
Q. Okay. Oh, you know what I forgot to ask you about No. 3. For M3, which is on Page 3, sorry, this was asked: During the past 12 months has any applicant been



advised to undergo any tests, treatments, hospitalization, or surgery that has not yet been completed or for which results have not yet been received. Do you see that?
A. Yes.
Q. And what's marked for that question?
A. No.
Q. Okay. At this -- at this time since it was November 5th, you had already had your testicle removal, correct?
A. Yes.
Q. Okay. And then had you already -- had you already seen Dr. Dhir?
A. I had not. I didn't -- that's why I didn't know my testicle was removed so I did not, no.
MR. CLACK: I just want to make sure I heard that right. So your testimony that as of November 5th you did not know that your testicle has been removed?
THE WITNESS: That's right. The way it was folded over the sack that it happened it created the boldus (phonetic) area on there.
THE COURT REPORTER: What kind of area?
THE WITNESS: Boldus.
THE COURT REPORTER: Bolus?
THE WITNESS: It was enlarged but it was also because it was healing and, yes, so it was folded

Page 29

skin.
BY MS. PRIETO:
Q. If we go on the page No. 7 on the bottom it's Bates labeled Tobias 58. Does this look like the page that we looked at before letting you know that this type of policy wouldn't cover all injuries or sicknesses?
A. Yes.
Q. Do you remember reading this page?
A. I do not.
Q. Okay. If you flip over two pages -- no, I'm sorry. Yeah, two pages it'll be on the bottom, Tobias 62. Do you see your signature there?
MR. KACAL: Tobias 62.
THE WITNESS: Tobias 62. Yeah. Oh, okay, I see it, yes.
A. Yes, I see it.
BY MS. PRIETO:
Q. Okay. And, again, this page says: Did you read and understand the limited benefits offered by the plan before you applied or paid for coverage?
A. Yes, I see that.
Q. And then you marked yes, correct?
A. Yes.
Q. Okay. After you had blood in your urine, what kind of treatment did you obtain beside -- like it was

Page 30

just chemo that you obtained?
A. No, I didn't -- I don't remember what I Obtained. But if the first one was chemo, but I believe the first time they just actually did a scan, a PT or CT -- PET or CT scan.
Q. Okay. When were you told that you were going to undergo, you know, a certain amount of chemotherapy?
A. I don't recall.
Q. After you're told that you have cancer, did you ever reach out to Tobias letting them know, Hey, I have cancer, I want to make sure that's covered under whatever policy I obtained?
A. My mom handled all that. I don't know. Like I said, she was the one who spoke to Tobias. I don't know.
Q. Do you know if you were ever on the phone while your mom spoke to them?
A. I might have been but I don't remember. Like I said, that was a long time ago. I don't remember at all.
Q. Okay. I have as part of your petition that you're complaining that the June 21 -- the June 2021 policy and the December 2021 policy was different. Is that correct, is that your complaint against my client?
A. Can you rephrase that? I mean, I was complaining that I was under the impression absolutely and told that this was going to be the same coverage or else, no, why

Page 31

else would I use something that's not -- wasn't going to cover me.
Q. Who told you that it was going to be the same coverage?
A. It was relayed through my mother, and so she handled that. She said they're going to handle everything with it, it was going to be the same coverage, we don't have to worry about that; and I was like, Okay, excellent. I don't know.
Q. What did you tell your mom you needed for insurance?
A. I just needed insurance. I was running a business, trying to deal with a family of five. I don't know what was said on that, ma'am.
Q. Okay. And so your com -- your -- you're assuming that these two coverages are not the same?
MR. KACAL: Objection. Form.
You can answer, Michael.
A. I don't understand. I thought that they were the same.
Q. And what does that mean to you? Does it mean that the wording in the policies are the same or that both policies are going to pay for the same thing?
MR. KACAL: Objection. Form.
A. I don't -- no, I just know that I just thought it

Page 32

was the same policy that I was getting before. I don't know how -- I don't know what you're asking I guess. Could you rephrase that?
Q. Sure. Did you know that the first policy that you had was not going to cover any preexisting injuries or sickness?
A. I didn't fill it out but, yeah, I don't -- I don't -- I guess, I don't know. I don't know. I remember I just filled out -- I was just sent a link to fill out with my esignature. That's what I remember.
Q. So then because I showed you both, right, where both of them tell you if you have a preexisting condition it's not going to get provided for, right, and you went through both applications stating that?
A. I don't remember going through both applications. I just remember verbally being told that's, that's what was going to happen.
Q. My your mother?
A. My mother who was speaking to Tobias, yes.
Q. But somebody from Tobias didn't tell you that specifically?
A. No, nobody even reached out for me there.
Q. Okay. So all the information that you got about whether or not the policy was similar or dissimilar would have been from your mom?

MR. KACAL: Objection. Form.
You can answer.
A. For the most part, yeah, it was. I was going through everything else and trying -- like I said, it was something that she could help out with. She helps me out with those kind of things.
Q. When you say "for the most part," at what point did you speak to somebody at Tobias that told you the policy's the same?
A. I didn't speak to anybody at Tobias really.
Q. Okay. So nobody at Tobias specifically told you the first policy and the second policy are the same?
A. They told me just to sign. That's all they told me to do is sign.
Q. But my question is more specific. My question is: Did anybody at Tobias personally tell you Policy 1 from June and Policy 2 from November are exactly the same?
A. No --
MR. KACAL: Objection. Form.
You can answer.
A. -- no, I don't remember anything like that. I don't remember.
Q. Okay. Did anybody from Tobias tell you specifically personally coverage from the June application and coverage from the November application is exactly the



same?
A. Nobody reached out for me. I was just told to sign.
Q. Okay. At any point did you have any questions that you might have wanted to ask Tobias instead of going through your mother?
A. No, I was -- she was handling it. I was dealing with business and kids and, you know, recovering from the surgery at that time around, too. So, yeah, she was handling everything. Figured that, that would be enough. She represented me on it.
Q. Okay. So you never spoke to Tobias, anybody from Tobias, correct, you personally?
A. Not that I remember, no.
Q. Okay.
MS. PRIETO: I will pass the witness.
MR. CLACK: Let's take five minutes.
MR. KACAL: Sure.
THE VIDEOGRAPHER: We're off the record at 10:42.
(A short break was taken.)
THE VIDEOGRAPHER: We're back on the record at 10:54 a.m.
E X A M I N A T I O N
BY MR. CLACK:



Q. Mr. Brewer, my name is Lance Clack, I represent Golden Rule Insurance Company. And I will try not to double up too many of the questions, but I want to go back and touch on some of these things and then some new things as well. I think you told me or told us earlier you live at 2106 Barrington Place, correct?
A. Barrington Pointe Drive.
Q. Barrington Pointe Drive. How long have you lived at the Barrington Pointe address?
A. Maybe 11, 12 years.
Q. And you also mentioned that you were married. Did I hear that correctly?
A. Yes.
Q. How long have you been married?
A. About two years.
Q. At the time that you took out the first Golden Rule policy back in July of -- or sorry -- June of '21 were you married then?
A. No, I don't remember. Honestly with my wife we have been off and -- I don't remember. We got a lot going on. I don't remember.
Q. Okay. Do you know who was living at the Barrington Pointe address in June of --
A. Yes, I do.
Q. -- sorry -- June of '21 when you got the first



policy?
A. Yes, I do.
Q. Okay.
A. It was Miriam Quiroz and Daysi Huerta, Gianlucan Huerta and myself. I don't know if Tenoch had been born yet and I don't -- I believe he was very, very young maybe.
Q. Alright. And I forgot to ask this, but you understand you're under oath just as were you -- as you were before we took the break?
A. Yes.
Q. Alright. Have you ever filed bankruptcy?
A. No.
Q. I think what I heard you say is you have never had any conversations yourself with any of the defendants, correct?
A. I don't remember having any conversations, no.
Q. You never recorded any conversations either with Golden Rule or with any of the agents at any time, correct?
A. Recorded, no.
Q. Alright. Correct to say that the only communications that you have had have been in writing whether it's with Golden Rule or any of the other defendants?

A. It would be via e-mail, yes, or something that was like my policy sent to my address, yes. If anything I was on there.
Q. And you were asked earlier if you have been conviction or arrested for a crime. Have you been charged with a crime?
A. Convicted or arrested for a crime or charged with -- charged with a crime, no.
Q. Yes.
A. I believe -- well, I don't remember actually. I believe it was a marijuana charge back in the day but that was it.
Q. Okay. And I think you told me you ran Main St Bistro. How long have you operated Main St Bistro?
A. About a little over ten years.
Q. Are you the owner?
A. Yes, sir.
Q. Is that located in Galveston?
A. In Galveston County, yes.
Q. What's the address of the bistro?
A. 615 East Main Street, League City, Texas 77573.
Q. Have you ever worked for an insurance company?
A. No.
Q. Have you ever sold insurance?
A. No.


Q. Have you ever worked in the medical field?
A. No.
Q. Do you have any training in the medical field for insurance disputes?
A. No.
Q. What did you do prior to opening Main St Bistro?
A. I was a chef.
Q. When did you first become a chef?
A. I guess my -- right after I graduated was the title, but I've always been a cook.
Q. I'm going to direct you back to Exhibit No. 1, which I think is in that stack in front of you. And you recognize Exh bit No. 1 as an application for insurance that you submitted on or about June 9th of 2021 to Golden Rule?
A. I don't remember submitting it but it has my name on there. I don't know if it was all filled out or anything like that.
Q. You don't dispute that this is the application for insurance, do you?
A. I don't dispute that, sir.
Q. Okay. Do you recall that in June of 2021 that you made the decision to obtain insurance coverage for yourself?
A. Yes.


Q. What lead to that decision to obtain insurance?
A. I was getting older and I decided that it would be time to start getting insurance.
Q. Alright. And I think you told me that your mother actually handled a lot of the leg work on the policy. Is that correct?
A. Yes, sir.
Q. Alright. So tell me how that came about. Do you call your mother up and tell her go find me insurance or how did that work?
A. Yes, along the lines of I need help finding insurance, I don't know what to have because I had some previously at Lakewood Yacht Club when I was employed there but now I don't, so after leaving that place.
Q. When did you leave Lakewood Yacht Club?
A. I don't remember. It was late 2000s, early teens. I don't know. I don't remember.
Q. Let me ask it this way. You told me you had been running Main St Bistro now for about ten years?
A. Yeah. Yeah --
Q. So --
A. -- it's way before that, yeah, so years before that.
Q. Is it fair to say that you have not had any insurance between when you began running Main St Bistro in


about 2012 and when you applied for the Golden Rule coverage originally in June of '21?
A. Yes, that's right.
Q. Okay.
A. Yes.
Q. Okay. So from 2012 until June of '21 you had no health insurance?
A. That is correct.
Q. And then in June of '21 you had a conversation with your mother to help you find some insurance?
A. Correct.
Q. Was that conversation triggered by any of these various symptoms that also led you to go to the doctor shortly after that policy became effective?
A. No.
Q. I have seen in the claims records that, in fact, the first visit to the doctor was right after this policy came out and so close to it that it was denied a being too closed to the issue date for the coverage to kick in. Do you recall that?
A. No, I don't.
Q. When do you first recall going to the doctor after the first policy issued in June of '21?
A. I don't remember, I just remember going to Dr. Dhir, and I don't remember the time.

Q. One thing before I forget, tell me your mother's name?
A. Ann Brewer, Carolyn Ann Brewer.
Q. Carolyn Ann Brewer. And does she go by Ann?
A. Yes. Yes, she does.
Q. Alright. And tell me your wife's name one more time.
A. Miriam.
Q. Miriam. Did Miriam have insurance in June of 2021?
A. I don't know.
Q. Did any of the children have insurance in June of 2021?
A. I couldn't tell you. My -- yeah, just Miriam takes care of those, so I don't do anything with the insurance, with that. I don't -- they take care of the bills and all that kind of stuff.
Q. How did it come about that you applied for insurance in June of 2021 but you were not applying for insurance either for your wife or any of your several children?
A. I don't know. I believe they had insurance. I don't know if they did or not. Like I said, I don't know. I know that they were covered maybe through the school because you'll have to provide that at that time, but I


believe the oldest one wasn't in school at that time, Daysi might have been. She probably does have insurance and I don't know about Tenoch. I don't handle that.
Q. Your wife handles that?
A. Yes.
Q. Why didn't you go to your wife and say, Since you handled all the insurance can you look into getting insurance for me as well?
A. Because her English isn't that great. And my mom can probably handled that a little bit better.
Q. Who paid the premiums on that first Golden Rule policy?
A. I believe my mother did.
Q. Tell me what you recall about your conversations with your mother around this first Golden Rule policy?
A. That she said that she had found some insurance for me at a reasonable price.
Q. You recall --
A. That she would get the first found of it and then after that when I needed to renew or anything that she would help me and we can go through there.
Q. Other than health insurance are there other matters that your mother handles for you?
A. Yeah.
Q. What are those?


A. Well, sometimes tax and legal things for my business. She used to have quite a bit of experience in that. She used to run payroll for her old place up there, so I got some answers on sales tax and payroll taxes. My dad helps me with some of the car insurance stuff or getting a car, stuff like that, that involves something I'm not knowledgeable about and somebody I can trust.
Q. Do you recall that at some point the application that is Exhibit 1 was sent to you to review and sign?
A. I don't remember going over and being reviewed with it.
Q. Do you recall that at some point you had to answer health questions related to the application?
A. I might have, I don't remember completely it's a long time ago.
Q. Sure. You see under deductible amount on page that's Tobias 38?
A. Yes.
Q. Alright. And there are four or five choices there of deductible, and the one that's selected is the $2500 one. Do you see that?
A. Yes.
Q. Can you tell me what went into that decision to select that and not something else on the application?
A. I don't know why.


Q. You don't recall any discussions about that at the time that you signed this application?
A. No, my mother handled mainly that.
Q. And above that there's a series of plans. Do you recall any discussion with anyone at that time about which of those plans to select?
A. I don't remember. I don't recall.
Q. Is that something you'd have to ask your mother?
A. Yes.
Q. There is at the top of that Page 38 the days of coverage and you see it says 184?
A. Yes.
Q. Do you know how that date was selected?
A. I do not.
Q. Okay. There is a statement of understanding on Tobias 40. Can you turn with me to that and tell me when you're there.
A. I'm there, sir.
Q. Okay. Do you see above where it says statement of understanding there is some block text and in the middle of that it says: Be sure to check your certificate carefully to make sure you're aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits. Do you see that language?
A. Yes.

Q. And below there is a statement of understanding. Do you see that?
A. Yes.
Q. And it says: I have read this application and represent that the information shown on it is true and complete. Do you see that?
A. Yes.
Q. Would you have signed the application down below without reading that and making sure that, that was a true statement?
A. I don't remember being sent this. I just remember being asked to sign stuff in a link. That's all I remember.
Q. Is it your habit to sign things like this without reading them or reviewing them?
MR. KACAL: Objection. Form.
You can answer.
A. Sometimes, yes.
Q. Is it your practice to sign health insurance documents without reading them?
MR. KACAL: Objection. Form.
You can go ahead.
A. I remember l ke what I did just signed where they told me to sign and I'd have coverage, so I don't know anything about that, yeah.



Q. You've been running Main St Bistro now for ten years, right?
A. Um-hmm.
Q Sorry is that "yes?
A. Yes.
Q. You're the owner, correct?
A. Yes.
Q. Do you sign the checks and you hire and fire the staff and do all the things that come with owning and operating a restaurant, correct?
A. Yes.
Q. Are you in the habit of signing agreements in your business without reviewing them and reading them and understanding them?
A. I usually go through -- sometime when I talk to the agent or my sales representative, yeah, I talk to them and they run me through it if I don't understand some of the fine print.
Q. So if don't have -- if you have things that you don't understand you talk to your agent, you ask questions, you figure out what you're committing to?
A. Yeah.
Q. Sorry, is that "yes"?
A. Yes.
Q. And that's true when you buy insurance for the



business, right?
A. Well, I ta k to my agent and they tell me what it could cover and how much it is. Usually that's just how much it is and I pay it.
Q. Alright. Based on your normal practice in your business, do you think it l kely that you reviewed this application when you signed it on June 9th, 2021?
MR. KACAL: Objection. Form.
Go ahead.
A. Rephrase the question.
Q. Yeah. Based on your normal practice, your normal business practice, do you think it is likely that you reviewed Exh bit 1 when you signed it back in June of '21?
MR. KACAL: Objection. Form.
Go ahead.
A. My business practice compared to my health insurance for personal, I don't know. On the personal stuff I don't know much about it, I just know my business stuff. That's all I've done since I've -- since '14, sir.
Q. My question is not what you know, my question is whether you think that you would have reviewed this before you signed it? And by "this," I mean Exhibit 1, the application you signed in June of 2021.
A. I don't remember if I reviewed it or not. I don't remember.



Q. Okay. If we look at the statement of understanding there is an Item 2 there and you see it says: No benefits will be paid for a health condition that exist prior to the day the insurance takes effect. Do you see that language?
A. Yes.
Q. And then down at the bottom you signed it. Your signature and the date, correct?
MR. KACAL: Objection. Form.
Go ahead.
A. That's my signature, it says esign, and date is 06/09/21.
Q. Okay. As we sit here today, do you have any reason to believe that anyone other than you signed this application on your behalf?
A. I don't believe so.
Q. If we to turn to the next page there's a Fact Membership Enrollment Form. Do you see that?
A. Yes.
Q. Did you ask anybody what it meant that you were enrolling in FACT?
A. No, I don't remember ta king about FACT.
Q. Alright. Turn with me, if you will, to Page 43. Do you see that Page 43 is a form that begins: Is this short-term health insurance plan right for me? And then

under that it says: You must read and sign this form. Do you see that?
A. I sorry, where is that?
Q. At the very top of the page.
A. Yes, at the very top, yes.
Q. Okay. And then the first thing that it says under the bold language is: This plan does not need to follow federal or Affordable Care Act rule. Unlike ACA plans, the short-term plan may not cover all injuries and sicknesses including any you have before applying. Do you see that language?
A. Yes.
Q. And then below that it says: How long will this plan cover me and it says 184 days. Do you see that?
A. Yes.
Q. And then it says: Can I renew or extend this plan. Do you see that?
A. Yes.
Q. And what does it say?
A. No.
Q. What did you understand that to mean when you first applied for this plan?
MR. KACAL: Objection. Form.
You can answer.
A. Don't remember seeing this.



Q. What does --
A. It was a long time ago, I don't remember every single thing I read on this or how I interrupted it.
Q. Okay. What does that mean to you as you sit here today?
A. It means I don't remember.
Q. No, no, what does that language mean to you that you could not renew or extend the plan?
A. It says: Can I renew or extend this plan and it says no.
Q. Do you understand that to mean that once the short-term health plan that you applied for in June of '21 expired you would have to acquire a new plan or different coverage?
A. Yes.
Q. Turn with me, if you will, to the next page, Tobias 44. Do you see that the first bolded questions says: Am I covered for an injury, illness, or disease I had before I applied for this plan (preexisting condition) question mark.
A. Yes.
Q. And then read with me, if you will, the answer below that, that is printed on this form.
A. No.
Q. And then what does it say?



A. You must tell the truth when answering these questions about your health. We can deny claims for injuries, illness, or disease that you have signing up for this plan (whether or not you tell us about you condition.)
Q. And then turn with me to the end of that form on the page Tobias 46. Do you see at the bottom of that page it says -- there's a question that says: Did you read and understand the limited benefits offered by this plan before you applied or paid for coverage? Do you see that?
A. Yes.
Q. And below that you checked that box next to the language that says: Yes, I read and understood and the benefits and limits of this plan, correct?
MR. KACAL: Objection. Form.
Go ahead.
A. I mean it says it's yes, I don't remember marking it. I just --
Q. It is marked, correct?
A. It is marking, that is correct.
Q. Do you have any reason to believe that someone other than you marked it and affixed your esignature down below?
A. Don't know if they marked it, but the esignature I don't know either. Would that be something that my --



the agent would have done?
Q. Certainly not. Do you have any reason to believe that your mother forged your signature on this document?
A. No.
Q. Alright. As we sit here today you don't remember checking the box and signing it, but you don't have any reason to believe that anyone forged your signature on this application, correct?
A. Correct.
Q. And then turn with me, if you will, to Tobias 49. And Tobias 49 is a document entitled application -- Acknowledgement of Application Completion. Do you see that?
A. Yes.
Q. And No. 5 says: I specifically adopt the statement of understanding presented on the last page of the application immediately above my signature. Do you see that?
A. Yes.
Q. And then below that you made an "X" and then you e-signed this form as well down at the bottom, correct?
A. I see it's signed, yes.
Q. Okay. You don't have any reason to believe that your signature on this form was forged, do you?
A. I do not.

Q. And if we look back to the statement of understanding, that's the statement back on Tobias 40, correct?
A. I'm sorry, which page?
Q. 40.
A. Okay. I'm at 40.
Q. That's the statement of understanding that is referenced on the acknowledgement that we just looked at that is Tobias 49, correct?
A. What were you saying were the same?
Q. On Tobias 49 there's an acknowledgment and at the bottom on that acknowledgement it says: I specifically adopt the statement of understanding presented on the last page of the application immediately above my signature, correct?
A. I see that, yes.
Q. And the statement of understanding is the statement of understanding that is on Tobias 40, correct?
A. Yes, I see that.
Q. And that is the statement of understanding that includes the statement: No benefits will be paid for a health condition that exist prior to the date insurance takes effect, correct?
A. That's what it says, yes.
Q. Okay. So by my account Golden Rule has told you


once on the statement of understanding, twice on the acknowledgment form, and then a third time -- or, no, a fourth time in the acknowledgement by referring you back to the statement of understanding that this coverage is not going to cover a preexisting condition. Would you agree with that?
A. Correct.
Q. Alright. Four times in Exhibit 1 you were told that this coverage will not cover a preexisting condition, correct?
A. Correct.
Q. Alright. Now I am going to hand you what I am going to mark as Exhibit 5.
(Exhibit 5 was marked for identification.)
Q. Alright. Exhibit 5 you recognize as a Cover Page and Welcome Letter for the first short-term plan.
A. I don't recognize this, but I'm -- it's a long time ago.
Q. Sure. If we look at the first page of Exh bit 5 there's an address there, 2106 Barrington Pointe Drive. That was your address at the time, correct?
A. Yes.
Q. And then if we look at the second page there's a letter and it has a policy No. 096422291. Do you see


that?
A. Yes.
Q. Do you recall receiving this letter?
A. It was a long time ago. I don't remember.
Q. Fair to say you don't deny receiving it, but you just don't remember one way or the other?
A. Correct.
Q. Okay. Alright. If we look in the middle of Page 15 there's a paragraph that begins: Unlike ACA short-term plans. Do you see that paragraph?
A. Yes.
Q. And you see it says on the first sentence: Do not offer coverage for preexisting conditions and, as a result, are often less expensive. Did I read that correctly?
A. Yes.
Q. And then it says: A preexisting condition is a health condition that exist before someone applied for or signed up for a new health insurance policy. Did I read that correctly?
A. Yes.
Q. And it says: Are issued for a specified period of time. Do you see that?
A. Yes.
Q. And then it says: If you need coverage beyond


this time period, you must reapply. Keep in mind, if you reapply, any illness or condition developed under your current plan would be preexisting under the new plan and would not be a coverage expense. Do you see that?
A. Yes.
Q. And so did you understand from that, that if you needed coverage passed the 184 days covered by this first policy you would have to reapply and that the preexisting condition you developed while the first policy was in effect would not be covered under the second policy?
A. I was under the impression that it would be covered for the second policy or else I wouldn't have renewed it.
Q. That's not what the language that we just looked at says isn't it?
A. It's not what was relayed to me, though.
Q. I'm not asking what was relayed to you, I'm asking you: Would you agree with me that this language we are looking at on GRIC 15 makes clear to you if you sit here today that coverage under the second policy would not exist for any condition you developed while the first policy was in force?
A. So my first policy said when -- so if I was -- I don't know. I guess, yes, I understand that it's saying here the new policy renewal that's what they needed.

Q. And you understood that any illness or condition developed under your current plan, that is the first plan, would be considered preexisting under any second plan and would not be a covered expense, correct?
MR. KACAL: Objection. Form.
Go ahead, Michael.
A. I was under the impression it would be.
Q. Well, I'm asking you if you understand that this letter says that it would not be?
A. (Indecipherable.) Current plan --
THE COURT REPORTER: I can't hear you, sir.
THE WITNESS: Huh?
THE COURT REPORTER: I couldn't hear you.
THE WITNESS: Oh, I'm just talking, I'm reading.
A. Any illness or condition developed under your current plan would be considered preexisting under the new plan and would not be a covered expense.
I was under -- I thought this meant it was under it -- if I was already getting treatment for something and then it happened to come up again that I was still covered when I renewed it.
Q. As you sit here today you would agree with me



that this letter says exactly the opposite of that?
A. That's what is stated it seems.
Q. Alright. This letter says that any illness developed under the first plan would not be covered under any subsequent plan, correct?
A. Correct.
Q. Alright. And I take it what you're telling me is even though Golden Rule sent you this letter back in June of '21 you don't recall reading it at that time?
A. No.
Q. Sorry, I asked a terrible question. Do you recall reading it at that time?
A. Do I recall reading at that time, no.
Q. I'm going to hand you know what I've marked as Exhibit 6.
(Exhibit 6 was marked for identification.)
Q. Do you recognize Exh bit 6 as a copy of the short-term plan that was issued to you in June of 2021?
A. I don't remember seeing this, no.
Q. I think you told me earlier that you got some correspondence and policy documents from Golden Rule at your house at Barrington Pointe. Do you recall if this was one of them?
A. I don't recall if I got this.



Q. Have you ever reviewed the first short-term policy as you sit here today?
A. My mother handled it, no, I have not.
Q. Okay. You don't recall reviewing it at the time that you got it?
A. Apparently not.
Q. Look with me, if you will, at -- there's a page GRIC 40. Do you see GRIC 40 is the Disclosure Record?
A. Yes.
Q. And it says in the second sentence of that big paragraph: Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits. Do you see that language?
A. Yes.
Q. Do you recognize that, that language is, in fact, the same language from the acknowledgement form that was on Exhibit 1 or very similar to it?
A. Yes.
Q. Alright. Did you ever review the policy to check the preexisting condition language?
A. I don't remember.
Q. Look with me, if you will, at Page 61, GRIC 61. Do you see on GRIC 61 on the right column about three entries down there's a definition of preexisting



condition?
A. I do.
Q. And do you see it says: Preexisting condition means an injury or illness from which the covered person received medical advice or treatment within the 12 months immediately preceding the applicable effective date the covered person became insured under the policy?
A. I see the definition, yes.
Q. And then look with me, if you will, at GRIC 78. And you see that at the bottom of GRIC 78 there is a bolded heading, preexisting conditions?
A. Where at?
Q. At the bottom of page GRIC 78.
A. Experimental or investigation treatment on unproven services. Where?
Q. I don't believe you're on the right page.
A. GRIC 78?
MR. KACAL: He's on the right page.
MR. CLACK: Oh, he is.
Q. I guess at the bottom there's a heading that preexisting conditions.
A. Yes.
Q. Okay. And below that it says: Preexisting conditions will not be covered under the policy.
A. Yes.

Q. Okay. So that sets forth clearly in the first short-term plan that it does not cover preexisting conditions, correct?
A. That's what it states, preexisting conditions will not be covered under the policy.
Q. Alright. So just to review we discussed that four times in the application documents and then a fifth time in the welcome letter, and then sixth in the policy itself Golden Rule informed you that preexisting conditions were not covered under the first short-term plan, correct?
A. It was written in there, yes.
Q. Sorry?
A. It was written in here, yes, the documentation, yes.
Q. That's six times in all these documents that you got back in June of 2021 Golden Rule made clear that preexisting conditions were not covered, correct?
MR. KACAL: Objection. Form.
A. It says -- it states it right here.
Q. Yeah, I'm asking a little bit of a different question. It says it in the policy itself --
A. Um-hmm.
Q. -- it says it four times in the application materials, and it says it once more in the welcome letter



for a total of six times, correct?
A. That's correct.
Q. And when I say "it," that this insurance does not cover a preexisting condition, correct?
A. That's right, that's what it says, yes, that's correct.
Q. And then at least twice that we have looked at, once in the application materials and once in the welcome letter, Golden Rule told you that that policy -- that this first short-term plan could not be renewed, correct?
A. That it could not be removed? I don't remember ta king to them on that, but if it was issued to me I don't remember reading it.
Q. So we looked at the welcome letter that's on Exhibit 5 and you agreed with me that in that welcome letter it tells you that this policy cannot be reviewed, correct?
A. That's what we just read, yes, correct.
Q. And then in the acknowledgment that is part of the application materials you recall there was a question: Can I renew or extend this plan? Answer, no. Do you recall that?
A. I do remember that one.
Q. Alright. So at least twice at the time that this first short-term policy issued, Golden Rule had told you



in writing it could not be renewed or extended, correct?
A. It says that -- state so, yes.
Q. Alright. Tell me when you first recall seeking treatment, medical treatment following the issuance of this first short-term plan.
A. Restate that, I'm sorry.
Q. Yeah. When did you first seek treatment after the first short-term plan issued?
A. I don't remember. I just remember I was told the 15th.
Q. You were told the 15th?
A. Of November.
Q. Okay. We'll come back to that. Let me hand you...
MR. KACAL: Lance, the welcome letter was 6, right -- or correct?
MR. CLACK: The welcome letter is 5, and I believe.
MR. KACAL: Okay.
MR. CLACK: And the certificate itself is 6.
MR. KACAL: How did they get that thing on there?
MR. CLACK: Good question.
Q. Alright. I'm going to hand you now what I'm



going to mark was Exhibit 7.
(Exhibit 7 was marked for identification.)
Q. Do you recognize Exhibit 7 as the series of Medical Records dated GRI -- or sorry, Bates stamped GRIC 369 through 450?
A. I see the paper, yes.
Q. Okay. And this first page is a record of a visit on December 1st, 2021, correct?
A. It is a record, yes.
Q. Alright. So at this time you had already applied for the second Golden Rule short-term policy, correct?
A. My mother handled that, but I don't -- I can't recall.
Q. Okay. We will circle back.
There's an assessment there: Michael Brewer is a 38 year old male with a history of recently diagnosed testicular cancer. Patient unsure if it was seminoma versus nonseminoma for which he received left-sided orchiectomy one month ago to be presented to the ACCC with gross hematuria. Do you see that language?
A. Yes.
Q. Alright. Does that fit generally with your recollection that you had, had an orchiectomy at the beginning of October 2021 and that, that was subsequently

diagnosed with cancer?
A. I did have an orchiectomy and then while down, I guess, I was diagnosed with cancer when I returned and ta ked to him, my urologist, yes.
Q. And to the best of your recollection as you sit here and you think you were informed of that diagnosis on or about November 15th. Is that what -- did I hear you right on that?
A. Yes, sir, you did.
Q. Okay. So did you ever have an understanding when you had the orchiectomy that they had taken tissue to test it and then you were waiting those test results and you received them on November 15th?
A. I did not know that they were getting test done. I don't recall that at all.
Q. Okay. Is it fair to say there was probably some conversation in the hospital shortly after that operation but you just don't have a good recollection of as we sit here today?
A. It was a private office, yes, but it was, like I said, around the 15th of when I was told.
Q. Okay. At some -- well, let's do it this way. You have in front of you, what I think, is Exhibit 4. Actually let's go back one further. Do you have Exhibit 3 in front of you?


A. Give me one second. Yes, I do.
Q. Exhibit 3 is an e-mail from Chris Davis at getmehealthcare.com, I guess, to you although it simply says dear client, correct?
A. It does.
Q. Do you recall receiving this e-mail?
A. No, I do not.
Q. At the -- at this date, November 3rd, you had already had a orchiectomy, but your testimony is you had not yet been told that you had cancer. Is that a fair statement?
A. Yes, that is correct.
Q. Okay. Did you forward this on to your mother or take any action when you received it?
A. I don't remember doing this. I believe she was the one who was in contact.
Q. Do you know if this e-mail came to you or it came to her?
A. I believe it came to her, but I do not remember the e-mail being brought to me. The majority of the e-mails were actually sent to her.
Q. Okay. Is it fair to say you don't recall ever seeing this prior to -- or when do you first recall receive this e-mail? Let me ask it that way.
A. I don't remember seeing this.


Q. Would it have been sometime after we got in litigation or when after your disputes with Golden Rule arose?
A. I guess that's when the first time -- I just saw it now. So I've been presented me -- I've looked at a lot information, I don't remember this being sent to me at the time of November 3rd, 2021.
Q. Okay. When do you recall first discussing or renewing your insurance with your mother?
A. When the insurance policy she was going to be almost up, so she said we're going to review it.
Q. Look with me, if you will, then at exhibit -- or let me ask you before I forget. You have never spoken to Chris Davis over the phone or in person?
A. I don't believe I have, no.
Q. Okay. The only contact you've ever had with Mr. Davis or with anybody at getmehealthcare.com or Tobias & Associates is poss bly this e-mail that's Exh bit 3 or possibly it was sent to your mother. Is that a fair statement?
A. I believe it was sent to my mother, yes, that's a fair statement.
Q. Okay. Look with me, if you will, to Exh bit 4. Do you recognize Exhibit 4 as an application dated November 5th, 2021, for Golden Rule short-term insurance


policy?
A. I see it's an application, I don't remember filling it out.
Q. Do you see that it is dated on the signature lines November 5th, 2021?
A. Yes, I do see.
Q. Alright. So as of the date of this application November 5th of 2021, you had, had the orchiectomy, you were awaiting the results of the biopsy, correct?
MR. KACAL: Objection. Form.
A. It was just a form that they -- I just had the orchiectomy and I was actually did not know anything at that time if I was diagnosed with cancer. I didn't know they were actually going to go get it tested as well.
Q. Were you having ongoing symptoms at that time as a result of the orchiectomy and whatever other else -- whatever other conditions had caused that surgery?
A. The only conditions I had prior were just swelling of the testicles so, no, once that was removed I didn't have any other.
Q. I think you told me earlier that you had some bleeding in your urine and that --
A. After.
Q. -- as a result you got an ultrasound. Do I hear that correctly?

A. No. I was -- ultrasound was first the night before I even got my orchiectomy.
Q. Okay. When to the best of recollection did that ultrasound take place?
A. It was before the orchiectomy so before the 21st, I don't remember; and it was two times that I went in for that.
Q. Would that have been as early as September of '21?
A. It would -- it could of, yes.
Q. Alright. Then did the orchiectomy relieve the -- or when was the bleeding in the urine?
A. That was when I first went into the hospital a couple days prior. I don't remember the date exactly.
Q. Sorry, prior to which?
A. Prior to the emergency room visit at MD Anderson.
Q. Okay. So we've looked at this December 1st emergency room visit. The bleeding in the urine would have started shortly before that?
A. Yeah, just a little -- yeah, it was, I believe, a day before, and when it happened again I went to go --
Q. Okay.
A. -- to MD Anderson, yes.
Q. Okay. Alright. There is e-mail address towards the bottom of the application that is Exhibit 4 and it


says: Cabie19363@yahoo.com. Do you see that?
A. I don't see which page you're on. Sorry, the first one?
Q. The first of Exhibit 4 where it says contact information.
A. Yes. Okay, yes.
Q. Is that your mother's e-mail address?
A. Yes, it is, sir.
Q. Okay. And is that her phone number or your phone number?
A. That is my phone number.
Q. Alright. Do you recall any conversations with your mother prior to or on November 5th prior to filling out this application?
A. I remember talking -- her taking care of most of this situation with this, so she just said I'll take care of it and she did.
Q. Was she aware at that time that you had, had the orchiectomy?
A. Yes, she was aware that I had, had surgery.
Q. Did you talk with your wife at that time about needing to get new insurance?
A. No. My mother took care of that.
Q. Was your wife aware of your insurance situation?
A. No.


Q. Alright. If you look with me -- what did you think you had at that time on November 5th, 2021? How would you describe the condition that had lead you to get an orchiectomy?
A. I thought it was an infection because it didn't hurt and it wasn't swelling. I didn't -- I looked up cancer signs before because that's some of the options, at least let me know sometimes this stuff can be answered, but it looks like it's -- it's an infection. And we even did ultrasound and he confirmed it was an infection until they actually operated was when they found out it was cancerous. And I was not told until that -- about three weeks later.
Q. Alright. Look with me, if you will, at the page that -- on Exhibit 4 that is marked Tobias 55. And you see there, there is a statement of understanding?
A. Yes, I do. Yes.
Q. And above that statement of understanding it says in the second sentence of that paragraph: Be sure to check your policy certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits. Do you see that language?
A. Yes.
Q. That is the same language that we saw on the


previous application that was Exhibit 1, correct?
A. Correct.
Q. And then down below that there is a statement of understanding in the second paragraph below that says: No benefits will be paid for a health condition that exist prior to the date insurance takes effect. Do you see that language?
A. Yes, sir.
Q. That is the same language that we saw, again, on the previous application, correct?
A. Correct.
Q. And then at the bottom of that page that's your esignature on the date November 5th of 2021, correct?
A. Correct.
Q. If we turn to a couple pages over there's a page Tobias 58. Oh, before I forgot one other question. Go back, if you will, to the page Tobias 53. Up at top of Tobias 53 there's a section where you choose the plan. Do you see that?
A. Yes.
Q. And you chose this time the value, a different plan. Do you see that?
A. Yes.
Q. Why did you change from the previous type of plan you had to the value plan?

A. My mother took care of that, I don't know.
Q. Did you have any discussions with her about it at that time?
A. I don't remember I did.
Q. Do you recall the original short-term plan, the short-term medical plus Elite A. Do you recall that?
A. Yes.
Q. And then when you applied for this one you switched to the value, correct?
A. Yes.
Q. Alright. But you don't recall any discussions around why that was done?
A. No, I do not recall.
Q. Okay. And then there's also a box there for deduct bles. Do you see that?
A. Yes.
Q. And you checked the box for $5,000, correct?
A. It is checked for 5,000, correct.
Q. The previous plan had a deductible of $2500, correct?
A. Correct.
Q. Alright. Do you recall why you switched from the 2500 to the $5,000 deduct ble?
A. Once again, I didn't handle all this. I don't remember the cause, no.


Q. But certainly when you signed this if you had reviewed the application that would have tipped you off that it was a new and different plan because it was a different choice of plan with a different deductible, correct?
MR. KACAL: Objection. Form.
You can answer.
A. I don't recall ever reading it.
Q. Is -- did your mother make those choices?
A. Don't know. I don't know if it was filled out by the insurance company or anything, I don't know.
Q. Have you ta ked to your mother about this situation since Golden Rule deny the claims that are an issue in the lawsuit?
A. About which situation?
Q. How it came about that this application got filled out or who made the choices for the plan type and deduct ble or any of it.
A. I haven't talked to her about that. All I just know that she helped me with the insurance. I don't know. I was just told to esign it.
Q. Okay. Turn with me, if you will, to Tobias 58. Tobias 58 is a form that begins at the top: Is this short-term health insurance plan right for me? You must read and sign this form. Do you see that language?


A. Yes.
Q. And then below that it says under the bolded language: This plan does not need to follow federal Affordable Care Act ACA rules. Unlike ACA plans, this short-term plan may not cover all injuries or sicknesses including any you have before applying. Do you see that language?
A. I do.
Q. Alright. That's the same language we saw in the similar acknowledgment form in Exhibit 1, correct?
A. Correct.
Q. And then below there as the reminder. Can I renew or extend this plan, and it says no, correct?
A. Correct.
Q. And that's identical language to what we saw in the previous acknowledgment form that was part of Exh bit 1, correct?
A. I believe so, yes, that's correct.
Q. And if you turn to the next page there's a bolded paragraph there that begins: Am I covered for an injury, illness, or disease I had before I applied for this plan (or preexisting condition)? Do you see that question?
A. I do.
Q. And then it says no, correct?
A. Correct.


Q. And below that there's a bullet point that says: You must tell the truth when answering questions about your health; and a second bullet point that says: We can deny claims for any injury, illness, or disease you had before signing up for this plan whether or not you tell us about your condition. Did I read that correctly?
A. Correct.
Q. That is identical to the language that we saw in the previous acknowledgment form that was part of Exh bit 1, correct?
A. Correct.
Q. And then if we look at Page 62 there is language at the bottom of 62 where it says: You must confirm you read and understand this form. Do you see that language?
A. Yes.
Q. And below that it says: Did you read and understand the limited benefits offered by this plan before you applied or paid for coverage? Did I read that correctly?
A. You did, yes.
Q. And below that you checked the box by the language that say: Yes, I read and understand the benefits and limits of this plan. I was not required to make a payment or apply for the certificate before getting this disclosure form, correct?

A. Well, the box says checked the form.
Q. And I read that language correctly, correct?
A. Correct.
Q. And you're not aware that -- of anyone else who may have forged your signature or forged your check in that box, are you?
A. I don't remember the check, but the signature I was just given links to sign signatures.
Q. That is your signature at the bottom of Tobias 62 and where it says type and sign -- or sign your name, correct?
A. I believe I had to type it, yes, the esign.
Q. And then right above that it says: Don't sign this document if you don't understand it. Do you see that?
A. I do.
Q. And they were so intent on that then they put the same thing in Spanish right underneath it, correct?
A. Yes, that's Spanish underneath as well on the same sentence.
Q. Certainly Golden Rule very much wanted you to have read this form and understood this form and understood what it meant, correct?
MR. KACAL: Objection. Form.
A. I was just sent links to esign.



Q. That's not my question at all.
MR. CLACK: Objection. Nonresponsive.
Q. Certainly Golden Rule wanted to make sure that you read and understood this acknowledgement form at the time that you signed it at the time you applied for this coverage, correct?
MR. KACAL: Objection. Calls for speculation.
You can answer.
A. It says that I should -- it says that I should have understood it. I -- it says here what it says and it is signed.
Q. And then on the last page Tobias 65 there is an acknowledgement of application completion. Do you see that?
A. Yes.
Q. And then the 5th item there says -- well actually, the 3rd item says: I have personally, carefully, and completely reviewed the completed application and prior to signing the application have made any changes necessary to avoid any incomplete or incorrect information. Do you see that?
A. I do.
Q. And then on 5 it says: I specifically adopt the statement of understanding presented on the last page of



the application immediately above my signature. Do you see that?
A. I do.
Q. And we know that the second item in that statement of understanding says that preexisting conditions will not be covered, correct?
A. Correct.
Q. And then there's a box where you check the box by the phrase: I understand the above list of acknowledgments, correct?
MR. KACAL: Objection. Form.
A. It is checked, yes.
Q. And then that's your esignature down at the bottom, correct?
A. That is my esignature.
Q. Were your -- were your reputations in this acknowledgement of application completion, that is the last page of Exhibit 4, true and correct at the time that you signed the acknowledgment?
MR. KACAL: Objection. Form.
A. Can you rephrase that question? Sorry.
A. Yeah. Were your representations in this acknowledgement of application completion true and correct at the time that you signed it on November 5th, 2021?
MR. KACAL: Objection. Form.



A. I don't remember all this stuff that I can do to it, but it is signed.
Q. Would you have signed it if it was not accurate, if your representations were not accurate?
A. I honestly don't remember just signing it. I just remember signing it, like just being told a link, so.
Q. But you understood at the time you signed this that Golden Rule was relying on the information in your application in making a determination as to whether you -- to issue you coverage, correct?
A. I was under the understanding that my mother was talking to them and we were getting it renewed. That's what I understood.
Q. Why did you think you had to sign all this? Did you not know that Golden Rule was relying on it?
A. Well, of course, they needed a signature, yes, sir.
Q. Alright. You understood they were relying on your information and your representations in this application, Exhibit 5 -- I'm sorry, Exhibit 4 in deciding whether to issue you coverage, correct?
MR. KACAL: Objection. Form.
A. I don't know if my mom was helping me out or I was represented with that at that time, but...
Q. Yeah, that's -- none of that's my question.

MR. CLACK: Objection. Nonresponsive.
A. Sorry.
Q. My question is: Did you understand that Golden Rule was relying on your representations in the application that is Exhibit No. 4 in deciding whether to issue you coverage?
MR. KACAL: Objection. Form.
Go ahead.
A. Can you rephrase that, please?
Q. Yeah. Did you understand when you signed the application that is Exhibit 4 that Golden Rule was relying on the truthfulness and accuracy of the information you provided and the representations you made in that application?
A. Yes.
MR. KACAL: Objection. Form.
Q. I'm sorry, I couldn't hear the answer.
A. Yes.
Q. You would agree with me that just as with the first application and the application for insurance that is Exhibit 4 Golden Rule told you no fewer then four times that preexisting conditions would not be covered, correct?
A. It is stated in there.
Q. It says it at least four times, correct?
A. Yes, it is stated four times, correct, at least.



MR. CLACK: Before we move on what's my next number?
THE COURT REPORTER: 8.
MR. CLACK: 8?
THE COURT REPORTER: Yes, sir.
BY MR. CLACK:
Q. I am going to hand you what I have marked as Exhibit 8.
(Exhibit 8 was marked for identification.)
Q. Do you see that Exh bit 8 is a series documents produced by your counsel Bates stamped Brewer 674, 675, and 676?
A. I'm sorry, where?
Q. At the bottom right there's some very tiny numbers Brewer 647, 675, and 676.
A. Yes, I see that at the bottom.
Q. Okay. There is on the first page what it looks to me like a call log for a phone number 561-910-4194. Do you see that?
A. Yes, I do.
Q. Alright. What phone number is that?
A. I have no idea.
Q. Above that there's a usage for 832-428-7266. Do you see that?



A. Yes.
Q. Whose phone is that?
A. Carolyn Ann Brewer's, my mother's.
Q. Alright. Does this reflect to you that your mother had four or five -- it looks like five calls with this 561 number in Boca Raton on -- three on November 5th and two on November 8th, 2021?
A. It does look like that, yes.
Q. Alright. Do you know what was discussed on those calls?
A. I do not, sir.
Q. Have you ever discussed with your mother what took place on those calls?
A. I don't know exactly what happened on each of those, but it was for getting insurance coverage.
Q. Beyond that it was for getting insurance coverage, have you ever had any discussions with your mother as to what was said on those calls?
A. She said it was going to be the same coverage that we had before and that it would cover everything.
THE COURT REPORTER: I'm sorry?
THE WITNESS: And it would cover everything.
THE COURT REPORTER: Thank you.
THE WITNESS: Yes, ma'am.



BY MR. CLACK:
Q. Anything else?
A. Can't remember, no.
Q. Alright. On the next page there are five calls, some in-going, some out-going on November 5th and one on November 4th, 2021. Do you see that?
A. Yes.
Q. Okay. Do you recognize any of the phone numbers that are listed there on the incoming calls?
A. I do not.
Q. Are either of those 832 numbers are those your numbers or numbers of someone in your family to your knowledge?
A. The 832-865-5198?
Q. Yeah.
A. That's the one you're referring to? Not that I know of, no.
Q. What about the 832-722-5101?
A. I believe -- I don't know. Not that I know of.
Q. And then I think you already told me you don't know what that 561-910-4194 number is?
A. Correct, I do not.
Q. Alright. The last page of that exhibit there's some handwritten notes that also in the upper left have a date 11/5. Do you see that?

A. The dates I see 12/12, 12/11, yes. 11/5 in the very corner.
Q. Yeah. Are these your mother's notes?
A. Yes.
Q. Okay. Have you ever spoke to her about these notes?
A. No, I have not.
Q. I will ask her tomorrow.
If you go back to Exhibit 4, on the second page of Exhibit 4 there's is a requested date, requested effective date of 12/12/21. Do you see that?
A. Yes, sir.
Q. Do you know how that date was arrived at?
A. I do not.
Q. That is the date after the previous short-term plan expired?
A. I have -- do not know.
Q. Did you have any discussions with your mother on or around November 5th when you were applying for this new coverage as to the effect of your ongoing treatment on the new coverage?
A. She relayed to me that my treatment would be covered through Golden Rule when she was ta king to the -- whoever she was talking to about renewing my application.
Q. I'm going to hand you now what I'm going to mark



as Exh bit 9.
(Exh bit 9 was marked for identification.)
Q. You recognize Exhibit 9 as the Welcome Letter for your second Golden Rule short-term plan?
A. Yes, I see that it is welcome and thank you.
Q. Alright. Do you recall receiving this letter?
A. I don't recall.
Q. The address that this Exh bit 9 is sent to 2106 Barrington Pointe Dr. That was your address in 2021 and remains your address as we sit here today, correct?
A. Correct.
Q. Okay. There is a paragraph about two-thirds of the way down and it begins: As a reminder your short-term medical plan. Do you see that?
A. Yes.
Q. And it says: Does not cover preexisting conditions, find out more about this on the CRG and your plan documents. Do you see that sentence?
A. Yes.
Q. Alright. Did -- when you received this letter, did you review it or do you recall reviewing it?
A. I don't remember receiving this letter.
Q. Alright. Would that have caused you concern if you had reviewed it at that time about your coverage under



the new short-term plan?
A. It might of but I don't know what some of that stuff means; but, yes, now that you've explained it better, yes, I -- preexisting conditions.
Q. Certainly as of December 12th when the second short-term plan became effective you had the orchiectomy and been diagnosed with cancer and winding up to about a ten day hospital stay for treatment of your cancer and other related issues, correct?
A. Yes, I believe so. I don't remember the exact date.
Q. If we look at the second page of Exhibit 9. Do you see in the middle -- you see at the top it says: Short-term medical customer reference guide?
A. Yes.
Q. And then in the middle there's an entry: Preexisting conditions. Generally, a health condition which exist before the applicable effective date is not covered during the term length of coverage. Do you see that language?
A. Yes.
Q. Do you recall reviewing that language when you received this welcome letter?
A. I don't remember receiving it or reviewing it, no.



Q. You would agree with me that in addition to the four times that Golden Rule had told you in the application they told you two more times in the welcome letter for your second short-term policy that it would not cover preexisting conditions, correct?
MR. KACAL: Objection. Form.
A. They stated it twice here that you pointed, yes.
Q. I'm going to hand you now what I'm going to mark as --
THE COURT REPORTER: 10.
MR. CLACK: -- 10.
Exh bit 10 was marked for identification.)
BY MR. CLACK:
Q. Exhibit 10. You recognize Exhibit 10 as a copy of the second Golden Rule short-term certificate?
A. I believe so it is. I don't know where it says the date or the term is.
Q. Well if you look with me at the page that says GRIC 741.
A. Okay.
Q. There's a effective date December 12, 2021. Do you see that?
A. Yes.
Q. And there's a certificate number, all that info

is there, correct?
A. Correct.
Q. Alright. If you go back to the first page, GRIC 739, down at the down there's a paragraph in somewhat larger font. Do you see that?
A. Yes.
Q. And do you see the second sentence says: Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits?
A. I see that, yes.
Q. And that was the same language that we saw in the first certificate that we looked at earlier that was Exhibit 6, correct?
A. Correct.
Q. And then if you look with me at the page GRIC 767 there is a definition of preexisting conditions on the left column and it says: Preexisting conditions means an injury or illness for which the covered person received medical advise or treatment within the 12 months immediately preceding the applicable effective date the covered person became insured under the policy. Did I read that correctly?
A. Yes, you read it correctly.
Q. That is identical to the preexisting condition



definition that we saw that was in the first short-term plan Exhibit 6, correct?
A. I believe so, yes.
Q. And then if we look a GRIC 784 there is a big bolded heading that says: Section 8, preexisting conditions. Do you see that?
A. Yes.
Q. And then below that it says: Preexisting conditions and complications resulting from a preexisting condition will not be covered under the policy or certificate. Do you see that language?
A. I see that.
Q. That language is identical to the exclusion for preexisting conditions that we looked at that was part of Exhibit 6 the first short-term plan, correct?
A. I believe so, yes.
Q. Alright. I want to direct your attention to one other thing that's back on the first page. And on the first page of Exhibit 10 there is a bold heading about half way down, it says ten day right to examine and return the certificate. Do you see that?
A. Yes.
Q. And it says: Please read the certificate. If you're not satisfied, you may notify Golden Rule within ten days of the day you received it. Premium paid will be



refunded less claims paid. Coverage under the certificate shall be voided as if coverage had never been issued. Do you see that language?
A. Yes.
Q. Alright. When you received the certificate in December of 2021, did you review it at that time?
A. I don't remember.
Q. Alright. Certainly, Golden Rule had told you four times in the application and twice in the welcome letter correspondence and then in the certificate itself that Golden Rule was not going to cover any condition that existed prior to December 12th, 2021, correct?
A. That's what it states here.
Q. And if you had read all that correspondence that Golden Rule sent you and looked at the seven times that they told you they were not going to cover preexisting conditions, you could have turned this policy in even after you got it in the mail and got your premiums back, correct?
A. That's what it states.
Q. And you could have gone and applied for coverage under the Administrative Care Act, the ACA coverage, or Obama Care coverage as some people call it, correct?
A. I do not qualify for Obama.
Q. Well, you understand that whether it's an



exchange policy or not, there are policies sold that will give you coverage without a preexisting conditions that comply with the Affordable Care Act?
A. Didn't know anything about that, I didn't handle this.
Q. Alright. Did you have any conversations with anyone about whether you should go get that coverage including your mother?
A. No, my mother had conversations with Golden Rule and she discussed that.
Q. She had conversations with Golden Rule or --
A. Not --
Q. -- she had conversations with Tobias & Associates?
A. Tobias & Associates, whoever it was, the agent.
Q. Alright. You never looked into it at all. Is that a fair statement?
A. That's a fair statement.
Q. In other words, what you want to tell the ladies and gentlemen of jury is that even though Golden Rule told you six or seven times with the first short-term policy and, then as we've just looked at, seven times with the second short-term policy in writing in multiple communications that those certificates did no cover preexisting conditions, you just ignored all that because

your mom said she talked to somebody who said something different?
MR. KACAL: Objection. Form.
A. My mother handled it. I was told to sign what I was told to sign through the agents.
Q. Is that a "yes?"
A. I was told to sign -- to sign through the agents.
Q. Is it your testimony to the ladies and gentlemen of the jury that you ignored the seven times with regard to the second certificate and the six or seven times with regard to the first certificate that Golden Rule told you that they were not covering preexisting conditions and that you ignored all that because your mom told you something different?
MR. KACAL: Objection. Form:
A. It was -- I don't remember doing any of this. I was just told -- what my mother had told me.
Q. I mean, beyond sending you 13 pieces of correspondence that told you they were not going to cover a preexisting condition, what more would Golden Rule have done to convey that message to you?
A. Probably get more directly in contact with me. I don't remember. I don't know how they would have.
Q. Yeah. How would Golden Rule have known that you were not reviewing the application, the welcome letter, or



the certificate that set forth your coverage?
A. I thought that they would known that.
Q. They would have known that you weren't reading any of it?
A. Not that I wasn't reading it, but that it was being relayed through me through my mother.
Q. Well, how would they have known that you were not reading all of these documents that they sent you including documents and acknowledgments that you signed as having read?
A. I was just sent a link through a esite to sit there and sign it. That's all I was -- that's all I had communications with.
Q. Well, you recall on the applications we looked at places where when you signed you acknowledged that you not only had read but agreed to the statements above those signatures?
A. I don't remember reading any of the other stuff. I just remember being send the signatures and signing it, being told to sign there.
Q. I'm not asking whether you recall as you sit here, as you recall doing it back then, I'm asking, we just looked at those applications where by your signature you acknowledged reading and understanding the application forms that you were submitting?



A. My signatures are on there.
Q. Yeah. And right above there it says: I've read it, I understood it, I know what I'm doing, right? You made that representation to Golden Rule?
MR. KACAL: Objection. Form.
Q. Correct?
A. I just remember signing it, that's all I remember completely doing. I don't remember checking anything offered or ta king to any agents about anything. I just remember being told a link to sign it and that's what I did.
MR. CLACK: I -- I'm going to object to that as nonresponsive.
Q. My question is a little bit different. My question is: As you sit here today, you would agree with me that when you put those electronic signatures on the applications you were representing to Golden Rule that you had read and understood the forms you were signing?
A. I was just sent the link. I did not read them. I was just told to sign.
Q. And my question's a little different. How was Golden Rule supposed to know that you were just signing things without reading them?
A. Because they were probably in touch with the agent.



Q. How would the agent have known that you were not reading the links you were sent?
A. Because I was just told to sign it to renew it.
Q. Who told you that?
A. My mother.
Q. Alright. How would the agent have known what your mother was telling you? And how would your agent have known that -- well, let's do it one at a time. I'm compounding myself.
MR. CLACK: Would you object --
MR. KACAL: Objection. Form.
Q. How would the agent have known what your mother was telling you with regards to the applications?
A. Because she would have relayed it back to the agent.
Q. Did she tell you that she did that?
A. She said she was taking care of it. She didn't go into specific things.
Q. Did your mother tell you, I told the agent you weren't going to read anything, you were just going to sign it without even glancing at it?
A. No, she did not say that, I believe --
Q. Okay.
A. -- but I don't know.
Q. You don't know what conversations took place been

the agent and your mother?
A. Correct.
Q. Alright. And then certainly you don't know of any conversation where anybody told Golden Rule, Hey, this guy is just signing these things, he's not actually reading then and the acknowledgements or any of this? You don't know if anybody ever said that to Gold Rule?
A. I don't know if they did or not, no, I don't.
Q. And, in fact, you were at the time all this happened a legal adult, you were 38 years old, correct?
A. Correct with a condition, that's right.
Q. You didn't have a condition when you filled out the first application in June of '21, did you?
A. The first one, no. I thought we were talking about the second. I apologize.
Q. Either one. You -- you were a legal adult at both times when you did the first and the second application, correct?
A. Of course I was.
Q. In fact, you've been a business owner running a restaurant for ten years, correct?
A. That's right.
Q. Do you think it was reasonable for Golden Rule to rely on your representation in the applications that you had read and understood what you were submitting to them?



MR. KACAL: Objection. Form.
A. I just sat there and was told what to sign. I don't know if Golden Rule actually talked -- reached out to me or besides sending me the information in the letters. That's -- I -- it was a blur at that time. It was a lot to deal with.
Q. Alright. Let's focus on the first application because you didn't know what was going on with the first application, right?
A. No, I didn't.
Q. Huh?
A. No, I did not.
Q. Okay. Was it reasonable for Golden Rule to rely on your signature on the first application that you had read and understood what you were submitting?
A. I was just told to sign it. I -- if that's what you want to say if I had to read it all and I -- and it does say here, it does state that, yes, have you read everything, and it says there's a mark next to it, yes, that's correct.
Q. And Golden Rule had no reason to know that, that wasn't true. Golden Rule had no reason to know that your certification that you read and understood it was anything other than accurate, correct?
A. Correct.



Q. Alright.
A. Because -- I'm sorry. Go ahead.
Q. No, I didn't mean to cut you off.
A. I didn't know if Golden Rule has also -- sometimes they fill automatically stuff out, at all either. I don't know if that's true either if it's done and represented. So, say, okay, you're going to renew the contract, say, with the second time if all stuff goes in first and they ask a couple questions. I don't know how the whole procedures work. I did not take care of it.
Q. Do you bear any responsibility for what occurred here where you wound up with a policy that did cover your treatment because your treatment was a preexisting condition?
MR. KACAL: Objection. Form.
A. I was not relayed that information.
Q. You weren't relayed what information?
A. For the -- that it would be like that through the agent. I didn't handle any of this.
Q. Well, your mom didn't relay that information. Is that what you're saying?
A. It wasn't provided to her maybe.
Q. Well, it was provided to you. We saw that Golden Rule provided it to you seven times, correct?
A. To me but not my mother who was handling the



situation.
Q. Your mother's name I did not see on any of these documents. Did I miss her applying for something somewhere?
A. No, you did not, sir.
Q. Okay. So Golden Rule told you, the insured, the applicant, the grown man, a business owner, 38 years old, seven times that that second certificate was not going to cover a preexisting condition, correct?
A. It does state that, yes.
Q. The application stated it, the acknowledgement to the application stated it, the acknowledgement -- the second acknowledgment to the application stated it, the welcome letter stated it, the customer guide that comes with the welcome letter stated it, and the certificate itself stated it, correct?
A. You stated that multiple times, correct.
Q. Okay.
MR. CLACK: It's ten after 12:00. Let's go to lunch.
THE VIDEOGRAPHER: We're off the record at 12:10.
(A short lunch break was taken.)
THE VIDEOGRAPHER: We are back on the record at 1:03 p.m.

BY MR. CLACK:
Q. Mr. Brewer, you understand that you are under oath just as you were before we took the break?
A. Yes, sir.
Q. Looking at the two certificates in front of you that we were discussing this morning, can you tell me any difference between the coverages in those certificates as you sit here today?
A. Exhibit 10 and 6?
Q. Yes.
A. The term and the length was one specific difference and price and base as well for coverage.
THE COURT REPORTER: What was that?
A. The base it was, I believe, $5,000 and 12 months and the other one was 184 days and 2,500.
BY MR. CLACK:
Q. So the deductible, the term. Any other differences between those two certificates that you are aware of?
A. Not that I'm aware of.
Q. Okay. If you look in front of you there is a document there clipped together marked Exhibit 11. Do you see that?
A. Yes, sir.
(Exhibit 11 was marked for



identification.)
Q. And this is a series of medical records affidavit, notices at the beginning, and a series of Bates stamped pages that are just Bates stamped 1 through 36. Is that what you have as well?
A. Yes.
Q. Okay. Turning with me, if you will, to the page that was Bates Stamped 1. Do you see that, that is first page in a series of your medical records, looks like, for treatment for visits to CLS-HTX Urology?
A. Let me see that -- let me see what it says. Dr. Dhir I see this one, yes, so that would have been Clear Lake.
Q. Okay. And turning with me, if you will, to page Bates Stamped 8. Do you see that Page 8 is a record of your visit to Dr. Dhir on June 14th, 2021?
A. June 14, 2021, yes.
Q. Alright. Is that the first time you saw Dr. Dhir to your recollection?
A. I believe so, yes.
Q. What lead you to go see Dr. Dhir on June 4th, 2021?
A. My testicle -- one of my testicles was starting to get enlarged.
Q. There is a -- a note there for reason for



appointment, it says: Testicular mass or persistent pain. Do you see that?
A. Yes.
Q. Does that fit with your recollection?
A. Testicular mass does, but it was persistent pain.
Q. And then there is under history of present illness it says: 37 year old with chronic hydrocele, notes it has doubled in size over the last few weeks, denies any urinary symptoms, denies fever, notes some LLQ abdominal pain. Do you see that entry?
A. Yes.
Q. Does that fit with your recollection of your symptoms on June 14th, 2021?
A. Besides the abdomen pain, which I said it was, I don't think it had anything -- he told me it didn't have anything to do with related; but, yes, no urinary symptoms, no fever, any of that, yes, sir.
Q. Alright. And then down at the bottom -- towards the bottom there is an entry there it says under male: Testes normal right testis. Enlarged and hardened, left testis 5 centimeters. Did I read that correctly?
A. Yes.
Q. Does that fit with your recollection of your symptoms on or about June 14, 2021?
A. Yes.



Q. This visit came about five days after you applied for the first Golden Rule short-term plan -- I'm sorry, about nine days after you applied for the first Golden Rule short-term plan, correct?
A. I don't remember when I first applied for it but, yes, if it -- if it is. When was the first date that I applied for it?
Q. So if you look back at Exhibit 1.
A. Okay.
Q. What is the date of Exhibit 1?
A. It's 9/21.
Q. Alright. So this doctor's visit on June 14th was five days after you applied for coverage with Golden Rule the first time, correct?
A. I believe so, yes.
Q. You had not had coverage prior to applying for that first Golden Rule short-term policy for about nine years, at least nine years, correct?
A. Yes, around nine years, yes.
Q. Okay. When did you first notice this mass or swelling of your left testicle?
A. Obviously, I don't recall. It was kind of right when I got into an accident when I was younger, but it really started to swell probably around that time.
Q. Did you have discussions with your mother about

your need to seek medical treatment for this enlarged testicle?
A. I just said I might need insurance pretty soon. Not over the testicle.
Q. Did you have any discussions with your wife prior to going and seeking -- or prior to the visit with Dr. Dhir?
A. No.
Q. Did someone else refer you to Dr. Dhir?
A. I don't remember. I don't believe so. I just think that they're a couple that we did research on and he came up with the most stars.
Q. Who is we?
A. My mother and I.
Q. Okay. Did you have a primary care physician at that time?
A. I believe I did not.
Q. When was the last time you saw a doctor of any type prior to this doctor visit on June 14th, 2021, with Dr. Dhir?
A. I don't remember, but it was for a subdural hematoma in an accident and I don't remember when that was. It was sometime within when my restaurant and Main St Bistro was opened up I do go see a medical doctor.
Q. Do you recall if it was within a year of this


June 14, 2021 visit?
A. No.
Q. So you haven't had coverage for about ten years, then you went and got coverage or applied for coverage with Golden Rule on June 9th of 2021, correct?
A. Correct.
Q. And then you went to Dr. Dhir for the first time on June 14th, 2021, correct?
A. Correct.
Q. And he prescr bed some ant biotics at that time?
A. Yes.
Q. And then ultimately the antibiotics I take it were not successful in treating your condition?
A. Correct.
Q. And then turn with me, if you will, to Page 16. Actually turn with me, look at Page 15. There's an entry on Page 15 it says: Case cancelled, patient took aspirin within the last five days. Do you see that?
A. Yes.
Q. Originally when they scheduled to do the surgery on you to fix whatever was going on with your left testicle on October 8th and then it had to be rescheduled?
A. I don't know when it had to be rescheduled, but I don't even remember the whole aspirin part. I think it was for a headache that I had but, yes.


Q. Okay. And there is an entry on Page 16 for October 21st, and is that the date that you had your orchiectomy?
A. I believe so, yes.
Q. Okay. Turn with me, if you will, to Page 24.
A. Okay.
Q. And do you see that Page 24 is a pathology report for you?
A. Yes.
Q. In the upper right it says: Collected 10/21/2021. Do you see that?
A. Collected 10/21/2021; received 10/22, yes.
Q. That's the date that -- that October 21st date is -- was the date of your orchiectomy, correct?
A. Correct.
Q. And it says: Reported October 26, 2021, correct?
A. Yes.
Q. Alright. And then there's a box that says: Final diagnosis. Do you see that box?
A. Yes.
Q. And it says: Partially necrotic malignant germ cell tumor. Did I read that correctly.
A. Correct.
Q. Alright. And then below there it says: This case will be sent to a uropathologist for expert


consultation to further classify this malignant testicular tumor. This case was discussed with Dr. Rohit, Dhir's assistant, Rachel, per telephone conversation at 10:15 a.m. on 10/26/2021. Do you see that?
A. Yes.
Q. Alright. So does that tell you that the lab made the diagnosis that you had cancerous tumor on October 26th of 2021?
A. Yes. But I have not seen these until now.
Q. That's --
A. Yeah, that's -- that's what it says now, yes, sir.
Q. Okay. Look back with me, if you will, at Page 2. And do you see on Page 2 there is a list there of patient encounters and there are dates and times?
A. Yes.
Q. Alright. There is the entry there you see for October 21st, 2021, when you had your surgery, correct?
A. Yes.
Q. And then there is an entry there for October 26, 2021, 10:23 a.m., which looks l ke that's probably when pathology ta ked to Rachel at Dr. Dhir's office, right?
A. That's what it stated earlier, yes.
Q. And then above that there's an entry for November 4th, 4:19 p.m., that says P/O follow-up appointment. Do

you see that?
A. I don't see -- where are we at right now?
Q. Alright. Do you see the line that's 10/26/2021 on Page 2?
A. I see on 10/26 I have 12:10 -- yes, I see that.
Q. Okay. Directly above that there's an entry November 4th, 2021. Do you see that?
A. Yes.
Q. Okay. And it says: PO follow-up appointment. Do you see that?
A. Yes.
Q. Alright. Does that refresh your recollection that on November the 4th the urology practice called you to schedule the follow-up appointment?
A. Yes, it said it would be -- yeah, I believe they -- I don't remember the exact date but, yeah, they might have called me. I don't know if I answered.
Q. Somehow they had got you set up for this appointment on November 15th, right?
A. Yes.
Q. So to the best of your recollection they either talked to you or leave you a message on November 4th to set up that appointment?
A. I don't remember if it was the 4th but they did call, yes.



Q. Alright. Tell me what you recall about that conversation?
A. That I was needed to be talked about what happened after surgery. He said that it was important that I come into the office and talk to me. I told him that I could but I would need more time, so it was a couple weeks after that I went and actually was able to see him. I asked him if it was anything important that I should know about, and he responded that it was better that I come and talk to him in person.
Q. That was a conversation you had according to these records on November 4th, 2021?
A. I don't know if that was on the 4th. I just remember talking to them and finding out, okay, what I needed to do when I could come in.
Q. Fair to say that according to the records of the urology practice that we're looking at they made that entry as taking place on November 4th, 2021?
A. It says follow-up appointment, yes.
Q. Certainly if Dr. Dhir or his assistant testifies that they had that conversation with you on November 4th, 2021, you are not going to dispute that, correct?
A. I don't remember but I don't know if they actually had it. I can't dispute it, I just -- I see it's right here, so.



Q. Okay. And then on November 5th, 2021, you applied for the second Golden Rule short-term plan, correct?
A. Yes.
Q. Did you have any conversations with your mother regarding this follow-up appointment or the results of your operation on November 4th, 2021?
A. I didn't know the results of my operation.
Q. Did you have any conversation with your mother on November 4th or November 5th, 2021, regarding this follow-up appointment?
A. I might have, I don't remember.
Q. Alright. You don't remember the substance of those conversations?
A. Yeah, I don't remember if I told her that we were going to -- that I was going to go to a follow up.
Q. Do you remember that the -- what actually triggered your application for the second plan was the fact that you knew you were going to receive additional information that the doctor didn't want to tell you over the phone regarding the outcome of your October testicular surgery?
MR. KACAL: Objection. Form.
A. I renewed it because I believe I needed insurance. I was going to continue to have insurance. One had almost expired, that's why.



Q. And you knew you were going to need more insurance because you knew that you were about to go in and get some medical news about your October surgery that was so serious the doctor wouldn't tell it to you over the phone, correct?
A. Well, I didn't know it was going to be that serious. I asked him if it was -- how serious it was, and he said that he would like to ta k to me over the phone, he does that with his patients. No other -- that's just his protocol, I don't know.
Q. You been to the doctor enough to know that if all comes back great and there's nothing exciting they just leave that in a voice mail, right?
A. Absolutely not.
Q. You've never got, you know, lab results or anything like that where it was ordinary and they just told you over the phone or --
A. I could access my lab results. That's different than being diagnosed. So when I went it and when I was getting my chemotherapy, for example, yeah, I was doing good on some instances, but it wasn't a phone call saying, Hey, you're doing good, I'd still have to go in and have a consultation with them.
Q. I'm going to hand you now what I'm going to mark

as Exhibit 12.
MR. KACAL: Could you a pass me a paper clip. I think there's a box right there.
Oh, thank you very much, Lance.
(Exhibit 12 was marked for identification.)
Q. Is Exhibit 12 --
MR. KACAL: Are you looking at this?
MR. CLACK: Yeah, yeah.
Q. -- the Claimant's Statement and Authorization that you submitted to Golden Rule?
A. My mother submitted this.
THE COURT REPORTER: I'm sorry?
A. My mother submitted this so I just signed it.
BY MR. CLACK:
Q. Okay. Is this your mother's handwriting, she's the one that filled it out?
A. She's the one who filled it out but that's my -- my signature.
Q. Okay. Was your mom closely involved in your medical care?
A. Yes.
Q. Does she live here in Houston?
A. No.
Q. Okay. Did she accompany you to any of your



doctors appointments?
A. When we started going to MD Anderson, yes.
Q. Would that have been after -- or when did you start going to MD Anderson?
A. I believe I first started when I was in the -- when I got the emergency room for treatment. I don't remember.
Q. Okay. There's a phone number at the top of this. Is that your phone number or her phone number?
A. That's my number.
Q. Okay. Do you know why this form got submitted?
A. I don't.
Q. Going to hand you now what I'm going to mark as Exhibit 13.
(Exhibit 13 was marked for identification.)
Q. Alright. Is Exhibit 13 a series of your medical records Bates stamped Brewer 639 to Brewer 659?
A. I see 12/30/21 and where is the other dates?
Q. At the bottom right there's a stamp Brewer 639 and then the last page should be 659.
A. Yes.
Q. Okay. Do you recognize the first page as records of a treatment of yours to a -- looks l ke Dr. Campbell on December 30th, 2021?



A. It says visit date, yes, 12/30/2021.
Q. Below there is an assessment. Do you see that assessment?
A. Where? Just right below that?
Q. There -- yeah, at the bottom. So there's a date of admission 1/4/2022, admitting diagnosis germ cell tumor and under that it says assessment. Do you see that language? That's where I'm sort of focused.
A. Am I missing something here?
MR. KACAL: Yeah, I'm hesitant to point it out, but if you look at the bottom of that page.
THE WITNESS: Oh, okay.
MR. KACAL: Yeah.
THE WITNESS: This on the very, very bottom. Okay.
BY MR. CLACK:
Q. Yes, do you see where it says assessment?
A. Yes.
Q. Okay. Do you see there it says he had an orchiectomy at an outside facility on 10/21/21. Do you see that language?
A. Yep. Yes.
Q. And that is accurate, correct?
A. Yes, I believe that's the correct date.
Q. And then it says: Restaging scans post op from



11/19/21 showed significant progression. Do you see that language?
A. Yes.
Q. Do you know what that refers to?
A. I do not. I believe it was maybe the CT scan I got through Dr. Dhir but I don't know.
Q. Okay. And then below that it says: CT was obtained 12/1/2021 showed a moderate left hydronephrosis due to bu ky retroperitoneal adenopathy invading the left ural -- utural [sic] -- ureter. Do you see that?
A. Yes.
Q. Alright. And 12/1/2021 that was when you reported to the ER because you had, had blood in your urine?
A. It was around probably that time. I don't remember.
Q. Well, let's not guess.
A. Okay.
Q. Let us look back at -- there's another exhibit over there with your medical -- medical records.
MR. KACAL: Yeah. It's going to be Exhibit 7.
Q. Exhibit 7. Alright. Does the Exhibit 7 refresh your recollection that the CT scan that was obtained on December 1st, 2021, was obtained at the same time that you

went into the ER and were admitted to the hospital on December 1st, 2021?

MR. KACAL: Objection. Form.

A. I don't see where it says I was admitted on the ER. If we're going to be on specific dates, where does it say that I was admitted into the ER? Because I can see this --

Q. So do you have Exh bit 7 in front of you?

A. I do.

Q. Alright. So you see at the top that's got the 12/1/2021 date?

A. Yes.

Q. Alright. Now at the bottom there is some notes that say: Admitting service: Hospital medicine; attending oncologist, Jason A. Mouabbi; date of admission: 12/1/2021 1:36 p.m.

A. Okay, yes.

Q. Alright. Does that refresh your recollection you were admitted to the hospital on or about December 1st of 2021?

A. I remember I was admitted, but I don't know if it was for my -- me having urine -- blood in my urine.

Q. That's fair. You were admitted for whatever reason on December 1st, 2021, to the hospital?

A. Yes.



Q. And how long did you stay in the hospital at that visit?

A. I don't remember.

Q. Look back then, if you will, at Exhibit, I think, 13.

A. Okay.

Q. Okay. Exh bit 13 goes on to say -- to discuss your condition and then it says: Outside pathology read at MD Anderson showed seminoma with extensive necrosis, invasive into hilar adipose tissue, lymphovascular invasion. His case was discussed with testicular cancer experts Dr. Chris Logothetis and Dr. Matt Campbell. Do you see that language?

A. Yes.

Q. Alright. Do you recall when you first saw Dr. Logothetis or Dr. Campbell?

A. I don't recall when I first saw them.

Q. Okay. And it goes on to say: It was decided to hold off on placement of nephrostomy tube. Patient underwent biopsy of the left retroperitoneal mass on December 6th, 2021. Do you see that language?

A. Are we on the second page --

Q. Yes, we're now into the 640.

A. Okay.

Q. Yes.



A. I see it 12/6/2021, yes.

Q. Does that fit with your recollection that you underwent a biopsy on December 6th, 2021?

A. Biopsy? What is a biopsy exactly? I don't -- for that they did the, what, a CT scan, a pit -- a PET scan. What was it, pathology, what?

Q. Normally a biopsy involves taking some kind of tissue to be sent to the lab.

A. But I believe that was done when they first took out my testicle on the -- October.

Q. Do you recall a second procedure or some kind of procedure on December 6th, 2021?

A. No.

Q. Okay. Fair to say that you're not saying it didn't happen, you just don't have a separate recollection of it as we sit here today?

A. I don't see how they would have gotten another sample besides blood, which would just show tumor markers.

Q. Okay. And then you see the next sentence says: Pathology showed metastatic germ cell tumor. Subsequently patient was started on emergent chemotherapy with etoposide and carboplatin on December 8th, 2021?

A. Yes.

Q. Alright. Does that fit with your recollection that you started chemotherapy on or about December 8th,



2021?

A. It was about maybe -- I don't remember, actually.

Q. Is it fair to say that if the records indicate that you started chemotherapy on December 8th, 2021, you don't disagree with that, you just don't have a specific recollection?

A. If it states if it came from the hospital then, yes, then that was probably when I came in, yes.

Q. Alright. There is an entry down at the bottom of that page that starts: Oncologic history, oncology history, testicular cancer. Do you see it says: December 8th, 2021, and it goes on into the next page to talk about the various drugs that were administered including the etoposide?

A. Yes, the etoposide, yes, sir?

Q. Alright. Look with me at the page Brewer 657.

A. Okay.

Q. There is about half way down an entry there IR CT guided biopsy retroperitoneal. Do you see that language, the bold language?

A. Be more specific, I'm sorry. Where at half way down the page?

Q. Yes. It says: IR CT guided biopsy retro --

A. Yes, sir.

Q. Okay. And then below that there is under

frequency: Routine once 12/6/21. And then there's instance released by: Azam Tewelde December 6, 2021. Do you see that language?
A. Yes.
Q. Alright. Does that refer -- and then if you go down below there's a questionnaire. One of the things is biopsy location and it says: Deep lymph node. Do you see that?
A. Yes.
Q. Alright. Does that refresh your recollection that they did a biopsy of the lymph node on December 6th, 2021?
A. No.
Q. Alright, that's fair. You don't remember one way or the other?
A. No. No, because if it was a lymph node -- it'd be a lymph node that would have been something I'd gone through what they'd have to actually take a simple out of. I don't remember if they took it with a needle or something, maybe; but, no, I don't remember that.
Q. Okay. Would you agree with me that you were diagnosed with cancer and that you began chemotherapy prior to the effective date of the second Golden Rule certificate?
A. I'm sorry, rephrase that. When did I start the


second treatment?
Q. Would you agree with me that you were diagnosed with cancer and began chemotherapy prior to the effective date of the second Golden Rule certificate?
A. When was the second certificate done, I'm sorry?
Q. The effective date of the second certificate was December 12th, 2021. And I think what we just looked at is that you had begun chemotherapy to treat your cancer no later than December 8th, 2021.
A. I'd have to check, I don't remember. I don't know if I did do it on the 8th or if it was administered after that or if they pushed it back, I don't know.
Q. Look with me, if you will, to Exhibit 13.
A. Okay.
Q. On the page -- the second page of Exhibit 13, which are the medical record we've just been looking at, it says there: Patient was started on emergent chemotherapy with etoposide and carboplatin on 12/8/2021. And then at the bottom of that page and on the next page there's an entry there for the administration of those drugs on December 8th, 2021, correct?
A. Correct.
Q. Alright. So based on your medical records you had began chemotherapy to treat your cancer on December 8th, 2021, prior to the effective date of the second


Golden Rule certificate on December 12th, 2021, correct?
A. Yes, it states that.
Q. I'm going to hand you what has been marked as Exhibit 14.
(Exhibit 14 was marked for identification.)
Q. Do you recognize Exhibit 14?
A. What do you mean by recognizing it?
Q. Have you ever seen this document before?
A. I don't recall seeing this document, no.
Q. Exh bit 14 is a list of diagnoses and the dates on which they were first treated that Golden Rule put together and was attached to some of the correspondence. As you sit here today looking you can see the description of those various conditions and then the dates of service out to the right. Do you see that?
A. Yes.
Q. Are there any of them that you disagree with, anything in Exh bit 14 that you disagree with as you sit here today?
A. I don't see any of the cancer treatment such as the -- when they actually provided it.
Q. But my question's a little different. My question is whether there are any of diagnoses and the dates of service there that you see in Exh bit 14 that you


disagree with as you sit here today?
A. Diagnosis and conditions. It says that I had -- they did all the test earlier prior to that 11/15 or 19. It seems about right.
Q. Alright. I'm going to hand you now what I'm going to mark as Exh bit 15.
(Exhibit 15 was marked for identification.)
Q. Do you recognize Exhibit 15 as a letter from Golden Rule to you dated January 25th, 2022, with some handwritten notes and highlighting?
A. I don't recall if I see it or know.
Q. Are these various notes that are written on here are any of those your notes?
A. The ones that said sign, authorization, and file equal how. That's mine.
Q. Okay. Do you know who the other notes are from?
A. That's my mother.
Q. Alright. And then there's some highlighting and some interlineation in the letter itself. Do you know if those are yours or your mother's?
A. Those I believe are my mother's.
Q. Okay.
MR. CLACK: Did I mark that one 15?
THE COURT REPORTER: Yes.

BY MR. CLACK:
Q. There is a highlighted sentence in the second paragraph, short-term policies do not provide coverage for preexisting conditions. Do you see that sentence?
A. Yes.
Q. Alright. That is exactly what Golden Rule had told you in the application and the welcome letters and the certificate itself, correct?
A. Yes.
Q. And --
A. I seems like so, yes.
Q. -- and then did you understand this letter when you received it to be informing you that your claims for cancer treatment would be denied based on the preexisting conditions exclusion in the second certificate?
A. When I came across the letter, yes. When it was brought to my attention through my mother.
Q. So this letter is addressed to 2106 Barrington Pointe Drive. That was your address, right?
A. Correct.
Q. Do you think that you did not see this till your mother brought it to your attention?
A. She was with me at the time, so she was handling all my mail.
Q. Okay. She was living with you --



A. Not living, visiting.
Q. Fair enough. She was visiting with you and she was handling your mail in January of 2022?
A. Yes.
Q. Where does she live when she's not visiting you?
A. Colorado.
Q. Okay. Was she in Colorado at the time that you applied for both of the Golden Rule short-term plans?
A. I don't know.
Q. Tell me about the conversation you had with your mother when she brought this letter to your attention.
A. Well, it was first very interesting because what we had been under the impression when we would talk to the agent that this would be transferred over, but this one would be -- they said it was a short-term, and they explained what short-term was after that but we were kind of taken off guard by it.
Q. When you say "we ta ked to the agent," I thought you never spoke to the agent?
A. We as in my mom and I.
Q. Okay. So your mother said that she taken off guard by it?
A. We were both taken off by this when we read the letter.
Q. Did you at that time go and review the



certificate or the welcome correspondence that you had received from Golden Rule?
A. No, my mother did.
Q. And what did your mother say when she communicated that with you?
A. I don't recall. She saying that they was under the impression that this was all going to be something that the insurance would cover.
Q. Alright. I'm going to hand you now what I'm going to mark as Exhibit 16.
(Exhibit 16 was marked for identification.)
Q. And do you see Exhibit 16 is a list of those same diagnoses but with some handwritten notes at the upper right?
A. Yes.
Q. Are those your notes or your mother's?
A. My mother's.
Q. There is an entry there for Shane Brodil. Do you see that?
A. Yes.
Q. I may have asked this, but have you ever spoken to Mr. Brodil?
A. I have not.
Q. Do you recognize that Exhibit 16 was originally



an attachment for the letter that is Exhibit 15?
A. I do not.
Q. If you look back at Exh bit 15 at the bottom of the first page.
A. Um-hmm.
Q. And it says: We are attaching a list of claims we received that were filed under your previous short-term coverage with us, ID No. 096422291, which was effective on 6/10/21 and terminated on 12/11/21. The conditions related to those claims are considered preexisting. It's defined by your plan's coverage under ID No. 096540158 since they were occurred prior to the effective date of this plan. Do you see that language?
A. I do.
Q. And then does that refresh your recollection that Exhibit 16 is that list of claims that was attached to Exhibit 15?
A. I don't remember but it's right here.
Q. Did you reach out to the insurance agents after you received the letter that is Exh bit 15 to discuss these issues with them?
A. My mother did. She was representing me.
Q. Alright. She talked to the agents after that?
A. Yes, I was going through chemotherapy and recovery.

MR. CLACK: Object to everything after yes as nonresponsive.
Q. I have here what I'm going to mark as Exhibit 17.
(Exhibit 17 was marked for identification.)
Q. Exhibit 17 appears to be a phone log for three calls that were made from -- or three calls that were made to 561-910-4194. Do you see that?
A. Yes.
Q. Is this your mother's cell phone records showing when she called the agent in February of 2022?
A. I don't see where it has her number on here.
Q. I will tell you, you produced the document, so --
A. Then it probably is, I didn't produce -- I didn't do this.
Q. Okay. Fair to say this is not a document that you created or you reviewed and we should ask your mother?
A. Yes.
Q. Alright. Are you aware or do you know if your mother had conversations with the agent in February of 2022 other than the three calls reflected on Exhibit 17?
A. I do not know the nature of her discussions with it at all.
Q. Did she ever talk to you about those calls?
A. She talked to me about them a little bit but


nothing specific, but mainly just we're going to get you insurance --
Q. Alright.
A. -- I'll take care of this, you just worry about going and getting treatment.
Q. Look back with me at Exhibit 12. So you see that Exhibit 12 is dated February 21, 2022?
A. Yes.
Q. And so it comes after the denial letter that is Exh bit 15 and after the calls that make up Exhibit 17. Do you see that?
A. Yes, it came December 12th.
Q. Okay. Wait say that again.
A. January 25th, I apologize.
Q. Yes.
A. It said effective date December 12th, 2021.
Q. So the denial letter came January 25th and then there was some calls presumably from your mother to the agent on February 8th and 9th and then there was this claims form dated February 21st, 2022. Are you with me?
A. February 21st, 2022?
Q. At the bottom.
A. Yes, February...
Q. The claim form.
A. This one. I think I'm jumping around but let's


see. I see February 21st, 2022, at the bottom just l ke was stated, yes.
Q. Okay. How -- do you how it came to be that, that claims form got submitted or if that was something that arose out of the phone calls or what lead to this admission of that claim form?
A. I have no -- my mother was handling all this.
Q. Okay.
MR. CLACK: What are we up to?
MS. PRIETO: 18.
Q. I'm going to hand you what I've marked as Exhibit 18.
(Exhibit 18 was marked for identification.)
Q. Exhibit 18 is a document that your attorneys produced in the lawsuit. Do you recognize this document?
A. Yes.
Q. Can you tell me what it has to do with this lawsuit?
A. It doesn't have to do anything with it.
Q. Okay. Can you tell me what it's related to?
A. Yeah, it's a gift card.
Q. Alright. As you sit here today, is -- there's no reason, that it doesn't have anything to your knowledge to do with anything that's at issue in the lawsuit. Is that


a fair statement?
A. Yes, absolutely, that's fair.
Q. I'm going to hand you now what I'm going to mark as Exhibit 19.
(Exhibit 19 was marked for identification.)
Q. Do you recognize Exh bit 19 as a letter that your attorneys sent to Golden Rule and Tobias & Associates and others dated February 22nd, 2022?
A. I don't remember but it is what it is, it says that. I don't recall. L ke I said, I was going through treatment and a lot of it is a blur.
Q. Did you review this letter before it was sent?
A. I believe my mother did.
Q. Okay. If we look -- if you look at the second page, Page GRIC 898 and just tell me when you're there.
A. I'm there.
Q. Alright. There is a sentence second paragraph that says: Dr. Dhir presented our client ant biotic -- prescribed our client antibiotics to treat the suspected infection. However, out client symptoms continued to worsen necessitating an operation to remove his testicle on October 21st, 2021. Do you see that language?
A. Yes.
Q. That sentence is accurate, correct?

A. That seems correct, I did have my surgery there.
Q. Alright. If we go above that it says: Our client, Michael Brewer, is a everyday man who had little to no health issues before June of 2021. On July 1st, 2021, our client attended a medical appointment with Dr. -- R. Robert Dhir MD of HTX Urology to discuss a suspected UTI infection. Do you see that?
A. Yes.
Q. Does that actually refer to the June 14th appointment that we looked at earlier?
A. I was fine before that, it was the 5th that I started -- or a little after, it was immediately. I don't remember the exact date, I don't.
Q. Well, look back with me at Exhibit 11, I believe. Yeah.
MR. KACAL: It's going to look like this, Michael.
THE WITNESS: Yeah, I'm just organizing this real quick, so. I'm going back and forth too many times, so I just want to make sure I grab it.
A. Okay, I got 11.
BY MR. CLACK:
Q. Alright. If you look at Page 8 of Exhibit 11. That is the medical records for a visit on June 14th, 2021, correct?



A. As started before, yes, correct.
Q. Okay. In the letter from your attorneys, that is Exh bit 19, when they refer to this July 1st appointment, do you think they meant the June 14th appointment?
A. I can't recall, I don't know.
Q. If you look back at Exhibit 11, the next visit after that June 14th appointment on Page 10 was on July 6th. Do you see that?
A. Yes.
Q. So there is no July 1st visit reflected in the records, correct?
A. I don't see any on Exhibit 11, no.
Q. And if we look back at Page 2 where all the visits -- or actually Page 3 where those early visits are set out -- oh, mystery solved. Look back at Page 3 of Exhibit 11.
A. Okay.
Q. There is a record there of an ultrasound on July 1st. Do you see that?
A. Yes.
Q. Okay. So does that refresh your recollection that you had the visit on June 14th, an ultrasound on July 1st, and then what the demand letter refers to, that is Exhibit 19, is that ultrasound?
A. Yes. It was the ultrasound that I had after my



first initial meeting with Dr. Dhir.
Q. Okay. If we look back at Exhibit 19, Page 898, there's an entry below the block -- the box of text and it says: On November 15th, 2021, our client received news from Dr. Dhir that his symptoms were being caused by testicular cancer. Do you see that?
A. I don't have -- I haven't caught up yet.
Q. Oh, sorry.
A. What page?
Q. GRIC 898. It's the second page.
A. Okay. The last paragraph?
Q. Yeah. On November 15th our client received news from Dr. Dhir that his symptoms were being caused by testicular cancer. Do you see that language?
A. Yes.
Q. That fits with your recollection, correct?
A. About that time, yes.
Q. Alright. And then it says down at the end that you looked around for alternative cancer specialists and decided to consult with Matthew Campbell MD of MD Anderson Cancer Center. Do you see that language?
A. Yes.
Q. Alright. Does that fit with your recollection?
A. For the most part, yes.
Q. Alright. So after this visit on November 15th



you couldn't get in to see the doctor Dr. Dhir recommended and that's when you began looking for Dr. Campbell?
A. Actually, Dr. Dhir recommended a different doctor for this he remembered -- directed me to Dr. Campbell, and he specifically recommended MD Anderson.
Q. And then if you turn to the next page at the top it says: Our client attended his scheduled appointment with Dr. Campbell on December 1st, 2021, where he was immediately admitted for in-patient treatment due to the seriousness of our client's condition. Do you see that sentence?
A. Yes.
Q. Does that fit with your recollection as to why you were admitted on December 1st, 2021?
A. I don't remember why I was admitted. I know there was a rush and that I was starting to urine blood around that time before I went in or around that time so, but I don't -- I couldn't give you the exact reason why.
Q. Does it fit with your recollection that you went in to see Dr. Campbell on December 1st and that he chose to admit you because of the seriousness of your condition?
A. I don't remember the date but it was the seriousness. He wanted to start procedure as soon as possible, yes.
Q. Well, and we have looked at the medical records,

specifically Exhibit 7, that show you were admitted on December 1st to the hospital, correct?
A. Correct, it is stated.
Q. Okay. And Dr. Campbell was the doctor that you sought out specifically to get treatment for your testicular cancer, correct?
A. Yes, he came highly recommended.
Q. Okay. And then below there's a sentence that says in that next paragraph: While admitted to MD Anderson Cancer Center the term of Golden Rule policy ID No. 096422291 began to approach. In order to ensure that the life sustaining treatment he was receiving continue, our client began the process of renewing his medical insurance policy. Do you see that language?
A. Yes.
Q. That's sentence is not correct, is it?
A. In order to ensure that life sustaining treatment he was receiving continued, my client began to process and renewing his medical insurance policy. Why is that not true?
Q. Well, you had already filled out the application for the second policy much earlier on November 5th, 2021, correct?
A. Correct.
Q. Alright. So you did not do anybody with regards



to renewing your insurance post that December 1st admission, you had already done it almost a month before, correct?
A. Correct.
Q. Then that next sentence says: Mr. Brewer contacted Christopher David at Tobias & Associates d/b/a getmehealthcare in December 2021 to discuss the renewal of his insurance policy. Do you see that sentence?
A. Yes.
Q. That sentence is not correct, is it?
A. Explain.
Q. You never spoke to Christopher Davis at any time?
A. Correct.
Q. Okay. Your mother spoke to Christopher Davis as we've seen back in November of 2021, correct?
A. Correct.
Q. No one spoke to Christopher Davis or anybody at Tobias & Associates on your behalf at all in December of 2021, did they?
A. My mother was speaking on my behalf, I believe.
Q. Your mother spoke to Mr. Davis according to the phone records we've looked at in November and in February, correct?
A. November and February only, so between November, all of December, and January nothing was ever relayed



through there. I don't know, I don't have my mom's numbers on me. I don't who she contacted.
Q. Fair to say to your knowledge she didn't talk to Mr. Davis in December of 2021 and you didn't ta k to Mr. Davis in December of 2021, but maybe there's a chance your mom might tell us tomorrow she actually did have that conversation in December of 2021?
A. I didn't -- as I repeated I have not had many -- much contact with them, my mother was the one who had contact, correct.
Q. You would agree with me that you did not talk to Christopher Davis in December of 2021 or at any other time for any reason?
A. I don't remember talking to anybody about any reason. There might have been where I was put on the other line, but I do not recall. I was going through a lot at that time.
Q. Sure. And it says: During these discussions Christopher Davis informed our client that a specific renewal option would allow Mr. Brewer to obtain a new policy with the same coverage he enjoyed under Golden Rule policy ID No. 096422291. Do you see that sentence?
A. Yes.
Q. That sentence is not correct, is it?
A. It's elaborate.



Q. You never spoke to Christopher Davis, correct?
A. We stated that, yes.
Q. And Christopher Davis never informed you of anything because he never spoke to you, correct?
A. As my recollection is, yes, he mainly talked to my mother.
Q. Not mainly, he exclusively talked to your mother, correct?
A. I don't know if I want to use the word exclusively, but she [sic] did have main communications with my mother.
Q. To the best of your recollection as you sit here today, you have never spoken with Christopher Davis at any time for any reason, correct?
A. If it -- well, if I did, it wasn't through anything but my mom being with me on the other line of the phone just understanding stuff. I don't remember, I was going through a lot at that time.
Q. That's what I'm asking. I can -- I'm only asking what you remember. That's all --
A. I don't remember.
Q. Okay.
A. I stated that previously.
Q. Alright. Move with me to GRIC 900. And you can see four lines down there's a sentence: Christopher Davis

specifically informed our client that Golden Rule policy ID No. 096540158 would provide the same coverage as Golden Rule policy ID No. 096422291. Do you see that sentence?
A. Which paragraph?
Q. The first paragraph under the box on 900.
A. Okay.
THE COURT REPORTER: On the box, what?
MR. CLACK: On 900.
A. I see the first sentence, yes.
BY MR. CLACK:
Q. Okay. Do you see that it says the 4th line down: Christopher Davis specifically informed our client that Golden Rule policy ID No. 096540158 would provide the same coverage as Golden Rule policy ID No. 096422291 prior to the submission of the relevant application?
A. I see that.
Q. That sentence is false, isn't it?
A. Elaborate.
Q. It is false in that you never spoke to Christopher Davis and Christopher Davis never spoke to you, correct?
A. Through my mother they spoke as in representing me.
Q. You told me that your mother just told you sign everything, it will be fine. Did I hear that correctly



this morning?
A. That sign everything, I took care of it, we just need your signature to get this going, yes.
Q. Alright. So correct to say you don't really know what your mother was told by Christopher Davis or told Christopher Davis, correct?
A. As I restated before I do not have conversations l ke that, no, she was in charge of that.
Q. Okay. And it's also true that the coverage under the two policies is the same, is it not?
A. The price is different. I thought it was 12 months and 5000 and then the other one 2500 and 18 days.
Q. I think it's correct that under that -- other than the terms and the deduct ble you could not identify any differences in the two policies, correct?
A. I don't know. I don't remember. I don't recall. I never knew it, yeah.
Q. And it's also true that certainly as regards to the preexisting conditions exclusion the language in the policy was the same, the language on the application was the same, and the language in the welcome materials was the same, correct?
A. As you presented it, yes.
Q. Have you completed your treatment for cancer?
A. No.



Q. It's still ongoing?
A. Yes.
Q. Have you ever been denied treatment for financial reasons?
A. Yes.
Q. When?
A. Well, because I couldn't pay for -- everything had to be out of pocket, so I was only denied -- I haven't been denied, I had to pay out of pocket. I should say that. Everything that I had to pay was out of pocket.
Q. Okay.
A. So they wouldn't perform it unless I paid for it first.
Q. Alright. That's fair. And we're going to explore all that, but two separate issues, right? My question right now is: Have you ever been denied treatment or gone without treatment because you did not have insurance coverage?
A. I was denied treatment because you did not cover me, yes. Golden Rule did not decide to continue coverage.
Q. Have you ever had a doctor refuse to treat you or not give you treatment for financial reasons?
A. Because I did not have -- I would -- financial reasons as of I did not have insurance or financial reasons as I couldn't afraid it?



Q. Either way.
A. I could afford the treatment that is the only reason I had treatment. If I did not -- was not able to afford it, I would not be able to have that treatment.
Q. Alright. But in one fact you were able to afford it, you did get the treatment?
A. Because I paid it for myself, yes.
Q. Okay.
A. Not through my insurance company.
Q. How much have you paid out of product for treatment for your cancer, or how much did you pay for treatment for the cancer in 2022?
A. In 2022?
Q. Yes.
A. I don't recall, but everything and overall was around 358,000 plus or minus some.
Q. Do you have other insurance coverage now?
A. Yes.
Q. Who is that through?
A. It's through the Marketplace.
Q. How did you go about getting that coverage?
A. Well, talked to the representative and he asked me to fill a couple of things out which I signed and then I starting having coverage with the -- same as I did with this, my mother mainly handled it.

Q. When -- when did that coverage become effective?
A. I don't recall.
Q. Do you know when -- I'm sorry, do you know what company your insurance through the Marketplace is through?
A. No, I don't.
Q. Have you ever looked at the policy?
A. I have copies of it. I have been going through treatment.
Q. Alright. Why didn't you go get coverage through the Marketplace in December of 2021?
A. Because we were told that this was going to be a dispute with this.
Q. I'm talking about before the first policy lapsed in December of 2021 when you were looking at, what'd I do? Should I get another short-term? Should I go get coverage in the Marketplace? Why did you not get coverage in the Marketplace then?
A. We were looking at options.
Q. Alright, yes. What options in the Marketplace did you look at in December of 2021?
A. I don't know, I didn't look at them, my mother did.
Q. Did you talk to your mother about Marketplace options?
A. I did. She's the one who came up with it.



Q. Alright. What did your mother tell you about Marketplace options in November -- November or December of 2021?
A. When I first got it I don't remember the exact dates, but she told that this would actually be something that I could sit there and have my insurance pay for my chemotherapy or anything else kind of treatment that I needed but I couldn't go to MD Anderson -- MD Anderson, I'd have to go to a different hospital.
Q. So what your mother found in November or December of '21 is that if you got Marketplace coverage you would not be able to use MD Anderson, correct?
A. No --
MR. KACAL: Objection. Form.
A. -- MD Anderson did not take Marketplace.
Q. Okay. Was that the reason that you chose not to get the marketplace coverage in November or December of 2021?
MR. KACAL: What was the date, '21, right?
MR. CLACK: '21.
A. We were looking at options, I don't know the exact reason why. I was not the one who took care of that. I was mainly worried about my life stake (phonetic) and getting treatment and trying to get healthy. That was



one of the last thing I was thinking about was looking at a couple of pieces of paper for it.
Q. How did you pay for the $358,000 that you have come out of pocket for your cancer treatment?
A. I paid some by myself and some my mother helped me with.
Q. Let me ask before I forgot. Does that include money that you have paid in 2023? Do you continue to get treatment at MD Anderson?
A. This is only the time that we specified in here. That was -- so I don't know the time frame that you're talking about. All of when I got Marketplace, that's when I stopped paying as much out of pocket. I still have to pay some for my deductible, but I'm not completely out of pocket.
Q. Sorry, the $358,000 figure is that everything or is that what you think Golden Rule should have covered under the 2nd under the second --
A. That's everything I paid out of pocket.
Q. Alright. How much of that reflects amounts you think Golden Rule should have covered under the second short-term plan?
A. That's everything that Golden Rule should have done with it. That was all the cancer treatments at $32,000 a pop.



Q. Well, you understand that even if Golden Rule had not denied your claim for this preexisting condition that, that second short-term plan would have terminated December 11th of 2022?
A. I'm not -- clarify, I don't understand.
Q. Do you understand that the term of the second Golden Rule policy was 364 days and it -- it would have terminated on December 11th of 2022?
A. Yes, it would have been terminated. I didn't add up all the numbers on it. I did not do all that information.
Q. Okay. You can't tell me of the 358 how much --
A. I don't know --
Q. -- is the treatment after that, treatment before that, you don't know?
A. Nope.
Q. Alright.
A. Do not know.
Q. I think you told me that of the 358 you had paid some and your mother had paid some.
A. My mother paid the majority of it, yes.
Q. Alright. How much of it did you pay?
A. I don't know.
Q. Alright. Was it more or less than a hundred grand?

A. I don't remember.
Q. Did you keep records of it?
A. I have bank statements, but I don't -- I could get them but I don't have them with me, no.
Q. Did you sell any assets to make those payments?
A. I had to.
Q. What did you sell?
A. A couple comic books that were, like, well rated for cash.
Q. What comic books, what additions?
A. I know it was Spawn and then I had First Appearance of Wendigo. I don't remember all of them.
THE COURT REPORTER: Wendigo?
THE WITNESS: Wendigo with the X-men.
BY MR. CLACK:
Q. Do you remember which Spawn it was?
A. No. 1 autographed.
Q. How much did you get for the comic books?
A. I don't remember, it wasn't a lot. It was just to make ends meet because I needed to pay bills for my house.
Q. Did you sell any other assets to pay medical bills?
A. No.
Q. And I think you told me that ultimately because



you were able to pay for it you got all the medical treatment that your doctors wanted you to get or recommended that you get?
A. No, I did not.
Q. What treatment did you forego?
A. Radiation which I had to change over.
Q. What do you mean "you had to change it over?"
A. Plus I had to extend when I got my -- I had to change over my plan because I couldn't afford the radiation treatment at MD Anderson. I could barely even afford the surgery.
Q. Where did you end up getting radiation?
A. I have not yet. I have treatment coming up tomorrow.
Q. When were you supposed to the first -- when were you first told to get radiation?
A. I was supposed to get it today. But when I was first told, I was told when I was at MD Anderson after they took -- my surgery. After my surgery we both concluded that even though we got all of the -- most of the cancer out it would be better to head it out with some radiation because that way I could -- it seemed to be very aggressive in coming back.
Q. Which surgery -- when was that surgery?
A. That surgery was around Thanksgiving.



Q. So originally around Thanksgiving you had a surgery and then the follow up to that surgery the doctors at MD Anderson recommended radiation?
A. Correct.
Q. But you could not afford the radiation and so you had to do it somewhere other than MD Anderson where it was covered by the plan?
A. Correct. We thought that the -- you know, we thought that the treatment when they did the operation would be done with it, the surgery that -- this would be the majority of it, but they said it was kind of near my airoid (phonetic) area and I couldn't -- they needed to be sure and they wanted to do, which I'm glad they did because now I do have a little bit coming back.
Q. Was that follow-up visit to the surgery sometime in December a couple weeks after the surgery?
A. It was around a little -- a couple weeks after the surgery. Oh, it'd have to be a little longer than a couple weeks after the surgery because I was still recovering. I don't remember the exact date.
Q. Sometime in December?
A. I don't remember the exact date.
Q. I'm not asking for an exact date. I'm looking for a month.
A. Can't give you a month, I don't know. I was



going through it, I was in and out of it. I could barely get out of my bed. I don't remember. It's been maybe a couple of months where I kind of feel normal, so maybe feel normal now, so I don't remember. Everything is a blur with this.
Q. Do you know if you had been able to get the radiation at MD Anderson when you would have had the radiation?
A. Yeah, almost immediately. As soon as I recovered from my surgery they planned on doing it. So that just depends on the patient how quick they recover.
Q. Do you think that would have been given the holidays first part of January that you would have had the radiation?
A. I was hoping so, that's what we had planed on. In January is when we tried to shoot for getting radiation, but we didn't know the exact date because they needed to make sure the tissue was healed.
Q. Okay. And now you've been cleared, the tissue has healed, and you're having it tomorrow February 21st?
A. Yes.
Q. So possibly we're talking about maybe 30 days from the original timeline?
A. I guess, yes, I don't know.
Q. Alright. Do you know how your mother paid for

the balance of the bills?
A. Retirement I believe, but I don't know.
Q. We'll ask her tomorrow.
MR. CLACK: This is going to be 20?
THE COURT REPORTER: Yes.
BY MR. CLACK?
Q. Do you have other damages in this lawsuit besides the medical bills that you had to come out of pocket for?
A. Damage besides medical bill, you mean the fact that I got stressed out completely. I was worried whether I was going to live or not because my insurance dropped me, wouldn't pay for anything. Yeah, it was a couple of stress related issues to that.
Q. Did you seek medical treatment for your stress?
A. I could barely even afford my regular medical treatment.
Q. Is that a "no?"
A. That's a -- it's a no.
Q. Did you also have stress because you had been diagnosed with a serious aggressive form of testicular cancer?
A. That would have been not -- that was less part of the stress but not the complete stress. The main stress was how am I going to pay for this, how am I going to live.


Q. Your testimony to the jury is you were more stressed out about your dispute with Golden Rule than you were stressed that you had an aggressive form of testicular cancer?
A. The reason being is because that form of testicular cancer, while aggressive, was also being treated by some of the best doctors in the world, which I could not get any access to. And that was not very reassuring for me since it was advanced and it was being very aggressive. It would have been nice to have the best professionals working on that, instead I'm having to go with whatever I can afford so, yeah.
Q. Well, you're having to go with the doctors that are covered by your Marketplace plan.
A. But when they weren't I wasn't covered anymore, I had to do what I could afford so.
Q. Who are the doctors that you used in 2022? Was it not MD Anderson?
A. No.
Q. Who was it?
A. It was -- oh, my gosh, we just started again. I forget right now. I don't remember the -- it's not Methodist -- they're off 6400 Avenue. I don't know.
Q. Here in Houston?
A. Yeah, right here in Houston, 6400 Avenue --


Memorial Hermann. There we go.
Q. Okay. So you in 2022 you did not get all your treatment at MD Anderson, instead you got it at Memorial Hermann?
A. In 2023. 2022 I still got all my treatment at MD Anderson. It wasn't until 2023 this last year that I'm starting to get it, yes.
Q. Okay, that's where I think we got crossed up a little bit. When you switched over to the Marketplace plan that's when you switched to Memorial Hermann?
A. That's correct. That was -- why such then is because they were one of the providers that I could use for hospitals so.
Q. In 2022 you chose to stick with MD Anderson for your treatment?
A. Correct.
Q. Alright. Did you ever look at what the difference would be in cost between MD Anderson and Memorial Hermann had you made that switch earlier?
A. I was already on a process with MD Anderson, no. They had everything that we felt confident in and we were seeing results at that time, so we've decided that would be the better thing to stick with it than bring a totally different set of team of doctors into this.
Q. Alright. I'm going to go back to my earlier


question which is: Is it your testimony to the jury that you were more stressed out by this dispute with Golden Rule than you were by the fact that you had an aggressive form of testicular cancer?
A. I was stressed -- as I stated, I was stressed out about both, but the reason I was so stressed out about it was now I can't get the same treatment that I would have gotten, it wasn't as good as doctors. So that part stressed me out. Not only was it my condition that I was in, it was the fact of my condition couldn't be carried out through these professionals because my insurance company decided that, you know, it was previously covered so.
Q. Alright. That's what I think I'm not following because what I thought you told me was that you had the same doctors and the doctors you wanted throughout the time period that would have been covered by Golden Rule anyway?
A. I'm sorry, rephrase that.
Q. Yeah, I thought you told me you had the MD Anderson doctors and those were the doctors you wanted throughout 2022 --
A. Correct.
Q. -- and that's the timeframe that would have been covered by the second short-term policy if the prex [sic]

hadn't applied, right?
A. Correct.
Q. So even if Golden Rule had paid all those 2022 claims, you still would not have the stress for switching to Memorial Hermann for 2023, right?
A. I would not have been stressed out financially, correct. Financially meaning I would like to continue MD Anderson.
Q. Alright. I'm going to try this one more time just to make sure I understand what you're telling me.
A. No problem.
Q. If Golden Rule had paid your claim for 2022 and you would stay at MD Anderson and used mom's money to pay 2023 at MD Anderson?
A. The reason we stuck through MD Anderson through 2022 was we at least knew we could finalize our chemotherapy and have surgery, which we already contacted through Dr. Campbell and Lori [sic]. They are already communicating. If I bought another set of doctors into this, it would have prolonged the treatment, I would have had to get a whole new work of labs, and they would have had to sit there and communicate, which would have been broughtened back which might have been more medical issues, more problems, and more money.
Q. Sure, I get that. My question is different. Let



me ask this way: One of the causes of your stress is that you have aggressive testicular cancer, correct?
A. We stated that, correct.
Q. Alright. One of the causes of your stress is that effective with 2023, you have had to switch over to Memorial Hermann because you're now on a Marketplace plan that does not provide coverage for MD Anderson?
A. That part is -- I was stressed not with -- not with Marketplace with Golden Rule. I wasn't stressed out because I had to change new hospital because of Marketplace, I was stressed out because I was already getting treatment at MD Anderson and I needed to continue that treatment.
As soon as we figured out what we were doing and we could have a break of time where, okay, we'd have a plan, we're going to execute this plan, then we could find another doctor, have room to breath, I got the masses mainly removed. It wasn't on a time crunch schedule like it is now. Now I can sit there and actually have a little bit of free play to actually have my radiation whereas before we needed to take care of it immediately, it was a life and death situation.
Q. And you did, you paid out of pocket and you got all that treatment and now you're on this track whereas you descr be that you have breathing room, correct?



A. Yeah, now I do, yes.
Q. Okay. Did you ever see any mental health professional or counselors of any type for any of the anxiety that you were undergoing in 2022?
A. No, I just talked to the nurses. They asked me -- basically they'll ask you those kind of questions. They'll say, How is everything, do you have any family problems, do you feel any anxiety, do you feel stress. And, yeah, that was some of the things that were relayed? Now we're paying all of this out of pocket, that's crazy. Yeah, it is a little stressful.
Q. Do you -- do you take any -- or have you taken any medication to treat anxiety or any sort of mental health issues in 2022 or 2023?
A. No.
Q. Have you had substantial changes to your daily routine or to your daily activities caused by stress or anxiety in 2022 or 2023?
A. Physical stress, yes.
Q. What changes did you make to your activities of daily living as a result of stress or anxiety in 2022 or '23?
A. 2022 mainly; 2023 is not as much as I recovered but in 2022 everything. I could not get out of the bed sometimes for two weeks, I had to be taken care of.



Q. Was that because of your cancer and the chemotherapy?
A. Yeah, because of my physical state, yes.
Q. Yeah, okay. My question is a little different which is: Have you had any episodes like that perilously as a result of mental anxiety in 2022?
A. Did I have stress because of mental anxiety in 2022?
Q Yeah.
A. Rephrase that.
Q. Yeah. Did you have changes to your activities of daily living or to your daily routine not because of your cancer but solely because of stress and anxiety in 2022?
A. Yes, I was depressed.
Q. When was that?
A. When I found out I wasn't going to be insured anymore.
Q. Did you take any medication for that depression?
A. No, a lot of the medication you can't cross with it. With chemotherapy you got etoposide it's platen, it's platen (phonetic). I already had kidney failure which is not great because they usually give you something that's going to dope you up a little bit and my body could barely handle as much as it was.
Q. What are the changes that, that depression caused

in your activities of daily living?
A. Like I stated, I would stay in bed, I would be highly wanting -- motivate -- unmotivated. But I went through it and decided I'm going to try to live. It was one of those things where I don't understand, I guess, what you're -- where we're going with the question. Was I stressed out because financially, yes. Did it affect me so much that I couldn't move or do anything, no. But it was there every day, every moment of every time --
Q. Alright.
A. -- when bills came around, when I wanted to spend time with my kids, spiritually, everything.
Q. Spiritually?
A. Yes. I mean we may not agree on the same God or anything; but, yeah, you have your doubts since things start to go that way.
Q. I'm going to hand you what I'm going to mark as Exhibit No. 20.
THE COURT REPORTER: No.
MR. CLACK: 21.
MR. KACAL: Hold on, wait, what is 20? I think he marked it but he hadn't introduced 20 yet.
MR. CLACK: Yeah, I put the sticker on it a while back and I didn't give it to him.
THE COURT REPORTER: Oh, okay.


MR. CLACK: Now I'm actually giving him 20.
(Exhibit 20 was marked for identification.)
BY MR. CLACK:
Q. Alright. Do you recognize Exhibit 20 as your First Amended Complaint in this lawsuit?
A. I have seen this, yes.
Q. Okay. Look with me, if you will, to Page 4. And there's a Paragraph 14. Do you see that?
A. Yes.
Q. And there's a statement there on July 1st, Mr. Brewer -- 2021, Mr. Brewer attended a medical appointment with R. Robert Dhir, MD of HTX Urology to discuss his suspected UTI infection?
A. Yes.
Q. This is the same sentence we saw from the demand letter a minute ago, correct?
A. Correct, when it came to the ultrasound.
Q. Yeah, what we determined at that time was, in fact, you saw Dr. Dhir on June 14th and then you had an ultrasound of July 1st of 2021, correct?
A. Yes.
Q. Alright. Then there is Paragraph 15 is about this e-mail that we looked at earlier that was sent from


Mr. Davis, correct?
A. I'm sorry, where?
Q. That Paragraph 15.
A. That was sent from Mr. David this big box thing?
Q. Yes, that big box. That's the e-mail we looked at earlier that was Exhibit 3 sent from Mr. Davis?
A. Yes, we've already looked at this, yes.
Q. Okay. And I think you told me you don't recall if that went to you or your mother, but certainly you do recall seeing that e-mail prior to applying for the second Golden Rule short-term policy --
A. Correct.
Q. -- correct?
A. Correct.
Q. Okay. And then if we look at Paragraph 16, there is a statement there on November 15th, 2021, Mr. Brewer received news from Dr. Dhir that his symptoms were being caused by testicular cancer. Do you see that?
A. Yes.
Q. And that fits with your recollection, correct?
A. What we've discussed earlier, yes, that fits.
Q. Okay. Then if we go to Paragraph 18, there is a third sentence in Paragraph 18 says: Mr. Brewer contract -- contacted Christopher Davis of Tobias & Associates, Inc., d/b/a gethealthcare [sic] in December of 2021 to


discuss the renewal of his insurance policy. Do you see that?
A. Yes.
Q. And what we discussed is that -- what actually happened was your mother had talked to Mr. Davis in November of 2021 prior to the November 5th application, but you can't tell us what happened on those phone calls, correct?
A. Correct, she handled that.
Q. Okay. And so certainly that's also true of the next sentence where it says: During those discussions, Christopher Davis informed Mr. Brewer that a specific renewal option will allow Mr. Brewer to obtain a new policy with that same coverage he enjoyed under Golden Rule policy ID No. 096422291. Any representation that Mr. Davis made was actually made back in October to your mother, and we would have to ask her about the details, correct?
A. Correct.
Q. Alright. We have been going about an hour. I actually think I'm just about done. But let's take five minutes and I'll check.
THE VIDEOGRAPHER: We're off the record at 2:26 p.m.
(A short recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 2:33 p.m.
BY MR. CLACK:
Q. Mr. Brewer, you understand that you're under oath just as you were before you took the break?
A. I do, yes.
Q. When you filled out the two applications that we've looked at, you did those online?
MR. KACAL: Objection. Form.
A. Which applications did I fill out? I just filled out an esignature.
Q. The Exhibit 1 and Exhibit 4. When you went through and put your esignature and the date on there, did you do that at a computer?
A. Yes.
Q. What -- is that a computer that you own?
A. Yes.
Q. Do you still own it?
A. Yes.
Q. Is it a laptop or desktop?
A. Desktop.
Q. What kind of computer is it?
A. HP.
Q. Was anyone present with you when you filled out those forms?



A. I don't remember filling out the forms.
Q. Well, when you --
A. Signing the esignature?
Q. -- did your esignature?
A. I don't remember. I don't remember if anybody else was with me.
Q. Yeah, sorry. I'm not -- I'm not fighting with you right now about filling out versus signing --
A. I just didn't know. I don't remember filling it out. You said filling out, so that's what I said.
Q. Fair enough.
MR. KACAL: Let him finish his question because she's going to have a hard time getting everybody, so.
THE WITNESS: Okay. Okay.
BY MR. CLACK:
Q. When you went through and you put your esignature on the applications that are Exhibit 1 and 4, do you recall if anyone was with you?
A. No.
Q. Was your mother out of presence and physically on the phone with you at the time that you did those?
A. I don't remember.
Q. Okay. Earlier you ta ked about your stress and anxiety and that sort of thing. Do you have an amount in



mind that you're going to ask the jury for mental anguish or emotional distress in this lawsuit?
A. I just want my bills paid. I'm not -- I can fix that, I just want my medical bills paid. I don't have an exact number.
Q. Do you have -- did you keep any kind of a diary or a journal or a calendar in 2021 or 2022?
A. I did not keep a diary, I don't keep a journal and a calendar. We have one but I don't know, just one that's on the wall, nothing like on a computer.
Q. Is it the kind of calendar where you wrote on medical appointments or anything like that on it?
A. It could have been, yes, I've did that; but normally I would just do it for birthdays.
Q. Do you have any social media accounts?
A. I do, Instagram.
Q. What's you Instagram account name -- user name?
A. Playswithfoods.
THE COURT REPORTER: Playswithfood?
THE WITNESS: Yes, plays_with_food.
BY MR. CLACK:
Q. All one word?
A. All one word. Underscores are in between the plays with food.
Q. Have you ever had a dispute with an insurance



company other than this lawsuit?
A. No.
Q. Anything else about this dispute that I've not asked you about that you want to tell me?
A. Nothing besides that it was not relayed through when we talked to the person that represented us was through my mother, so what I contacted; but other than that, we covered a lot of things. So I don't have any more questions.
MR. CLACK: I'll pass the witness.
MR. KACAL: We'll reserve our questioning for trial.
MS. PRIETO: I -- sorry, I have a follow up foul. Sorry.
E X A M I N A T I O N
BY MS. PRIETO:
Q. When you were ta king to Golden Rule's counsel earlier you made a comment that your mom told you that your treatment was going to be covered under that second policy, and I'm curious what you mean by. What treatment did you think you were going to get at that time that you felt was going to get covered?
A. I don't remember. I just remember we needed to talk through it. I got diagnosed on the 15th, so we didn't know what kind of treatment was going to be needed.

All I know we talked to Dr. Campbell but whatever he suggested, but I don't remember exactly. It was just my mother who took care of that stuff.
Q. Okay. So I guess your testimony is you didn't tell your mom, Mom, I'm going to get this kind of treatment and that kind of treatment is going to get covered on the policy, correct?
A. I told her what I needed and what kind of treatment, but I don't remember the time of day. I don't -- I know I kept her in the loop because she was the one handling the insurance, and I kept her in the loop because she wanted to know how sick I was.
Q. So what did you tell her? So I want to know like --
A. I don't remember exactly.
MR. KACAL: Let her finish her question.
Q. Let me go back. So when you fill out -- or when you signed the second application on November 5th, 2021, what kind of treatment did you think you were going to get?
A. I did not know.
Q. Okay.
A. I don't --
Q. So then -- sorry. So then it's possible that you did not communicate to your mom, I need X treatment



covered under a new policy?
A. I don't remember what was said exactly. That was a long time ago. I just remember I kept her updated on what was going on with me, but it was the -- I -- she handled all that. I don't remember everything and every word that was said at that time. I don't -- I couldn't give you a definitive answer and I don't want to sit there and tell you something that's not true.
Q. Sure. Is it fair to say that when your mom talked to Tobias & Associates right before, I guess it would have been, November 4 and November 5th, she didn't tell them and she couldn't have told them my son has cancer because you didn't know that allegedly, right?
A. Yeah, I did not know that until the 15th until I talked to -- around the 15th, around -- after my orchiectomy and my surgery to have my testicle removed. After that -- about three weeks after that so is when I found out that I had cancer.
Q. So on November 4th and 5th did you tell your mom, I had my testicle -- some part of my testicle removed because I remember you said you didn't know that it was fully removed, right?
A. I did not re -- I did not know it was fully removed. I thought they did a portion of it, correct.
Q. Okay. And at that were you having any symptoms



that you would have relayed to your mom?
A. Just I was having pain because of the surgery, but other than that, no. And that quickly went away.
Q. Okay. And you didn't -- you told us earlier that you didn't know that they were -- that they had biopsied --
A. Correct.
Q. -- on the testicle that --
A. Sorry, yes. That's correct.
Q. Okay. And so it's possible then November 5th and 4th you didn't communicate to your mom, I'm going to need more treatment, I have cancer, I'm concerned that I'm going to have to keep going to doctors related to my issues with my testicle?
A. We didn't relay anything until really we knew that other than we were going to continue to get coverage and I did not know what sym -- or what my actual outcome was. I did not know that.
MS. PRIETO: Okay, I'll pass the witness.
MR. KACAL: Again, we reserve our questions for trial.
THE VIDEOGRAPHER: We're off the record at 2:41 p.m.
(Proceedings ended at 2:41 p.m.)



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BREWER, | § | |
| | § | |
| VS. | § | C.A. NO. 4:22-CV-00969 |
| | § | |
| GOLDEN RULE INSURANCE COMPANY AND TOBIAS & ASSOCIATES, INC. D/B/A GETMEHEALTHCARE | § | |

---

REPORTER'S CERTIFICATION
OF MICHAEL BREWER
TAKEN ON FEBRUARY 20, 2023

---

I, Angela Steele, Shorthand Reporter, Notary in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, MICHAEL BREWER, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above foregoing deposition as set forth in typewriting is a full, true and correct transcript of the proceeding has at the time of taking of said deposition.

I further certify that I am not in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of this attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

Certified to by me on this, the 20th day of February, 2023.

______________________________
Angela S. Steele,
Shorthand Reporter, Notary
Expiration: 10/17/23
Firm Registration No.
ESQUIRE DEPOSITION SOLUTIONS
1235 North Loop West
Suite 510
Houston, Texas 77008
(713) 524-4600



Reference No.: 9151743

Case: BREWER V. GOLDEN RULE INS.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

______________________________
Michael Brewer

NOTARIZATION OF CHANGES
(If Required)

Subscribed and sworn to on the ______ day of

__________________________, 20____ before me,

(Notary Sign)_________________________________

(Print Name) Notary Public,

in and for the State of _____________________



Reference No.: 9151743
Case: BREWER V. GOLDEN RULE INS.

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
Michael Brewer



Reference No.: 9151743
Case: BREWER V. GOLDEN RULE INS.

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
Michael Brewer