IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BREWER, | § | |
| | § | |
| VS. | § | C.A. NO. 4:22-CV-00969 |
| | § | |
| GOLDEN RULE INSURANCE | § | |
| COMPANY AND TOBIAS & | § | |
| ASSOCIATES, INC. D/B/A | § | |
| GETMEHEALTHCARE | § | |

---

VIDEOTAPED ORAL DEPOSITION
OF CAROLYN ANN BREWER
TAKEN ON FEBRUARY 21, 2023

---

ORAL DEPOSITION of CAROLYN ANN BREWER, produced as a witness at the instance of the Defendants, was duly sworn, was taken in the above-styled and numbered cause on the 21st of February, 2023, from 10:02 o'clock a.m. to 03:37 o'clock p.m., before Angela Steele, Shorthand Reporter, Notary, in and for the State of Texas, reported by machine shorthand at, The Cobos Law Firm, 711 W. Alabama Street, Houston, Texas, pursuant to the Federal Rules and the provisions states on the record or attached hereto.



A P P E A R A N C E S:

FOR THE PLAINTIFF(S):

Mr. Nicholas Kacal
THE COBOS LAW FIRM
711 W. Alabama Street
Houston, Texas 77006
713-234-5860
nicholas@cobos.law

FOR THE DEFENDANT(S):

Ms. Leida Prieto
RYMER, ECHOLS, SLAY & NELSON-ARCHER, P.C.
2801 Post Oak Boulevard
Suite 250
Houston, Texas 77056
713-626-1550
lprieto@renlaw.com
Counsel for Tobias & Associates

Mr. Lance Clack
FIGARI DAVENPORT LLP
901 Main Street
Suite 3400
Dallas, Texas 75202
Counsel for Golden Rule

Also present: Diago Ramirez, Videographer



I N D E X


| | PAGE |
|---|---|
| Appearances .......................... | 2 |
| CAROLYN ANN BREWER | |
| Examination by Ms. Prieto.......... | 5 |
| Examination by Mr. Clack........... | 31 |
| Examination by Ms. Prieto.......... | 168 |
| Reporter's Certificate ............... | 171 |




EXHIBITS MARKED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| PREMARKED AND PROFFERED EXHIBITS | | |
| Exhibit 1 | 1st Application for Coverage | 11/136 |
| Exhibit 3 | E-mail from Christopher Davis | 16/175 |
| Exhibit 4 | 2nd Application for Coverage | 21/84 |
| Exhibit 5 | ID Cards and Welcome Letter | 57 |
| Exhibit 6 | 1st Golden Rule Policy | 61 |
| Exhibit 11 | Medical records affidavit, notices | 68 |
| Exhibit 8 | Phone Log | 78 |
| Exhibit 9 | 2nd Welcome Letter | 99 |
| Exhibit 10 | 2nd Golden Rule Policy | 101 |
| EXHIBIT MARKED | | |
| Exhibit 21 | 11 double-sided e-mails | 116 |
| PREMARKED AND PROFFERED EXHIBITS | | |
| Exhibit 15 | Golden Rule Letter with handwritten notes | 131 |
| Exhibit 16 | Diagnoses list with more notes | 142 |
| Exhibit 17 | Phone Log with three calls | 144 |
| Exhibit 12 | Claimant's Statement and Authorization | 147 |

P R O C E E D I N G S

*********************

THE VIDEOGRAPHER: Alright. We are now on the record. This is the videotaped deposition of Ann Brewer in the matter of Michael Brewer versus Golden Rule Insurance Company, et al. Today's date is February 21st, 2023 and the time is now 10:02 a.m.

Counsel, will you please introduce yourselves and the witness will be sworn.

MR. KACAL: Yes, I'm Nicholas Kacal with the Cobos Law Firm here on behalf of Plaintiff Michael Brewer.

MS. PRIETO: Leida Prieto on behalf of Defendant Tobias & Associates, Inc.

MR. CLACK: Lance Clack for Defendant Golden Rule Insurance Company.

THE COURT REPORTER: Raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give in this action will be the truth, the whole truth, and nothing but the truth under the penalties of perjury?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

E X A M I N A T I O N

BY MS. PRIETO:



Q. Good morning, Ms. Brewer. Can you please state your full name for the record.

A. Carolyn Ann Brewer.

Q. Okay. I represent Tobias & Associates. Do you understand who I am and who I represent?

A. Yes, I do.

Q. Have you ever given a deposition before?

A. No.

Q. So I'm going to go through a few ground rules. The court reporter to your right will be taking down everything we say, and so it's important that you provide verbal responses. She can take that down. So if you ever shake your head and then I ask, you know, "is that a yes," I'm not trying to be rude, I just want to make sure that it's on the record.

A. Okay.

Q. It's also important that you let me finish my question before you start your answer so that it's easier for her to take everything down. If you need a break, that's fine. I will just ask that you answer the last question that was posed. And then if you don't hear or understand one of my questions, please let me know and I'll rephrase it or restate it.

Are you under the influence of alcohol or drugs that might impair your ability to provide testimony



today?

A. No.

Q. Okay. Did you have a chance to meet with an attorney before your deposition?

A. Yes.

Q. Okay. I don't want to know what you guys ta ked about, I just want to know about for how long you met?

A. I got here about a little after 9:00, so I've just been reading things, and I had a few phones calls for myself out in the parking lot I had to do, so; but right around a little after 9:00 I would say.

Q. Okay. What documents did you review?

A. I reviewed the -- the -- goodness. The timeline, I guess the ones that Michael had yesterday the -- I don't know what you call them, I'm sorry.

Q. The exhibits?

A. The exhibits. Yes, thank you.

Q. Is there anything else that you looked at?

A. No.

Q. What is your current address?

A. My current address is

Castlerock, Colorado 80108. And that's

Q. Okay. During 2021 and 2022, was that your same address?

A. That's correct.



Q. Do you have any experience as an insurance agent?

A. I'm sorry, but I'm a little hard of hearing. Can you just raise it -- your voice maybe just a little so I can hear. Thank you.

Q. Okay. Do you have any experience as an insurance agent?

A. No.

Q. Okay. Have you ever worked in the insurance field?

A. When I was maybe 20 -- in my early, early 20s I was an adjuster is Detroit for the Iron Worker -- Reinforced Iron Workers. But that was just paying the claims, that was nothing else. Just paid claims.

Q. Those claims were for what type of insurance?

A. It was the union, the -- like the carpenters iron workers reinforced steel, all the union workers in Detroit.

Q. Okay.

A. And it was strictly just paying them, just sending them to be paid.

Q. Okay. When did Mr. Brewer first tell you that he needed insurance?

A. He said in June. I believe it was June, right around June 10th -- 9th, 10th.

Q. Of what year?

A. Of 2021.
Q. Okay. Did he tell you why he needed insurance?
A. He said he was getting older, he had just -- he had, had another child, and that he, you know, needed -- started to -- he felt like he needed insurance.
Q. Were you aware he had any symptoms or medical issues at that time in June of 2021?
A. No.
Q. What did you do to look for insurance for Mr. Brewer?
A. I -- his partner had called me and said, "We've been looking for insurance, but I don't speak English very well so could you do it. Could you look for it."
Q. What --
A. And she gave me the name of Tobias and she gave me their number.
Q. Whenever Mr. Brewer's partner told you that he needed insurance, what did she say that he wanted specifically? Did she give you any idea of --
A. He wanted medical insurance.
Q. Okay. Did she give you -- did she tell you, What we're looking for is a certain type of deduct ble or for a certain type of premium, anything like that?
A. Nope.
Q. Okay.



A. No.
Q. Do you know how she had to Tobias & Associates name and number?
A. I think she just looked on the internet.
Q. Okay. Besides reaching out to Tobias & Associates, did you ta k to any other agent?
A. No. I -- oh, well I told her that I had -- no, I didn't reach out to any other insurance companies.
Q. Okay. Do you remember when you first reached out to Tobias & Associates?
A. When I first ta ked with them?
Q. Yes.
A. I believe it was the on -- it was either the 9th -- the 9th or the 10th, yes.
Q. Of June?
A. Of June, yes.
Q. 2021.
A. 2021.
Q. Was there any particular reason besides the fact that Michael Brewer's partner gave you Tobias' contact information that you chose to reach out to them?
A. No.
Q. Do you remember who you spoke to at Tobias & Associates?
A. Shane Brody [sic] and Christopher Davis.



Q. Did you ta k to Mr. Davis back in June of 2021?
A. No, it was strictly Shane Brody.
Q. And what was the conversation about between you and Mr. Brody?
A. Getting insurance for Michael.
Q. What did you -- what did you ask for in particular when you spoke to Mr. Brody?
A. I asked for insurance, health insurance.
Q. Okay.
A. I asked for health insurance.
Q. And what did Mr. Brody tell you?
A. He told me that he could get insurance from June until December because it was June at that point and it could be renewed when the policy -- about a month before the policy was up he would send a renewal.
Q. Okay. Is there any reason why you chose a short-term policy?
A. I did not realize it was a short-term policy.
Q. Have you ever had a short-term policy before?
A. No.
Q. Were you told that it was going to be a short-term policy?
A. No.
Q. Were you told any specifics about the type of coverage that you were going to obtain?



A. No. It was just supposed to be insurance from June until December.
Q. Okay. Did you communicate any of your conversations with Mr. Brody to Mr. Brewer?
A. Yes.
Q. Okay. What did you tell Mr. Brewer?
A. I told him that they would -- they said that they can get him an insurance policy from June until December, renewable at the end of the year.
Q. Okay. Well, let me show you what was previously -- it's put in your stack -- what was previously marked as Exhibit No. 1 --
A. Okay.
Q. -- to Michael Brewer's deposition.
(Exh bit 1 was previously marked and proffered to the witness.)
A. What is this?
Q. Have you ever seen -- you can flip through it, but have you ever seen this before?
A. No.
Q. On Page 1 of Exhibit 1 under e-mail, is that your e-mail?
A. Under Exhibit 1, Page 1. I'm trying to find it.
Q. So it will be a box at the very bottom that says contact information and it has a phone number --

Page 13

A. Yes, that's my e-mail.
Q. Okay. Do you remember giving your e-mail to Tobias & Associates?
A. Yes, I do.
Q. Okay. Did Tobias & Associates send you a link for an application?
A. No, they filled it out over the phone. I gave them the information.
Q. Okay. And then after you gave the information, were you then sent a link to this e-mail?
A. Yes.
Q. Okay. Did you then click on that link and go through it?
A. As far as I -- I -- restated the question because I don't understand go through what.
Q. This application.
A. No. As -- okay, let me -- no, I didn't go through the application. There was -- I -- in my opinion, there wasn't -- as far as I can remember, there wasn't a link to look at the application, but I cannot remember to be honest with you. But I did give them the -- when they asked me questions, I did give them the response they needed.
Q. Okay. So I guess let me ask you if they asked you on Page 2. Under medical history did they ask you if

Page 14

Mr. Brewer within the last five years he had cancer?
A. No.
Q. Did they -- okay. Did they ask you whether he had undergone any tests that had not yet been completed?
A. No.
Q. Okay. If you go to the following page, Page 4. Do you remember seeing this page?
A. No.
Q. Okay. Do you know whether or not you signed an application on behalf of Mr. Brewer?
A. No, I did not sign an application for Mr. Brewer.
Q. Okay. Do you know how Mr. Brewer got a copy of this application?
A. I don't think he did get a copy of this application.
Q. And why do you say that?
A. Because I don't think I got a copy of this application.
Q. Okay. Do you know whether Mr. Brewer had to sign anything in order to get insurance?
A. I think he had to esign.
Q. Okay. And would he have gotten -- since sent the portal to be able to esign from you?
A. Could you repeat the question?
Q. Sure. It's our understanding that Tobias -- the

Page 15

communications all went through you.
A. Yes.
Q. Were you the one that then gave him access to the portal to be able to esign?
A. I don't believe there was ever -- I'm not clear what you mean about portal.
Q. Was it a link or something that he had to click on online to be able to esign?
A. I -- I believe so, yes.
Q. Okay. Would that have gone through you?
A. It was either through my e-mail or his telephone number because that's to both that are on there. So I'm not sure which one of them it went through, whether I sent it or whether it went through his telephone number because I gave him his number.
Q. Okay. At what point do you reach out to Tobias & Associates the second time?
A. The second time was he sent -- Christopher Davis sent an e-mail on 11/3 saying that it was time for renewal and then I called him on 11/5 of 2021.
Q. Okay. Is there any particular reason that you decided to reach back out to Tobias instead of going somewhere else to get insurance?
A. No.
Q. When you called Mr. Davis, what did you tell him?

Page 16

A. I told him that we would l ke to renew his policy.
Q. Okay. In your stack there should be something that -- it says at the bottom as Exhibit 4. It should be an e-mail.
MR. CLACK: Got to move some trees.
MR. KACAL: I believe it's 3.
MS. PRIETO: 3?
MR. KACAL: Yeah.
MS. PRIETO: Sorry.
Q. And can you look for Exhibit No. 3, I thought was the one.
(Exhibit 3 was previously marked and proffered to the witness.)
A. Alright.
Q. Okay. Is this the e-mail that you referred to earlier?
A. Yes, it is.
Q. Okay. So did this go to Mr. Brewer or to you?
A. To me.
Q. This e-mail was dated November 3rd, 2021. It says: I wanted to reach out as your UnitedHealthcare medical insurance policy is coming to its expired/ --
A. Expiration.
Q. -- expiration, sorry -- expiration/renewal date.

Do you see that?
A. Yes.
Q. Okay. And it says: In order to renew this coverage or explore alternative carrier options, please contact me direct either via e-mail or phone. And then he list the phone number. Do you see that?
A. Yes.
Q. Whenever you reached out to Mr. Davis, did he tell you that you would be renewing a policy or that you had to apply for a brand new policy?
A. He said that I could renew the policy. When I asked -- when I called, I said, "I would l ke to renew the policy, and he said, just -- he said, "I can renew it, just a moment," and he put me on hold.
Q. Okay. After he comes back from hold does he tell you anything else?
A. He said in the -- I wrote it on this little slip that I kept and that's when he -- when all the information was on there. He said, "Same coverage effective this date," and he give me the -- the deduct ble, how much it would be. Deductible, how much it would be per month and you know, Michael's -- would have to pay out, the percentage that, you know, have. I think it was 70/30 if I can -- if I recall right.
Q. Okay. When you talked to Mr. Davis on -- after


this e-mail, do you tell him anything about Michael's health?
A. Yes, I do.
Q. Okay.
A. I told him that he had -- they thought it was an infection, but anyway that he had an -- a testicle removed and that it looked suspicious, you know, and that he, you know, could be ongoing with, you know, his medical. And that's what I said, but I did tell him that he, you know, had his one testicle removed.
Q. Okay. How did you know that he had a testicle removed?
A. How do I know he had one? Because Michael told me. I mean, I know he had the surgery. The surgery was back in October.
Q. So by November you were aware that his entire testicle had been removed?
A. Yes.
Q. And then you said that it looked suspicious?
A. Yes.
Q. What did you mean by that?
A. I meant because my -- I looked it up on the internet, my daughter is in science, my son-in-law is -- has medical training, he's, you know, he's a doctor of chiropractor, he went through medical school. And we've


talked about it as a family, you know, and we all came to the conclusion that it could be cancerous, it could be, you know, something to be concerned about because, you know, it has -- something to be concerned about.
Q. Okay. Do you know if Mr. Brewer told you at that time that he thought it might be cancerous?
A. No, he did not.
Q. So you said that you had told them that he might got -- might have ongoing medical treatment, did you specifically tell them that you thought Michael might have cancer treatments?
A. No, I did not. But I told them that it look suspicious and it could be ongoing.
Q. At this point did Mr. Brewer tell you that he needed something specific when it came to insurance?
A. No, it was just we thought it was a renewal.
Q. Was there any particular reason why there was a change between the -- 184 days to 12 months of coverage?
A. Because we got it in June to December, and he said it would be renewed -- we could renew in December; so that's the reason that we renewed it for a year after that.
Q. You didn't find it odd that one policy was for 184 days and the alleged renewal would be for a significantly more period of time?


A. No, I did not.
Q. Okay. Did you make any determinations regarding deductible?
A. The --
Q. So the deduct ble also changed from one policy to the next, did you make any determination regarding, yes, let's change the deductible or not?
A. No, they did.
Q. At this point did you guys consider going to the Marketplace to obtain insurance?
A. No. We thought we were covered under the insurance policy.
Q. Had you had a chance to read the first policy that Mr. Brewer had?
A. No, we never received a policy.
Q. Okay. Did you know whether or not Mr. Brewer was pending pathology results around that November timeframe, November 2021?
MR. KACAL: Objection. Form.
You can answer.
A. Did I? No. No.
Q. Were you -- did you come down to Texas whenever Michael had his testicle removed?
A. No.
Q. Do you know whether he was accompanied by

anybody?
A. During -- could you restate that? During what?
Q. Do you know if Michael was accompanied by anybody during his testicle removal?
A. His partner.
Q. Okay. On your stack if you can look at what was previously marked as Exh bit No. 4 to Mr. Brewer's deposition.
A. Okay.
(Exh bit 4 was previously marked and proffered to the witness.)
Q. Do you remember seeing this application?
A. When is...
Q. And you can flip through. There's a date in there when Mr. Brewer signed it.
A. No. No.
Q. Do you know if you filled out this application?
A. Pardon?
Q. Do you know if you filled out this application?
A. No, I did not.
Q. Okay. Do you know if you got a link to sign for this application?
A. I believe we did because it says it's esigned, but...
Q. I have that this was signed on November 5th,


2021.
A. Um-hmm.
Q. Were you here in Texas during that time?
A. 11/5. Let me think a minute. Was I in Texas? I do not believe so.
Q. When you spoke to Tobias & Associates at the beginning of November, did you provide Michael Brewer's e-mail?
A. Yep.
Q. Was Mr. Brewer on the phone with you whenever you spoke to Tobias & Associates?
A. No. But I did give them his telephone number.
Q. Okay. Do you know whether Mr. Brewer ever talked to Tobias & Associates himself?
A. He did not.
Q. After you had this conversation with Tobias & Associates, what did they tell you was the next step?
A. In November what was the next step?
Q. Yes.
A. They didn't say anything.
Q. Okay.
A. As far as -- I don't understand the question.
Q. I'm trying to figure out how Mr. Brewer or you got a copy of this application.
A. I don't think we got a copy of the application,


but I -- it's been so long ago I cannot tell you, but I don't believe we got a copy of the application. I think we just got a copy of the esign.
Q. So you're -- do you think that because you clicked on the link and you saw what it looked like or you're just assuming?
A. I don't know.
Q. Okay.
A. I really don't know.
Q. After you talked to Tobias & Associates what did you tell Mr. Brewer about the policy that he's applying for?
A. I told him that it was -- that they said it was a renewal, same coverage, you know, just different deductibles or whatever of that, but it was the same coverage and it was in effect on 12 -- 11 or 12. I don't remember the exact date, but it would become effective then.
Q. Did you think it was weird that although you thought it was a renewal that he would have to apply for something again?
A. No.
Q. Okay. Other times that you've had insurance, have you had to apply multiple times for coverage for a renewal?


A. I've had only insurance for teachers, which they take care of everything. I was a teacher and our insurance just, you know, went on, they -- you know, they signed us up and then we just, you know, had insurance. That was it.
Q. Because you -- l ke you got health insurance through your work which was --
A. Yes.
Q. -- some school district. Okay. So whenever that -- whenever that would happen, they wouldn't give you a link or paperwork so you could decided what deductible you wanted, what kind of coverage you wanted, what the max out of pocket was, none of that --
A. No if --
Q. -- they would just pick it for you?
A. -- no, if did -- if we wanted to change anything we would have to call them.
Q. But then you were given those options so you'd have an idea of what it looks like, you know, to pick from different coverages?
MR. KACAL: Objection. Form.
A. No.
THE WITNESS: I'm sorry.
MR. KACAL: No, you can answer.
A. No, I -- we would never get anything. It would

just be calling them up and saying we wanted to, you know, maybe add a person or, you know, something l ke that but that's it. I mean -- and I never did it, so I don't know.
BY MS. PRIETO:
Q. Okay. Do you then -- are you -- do you come back to Texas in December of 2021?
A. Yes.
Q. Okay. At that time did you go through Michael Brewer's mail at any point?
A. Yes.
Q. Okay. And when you went through his mail, did you look at any insurance documents?
A. There was nothing in there except for bills from his doctors, like Dr. Dhir. That was it.
Q. Do you know about when you came to Texas in December?
A. We came to Texas actually after he was admitted on the 1st I believe. Yes, we came down on the 1st. Yeah.
Q. Do you know if he got a copy of his policy sent to him?
A. He did not get a copy of his policy, I looked. I looked in boxes for everything.
Q. At that point did you think that was odd that he wouldn't get a copy of his policy?


A. We tried to do -- that's when I called to -- tired to get on the portal and couldn't get on the portal, so I called Chris Davis to try to get on the portal.
Q. Were you able to get on the portal?
A. No. They had the wrong birth date and it was never fixed.
Q. Okay. Did you tell Mr. Davis why you wanted to get on the portal?
A. We just wanted to get on the portal; I mean, we wanted to log in, but no.
Q. Did you ever ask Mr. Davis for a copy of Mr. Brewer's policy?
A. Yes, I told him we never received a policy.
Q. Okay. At that point do you know if he sent you one?
A. He never -- no policy was ever sent.
Q. How long did you stay in Texas, you know, from December to how long?
A. I believe three weeks. I'm not really sure but around that area. I know it was probably through Christmas off and on. I would go back for maybe two or three days and come back, and that was that whole year of 2022.
Q. Okay. So you called up Mr. Davis, you said, Hey, I can't get in the portal, he's not able to let in, do you


call him again to see if he --
A. Um-hmm.
Q. -- can get you on? How many times did you call to try to get on the portal?
A. I don't know. A couple maybe, one or two.
Q. Do you call him again to request the policy?
A. When I ta ked to him the one time I asked -- I told him that we did not receive an -- a policy.
Q. Okay. Do you ever contact anybody else at Tobias & Associates to either get on the portal or get a copy of the policy?
A. I -- when I have called -- when I called a couple times no one -- they said that they would give Chris the message and have him call me back but no one ever called me back.
Q. Do you know who paid for the second insurance policy?
A. I did.
Q. Did you pay any out of pocket for Mr. Brewer's medical treatment following 2021?
A. For which medical treatment are you talking about?
Q. For his cancer treatment.
A. Yes.
Q. Do you know how much you paid?


A. Umm, total from probably about 150,000 for MD Anderson, and that's not including his surgery.
Q. How much did you pay for his surgery?
A. About 130.
Q. Okay. And those are both like 150,000 and then 130,000?
A. That's correct.
Q. Okay. Where did you get that money?
A. Out of my retirement and savings.
Q. Okay. Is there any particular reason why you paid for the second insurance policy instead of having Mr. Brewer pay for it?
A. Because he was -- you know, at that point he had just had a child, he was -- had this restaurant and everything and I didn't want to burden him with the fact of, what, however much it was. How much? $5,000, 6,000. It was another bill.
Q. After you talked to Tobias & Associates that Mr. Brewer had a complete testicle removal and that it appeared suspicious, did they tell you anything in response?
A. No, not a thing. That's when he got off the phone, put me on hold, and then came back and said, We can renew the policy here's what it is, same policy. You know, here's the deductible, here's what it will cost --

you know, the 70 percent, 30 percent.
Q. Okay. Have you -- to today have you ever looked at Policy 1 and Policy 2?
A. No.
Q. I know -- do you believe that they're different coverages?
A. Well, they're different deductibles, I believe or different -- but I'm not sure.
Q. And so at the time that you're talking to Tobias & Associates --
A. Um-hmm.
Q. -- about this second policy, did you know that it would be a different deductible?
A. They told me at that time that it would be a different deductible.
Q. Did you find that odd if you were looking for the same coverage?
A. No, why -- you know, they change all the time insurance -- in my opinion just change all the time. My insurance change all the time.
Q. And so although you asked for the same coverage --
A. Same, um-hmm, no --
Q. Let me ask the question.
A. Oh, I'm sorry. I'm sorry.



Q. Although you asked for the same coverage, you didn't find it odd that the term would be longer, the deductible would be different, and the premium be different?
A. I did not. I did not.
Q. But you were aware before Mr. Brewer signs the application that the policy term limit would be different, correct?
A. Policy?
Q. Term.
A. Because -- yes, because it was a renewal for another year. That's what I was lead to believe that it was -- he had it in June till December, that was the end of the year. Then at the beginning of the next year, just like a lot of policies, they are renewed, and that's what I was lead to believe that it was a renewal for another year. And then you had to, you know, renew it for another year.
Q. But when you're told it's a renewal, it's obviously not the same, right, because one is 184 days and the other one is 12 months?
A. Because they said I could renew it in December because it was the end of the year.
Q. And you didn't think it was a renewal, why -- why would I need to renew something but extend the period of



time? So it's -- it wasn't odd to you that they were l ke, Yeah, we're going to call it renewal but instead of you getting 184 days you going to get almost a full year?
MR. KACAL: Objection. Form:
You can answer.
A. I did not find that odd because it was for the next year.
MS. PRIETO: I'll pass the witness.

E X A M I N A T I O N

BY MR. CLACK:
Q. Alright. Ms. Brewer --
A. Um-hmm.
Q. -- I represent Golden Rule Insurance Company --
MR. CLACK: Oh, I'm sorry.
MR. KACAL: Guys, y'all mind if we have a --
MR. CLACK: Yeah, you want --
MR. KACAL: -- like a five, ten?
MR. CLACK: Yeah, let's do it.
MR. KACAL: This might be a good stopping spot.
THE VIDEOGRAPHER: We are off the record at 10:40 a.m.
(A short recess was taken.)



THE VIDEOGRAPHER: Back on the record at 10:48 a.m.
Q. Alright. Ms. Brewer, you understand you are under oath just as you were before we took the break?
A. Yes, I do.
Q. I think you told me that you had been a teacher. Did I hear that correctly?
A. That's correct.
Q. What years were you a teacher?
A. 1994 till 2011.
Q. What did you teach?
A. I taught computer science and math for middle school.
Q. Was that in Colorado?
A. No, it was in Texas.
Q. Okay.
A. And it was in Las Vegas, Nevada.
Q. And then what have you done since you left teaching in 2011?
A. I am retired.
Q. I thought I heard somebody say at some point today or yesterday that at some point you had handled the payroll duties or something like that for a company. Did I make that up?
A. Payroll. No, I've never -- that I can remember.

Before that I worked for Colorado as a -- in their computer department but, no, I've never handled payroll.
Q. Okay. That was going to be my next question. Prior to 1994 what did you do?
A. I worked for the Colorado -- for the Douglas County School District.
Q. And what did you do for the Douglas County School District?
A. I was part of the computer department, technology department.
Q. And how long does that take us back to?
A. 1985 to 1994.
Q. Alright. You've never worked for an insurance company?
A. L ke I said, in -- in my 20s, early 20s I was a, what they call a, claim adjuster. I think that's what they called us where all we did was look at the claim, send it to payroll, send it to -- not payroll but send it to be paid.
Q. Other than that experience have you ever worked for an insurance company?
A. No, I have not.
Q. Do you have any training in any medical field?
A. No.
Q. Do you have any training as an insurance agent or



in the insurance field other than the work we've already ta ked about as a claims adjuster?
A. No.
Q. Have you ever had a dispute with an insurance company other than this lawsuit?
A. Could you rephrase that? As far as...
Q. Have you ever filed suit against an insurance company?
A. No, I have not.
Q. Have you ever submitted a claim to a department of insurance complaining about the conduct of an insurance company?
A. I have not.
Q. Have you ever had a claim denied where you appealed that claim or you sought legal counsel to assist you with that claim against an insurance company?
A. I have not.
Q. I think you told me that your permanent residence is in Colorado. Is that correct?
A. That's correct.
Q. And at one point you referred to, I think you said we came down. Are you married?
A. Yes, I am.
Q. How long have you been married?
A. Since 1980.



Q. What's your husband's name?
A. Michael.
Q. Alright. And I think you told me -- well, other than MB that's the plaintiff in this lawsuit, do you have other children?
A. Yes, I do.
Q. What are their names and ages?
A. I have a daughter Rachael Stewart, S-t-e-w-a-r-t, R-a-c-h-a-e-l. I have a son Jamieson, J-a-m-i-e-s-o-n, Mackie, M-a-c-k-i-e. And those are my only two children other than Michael.
Q. Did I hear you say a moment ago that Rachael Stewart is -- had been to medical school?
A. No.
Q. No. Somewhere you mentioned --
A. It was -- it was her husband.
Q. Her husband, okay.
MR. KACAL: Let him finish the question so that --
THE WITNESS: I'm sorry.
MR. KACAL: -- we can get a clear record.
THE WITNESS: I'm sorry.
BY MR. CLACK:
Q. That's alright. I knew I heard that too fast or



wrote it down too fast.
So Rachael Stewart's husband is a medical doctor?
A. He is a chiropractor -- medical doctor, chiropractor. He's been to medical school, yes.
Q. What's his name?
A. Joseph Stewart.
Q. Joseph. I want to go back. On the stack in front of you there is an Exhibit 1. Do you see that document?
A. I do.
Q. And this is the application for the first short-term policy and you can see that there are a number of signatures on there that are dated June 9th, 2021. Do you see that?
A. Yes.
Q. Okay. In June of 2021, you were living in Colorado, correct?
A. That's correct.
Q. Did you come to the Texas at all in June, July or August of 2021?
A. Goodness. I -- I cannot say for sure, but I usually come to Michael's about every two to three months, so I would have to look back on my calendar to tell you the exact dates but, I...

Q. My understanding is that you originally reached out to Tobias & Associates and then that began a process by which this application got filled out and submitted to Golden Rule?
A. Correct.
Q. Alright. Why did you reach out to Tobias & Associates to seek insurance coverage for Michael Brewer?
A. Because his partner had called me and asked if I would call them about getting him medical insurance.
Q. When you say "his partner," what's that person's name?
A. Miriam Quiroz.
Q. I think Michael identified her as his spouse yesterday --
A. Well --
Q. -- is there a reason that you use the word partner instead of wife or spouse?
A. Well because I think they're common-law.
Q. Okay.
A. That's what it is. He uses spouse, I use partner.
Q. Fair enough. Alright. Ms. Quiroz reached out to you. When did she reach out to you to ta k to you about getting insurance for Michael?
A. Right around that first week of June. I can't



say the exact date.
Q. Is that something that is reflected on your calendar on in your phone logs?
A. I do not know.
Q. I have seen some documents produced in this case that I think to be your phone logs or printouts from your cell phone bills. Are you familiar with those?
A. Yes, I am.
Q. Have you done a search to try and see if you could figure out when Miriam first reached out to you to talk about getting insurance for Michael?
A. I have not.
Q. What did Miriam tell you in this call where she reached out to get your assistance in getting insurance for Michael?
A. She just said Michael wanted health insurance, could I help.
Q. Did you talk to Michael about the insurance situation at that time?
A. Just that he wanted insurance.
Q. How long had it been at that time to your knowledge since Michael had, had insurance?
A. Probably years.
Q. Did Ms. -- I'm going to call -- say her last name again.



A. Quiroz, Miriam Quiroz.
Q. Quiroz?
A. Quiroz.
Q. Alright. Did Ms. Quiroz at that time mention to you that Michael had, had any kind of medical problems?
A. She did not.
Q. Did she mention to you that he had, had swelling in a testicle or that he was scheduled to get medical treatment for ailment?
A. She did not.
Q. What did you do after you talked to Miriam about getting Michael insurance?
A. I called the insurance that she had given me the number.
Q. Is that Tobias & Associates?
A. That's correct.
Q. Alright. And who did you speak with at Tobias & Associates --
A. Shane Brody [sic].
Q. That's one of those times when if you let me finish you would know where I'm going.
A. I -- I thought you were finished, I'm sorry.
Q. That's okay. You called Tobias & Associates then and spoke to Mr. Brody?
A. That's correct.



Q. Tell me what you recall about your conversations with Mr. Brody at that time?
A. That I told him that Michael needed medical insurance.
Q. Anything else?
A. Not to my knowledge, just that he needed medical insurance.
Q. And what did he -- Mr. Brodil tell you at that time?
A. He said since it was June he could get insurance from June until December.
Q. Was that because he could not -- Michael could not get a Marketplace policy in June, you would have to wait until open enrollment at the end of the year?
A. Never even considered Marketplace insurance at that time.
Q. Okay. Did Mr. Brodil talk to you about any insurance other than Golden Rule insurance?
A. He did not.
Q. Did he send you any written materials, direct you to any websites at that time?
A. He did not.
Q. Alright. And then what happened next after this conversation that you had with Mr. Brodil?
A. He said that he -- we could fill out the

application and that's what we did.
Q. When you say "we," do you remember you and Mr. Brodil or you --
A. That's correct.
Q. Okay. And when you say "that you and Mr. Brodil filled out the application," tell me about that process.
A. He asked me questions and I answered.
Q. Did those include questions about Michael Brewer's health?
A. I don't believe he answered -- asked any questions about his health.
Q. Fair to say you don't recall questions about his health, about Michael Brewer's health being asked of you at that time?
A. That's correct. I don't think he did.
Q. What questions do you recall being asked?
A. His date of birth, his age, date of birth, social security number, where he lived, whether he smoked. I do know that one. Those are the ones I recall.
Q. If you look at the first page of Exhibit 1 down towards the bottom and there's a box for contact information. Do you see that box?
A. On what page, please?
Q. The first page of Exhibit 1.
A. Yes.


Q. Alright. And there's a phone number. Is that Michael Brewer's phone number?
A. That's correct.
Q. And then there's an e-mail address. Is that your e-mail address?
A. That's correct.
Q. Why did you use your e-mail address?
A. Because Michael is so busy with his restaurant and his life that I take care of -- have things sent to me so I make sure they're read.
Q. There is an address up above that. Is that Michael's address?
A. That is correct.
Q. And I think you said there -- at some point became an issue with the birth date as it related to getting in the portal. There's a birth date show up here at the top of that application, is that Michael's correct birth date?
A. That is correct.
Q. Alright. What happened after you had this conversation with Mr. Brodil and he asked you for this contact information and other info for the application?
A. Could you repeat that again?
Q. Sure. After this conversation you had with Mr. Brodil where y'all, as you put it, filled out the


application, what happened next?
A. He gave me the price, gave me the deductible, gave me the coverage, and said Michael had to esign it.
Q. When you say "he gave you the price," he just told you how much it was?
A. That's correct.
Q. Alright. If you look there is a page, the second page of the application, Tobias 38.
A. Um-hmm.
Q. Sorry, is that a "yes?"
A. Excuse me?
Q. You have to say yes or no, the ums don't come through on the record.
A. Oh, I'm sorry. What did you ask? Could you repeat that, please?
Q. Sure. Do you see the page -- are you on Page Tobias 38?
A. Yes.
Q. Alright. Up at the top you can see there's a section called plan selection and there are a number of plans listed below that. Do you see that?
A. Yes.
Q. And the one that is selected is short-term Medical Plus Elite 8. Do you see that?
A. Yes.


Q. How did it come to be that, that plan was selected as opposed to the other plans if you recall?
A. Because they filled it out.
Q. Who is they?
A. Shawn Brody [sic].
Q. Do you recall any discussion on this phone call with Mr. Brodil about which of those plans to select?
A. No.
Q. And then below that there are five different deductible --
A. Um-hmm.
Q. -- amounts listed. Do you see that?
A. Yes.
Q. Do you recall any discussion with Mr. Brodil on this call as to what would be the best deductible for Michael's insurance?
A. No.
Q. Okay. One other question if we go back to that first page because I forgot to ask. Can you see at the top of the first page there is a listing for applicant information?
A. At the very top?
Q. Yes.
A. Yes.
Q. I noticed that this application was only for

Michael. Do you see that?
A. Yes.
Q. Do you know why it was that the only person applied for in June of 2021 was Michael and that no insurance was sought for Ms. Quiroz or any of the children in the family?
A. Yes, I do know.
Q. Alright. Why was Michael the only one that you were seeking insurance for at this time?
A. He is currently -- he was currently divorced from his first wife, and he pays insurance for his first two -- for his two children.
Q. So my understanding is that at the time of this application the situation was that Michael was living with Ms. Quiroz and that he -- that Ms. Quiroz had two children that were living in the home and that Michael had one child by a previous marriage living in the home and that also he and Ms. Quiroz had a child together, Tenoch, who had just been born. Does that fit with your understanding?
A. No. None of his other children lives with him. They live with their mother.
Q. Okay. His children from the previous marriage live with their mother?
A. That's correct.


Q. And so at this time he was living with Ms. Quiroz and her two children and then a third child that he had with Ms. Quiroz?
A. That's correct.
Q. Alright. Why did he not -- at the time of this application, why were they not seeking insurance for Ms. Quiroz, her two children, or the child that Michael had with Ms. Quiroz?
A. I believe they're on Medicaid, but I don't really know that for sure.
Q. Did you ever discuss that with Michael or Ms. Quiroz?
A. No.
Q. Alright. How did it come to past that Mr. Brewer's esignature wound up on this application that is Exh bit 1?
A. I think he was sent a link to sign it through me.
Q. That was going to be my next question. Was it the case that a link was sent to you and then you forwarded it to Mr. Brewer and then he went on and esigned it?
A. That's correct.
Q. You did not -- for instance, on the Page Tobias 40 down at the bottom where that esignature is, you did not esign for Mr. Brewer?


A. I did not esign for Mr. Brewer.
Q. And to your knowledge no one else esigned for Mr. Brewer, he clicked on the link and went on there and put his esignature on there?
A. As far as I know, yes.
Q. Did you have any discussions about this application process with MB prior to sending him the link to sign his application?
A. Could you rephrase that?
Q. Sure. You told me that you had a conversation with Ms. Quiroz before you talked to Tobias & Associates. Did you ever have a conversation with Michael before you talked to Tobias & Associates?
A. Just that he was looking for insurance, medical insurance.
Q. Was this separate from the conversation you had with Ms. Quiroz?
A. Yes.
Q. What did Michael tell in that conversation?
A. That he needed medical insurance.
Q. Did he say why?
A. He said he was getting older, he has three children.
Q. Anything else?
A. That's -- that's the best to my knowledge that he


said. He was just looking for medical insurance at that point because of his family.
Q. And then did you have any conversations with Michael about this application after you talked to Tobias & Associates?
A. Just that he needed to esign it.
Q. Do you recall anything else from that conversation?
A. No.
Q. Did you talk to Michael at all about this application after he esigned it?
A. I told him the deductible what it would be, what the insurance -- you know, how much it would be, the deductible, the percentage that they paid, and that I would take care of the bill.
Q. You paid the premiums for this first short-term policy as well as the second?
A. And, yes, I did.
Q. Okay.
A. Yes.
Q. Okay. Did you have any other discussions with Michael after he esigned the application that you recall?
A. No.
Q. Did Michael tell you anything about the esign process or the application that you recall?

A. No.
Q. Alright. Look with me, if you will, on the page that is Bates Stamped Tobias 40.
A. Yes.
Q. Do you see at the top of Tobias 40 there's a paragraph that is slightly larger text to the rest of the page?
A. Yes.
Q. And do you see it says: Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits?
A. Yes.
Q. Did you ever have any discussion with Michael about that language after he reviewed and esigned the application?
MR. KACAL: Objection. Form.
A. I don't believe I did.
Q. And then below that there's a statement of understanding. Do you see that?
A. Yes.
Q. And it says immediately under that box: I have read this application and represent that the information is shown on it is true and complete. Do you see that sentence?



A. Yes.
Q. And then it says I understand that, and if we go to Bullet Point 2 it says: No benefits will be paid for a health condition that exist prior to the date insurance takes effect. Do you see that language?
A. Yes.
Q. Did you ever have a discussion with Michael about that language after he reviewed and signed this application?
MR. KACAL: Objection. Form.
A. No.
Q. Did you review the application at all before you sent the link to Michael?
A. No.
Q. Look with me, if you will, to page Bates Stamped Tobias 43?
A. 40?
Q. 43.
A. Alright.
Q. And do you see Tobias 43 says at the top: Is short-term health insurance plan right for me? And then it says: You must read and sign this form. Do you see that language?
A. I do see that.
Q. And then below the bolden language there's some



language that says: This plan does not need to follow the federal Affordable Act, ACA rules. Unlike ACA plans, this short-term plan may not cover all injuries or sicknesses including any you may -- you have before applying. Do you see that language?
A. I do.
Q. Did you discuss that language with Mr. Brewer at any time?
A. I did not.
Q. And then below that there are two questions, and the first one says: How long will this plan cover me and it says 184 days. Do you see that?
A. I do not see -- oh, here. Yes, I do.
Q. And then below that there is a question that says: Can I review or extend this plan? Do you see that question?
A. I do.
Q. And what is the answer to that question?
A. No.
Q. Did you review that the language with Michael after signed this application?
A. I did not.
Q. If you turn to the next page there is a question there in bold and it says: Am I covered for an injury, illness, or disease I had before I applied for this plan,



a preexisting condition. Do you see that question?
A. I do.
Q. And the answer there is no. You must tell the truth when answering questioning about your health. We can deny claims for any injury, illness, or disease you had before signing up for this plan whether or not you tell us about your condition. Do you see that language?
A. I do.
Q. Did you ever discuss that language with Michael after he filled out this application?
MR. KACAL: Objection. Form.
A. No.
Q. And then if we turn to the end of that disclosure form, Tobias 46. Are you with me?
A. Yes.
Q. Down at the bottom of Tobias 46 there is an esignature for Michael Brewer dated June 9th, 2021. Do you see that?
A. I do.
Q. And to the best of your knowledge MB is the one who filled out and dated that esignature, correct?
A. That's correct.
Q. Alright. Do you see just above that it says: You must confirm you've read and understand this form. Do you see that?

A. I do.
Q. And then it says: Did you read and understand the limited benefits offered by this plan before you applied or paid for coverage? Do you see that language?
A. I do.
Q. And then below that do you see that there is a box and that box has been checked?
A. I do.
Q. And to the side of that box it says: Yes, I read and understand the benefits and limits of this plan. I was not required to make a payment or apply for this certificate before getting this disclosure form. Do you see that language?
A. I do.
Q. And then below that do you see it says: Don't sign this document if you don't understand it. Do you see that?
A. I do.
Q. And then the same sentence is repeated below that in Spanish. Do you see that?
A. I do.
Q. To the best of your knowledge is Michael Brewer the one that checked that box indicating he read and understood the benefits and limits of the plan?
MR. KACAL: Objection. Form.


You can answer.
A. I do not know.
Q. Well, if he didn't check it, who else would have checked it?
A. I guess he would of, but I didn't see him.
Q. You didn't see him do it but you sent him the link to --
A. Yes, I did. Yes, I did.
Q. No one ever told you, Oh, no, Ms. Quiroz did it or someone else did it, one of the kids did it, anything like that did they?
A. No. No.
Q. Have you ever discussed with Mr. Brewer, with Michael Brewer whether he was, in fact, the one that signed these forms?
A. He did sign them.
Q. Alright. Do you believe that he would have signed these forms without making this certification correct that he read and understood this disclosure and the limited benefits offered by the plan?
MR. KACAL: Objection. Form.
A. I do not know. I do not know because I did -- I've never seen this form.
Q. Is your son in the habit of signing certifications that are not accurate?


A. No.
Q. Do you believe him to be an honest person?
A. Yes.
Q. And so when he certified to Golden Rule that he had reviewed this form and understood it, do you believe that, that was accurate?
MR. KACAL: Objection. Form.
A. Could you repeat that?
Q. Sure. Do you believe that when Michael Brewer signed that form that we were looking at and certified that he had reviewed it and understood it, do you believe his certification was accurate?
MR. KACAL: Objection. Form.
A. I cannot speak for him so I don't know.
Q. Look with me, if you will, at the last page of Exh bit 1 -- or I'm sorry, it's not the last page but it's Tobias 49. Do you see Tobias 49 says at the top: Acknowledgment of application completion?
A. I do.
Q. And then there's an acknowledgment, and do you see Item 5 under acknowledgement says: I specifically adopt the statement of understanding presented on the last page of the application immediately above my signature. Do you see that language?
A. Yes, I do.


Q. And do you understand that referred to the statement of understanding that we looked at earlier that says among other things: No benefits will be paid for a health condition that exist prior to the date insurance takes effect?
A. I do.
Q. And then below that there is an X next to the sentence: I understand the above list of acknowledgements. Do you see that?
A. I do.
Q. And based on what we know Michael would have been the one to place that X there, correct?
MR. KACAL: Objection. Form.
A. I do not know that he did but, yes, I would assume.
Q. You don't know of anyone else who could have done it, do you?
A. No.
Q. No one has ever told you that someone --
A. No.
Q. -- else have, have they?
A. No.
Q. And then below that it says: By entering my name below, I am indicating my intent to electronically sign this acknowledgement, and warrant to all of the statements

in it are true, correct, and accurate. Do you see that sentence?
A. I do.
Q. And then below that is Michael Brewer's esignature dated June 9th of 2021, correct?
A. Correct.
Q. Would you agree with -- or to the best of your knowledge, Michael Brewer is the one who went through this document based on the link you sent him and esigned it in all the places indicated, correct?
MR. KACAL: Objection. Form.
A. To the best of my knowledge.
Q. And you would agree with me that this application packet told Mr. Brewer at least -- well, in four different ways that the plan would not cover preexisting conditions?
MR. KACAL: Objection. Form.
A. I can see where it says that but, yes.
Q. What happened after the application was submitted to Golden Rule with regard to Mr. Brewer's health insurance coverage?
A. Could you repeat that?
Q. Yeah. Do you -- do you know what happened next?
A. He received his insurance cards.
Q. Okay. Look with me, if you will, at Exhibit 5.
(Exhibit 5 was previously marked and


proffered to the witness.)
A. Yes.
Q. And do you see Exhibit 5 is the first page of an envelope that says: Your ID cards are enclosed, and it is addressed to Mr. Brewer at his house in League City? You're already onto the second page, but I'm just asking you about the first page.
A. Yes.
Q. Okay.
A. This is the first page.
Q. Yes. Alright. And I think you told me Mr. Brewer received those ID cards?
A. Yes, he did.
Q. And if you turn with me to the second page of Exhibit 5, you see that is the welcome letter that comes with the ID cards?
A. Yes.
Q. Alright. Did -- have you ever seen this letter before?
A. I have not.
Q. Alright. Did you ever discuss it at any time with Michael?
A. I have not.
Q. Do you see that it says about half way down on that first page: Unlike ACA plans, short-term plans do


not offer coverage for preexisting conditions and as a result are often less expensive. Do you understand that language?
A. Okay, unl ke ACA plans, short-term plans. Yes, I do.
Q. And then below it says: A preexisting condition is a health condition that exist before someone applies for or signs up for a new health insurance policy. Do you see that language?
A. I do.
Q. And then below that it says: Are issued for a specific period of time. Do you see that language?
A. Yes.
Q. And below that it says: If you need coverage beyond this time period you must reapply. Keep in mind if you reapply, any illness or condition developed under your current plan would be considered preexisting under the new plan and would not be a covered expense. Do you see that sentence?
A. Yes.
Q. And you would agree with me that at the time that Golden Rule sent Mr. Brewer his ID cards for the first short-term plan that, that language made clear to him that if he developed any illness while that plan was in effect it would be considered preexisting under any new or


subsequent plan?
A. I do not know that. I mean, I'm not in the insurance business, I don't know.
Q. What does that sentence mean to you that says: If you need coverage beyond this time period you must reapply. Keep in mind if you reapply, any illness or condition developed under your current plan would be considered preexisting under the new plan and would not be a covered expense?
A. Any coverage beyond this time period you must reapply --
THE COURT REPORTER: Speak up, ma'am.
A. Oh, if you need coverage beyond this time period you must reapply. Keep in mind if you reapply -- developed under your current plan would now be considered preexisting. Just means that you have to reapply and preexisting conditions.
Q. Right. That once this plan has expired, Mr. Brewer would have to reapply for a new plan and any illnesses he developed while this plan was in effect would be preexisting and not covered by the new plan, correct?
A. Yes.
Q. Did you ever discuss this language with Mr. Brewer after he received this welcome letter?
A. I did not.

Q. Look with me, if you will, at Exh bit 6.
(Exhibit 6 was previously marked and proffered to the witness.)
Q. Do you recognize Exhibit 6 as a copy of the certificate for the first short-term plan?
A. No.
Q. Have you ever seen it before?
A. No.
Q. I think you said a minute ago you thought that Mr. Brewer had not received a copy at the time this coverage issued because you never found a copy in his house. Did I hear that correctly?
A. I asked him -- yes, I have never seen it nor have I seen it in his house.
Q. I will tell you he did not dispute yesterday that he got a copy of it shortly after it was issued. But I just want to be clear, your statement that he didn't receive this based on the fact that you didn't find it when you came in later and tried to find a copy at his house?
A. Based to my --
Q. Sorry?
A. -- on -- I have never seen this document, and as far as I'm concerned I never seen it.
Q. Alright. At the time that the coverage issued



you were living in Colorado, correct?
A. Correct.
Q. And this issued in June of 2021?
A. Um-hmm.
Q. Correct?
A. Correct.
Q. When was the first time that you tried to find a copy of it at Mr. Brewer's house?
A. I believe it was July or August.
Q. Of '21?
A. Yes.
Q. Why were you looking for a copy of it in July or August of '21?
A. Because I was making him files for all his personal belongs. He tends to be quite messy.
Q. You came to Mr. Brewer's house in July or August of '21 and you were organizing his office or what were you doing?
A. Just organizing him. He keeps things in a box, and I tend to come every maybe couple of months and stuff and visit and then organize him.
Q. Okay. So you didn't find the policy in the box?
A. No, I did not.
Q. Alright. So you don't know if a policy was sent to him and got thrown away or a policy was sent to him and



it got placed somewhere else, you just know when you came to organize his documents it wasn't in the box. Is that a fair statement?
A. I asked him if he had received the policy and he said, No, to his best of knowledge he did not remember seeing a policy.
Q. Well, that's two different things. But the bottom line is --
A. I don't understand.
Q. -- when you came to organize him --
A. Um-hmm.
Q. -- after this policy issued, there was no policy in the box and he didn't know if he'd received a policy or where he might have put it. Fair statement?
A. Correct.
Q. Alright. I'll tell you he did not argue with me yesterday that he got a copy of it, so I'll let you and him sort that out. I just want to make sure you were not there at the time -- living in the house at the time that it issued.
A. I was not.
Q. Look with me at Exhibit 6 at page GRIC 40. Oh, did you ever talk to Ms. Quiroz about whether she had seen a copy of the policy?
A. I did.



Q. Did she tell you she did not recollect seeing a copy of the policy?
A. She said she did not receive a policy.
Q. Did you ever talk to anybody else living in the house about it?
A. Auh, no.
Q. Looking with me, if you will, at GRIC 40.
A. Um-hmm.
Q. And did you see it that, that page is a disclosure rider?
A. I see.
Q. And it says, second sentence there's some language: Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits.
A. I see that.
Q. Do you recognize that as the same or very similar to the language in the disclosure form that was part of the application packet?
A. I do.
Q. And look with me, if you will, at Page 61, GRIC 61.
A. Yes.
Q. And do you see on the right-side column there's a

definition of preexisting condition and it says: Preexisting condition means an injury or illness for which the covered person received medical advice or treatment within the 12 months immediately preceding the applicable effective date that the covered person became insured under the policy?
A. I do.
Q. And you recognize that as very similar or the same as the language that was in the welcome materials and the application packet regarding the preexisting condition?
MR. KACAL: Objection. Form.
A. Similar.
Q. Similar. And then look with me, if you will, at Page GRIC 78. And do you see at the bottom of GRIC 78 there is a large bold heading that says preexisting conditions?
A. Yes.
Q. And below that what does it say?
A. Will not will covered.
Q. It says: Preexisting conditions will not be covered under the policy, correct?
A. Correct.
Q. And that's exactly what Golden Rule had told Mr. Brewer both in the application packet and in the


letter that accompanied his ID cards, correct?
A. Correct.
Q. When you came out to organize Mr. Brewer's personal things in July or August of '21, did you at that time make any effort to get another copy of the policy or the certificate?
A. We had tried the portal several times and it -- we could not log onto the portal.
Q. What to your understanding was the issue with the portal at that time?
A. That it just said his log in either his name or his date of birth or log in was not correct.
Q. I thought you said a minute ago that ultimately there was some issue with his date of birth being wrong?
A. That was the second one.
Q. Do you know what the issue was with the first one?
A. No, I do not. I just know that he couldn't log in.
Q. Did you talk to anyone at Golden Rule about that issue at that time?
A. Not Golden Rule.
Q. Did you talk to anyone at Tobias & Associates about that issue at that time?
A. I do not think so, I don't remember to be honest


with you whether we called to say or not. But I do know the second one we did -- could not.
Q. Fair to say the first one you don't recall if you talked to anyone about your difficulties with the portal, but you know you did after the second policy issued?
A. Yes, because we thought it was strange.
Q. Okay.
A. That we couldn't log in.
Q. Before I forget, have you ever spoken to anyone at Golden Rule at anytime about any of the issues in this lawsuit?
A. No.
Q. Have you ever recorded any phone calls either with Golden Rule or with anyone at Tobias & Associates?
A. Record?
Q. Correct.
A. No.
Q. When did you first become aware that MB had some issue or illness with his testicles?
A. He had an illness with them?
Q. That he was seeking medical treatment.
A. Could you restate that, please?
Q. Yeah, sure. When did you first become aware that Michael Brewer was seeking medical treatment for some issue with his testicles?


A. Just before his -- the removal of his testicle.
Q. Looking with me, if you will, at Exhibit 11.
(Exhibit 11 was previously marked and proffered to the witness.)
MR. KACAL: Did you say 7?
MR. CLACK: 11.
A. 11, yes.
Q. Alright. Exhibit 11 is a series of records from the HTX Urology.
A. Um-hmm.
Q. And there's some declaration at the beginning and there should be a number of pages that are Bates Stamped 1 through 36. I want to direct your attention first to the page that's actually Bates Stamped 3.
A. Okay, yes.
Q. Okay. Beginning on Page 3 there are a list of visits from Michael Brewer to HTX Urology, and the first one down at the bottom is dated June 14th, 2021. Do you see that?
A. Say that again.
Q. Sure. Do you see a visit on Page 3, the last thing on that page there is a date 6/14/2021, 9:50 a.m.; and it says Rohit Dhir, Robert. Do you see where I'm at?
A. Yes.
Q. Okay. Did you have any discussions with

Mr. Brewer about the issues, this testicular pain or swelling around the time of this June 14th, 2021, visit?
A. Not to my knowledge, no.
Q. When was the first time that you recall having any discussions with Mr. Brewer about that issue?
A. I do know he said that he was taking antibiotics, that he thought he had an infection; and I cannot tell you what date that was.
Q. Would that have been in June or July of 2021?
A. It was probably July.
MR. KACAL: Let him finish his question.
THE WITNESS: I'm sorry.
BY MR. CLACK:
Q. Looking with me, if you will, if you actually flip back to Page 2.
A. Um-hmm.
Q. Are you on Page 2?
A. Yes.
Q. There is an entry there for October 7th, 9:40 a.m., urology surgery. And then there's another entry above that October 8th, 2021, urology surgery. Do you see that?
A. Down at bottom, let's see. Urology on 10/7, is that the one you're asking me?
Q. 10/7 and 10/8 there's those two --



A. Yes, I do see those.
Q. Okay. Does that refresh your recollection that Mr. Brewer was scheduled originally for an orchiectomy at that time and that ultimately it got pushed back to October 21st?
A. Yes.
Q. Alright. Did you have any discussions with Mr. Brewer prior to that surgery about what he understood that surgery was for?
A. Yes.
Q. What did he tell you he was going to have surgery for?
A. Just to see why his testicle was swollen.
Q. After the surgery on October 21st, when did you learn that they had removed Michael Brewer's left testicle?
A. That evening.
Q. The same day?
A. That they had removed it?
Q. Yes.
A. Yes.
Q. And who told you that?
A. Michael.
Q. Would it surprise you to learn that Michael told us yesterday he didn't actually learn they had removed his



testicle until sometime later, sometime in the middle of November.
A. I believe that he learned he had cancer in November, but the testicle he did know he had removed on the 21st.
Q. Why did Mr. Brewer tell you when he ta ked to you on October 21st, why did he tell you that the doctors had removed his left testicle?
A. That he moved his testicle?
Q. Yes. Why? Why they had done it, or did he tell you why they had done it?
A. He didn't really go into details on why they remove it. They removed it because it was enlarged. And I guess they deemed it was -- they needed to remove it.
Q. Did he tell you at that time that they had taken tissue samples and sent those to pathology to determine if he had some type of cancer?
A. No.
Q. When was the first time that you recall that anyone raised a prospect that he might have some type of cancer?
A. On the 15th of November.
Q. When the diagnosis was made?
A. That's correct.
Q. I thought you said a minute ago that there was



some conversation between -- between and among the family involving Dr. Stewart --
A. Um-hmm.
Q. -- your son-in-law and I'm not sure who else about the possibility that Michael Brewer might have cancer of some type? Did I hear that correctly?
A. That's correct.
Q. When did that conversation take place?
A. When he -- just before he went in to surgery, like just before, because he said the doctor, you know, they wanted to see why it wouldn't go down. I knew he was taking antibiotics and the swelling was not going down and they wanted to know why. So we kind of researched it and started ta king about it and...
Q. So prior to the October 21, 2021, surgery there were discussions between and among you and Dr. Stewart, your son-in-law, and Michael Brewer as to what the reason might be that the antibiotics were not relieving the symptoms in his left testicle?
A. It was not with Michael, it was just between the three of us.
Q. Who were the three?
A. My daughter, Rachael, your son -- her husband, and me.
Q. Okay. So there was some conversation prior to

the October 21st surgery between yourself and your daughter, Rachael Stewart --
A. Um-hmm.
Q. -- and your son-in-law, Dr. Stewart, to the effect that Michael might have cancer, that might be the cause of the symptoms in his left testicle. Is that correct?
A. We looked on the internet and we looked on everything else, and that was one of the things that could have been. It could have been another inflection. There were many things that we looked at but, yes, it could have been.
Q. Did you ever discuss that with Michael?
A. No.
Q. Did you have any discussions with Michael at any time prior to or after his surgery but before November 5th of 2021, where the issue of him potentially having cancer was raised?
A. No.
Q. If you look on that Page 2 where we're at there.
A. Um-hmm.
Q. There is a little bit above that there's an entry for 10/26/21 that says pathology out to the right. Do you see that?
A. Yes.



Q. And then there is an entry above that for November 4th, 2021, and it says P/O follow up appointment. Do you see that?
A. Yes.
Q. Alright. Mr. Brewer testified yesterday that at some point around that time he had a conversation with the urology practice where they told him they had news about his testicular mass and he needed to come in and hear it in person. Do you know recall on or about November 4th, 2021 discussing with Mr. Brewer that he was going to need to come into the urology practice and get some news from the doctor?
A. No.
Q. Do you recall any discussions between October 21st when Mr. Brewer had his surgery and November -- later in November when he applied for the second short-term policy where you discussed his testicular condition with him?
A. Could you repeat that question?
Q. Sure. Did you talk to Michael between October 21st and November 5th of 2021, about the issues with his left testicle?
A. Just that he had, had his testicle removed.
Q. Anything else?
A. No.



Q. Did you talk to him in that timeframe about the fact that he was going to have to see the urologist again for a follow up to get test results or anything else?
A. I did not.
Q. Did you talk to him in that timeframe about the fact that he had an ongoing symptoms?
A. That he had -- pardon?
Q. Ongoing symptoms.
A. No, I did not.
Q. Did you talk to Ms. Quiroz about any of these issues?
A. I did not.
Q. Did you talk to anyone else living in the house about Mr. Brewer's condition been October 21st and November 5th, 2021?
A. In whose house?
Q. I'm sorry, in Mr. Brewer's house.
A. I did not.
Q. Did you talk to anyone other than Rachael Stewart and Dr. Stewart about Michael Brewer's testicles between October 21st and November 20 -- and November 5th, 2021?
A. I did not.
Q. Look with me, if you will, to Exhibit 3.
(Exhibit 3 was previously marked and proffered to the witness.)



Q. Exhibit 3 is an e-mail from Chris Davis dated November 3rd, 2021. Do you see that?
MR. KACAL: Give us a second, Lance.
MR. CLACK: Sure, I'm sorry. Yeah.
A. And was that -- could you repeat the exhibit again.
Q. No. 3, please.
A. Yes.
Q. Okay. Do you have Exhibit 3 in front of you now?
A. I do.
Q. Is it an e-mail from Chris Davis dated November 3rd, 2021?
A. It is.
Q. Well, I'll tell you it was produced by your counsel in this case but it doesn't say who it was sent to. Do you know who was the recipient of this e-mail?
A. It was sent to me.
Q. Was it sent to your cabie19363@yahoo address?
A. It was.
Q. Alright. When do you first recall seeing it?
A. On Wednesday November the 3rd, 2021.
Q. I notice it is addressed, Dear Client.
A. Um-hmm.
Q. Did you have an understanding when -- sorry. Do you see that language, Dear Client?

A. I do.
Q. Did you think when you received it that it was an automated e-mail? In other words, it didn't have much of a personal touch?
A. No.
Q. And then it says: I wanted to reach out as your UnitedHealthcare medical insurance policy is coming to its expiration renewal date. Do you see that language?
A. I do.
Q. How did you know what policy that referred to?
A. Because it was Michael -- he's the only one that has UnitedHealthcare.
Q. You or your husband did not have any type of UnitedHealthcare coverage at that time?
A. We do not.
Q. And then it says: Expiration or renewal date. Did you on or at point whether it referred to an expiration or a renewal of that coverage that was then in place?
A. I thought it was the renewal date.
Q. Why did you think that?
A. Because it said renewal.
Q. What said renewal?
A. That the insurance would be renewed.
Q. What -- yes, what said that?



A. Restate that.
Q. Sure. Why did you think it was a renewal rather than an expiration?
A. Because it said in order to renew this coverage.
Q. You -- because of the next sentence that says: In order to renew this coverage or explore alternative carrier options. Is that the language you were looking at?
A. Yes.
Q. Okay. And it says: Please contact me directly me directly via e-mail or phone at 561-910-4194, correct?
A. That's correct.
Q. Okay. Look with me, if you will, at Exhibit 8.
(Exhibit 8 was previously marked and proffered to the witness.)
A. Yes.
Q. Is Exhibit 8 -- the first page of Exh bit 8 part of your phone bill?
A. It is.
Q. Alright. And at the top there's a number 832-428-7266. Do you see that?
A. I do.
Q. Is that your phone number?
A. It is.
Q. And then there are five phone calls shown that



are dated either November 5th or November 8th, 2021, correct.
A. Correct.
Q. Is this all of the records you were able to find where you called Tobias & Associates in November of 2021?
A. It is.
Q. Alright. I want to start with that first call November 5th, 2021 at 8:55 a.m. Do you see that?
A. I do.
Q. It says over to the side that, that call was a 17 minute call. Do you see that?
A. I do.
Q. Tell me what you recall about that telephone call.
A. I called to renew the policy.
Q. Can you tell me who you spoke to on that call?
A. Christopher Davis.
Q. And can you tell me what you and Mr. Davis discussed?
A. Discussed renewing the policy.
Q. Specifically what did you say to Mr. Davis if you recall. If you don't that -- I can only find out what you recall --
A. Yes.
Q. -- so if you -- to this whole line of



questioning, if you don't remember it's fine to say I don't remember but...
A. I remember calling and telling him that we needed to renew the policy, and I also told him that Michael has, you know, the testicle removed. I told him that it could be ongoing, I did not know, that it looked -- could have looked suspicious, you know, because it was swollen, and that we needed to renew his policy. He said hold on a minute. I do remember a long wait, and then he came back and he said that here's how we can renew the policy, same coverage just, you know, gave me that -- and I wrote it down on that slip of paper, and that's all I recall.
Q. They are three calls shown on November 5th --
A. Yeah.
Q. -- and so the first one that says 8:55 a.m. and it says it was 17 minutes long.
A. Um-hmm.
Q. And then the second one says it began at 9:12. Do you see that?
A. I do.
Q. And it says it was five minute, and then there was --
A. Yes.
Q. -- a third one that began at 9:17.
A. Yes.

Q. Alright. Based on that does it look like you were disconnected or something happened that you had to keep calling back in?
A. I do not recall. I just know that I talked to them several times that day just about the policy but -- renewal policy, but I don't -- I -- to be honest, I do not remember.
Q. Where were you when you made these calls?
A. I was in Colorado.
Q. Are these times local time in Colorado?
A. They are.
Q. Where were you-- were you in your house in Colorado?
A. I was.
Q. Do you recall what room?
A. My living room office.
Q. Do you recall anything else that was said on these November 5th calls that you have not already relayed?
A. I do not.
Q. If we turn to the next page there is a list of five calls. They're on November 4th and November 5th, 2021. Do you see that?
A. I do.
Q. Alright. Those three calls in the middle that


have the 561-910-4194, are those basically the same three calls that are on the first page for November 5th?
A. Yes.
Q. These other three calls with the 832 numbers, who are those calls to or from.
A. The last one's my husband, and the top one is my daughter.
Q. Do those have anything to do with this lawsuit?
A. No.
Q. Are they just on here because of the way that this was printed they got --
A. That's correct.
Q. -- part of the search?
A. That's correct.
Q. The third page of the exh bit, the Exhibit 8 --
A. Yes.
Q. -- there are some handwritten notes on a note pad that says, Oh, my gourd. Do you see that?
A. Yes.
Q. Is this your handwriting?
A. That is.
Q. They're -- when were these notes taken?
A. On the 5th.
Q. And then there are some dates, what are those dates?


A. I believe that is when the first -- that was when the one expired and the other one started.
Q. And then there's price. What does that refer to?
A. The price is 285.19 plus 20 I think that was for -- I'm not really sure what the 20 was for.
Q. And then under that it says: Coverage and what does it say below that?
A. Same coverage. Same cover.
Q. And then below that there is some numbers. What are those numbers?
A. 5,000 70/30, and I'm not sure what the 1734 is. Maybe that the deductible. No, 5,000 -- 70/30, 1734. I think that's the -- is that the year? No, that's not the year. (Indecipherable.)
THE COURT REPORTER: I can't hear you.
A. I'm not really sure what the 1734 is.
BY MR. CLACK:
Q. Did you take any other notes --
A. No.
Q. -- during these phone calls with Tobias --
A. No.
Q. -- & Associates?
A. I did not.
MR. KACAL: Allow him to finish his question.


THE WITNESS: I'm sorry.
BY MR. CLACK:
Q. Alright. Then if you go back to the first page of Exh bit 8 there are two calls on November 8th, 2021. Do you see that?
A. I do.
Q. And it looks l ke the first one of those you called Tobias & Associates and then you got a call back that lasted a minute. Is that what you see as well?
A. I do.
Q. What were those two calls on November 8th about?
A. I believe we couldn't get into the portal. I couldn't get into the portal.
Q. Okay. Look with me, if you will, at Exhibit 4.
(Exhibit 4 was previously marked and proffered to the witness.)
A. Yes.
Q. Alright. Do you recognize Exh bit 4 as the application for the second Golden Rule short-term policy?
A. Yes.
Q. Did this one work the same way, you got a link from Tobias & Associates and then you forwarded that link to Michael to fill out?
A. Yes.
Q. And I notice at the top the birth date is the

same as the first application. That is Michael's birth date, correct?
A. Correct.
Q. So I'm lost on this birthday issue you were talking about with regards to the portal.
A. Either they -- they could have input it incorrectly or something else they input correct -- incorrectly. Maybe a number on the policy, but we could not get into the portal and that's why I called.
Q. Okay. Look with me -- let me ask you this.
A. Um-hmm.
Q. On November 5th at the time this was submitted, your recollection is that Michael Brewer knew he had, had the orchiectomy and they had removed his left testicle and he was awaiting testing from that operation to tell him the ultimate cause of his symptoms. Is that a fair statement?
MR. KACAL: Objection. Form.
A. Correct.
Q. Okay. Look with me, if you will, at the second page of Exhibit 4.
A. Yes.
Q. And up at the top there are five choices of plans and the Value plan is selected. Do you see that?
A. I do.



Q. Do you recall from Exh bit 1 that at the time of the Exhibit 1 the Short Term Medical Plus Elite A was selected?
A. I'm confused.
Q. Alright. So if you look at Tobias 38 on Exh bit 1.
A. Okay.
Q. There are a number of plans there and the box that's checked is the Short Term Medical Plus Elite A. Do you see that?
A. I do.
Q. And then if you look at Tobias 53 there are five plans offered there and the one that's selected is Value. Do you see that?
A. Yes.
Q. Alright. Do you know or why did you make the decision to move from the Plus Elite to the Value?
A. I did not make that choice.
Q. You don't recall any discussion about that decision?
A. That was the -- that was when he came off the phone, came back, and gave me the coverage. I had no selection in this coverage.
Q. Then on the deduct ble there are six different deduct ble amounts listed there. Do you see that?



A. I do.
Q. Alright. Do you recall any discussion about what the deductible amount would be?
A. Only when he -- only on that notepad when I wrote it down that's what he said the renew -- what it would be.
Q. Do you recall discussions about the amount of the premiums and whether the Value or the higher deductible were chosen to save money on the premiums?
A. It was not discussed.
Q. To your recollection?
A. To my knowledge, yes.
Q. Do you recall any discussions with Tobias & Associates on these calls in November of 2021 about a Marketplace plan?
A. No.
Q. Michael Brewer testified yesterday that there was discussion, at least between you and him, about the Marketplace plan in November or December of 2021, but that he chose not to get a Marketplace plan because it did not cover his doctors at MD Anderson.
MR. KACAL: Objection. Form.
Q. Do you recall conversations with Mr. Brewer about that issue in November or December of 2021?
MR. KACAL: Objection. Form.
A. It was not in 2021.



Q. Do you recall any discussions with Michael Brewer about the Marketplace plan or getting a Marketplace plan in November or December of 2021?
MR. KACAL: Objection. Form.
A. It was no discussion on 2021.
Q. When do you recall discussing the Marketplace plans with Michael Brewer?
A. It was in 2022. It was after his last treatment in the end of June right about July. That's when we started discussing the Marketplace insurance.
Q. Did you have any discussions with Michael prior to these conversations with Tobias & Associates on November 5th of 2021, about the new coverage?
A. Could you rephrase that or repeat that?
Q. Yeah. Did you have -- well, let me ask it this way: Did you have any discussions with Michael prior to the conversations with Tobias in 2021 about the fact you were going to call them in response to that e-mail that you showed us?
A. Yes, to renew.
Q. When did you have these -- those conversations with Michael?
A. Probably that same day, told them that they had e-mailed and going to re -- going to renew the insurance.
Q. Do you recall anything else about that

conversation, or do you recall anything that Michael said to you at that time?
A. No, I did not.
Q. Did you have conversations with Michael after the conversations with Tobias & Associates on November 5th, 2021?
A. Yes, I did.
Q. Alright. Tell me about those conversations.
A. Just told him that I renewed the insurance.
Q. Well, did you renew the insurance, or did you get the link and then he had to fill out the link and esign and do all those things?
A. I -- corrected. I talked to them and then sent him the link and he -- and when I say "I got it," it means I talked to Tobias.
Q. Alright.
A. Uncorrect.
Q. Certainly when we look at the esignatures that are on Exhibit 4, those are Michael's esignatures, correct?
A. Yes, they are.
Q. You did not sign --
A. I did not sign the applications.
Q. Alright.
MR. KACAL: I know we're all getting



excited here.
THE WITNESS: Yeah.
MR. KACAL: It's insurance coverage --
THE WITNESS: I got excited.
MR. KACAL: -- I'm telling you.
BY MR. CLACK:
Q. Look with me at Tobias 55 or Exhibit 4.
A. Yes.
Q. Do you see up at the top of Tobias 55 there's a paragraph in slightly larger language than the rest of the text?
A. Yes, I do.
Q. And that paragraph says: Be sure to check your policy certificate carefully to make sure you are aware of any exclusions or limitations regard coverage of preexisting conditions or health benefits. Did I read that correctly?
A. You did.
Q. That is identical to the language that we saw that was part of Exhibit 1, isn't it?
A. It is.
Q. And then below there, there is a statement of understanding. Do you see that?
A. I do.
Q. And under that it says: I have read this



application and represent the information shown on it is true and complete. Did I read that correctly?
A. You did.
Q. And then it says: I understand that no benefits will be paid for a health condition that exist prior to the date the insurance takes effect. Did I read that correctly?
A. You did.
Q. And that is identical to the language in the statement of understanding that we saw in the first application that was Exhibit 1, correct?
A. Correct.
Q. And below there is Michael Brewer's esignature dated November 5th, 2021, correct?
A. Correct.
Q. Turn with me, if you will, to Tobias 58, still part of Exhibit 4.
A. Yes.
Q. Tobias 58 is a disclosure dated -- I'm sorry -- it's a disclosure form that says at the top: Is this short-term health insurance plan right for me? You must read and signed this form. Do you see that?
A. I do.
Q. And then below the bolded language there is some language that says: This plan does not need to follow



federal Affordable Care Act ACA rules. Unlike ACA plans, this short-term plan may not cover all injuries or sicknesses including any you have before applying. Do you see that language?
A. I do.
Q. That language is identical to the language in the disclosure form that was part of Exhibit 1, isn't it?
A. That's correct.
Q. And then below that there is a question: Can I renew or extend this plan? And the answer is no, correct?
A. Correct.
Q. That language is also identical to the language in the disclosure form that was part of Exhibit 1, isn't it?
A. Correct.
Q. And then if we turn to the next page there is a sentence in bold and it says: Am I covered for an injury, illness, or disease that I had before I applied for this plan, a preexisting condition? Do you see that sentence?
A. I do.
Q. And then below that it says: No, you must tell the truth when answering questions about your health. We can deny claims for any injury, illness, or disease you had before signing up for this plan whether or not you tell us about this condition. Did I read that correctly?

A. You did.
Q. And is that language identical to the language in this disclosure that we saw that was part of Exhibit 1?
A. It is.
Q. Turn with me, if you will, to Tobias 62. The bottom of Tobias 62 there is an esignature where MB signed this form on November 5th, 2021, correct?
A. Correct.
Q. And above that it says: You must confirm you read and understand this form in bold language, correct?
A. Correct.
Q. And then below that it says: Did you read and understand the limited benefits offered by this plan before you applied or paid for coverage, correct?
A. Correct.
Q. Below that there is a box, and that box is checked, correct?
A. Correct.
Q. To the best of your knowledge MB is the one who put that check mark there, correct?
A. As far as I know, yes, correct.
Q. And then it says: Yes, I read and understand the benefits and limits of this plan. I was not required to make a payment or apply for the certificate before getting this disclosure form. Did I read that correctly?



A. Yes.
Q. Below that it says: Don't sign this document if you don't understand it, correct?
A. Correct.
Q. And then they repeated the -- the form repeats that sentence in Spanish, correct?
A. Correct.
Q. That is identical to the language that we saw that was part of this form for Exhibit 1, correct?
A. Correct.
Q. And then below that Michael signed it. That's his esignature below it, right?
A. Correct.
Q. If we look at the last page of Exhibit 4, there's a page Tobias 65, an acknowledgment of application completion. Do you see that?
A. I do.
Q. And that says in Item 5: I specifically adopt the statement of understanding presented on the last page of the application immediately above my signature. Did I read that correctly?
A. On No. 5? The last -- oh, here it is. Yes.
Q. We know that, that statement of understanding in Bullet Point 2 says that the coverage will not pay for a preexisting condition, correct?



A. Correct.
Q. Just below that Item 5 Michael put the X next to the sentence that says, I understand the above listed acknowledgment, correct?
MR. KACAL: Objection. Form.
A. Correct.
Q. And the below that he signed and dated it November 5th, 2021, correct?
A. Correct.
Q. I think one of the things that I am hearing from you is that you were unaware or did not know that the second short-term plan did not -- oh, the second short-term plan did not cover any condition that Michael developed while the first short-term plan was in force. Is that your testimony?
A. That's correct.
Q. And is that because you did not actually click the link and go through and review these application materials that we have looked at in Exhibit 4?
A. That is because I don't -- neither Michael or I recall getting these as I told you before. Tobias and them filled out a lot of this for us.
Q. Well, let's focus on what you recall. You never went through and esigned Exhibit --
A. That's correct.



Q. -- 4? Michael is the one that clicked on the link and went through and looked at these pages and affixed his esignature?
A. Correct.
Q. As you sit here today, you think that Michael was a -- is an honest and truthful person, correct?
A. Correct.
Q. And so you think when he made these certifications to Golden Rule that he had reviewed these forms, read these forms, and understood these forms, that those were true and accurate certifications, correct?
A. I cannot tell -- I do not know if they sent this entire packet is what I'm saying. The only thing I know is the esignature. In other words, I've never seen these before.
Q. Well, whether you've seen them or not --
A. No, then Michael.
Q. Yeah, Michael signed them, he put the Xs in the boxes both on the acknowledgement of application and the last page of the disclosure form. He went through them, he clicked on the link, he signed them, right?
MR. KACAL: Objection. Form.
A. To my knowledge he did sign it, but I -- l ke I said, I do not know that he received everything in this packet.

Q. You would agree with me that as we're looking at them here, Exhibit 1 and Exh bit 4 make it extraordinarily clear that the coverage Michael obtained would not cover any preexisting condition, correct?
A. It's hard to say because of the e-mail on renewal.
Q. Well, the -- when you say "the e-mail," are you ta king about Exhibit 3?
A. Yes, I am.
Q. The Dear Client e-mail?
A. Yes.
Q. That says: Your policy is coming to its expiration/renewal date. In order to renew this coverage or explore alternative carrier options --
A. Um-hmm.
Q. -- contact me, correct?
A. Correct.
Q. So it says: Expiration/renewal, correct?
A. Um-hmm, that's correct.
Q. Now what the application material say and -- is that the new coverage is not going to cover any preexisting conditions no matter what, correct?
A. That's what it says here, yes.
Q. Okay. And when you "here," you're looking at Exhibit 4?



A. That's correct.
Q. And, in fact, both the welcome letter and the application materials for Exhibit 1 told you that policy could not be renewed, correct?
A. Which one?
Q. Exhibit 1 and Exhibit 5 both told you that, that first coverage, that first short-term plan could not be renewed, correct?
A. That's what it says here, that's correct.
Q. And when you say "here," you're looking at Exhibit 1?
A. I'm looking at Exhibit 1 and I'm looking at Exhibit 4.
Q. Okay. And in Exhibit 5 which was the welcome letter with the ID cards for the first policy, it also told that the first short-term could not be renewed, correct?
A. Yes.
Q. Okay.
A. It's a short-term, yes.
Q. Alright. And what happened after Michael submitted the application for the second short-term regarding his coverage?
A. The only thing I know is he received his cards.
Q. He got new ID cards?



A. Yes.
Q. Looking with me, if you will, to Exhibit 9.
(Exhibit 9 was previously marked and proffered to the witness.)
Q. Before we talk about Exh bit 9, at this time in November of 2021 where you in Colorado or were you --
A. In November of 2021?
Q. Yeah.
A. We were -- the day after he called that they came cancer -- that they said he had cancer we went down.
Q. So November --
A. That would have been the 16th.
Q. November 16th. So the first half of November you were in Colorado and then you came to Houston on November 16th?
A. That's correct.
Q. Looking with me, if you will, to Exhibit 9. Do you recognize Exhibit 9 as welcome letter that came with Mr. Brewer's ID cards for the second short-term plan?
A. I do not. Because I did not see this.
Q. Okay. You didn't see at the time he received it?
A. No.
Q. Do you see under the bolded heading ID cards it says: A paper copy of your ID cards is enclosed?
A. Yes, I do.



Q. Alright. Certainly, you don't dispute that this is the welcome letter or that came to Michael in November of 2021, you just don't recall seeing at that time. Is that a fair statement?
A. That's correct.
Q. Alright. Do you see about two-thirds of the way down there is a bold heading that says: As a reminder your short-term medical plan?
A. Yes.
Q. That language goes on to say: Your short-term medical plan does not cover preexisting conditions, find more about this on the CRG and your plan documents. Do you see that language?
A. I do.
Q. And then if we turn to the next page do you see that, that is the CRG more -- a customer reference guide for the short-term plan?
A. I do.
Q. And do you see the forth heading down it has in bold preexisting conditions?
A. I do.
Q. And it says: Generally, a health condition which exist before the applicable effective date is not covered during the term length of coverage.
A. I do.

Q. Do you recall discussing that language with Michael in November of December of 2021?
A. I do not.
Q. Look with me, if you will, to Exhibit 10.
A. Please repeat that.
Q. Exhibit 10.
(Exhibit 10 was previously marked and proffered to the witness.)
Q. Do you recognize Exhibit 10 as the second short-term certificate?
A. I see it looks like a policy, I don't know.
Q. Have you ever seen it before?
A. No, I have not.
Q. Do you see if you look at Page 741 which is the data page, that, that is the data for the second short-term plan?
A. Yes.
Q. Okay.
MR. KACAL: Which page are we looking at, Lance?
MR. CLACK: 741.
Q. If we go back to the first page, do you see that there is a -- some text that's slightly larger font at the bottom of the first page?
A. Repeat that question.


Q. Yes. On the first page of Exhibit 10 towards the bottom there is a paragraph in slightly larger font than the rest of the page. Do you see that?
A. Yes, I did.
Q. Do you see that it says in the second sentence: Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits?
A. Yes, I do.
Q. Do you recall -- or do you recall if that language is identical to the language that we looked at in the first certificate that was the Exh bit 6?
A. I do.
Q. And then look with me if you will at GRIC 767.
A. Alright.
Q. Do you see on the left side of the Page 767 there is a definition of preexisting condition which says: Preexisting condition means an injury or illness for which the covered person received medical advice or treatment within the 12 months immediately preceding the applicable effective date the covered person became insured under the policy?
A. I do.
Q. Do you recognize the language as identical to the definition of preexisting condition in the first certificate that was the Exhibit 6?
A. I do.
Q. Look with me, if you full, at GRIC 784. Do you see on page GRIC 784 there is a bold section preexisting conditions?
A. I do.
Q. Below that it says: Preexisting conditions and complications resulting from a preexisting condition will not be covered under the policy certificate.
A. I do.
Q. And that language is the same as we saw in Exhibit 6 in the first certificate, correct?
A. Correct.
Q. As you sit here today other then the term and the deductible, can you point to any differences in the coverage between the first short-term plan, Exhibit 6, and the second short-term plan, Exhibit 10?
A. I have not read all these so I don't know.
Q. And that's fine. If you don't -- if you're not aware of any that's fine. I'm just trying to figure out what you know. Other than the term and the deduct ble, can you tell me any differences in coverage between the two plans that Mr. Brewer obtained?
A. I haven't read them and I'm not even sure of this person [sic], so I cannot tell you any -- I just can't say.




Q. Have you discussed with Michael at any time whether he reviewed all these application materials, welcome letters, or plan documents that told him more than a dozen times that these plans did not cover preexisting conditions?
MR. KACAL: Objection. Form.
A. I have not.
Q. You've gone back -- you went back in preparation for your deposition today and reviewed these exhibits certainly that were marked yesterday, correct? Or let me ask it a different way. Did you review documents in your preparation -- in preparation for your deposition here today?
A. Yes, I have.
Q. Alright. What documents were those?
A. They were -- I don't understand.
Q. What documents did you review in preparation for your deposition?
A. Just answers that we had -- that Michael had submitted and back -- that and a timeline.
Q. Okay. Have you ever looked at Exhibits 1 or 4?
A. Okay. That's --
Q. Prior to today?
A. Not that I know of.

Q. Have you looked at the welcome letters prior to today that we looked at?
A. No.
Q. Have you looked at Exhibit 6 and 10, the certificates that we looked at prior to today?
A. 6 and 10 hold one, let me look. 6, I have not. And 9 -- I have not.
Q. Does it bother you at all as you sit here today that all of these representations, all these times that Golden Rule told Michael in written that these policies could not be renewed and they did not cover preexisting conditions that he ignored all that language or didn't bring that language to your attention?
MR. KACAL: Objection. Form.
A. Does it bother me?
Q. Yeah.
A. No, it does not bother me that -- and I don't -- rephrase that question.
Q. If you had known in November, December of 2021 that the welcome letter that Golden Rule sent to Michael that had his ID cards says this policy does not cover preexisting conditions, would you have talked to Michael about getting other insurance?
A. Well, let me put it this way. I was unaware of it, and the fact that he -- well, let me put it this way.


The renewal -- we thought it was a renewal for just to continue. Preexisting condition, he had the condition in December and actually November and October, and I don't think we realized that it was a preexisting condition under -- he already had the condition and so it was ongoing and it was a renewal.
Q. Alright.
MR. CLACK: I'm going to object to it was a renewal.
Q. But certainly he had the condition that's at issue in this lawsuit in October and November and the first part of December of 2021. We agree on that, right?
A. That he had the -- yes, I do.
Q. He was diagnosed with cancer -- or he was told that he had cancer certainly by November 15th of 2021, correct?
A. That's correct.
Q. And he was undergoing chemotherapy in the first week or so of December 2021 prior to the effective date of the second short-term plan, correct?
A. That is correct.
Q. Okay. If you had read the welcome letter or if Michael had read the welcome letter for the second short-term plan and said, Hey, this plan is not going to cover any condition that arose prior to the effective date


of this plan, would you have reached out to Tobias or to somebody to ta k about getting different insurance?
A. If we had realized that?
Q. Uh-huh.
A. I'm not -- I don't know. I -- you know, I can't speculate right now what we would have done. I think it was right now we just thought it was a renewal.
Q. And you keep saying that. Why do you think it was a renewal?
A. Because of the e-mail.
Q. Exhibit --
A. Tobias' e-mail, Chris --
Q. -- Exhibit 3?
A. Chris's. Was a renewal. And when we talked -- when I talked to him he said that the same coverage -- and I told him what was going on -- the same coverage, you know, it would be -- it would just be, you know, different deductible, different amounts, and it would be from December to December.
Q. Alright.
A. So I feel l ke it was -- you know, they said it was a renewal?
Q. Who said it was renewal?
A. Chris. Christopher Davis.
Q. So you're relying on Exhibit 3 and then the


conversation with Mr. Davis on November 5th, correct?
THE COURT REPORTER: November 5th?
MR. CLACK: 5th.
A. Yes.
BY MR. CLACK:
Q. Okay. Exhibit 3 says expiration/renewal, correct?
A. Correct.
Q. And then it says: In order to renew this coverage or explore alternative carrier options please contact me, correct?
A. Um-hmm.
Q. So is that a "yes?"
A. Yes.
Q. And all of this in an e-mail that does not even identify the insured by name or any policy by number, correct?
A. That's correct.
Q. Okay. There's nothing in Exhibit 3 that tells you whether what is about to happen is going to be an expiration or whether it's a policy that you can renew, correct?
MR. KACAL: Objection to form.
You can answer.
A. Yes.

Q. What tells you that you -- what in Exhibit 3 do you think tells you, you can renew the short-term plan that was then in effect?
A. The language, in order to renew this coverage.
Q. The sentence that says --
A. And if you would like to renew your current plan. If you would l ke to renew -- your renewal date, renew and renew, renew.
Q. Alright. You're relying on the fact that he uses the word renewal next to expiration and the sentence that says, in order to renew this coverage or explore alternative carrier options, and the sentence that says, if you would like to renew your current plan at the same level of coverage those three plans, correct?
A. Correct.
Q. You understood when you got this e-mail this was some foreign e-mail that was automatically generated and was not personalized to either you or Michael Brewer or to the specific coverage he had, right?
A. I did not.
Q. You mean, the Dear Client was not a tip off that this was not a very personalized e-mail?
A. They had my e-mail that I -- you know, it was to me. It was sent to my e-mail.
Q. You don't get ever spam e-mails that are, you



know, Dear Client or use your wrong name or anything l ke that?
A. If they do they go to spam usually.
Q. Why did you think it was more reasonable to rely on this e-mail Exh bit 3 and this one alleged conversation with Mr. Davis as opposed to the more than a dozen times that Golden Rule informed Michael in writing that these policies could not be renewed and would not cover preexisting conditions?
A. Because he was a representative, he represented the insurance company.
Q. You understand that insurance policies are written documents and that insurance benefits are based on written documents, correct?
A. That's correct.
Q. Alright. And you understand that's why Golden Rule goes through the trouble of sending all these disclosures and welcome letters and certificates and having Mr. Brewer or MB sign acknowledgments is because it's the written documents that govern what are we paid and not paid, correct?
A. Correct.
Q. You understood that when you ta ked to Christopher Davis there were a lot of terms in that policy that he did not go over with your in that conversation?



A. Chris -- Christopher Davis did not go over a lot of things in that conversation. He was quickly to renew a policy.
Q. I think you told me that notwithstanding the link shown on Exhibit 8 that shows about call -- 40 minutes of calls --
A. Um-hmm.
Q -- for a bunch of that time you were on hold. Is that a fair statement?
A. And that is a fair statement.
Q. Is it -- how long do you think you actually spent, not on hold, but actually ta king to a human being on those three calls on November 5th?
A. That's hard for me to speculate how much, but I know I was on a call -- hold for a long time. He didn't even go over the application the first time -- the second time, excuse me.
Q. Are we talking about something between five and ten minutes of actual human interaction?
A. Maybe. I don't -- to my best recollection I do not remember the exact time. I could say it was a short time. I was on hold a long time.
Q. So you spent between five and ten minutes more or less with Mr. Davis on the phone on November 5th, 2021, setting up this second short-term policy for Michael



Brewer, correct?
A. Yes.
Q. And you understood there were a lot of terms in that short-term plan that you had not discussed with Mr. Brewer -- I'm sorry, you had not discussed with Mr. Davis, correct?
A. Mr. Davis did not talk to me about anything, just to renew the policy.
Q. You understood that there were a number of terms in the short-term plan that would be dependent on the actual certificate, the actual documents, and that had not been read off to you or otherwise discussed between you and Mr. Davis on November 5th, 2021, correct?
A. I don't understand the question.
Q. It was probably a terrible question to be honest.
A. Could be.
Q. When you talked to Mr. Davis on November 5th, 2021, you understand that there were a lot of details and a lot of provisions in the second short-term certificate that you were not going over with him?
A. I wouldn't say a short-term, I was just -- as far as what a renewal and it was the same coverage. He -- you know, that's -- that's what I want -- that's what he said, same coverage, you know, from here to here.
Q. He didn't try to go through, for instance,

Exhibit 10 with you term by term and read off all the benefits, all the exclusions, all the definitions that were in that certificate, did he?
A. He didn't go over anything with me.
Q. And you understood those things would be determined by what was in the certificate, correct?
A. Did I understand the certificate? Rephrase that --
Q. You understood that --
A. -- I'm not sure what you mean.
Q. -- you understood that the certificate would set forth all the provisions and details of the coverage that you were not discussing in this five, ten minute phone call with Mr. Davis, correct?
A. I just would say it was a renewal. That's all I remember it was a renewal of the policy.
Q. Alright. Let's take five minute.
THE VIDEOGRAPHER: Okay. We are off the record at 12:31 p.m.
(A short break was taken.)
THE VIDEOGRAPHER: And we back on the record at 1:31 p.m.
BY MR. CLACK:
Q. Ms. Brewer, you understand you are under oath just as you were before we took the break?



A. I do.
Q. Did you pull the Exhibit 3, is that from your cadie19363@yahoo.com e-mail address?
A. That is correct.
Q. Have you gone back and searched that e-mail account to determine if you have any other e-mails either from Tobias & Associates or from UnitedHealthcare in 2021 or 2022?
A. Yes, I have.
Q. Have you found any such e-mails?
A. Yes, I have.
Q. What other e-mails have you found from either UnitedHealthcare or Tobias & Associates?
A. I have found just where they say log into the portal, welcome, you've finished your application, things like that, yes, I have.
Q. Have you provided those e-mails to Michael Brewer's counsel in this case?
A. Yes, I have.
Q. With regard to all those e-mails were you acting as a agent or on behalf of Michael Brewer?
A. Could you rephrase that as an agent or as a mother?
Q. Well, yesterday Michael said that when you dealt with Tobias & Associates on his behalf you did so, you



know, as his agent at his behest. Is that accurate?
A. Yes, I -- I -- I do a lot of work for Michael, yes.
Q. And these e-mails that you received from Golden Rule that you just discussed that you provided to Mr. Brewer's counsel at sometime in the past, were those all e-mails relating to Michael Brewer's coverage and communications from Golden Rule that were directed to Michael that's sent to your yahoo account because that was the account provided on the application?
A. Yes.
MR. CLACK: We may need to take this up off the record, but I don't think y'all have produced those.
MR. KACAL: Let me take a look and see what e-mails I have. Could we go off the record real quick?
MR. CLACK: Yeah.
THE VIDEOGRAPHER: We are off the record at 1:34 p.m.
(A short recess was taken.)
THE VIDEOGRAPHER: And we are back on the record at 2:11 p.m.
BY MR. CLACK:
Q. Mrs. Brewer, you understand you are under oath



just as you were before we took the break?
A. I do.
Q. Alright. I'm going to hand you now what I've marked as Exhibit 21.
(Exhibit 21 was marked for identification.)
Q. Does Exhibit 21 consist of 11 double-sized pages of e-mails that you have retrieved from your cable19363@yahoo.com [sic] account?
A. Yes, it does.
Q. Are these e-mails that were sent to your Yahoo account related to Mr. Brewer's insurance coverage in 2 -- 2021?
A. Yes.
Q. I want to direct your attention to the first page of the exhibit. Is that an e-mail from a unitedhealth1donotreply address, addressed to Michael Brewer --
A. Yes.
Q. -- dated -- and is it dated June 9th, 2021 at 4:49 p.m.?
A. Yes.
Q. Is this the e-mail that you received with the link to the application for the first short-term policy?
A. Let me see. Yes.

Q. Okay. And it says in that e-mail: Dear, MB, here is the information you requested. That's how it begins, correct?
A. Yes.
Q. And then it says: To submit your application please verify the answers on your application are correct, provide any missing information, electronically sign and submit your application. Did I read that correctly?
A. That is correct.
Q. Did you actually click the link and correct the application?
A. No, Michael -- I sent this to Michael.
Q. Alright. Do you still have the e-mail where you forwarded this e-mail to Michael --
A. To Michael?
Q. Yes.
A. I do not know.
Q. Sorry?
A. I do not know.
Q. Okay. Is that something that you have looked for?
A. I have -- I usually get rid of a lot of things, like all my messages and stuff.
Q. Do you recall if when you received this e-mail, it's the first page of Exhibit 21, you were on the phone



with Michael or otherwise discussing the application with him?
A. Repeat that again, please.
Q. At the time that you received this e-mail at 4:49 p.m. were you talking to Michael?
A. I had talked to Michael or I was going to talk to Michael before I sent the link.
Q. Do you think that you talked to him between receiving this e-mail and sending the link?
A. Yes.
Q. Was it basically at the same time that you received this e-mail?
A. I am not sure.
Q. Tell me what you recall about that conversation.
A. That he needed to sign, esign.
Q. Anything else?
A. No.
Q. If you look at the second page -- the first page is double-sided and then --
A. Um-hmm.
Q. -- there's a second complete page on Exhibit 21.
A. Yes.
Q. Do you see that is an e-mail dated June -- June 9th, 2021 at 4:53 p.m., again from unitedhealth1 --
A. Yes.



Q. -- donotreply address?
A. Yes.
Q. So this is four minutes after the first -- the first e-mail, correct?
A. That's correct.
Q. And do you see it says: Dear, Michael Brewer, your short-term Medical Plus Elite A application and payment information have been received.
A. Um-umm.
Q. Sorry, is that a "yes?"
A. Yes.
Q. Was that payment information your payment information or your financial information because you were paying the premium?
A. Probably. Be able to find it, yes. I mean, I gave them my credit card if that's what you're asking.
Q. You gave who your credit card?
A. I gave whoever needed to have my credit card to get his insurance.
Q. Did you give that information directly to the agent or did you give it to Michael to fill in the form?
A. Or to -- could you repeat the last part of that, I didn't hear it?
Q. Or to Michael to complete the application process.



A. I do not.
Q. Alright. Given the short time span which Michael had to --
A. Um-hmm.
Q. -- review and verify that application, does that refresh your recollection that you were on the phone with him at the time he did this?
A. Yes.
Q. Okay. And did you walk him through the review of the application and the esignature process?
A. The only thing I did is I told him to sign because that's the only thing I was assuming that they was -- that it was, was just a signature.
Q. Did you tell him to follow the instructions on the e-mail and verify that the answers on the application were correct?
A. I do not know. I don't remember.
Q. Did you tell him not to do that?
A. Nope.
Q. Did you tell him to go ahead and provide the missing information that was for the missing places on the application?
MR. KACAL: Objection. Form.
A. I don't know.
Q. Did you tell him not to do that?

A. No.
Q. Alright. That third complete page of Exhibit 21 is -- is that an e-mail at 4:53 p.m. on June 9th, 2021 --
A. Um-hmm.
Q. -- again from the unitedhealth1 or uhc.com address?
A. Yes.
Q. And that has a member subscriber ID and it's talking about the Healthiest You Membership?
A. Yes.
Q. The fourth complete page of Exhibit 21 do you see that, that is an e-mail at 4:58 p.m. on June 9th, 2021, from an apply@ubaapplication.com address?
A. Um-hmm.
Q. Is that a "yes?"
A. Yes.
Q. What is -- and it says: Thank you for applying for enrollment in one or more programs with products available exclusively through United Business Association do. You see that?
A. I do.
Q. What is the United Business Association?
A. United Business Association?
Q. Yes. Do you see this says --
A. Yes, I do.



Q. Okay. What is the United Business Association?
A. I was -- I do not know specifically what it is, but if I had to say it was related to Shawn Brody [sic] in calling him.
Q. Do you know what type of insurance this e-mail, the 4:58 p.m. e-mail was for -- what that application was for?
A. No.
Q. Is this also --
A. I did not.
Q. -- an application that you forwarded on to Michael?
A. Yes.
Q. Okay.
A. Or the link, I'm not sure.
Q. Do you think you would have sent the link and deleted the rest of the e-mail?
A. No --
Q. You would --
A. I would not have.
Q. I'm sorry, I didn't mean to cut you off.
You would have forwarded that 4:58 p.m. e-mail just the way you received it --
A. Absolutely.
Q. Alright. Then if we look at the next page, is



the next page an e-mail from getmehealthcare.com address at 5:02 p.m.?
A. Yes.
Q. Alright. And that e-mail says: Congratulations, Michael Brewer, your application for STM Plus Elite is set to be effective on 6/11/2021. Do you see that language?
A. I do.
Q. That is an e-mail related to the first Golden Rule short-term plan, correct?
A. Correct.
Q. Did you have an understanding as to what STM meant when you read this e-mail?
A. No.
Q. Do you understand that, that means short-term, that's an abbreviation of short-term?
A. No, it was a lot of acronyms on her, no.
Q. What other acronyms are on there?
A. GAP.
Q. We're on the page that --
A. UBA.
Q. Sorry. The page that we're looking at, what other acronyms do you see?
A. Just that one.
Q. Just that one?
A. Yes.



Q. Did you ever call anybody up and say, Hey, what does STM mean?
A. No.
Q. If you turn to the next page in Exhibit 21, is that also an e-mail from getmehealthcare.com address --
A. Correct.
Q. -- dated June 9th, 2021, 5:04 p.m.?
A. Correct.
Q. And that says: Your application for gap plus is set to be effective on 6/11/2021. Do you see that?
A. I do.
Q. What was the gap plus insurance that you -- were you applying for?
A. I have no clue right now. I have -- I don't know.
Q. Do you know what company that coverage was obtained from?
A. Pardon?
Q. Do you know what company issued that coverage?
A. I do not.
Q. If we turn to the next page of Exhibit 2021 [sic], there is another e-mail with the same address, same date that looks to me to be basically the same e-mail is that -- as the previous page. Is that what you see as well?

A. Yes. No, wait a minute. Yeah.
Q. And if you turn to the next page there is an e-mail from a ubaapplication.com address --
A. Yes.
Q. -- dated June 9th, 2021 at 5:04 p.m. Do you see that?
A. I do see that.
Q. And this says: Your application is complete. Once again thank you for applying for enrollment with United Business Association. Do you see that?
A. I do.
Q. And if we turn to the back of that page there is some language at the top where it says: Cost transparency and it talks about critical illness benefit, group accident insurance, group hospital fixed indemnity insurance, group life insurance, and gap plus benefit boost. Do you see that language?
A. I do.
Q. Does that refresh your recollection at all as to what Michael was applying for from the United Business Association?
A. I think it was insurance and then there was the monthly fee. Is there a $10 or $20 monthly fee?
Q. Yes. What kind -- I don't know -- there's a UBA membership and a gap plus on the first page of that



5:04 p.m. e-mail.
A. And it was for an insurance on that.
Q. Yes. What insurance was he buying from the United --
A. I was --
Q. -- Business Association?
A. I'm not really sure. I think it was just a one time if something happened it was a certain amount you would get.
Q. The next page in this stack of e-mails is an e-mail on June 9th, 2021, 5:11 p.m. from the ubaapplication.com address. Do you see that?
A. I do.
Q. And that has a link for a UBA member portal log in. Do you see that?
A. I do.
Q. Is that a portal log in that you were unable to get into?
A. Yes.
Q. Okay. Do you have an understanding that the United Business Association is not affiliated in any way with Golden Rule and that was completely separate insurance?
A. I did not.
Q. Alright. Were you attempting to use your Golden



Rule policy number and other credentials to log into the UBA member portal?
A. I just followed the directions.
Q. On this e-mail?
A. Yes.
Q. Other than this UBA member portal log in where the link is in the middle of this e-mail, are there any other portals that you attempted to log into related to Michael Brewer's insurance that you could not get into?
A. No.
Q. And than the next e-mail -- and the last e-mail is the one we've already looked at the e-mail on November 3rd, 2021, from Chris Davis at getmehealthcare.com, correct?
A. Correct.
Q. Alright. Do you have any e-mails in your Yahoo account related to the November application process?
A. I do not.
Q. Did you look for those e-mails?
A. I did look for those.
Q. And you've not been able to find them?
A. This -- this one is the only ones that I have found, that I have. As a matter of fact, I don't -- where this one went either. I mean, here it said hard copy and it says, but...



Q. Okay. And I think you told me you had not looked for an e-mail between you and Michael Brewer forwarding these links and not --
A. No. No.
Q. -- taking them out?
MR. KACAL: Allow him to finish his question.
Q. Do you have a way to access your e-mail here?
A. I do.
Q. We should go off the record and see if those are there.
MR. KACAL: Okay. Sure, I have no problem with that.
THE VIDEOGRAPHER: And we are off the record at 2:25 p.m.
(A short recess was taken.)
THE VIDEOGRAPHER: And we are back on the record at 2:35 p.m.
BY MR. CLACK:
Q. Mrs. Brewer, you understand you're under oath just as you were before we took the break?
A. I do.
Q. Have you now completed a search of your e-mail inbox for any e-mails from or to Golden Rule or UnitedHealth1 or Tobias & Associates or Michael Brewer

related to the insurance coverage at issue in this lawsuit?
A. I have.
Q. Were you able to find any additional e-mails?
A. I have not.
Q. What is e-mail address that Michael Brewer used with you normally sent e-mails?
A. Normally what I would do is either send them to his phone at 832-496-7316. That's normally how I reach him or his e-mail is m_brewer5@hotmail.com.
Q. With regard to the e-mail that is the first page of Exhibit 21, would you have forwarded that e-mail to Michael's hot mail address that you just gave us?
A. Yes.
Q. Just so I'm clear, is it your testimony to the jury that between 4:49 and 4:53 p.m. on Wednesday, June 9th, you received the e-mail that is the first page of Exhibit 1 forwarded it to Michael, that Michael then opened it, reviewed the application, esigned where indicated, and checked it back in or did finish or did whatever he did to complete the application process?
A. Yes, because I was probably on the phone with him.
Q. At the time that you got the e-mail?
A. Yes.


Q. You recall him asking you any questions like, Hey, what's all this -- well, all these places that talks about preexisting conditions or --
A. No.
Q. -- anything that would be renewed?
A. No.
MR. KACAL: Let --
THE WITNESS: Sorry.
MR. KACAL: -- let him finish his question.
Q. Did he ask you any questions in that regard?
A. No.
Q. How long do you think there would be between the e-mail where you were provided the application link and when Michael filled it out for the November application process if you have those documents?
A. I don't know that I have those document.
Q. Yeah, we don't -- you don't have the November e-mails, right?
A. Right.
Q. How long do you think it was between when you got the link and when Michael filled it out in November.
A. Probably the same amount of time because we just talk on the phone.
Q. Were you in Texas when Michael was hospitalized


at the beginning of December 2021?
A. Yes.
Q. And at some point in that hospitalization did his coverage switch from his first short-term plan to the second short-term plan?
A. Yes.
Q. Did you have any discussions with the hospital or the finance department at the hospital around that switch?
A. No.
Q. Who -- who was handling any discussions with the hospital at that time?
A. No one. They -- MD Anderson handles their own. They just ask for the insurance card and they contact the insurance company themselves.
Q. Other than providing the insurance card, you don't recall -- do you recall any other discussions with the hospital in that regard?
A. None.
Q. If there had been such discussions, would you have been the person handling them at that point?
A. Probably because he was hospitalized, yes.
Q. Alright. Look with me, if you will, at the stack in front of you there is an Exhibit 15.
(Exhibit 15 was previously marked and proffered to the witness.)


A. Exhibit 15?
Q. Yes.
A. Um-hmm. Yes.
Q. Is Exh bit 15 a letter from Golden Rule to Mr. Brewer dated January 25th, 2022, with a number of handwritten notes that has highlighting on it?
A. Yes.
Q. Alright. I am told that some of these handwritten notes are your handwritten notes. Does that fit with your recollection?
A. Yes.
Q. I'd like to start at the very top in the sort of the center of the page at the top. I am not going to pretend that I can read that, but is that your handwritten note?
A. Yes.
Q. Can you tell me what it says?
A. Affordable emergency HC reform.
Q. Can you tell me what that note refers to?
A. I have -- I do not know.
Q. And then there is down on the right it says: myuh1.com. Do you see that?
A. Yes.
Q. Can you tell me why that is written there?
A. Yes.

Q. Okay.
A. Can I tell you why it's written there?
Q. Yes, why is it written there.
A. I cannot remember now why I wrote that there.
Q. Then if we go down a little bit under the word coverage there is something written very small. Do you see that?
A. I do.
Q. Can you tell me what it says?
A. I cannot.
Q. Do you think it is your note?
A. It looks like my handwriting, yes.
Q. I can't figure it out either --
A. Neither can I.
Q. Yeah, alright. If we go down a little bit there is a highlighted sentence in the second full paragraph that says: St policies do not provide coverage for preexisting conditions. Do you see that sentence?
A. Yes.
Q. Is that your highlighting?
A. Yes.
Q. Why did you highlight that sentence?
A. Because that was the first time I was aware of that.
Q. That language is consistent with the language



that we looked at in the applications and the acknowledgment form that accompany the applications --
A. Um-hmm.
Q. -- and the welcome letters and the plan documents that we looked at earlier, correct?
A. Correct.
Q. Did you discuss with Michael at the time that you first saw this letter whether he had previously been aware of that language in the other documents that Golden Rule had provided to him?
A. Could you say that again?
Q. Sure. Did you discuss this sentence with Michael when you received Exhibit 15?
A. January -- what was the date? I'm sorry, I'm a little -- you have to speak up louder. I'm a little hard of hearing.
Q. Sorry. At the time that you received or that Michael received this letter that is Exhibit 15 and you highlighted this sentence regarding --
A. Yes.
Q. -- the preexisting condition exclusion, did you discuss that sentence with Michael at that time?
A. When we called, we discussed it.
Q. When you called who?
A. We called Golden Rule.



Q. You called Golden Rule or you called Tobias?
A. We called Golden Rule.
Q. Okay. When did you call Golden Rule?
A. It must have been within -- after January 25th. I cannot lie.
Q. Who was on that call on your end?
A. Michael and I. I was down there.
Q. Do you recall who -- the name of the person you dealt with on the Golden Rule?
A. I do not.
Q. You were in Texas at this time?
A. That's correct.
Q. Tell me what you remember about that call.
A. I remembered we were both kind of blind sided saying, you know, short-term policy, preexisting, and it was like -- it wasn't preexisting. He had it before and he had a policy and his policy was renewed. And, you know, they said it was renewable so we renewed it. And how can it be preexisting if we renewed when he already had an insurance policy?
Q. Well, who was it was renewable?
A. It was Christopher Davis.
Q. Certainly that is not what the application for either policy said, correct?
A. It said that -- said what?



Q. That it -- both applications said that the policy was not renewable, correct?
A. I don't know if they didn't say they or not, that they weren't renewable. They just said it was a policy.
Q. Well, go back and look at Exhibit 1.
(Exhibit 1 was previously marked and proffered to the witness.)
A. Okay.
Q. Exhibit 1 is the application for the first short-term policy, correct?
A. That's correct.
Q. And on Tobias 43.
A. Yes.
Q. It says in the middle of the page in bold: Can I renew or extend this plan? Answer, no, correct?
A. Yes.
Q. And that's also what the welcome letter that came with the ID cards for the first short-term plan said, correct?
A. I don't believe that letter came with the ID cards. I believe that letter came -- that letter came later -- ID cards came and then the letter came.
Q. Well, two separate things. I'm not talking about the application, I'm talking about the welcome letter that came with the ID cards for the short-term plan. Do you

recall we looked at that, Exhibit 5?
A. Yes, I know that you had put there, but the only thing I remember is this and the cards.
Q. Okay. If you look at the second page of Exh bit 5 --
A. Um-hmm.
Q. -- do you see at the top it says: Welcome and thank you for selecting our short-term medical plan. Your plan documents and ID cards are included with this letter. Do you see that language?
A. I do see that language.
Q. And it's in the envelope that says: ID cards enclosed, correct?
A. Okay, yes.
Q. And do you recall that Mr. Brewer received his ID cards?
A. That's correct.
Q. Okay. And that letter says: If you need coverage beyond this time period, you must reapply. Keep in mind that if you reapply, any illness or condition developed under your current plan would be considered preexisting under the new plan and would not be a covered expense, correct?
A. I see that, yes, correct.
Q. And that's what happened here, Mr. Brewer



developed a illness, a condition under the plan that this welcome letter relates to, and then he went and got another short-term plan, correct?
A. Correct.
Q. So the language that is in Exhibit 15 that you highlighted that said: Short-term policies do not provide coverage for preexisting conditions, that language is consistent with the language in the applications and the welcome letters for both of Mr. Brewer's short-term policies, correct?
A. Correct.
Q. And I think we got a little off track. I was asking you about this phone call you had with Golden Rule after you received the January 25th, 2022 letter. Is there anything else that you told Golden Rule on that call that you did not tell me about in your previous answer?
A. Not that I recall, no.
Q. What did Golden Rule, the person that you spoke to say to you at that time?
A. He just read -- went over this and said the illness. He said look on this page, the illness means that part of sickness, disease, disorder, and normal condition of a covered person. That all illnesses exist at the same time or due to the same or related causes are deemed to be one illness.



Q. And certainly you don't disagree --
A. And --
Q. I'm sorry. I didn't mean to interrupt you.
A. -- and then it said: Further if an illness is due to causes which are the same, as, or related to the causes of a prior illness, the illness will be deemed a continuation or reoccurrence of the prior illness and not a separate illness. That's where I was confused.
Q. How were you confused?
A. Because: Further if an illness is due to causes which are the same, as, or related to the prior illness, the illness will be deemed a continuation. So that's where we taught it was a continuation of the one that he had, had.
Q. I think we all agree on that. You and I agree that the illness that Mr. Brewer was seeking treatment for under the second short-term plan, the condition he was seeking treatment for, is the same condition --
A. Um-hmm.
Q. -- that he developed in October of 2021 and for which he sought treatment in October, November, and December of 2021 under the first short-term plan, right?
A. Yes.
Q. There is on Page 15 under that highlighted language we were looking at there's a note there that



says: Period. Question mark. And then the language: Separate plan with a new preexisting conditions period is underlined. Do you see that?
A. I do.
Q. What does that note refer to?
A. Don't -- I don't know. I think it's just, you know, separate -- separate plan with a precondition -- preexisting condition.
Q. And then --
A. I think that's what it is.
Q. -- and then that next sentence says: Multiple short-term plans do not offer a continuation of coverage from one plan to the next, right?
A. Correct.
Q. Then there's some highlighted language for illness, a sentence for the definition -- or two sentences for the definition of illness. Is that your handwriting -- or your highlighting, I'm sorry?
A. It's probably mine or Michael's, yes. Probably mine.
Q. Was -- was that something you highlighted as part of the call with the Golden Rule person that we talked about?
A. Yes. Yes.
Q. And then there's some brackets around the bottom

part of that definition. Are those your brackets?
A. Yes.
Q. Why are those brackets there?
A. We were confused on further if an illness is due to the causes which are the same as related to the prior illness, the illness will be deemed a continuation. That's where we came in with the -- we renewed the insurance, it's a continuation, why wasn't it covered? We were totally -- we are -- we were confused on that.
Q. Did the person that you talked to at Golden Rule explain to you that it was not a renewal but a separate new short-term plan --
A. No.
Q. -- with a new preexisting condition period?
A. I'm sorry, no. They -- all they went was over this.
Q. And there's some underlining of the ID number, the plan ID number in the last paragraph. Can you tell me why that is underlined?
A. Because I think that's the new -- that was the new plan. That was the ID on the ID cards of the plan.
Q. Of the new plan?
A. Yeah, of the plan that they sent out, yes.
Q. And that's the plan that became effective on December 12th?



A. Yes.
Q. And it had a different plan number than the June plan, correct?
A. Yes, it did.
Q. That paragraph also says: We are attaching a list of claims we have received that were filed under your previous short-term coverage. Do you see that language? The last full paragraph of the first page of 15.
A. Yes, I do.
Q. Alright. Look with me, if you will, at Exhibit 16.
(Exhibit 16 was previously marked and proffered to the witness.)
A. Exhibit 16 did you say?
Q. 16.
A. 14, 15 -- maybe this one is 16.
Q. Is Exhibit --
A. Yes.
Q. -- 16 a copy of that list of claims that was provided as an enclosure to Exhibit 15 with the addition of some handwritten notes at the top right?
A. Please repeat that.
Q. Sure. Is Exhibit 16 a copy of the list of the claims that was enclosed in Exh bit 15 with the addition of some handwritten notes at the top right?



A. No.
Q. What do you think Exhibit 16 is?
A. Exhibit 16 was a -- received from Golden Rule separately, I believe. I don't believe it was included in -- in the -- that letter, Exhibit 15.
Q. At some point whether it was with Exhibit 15 or not, at some point Golden Rule provided this list that is Exhibit 16 setting forth the conditions for which Mr. Brewer was treated while the first short-term plan was in effect?
A. That's correct.
Q. Is there anything in Exhibit 16 that you disagree with in terms of you don't think he was actually treated for those conditions or you don't think he was treated on the dates of service that are shown in the right-hand column?
A. No.
Q. Up at the top there is some handwritten language on Exhibit 16. Do you see those notes?
A. I do.
Q. Are those your notes?
A. Yes, they are.
Q. The first one seems to say: Shane Brodil and then it had a phone number. Do you see that?
A. Um-hmm. Yes.



Q. Why is that written on Exhibit 16?
A. Probably because I tired to give him a call.
Q. And then -- well, did you talk to Mr. Brodil after you received the January 25th correspondence?
A. No.
Q. And then below that there are some numbers and some letters and a separate handwritten note. Do you see that?
A. I do.
Q. What is that referencing?
A. I do not know.
Q. Look with me, if you will, to Exhibit 17.
(Exhibit 17 was previously marked and proffered to the witness.)
Q. Is Exhibit 17 a page from some type of cell phone records reflecting calls to 561-910-4194?
A. Yes.
Q. Are these calls from your cell phone?
A. They are.
Q. And maybe I'm just missing it. Is there a page on here that tells us what the -- the phone number making the calls is?
A. No.
Q. Okay.
A. That's -- I believe that is Chris -- Chris Davis'

number.
Q. Okay. Do you -- do you recall calling Mr. Davis on February 8th and February 9th --
A. Yes.
Q. -- of 2022?
A. Yes.
Q. Alright. And the first call there is on February 8th, 2022, and it says it was eight minutes long. Do you see that?
A. I do.
Q. What was that about?
A. That call was to tell them about Michael's condition and that we didn't know that it was a short-term insurance policy.
Q. You didn't know which one was a short-term?
A. That -- because of preexisting, that we didn't know that -- you know, that it was two different -- we thought it was a renewal, but unfortunately I -- you can see the length of them, I was never able to talk to anyone.
Q. The first one that lasted eight minutes long you did not actually speak to a person?
A. I -- I think I ta ked to someone, explained it that I wanted to ta k to Chris Davis, that I had been -- you know, he was the one who was giving me my, you know,



information and that I wanted to talk to him. And then I think after that -- you know, and then you can see I called back to try to get in touch with him and no one would call me back.
Q. So you never actually spoke to Mr. Davis in February of 2022, what this reflects is three attempts but ultimately they were unsuccessful as far as you recall?
A. To -- to speak with Mr. Davis, yes.
Q. Did you speak to Mr. Davis at any time in 2022 that you recall?
A. 2022, yes, when the renewal. No, wait a minute that was 2021. I'm getting -- it was 2021. No, I did not speak to Mr. Davis in 2022.
Q. Did Mr. Davis or Mr. Brodil assist you with finding the Marketplace plan in which Michael is currently enrolled?
A. They did not.
Q. You used a different broker for that?
A. Yes.
Q. And who is that broker?
A. Me. I filled out all the information. I -- there is a -- I did have a lady that helped me, but I don't recall her name, I can get that, but basically I filled out all the information.
Q. Look with me, if you will, at Exhibit 12.



(Exhibit 12 was previously marked and proffered to the witness.)
A. Okay.
Q. What was the purpose of Exh bit 12?
A. I believe that was information Golden Rule wanted it looks like.
THE COURT REPORTER: It was what, ma'am?
THE WITNESS: It was what Golden Rule wanted.
A. It was information that Golden Rule Insurance Company.
BY MR. CLACK:
Q. So this is dated February 21st, 2022. Do you see that?
A. Yes.
Q. And so it was filled out after Golden Rule had sent the denial letter or after I think that you had this conversation with Golden Rule about the basis for the denial. Does that fit with your recollection?
A. Probably, yes.
Q. Is it your testimony that you think someone at Golden Rule told you they wanted this filled out?
A. Yes. Yes, I believe this was sent to Michael having him fill it out. To fill it out, yes.
Q. There is some correspondence that came in the



mail?
A. Yes.
Q. At what point when did you and Michael start actually reading the correspondence that Golden Rule sent to you?
MR. KACAL: Objection. Form.
A. Well, this was very short, and I believe they wanted information. That was when we had started the litigation, and that's what they wanted; and I believe we ta ked to our attorney.
Q. Okay. You didn't send this because Golden Rule requested it, you sent it because your attorney needed you to get information from Golden Rule and this was the form to do that? Is that a fair statement?
A. Could you repeat that?
Q. Sure. This form that is Exhibit 12 was filled out --
A. Um-hmm.
Q. -- because you needed information from Golden Rule for the litigation, and this was the form that you had to fill out to get records from Golden Rule?
A. No, Golden Rule wanted this information.
Q. For what purpose?
A. I don't know.
Q. You think that Golden Rule sent you some

correspondence that said fill this out and send it back?
A. Yes. This is what Golden Rule did.
Q. And that was correspondence you would have received in 2022?
A. Yes.
Q. Alright. So this takes us back to my earlier question. You reviewed whatever correspondence triggered the filling out of Exhibit 12, and you certainly reviewed the denial letter that we looked at that was Exhibit 15, correct?
A. 15. Okay, here's 15. And what was your question again?
Q. You and Michael reviewed the correspondence from Golden Rule that is Exhibit 15 at or near the time that Michael received it from Golden Rule, correct?
A. Correct.
Q. You and Michael received whatever correspondence Golden Rule sent him in 2022 that triggered the filling out the submission of Exhibit 12 at or near the time it was received, correct?
A. Correct.
Q. Your testimony is that you and Michael did not review the welcome letters that are Exhibit 9 and Exhibit 5 at or near the time that they were received. You just took the ID cards and threw the rest to the side, correct?


MR. KACAL: Objection. Form.
A. No, not that I recall. I don't.
Q. So my question is this: Given that your testimony is that in 2021 you were not reviewing correspondence from Golden Rule but in 2022 you were, what was the triggering event or the date on which you actually started reading the mail that Golden Rule was sending you or sending to Michael?
A. I do not know. I don't know that -- I don't know that -- phrase that question. I'm not --
Q. I will not -- I mean, I will ask it again in a slightly different way. Why is it that you reviewed the denial letter when you got it but these welcome letters that informed you about important parts of your plan including the preexisting condition exclusion you claim that you and Michael did not read when they were received?
A. I -- I was under the impression that it was just a renewal, and then we get the denial and that's a shock. And so then Golden Rule sends this, we fill it out, we called them and ask what we should -- you know, should we fill it out, so we did. It's just that's because it was denied. You know, you're in a state of shock.
Q. Since prior to January of 2022, Michael and you were not in the habit of reading correspondence with Golden Rule, how did you know to read that letter so that


you could find out if it was a denial?
A. We did read correspondence, maybe not all of it, but we did read correspondence from Golden Rule.
Q. You told me that y'all did not review any of the numerous pieces of correspondence we have looked at today which informed you that these are short-term plans with preexisting condition exclusions, was it your policy and was it Michael's policy to only read correspondence that did not discuss the preexisting condition exclusion?
MR. KACAL: Objection. Form.
A. I don't think I said that we didn't read them.
Q. Do you admit to me then that you did read the welcome letters that are Exhibit 9 and 5 when they -- when Michael received them or that he read then when he received them with the ID cards for the insurance?
A. I could say that if we read them we did not understand what short-term meant in that. I don't know. It's been a long time and I really don't know.
Q. Have you kept a systematic record of the amounts that you think you paid Mr. Brewer's medical bills in 2022?
A. Yes.
Q. Is that written down somewhere?
A. Yes, I believe we have it.
Q. And you provided that record to your counsel?


A. Yes.
Q. What is the total number that you have paid -- that you think you have paid for Michael's medical care between December 12th, 2021 and December 11th, 2022?
A. My personal?
Q. Your personal.
A. About 100 -- say the dates again.
Q. Between December 12th, 2021 and December 11th of 2022.
A. I would say probably 100 and -- well, there's two -- two different ones. There's 150 to MD Anderson for -- that the insurance didn't -- that we paid for him to continuing care; and then there was his surgery in November of 2022, which was 100 -- about 140,000.
Q. What was that surgery for?
A. To remove cancer.
Q. Okay. So you think that you have come out of pocket about 280,000?
A. 50.
Q. I think you told me 250,00o plus 130 or 140, 000.
A. No. No. No, the total 250. So it was about 138 and then about 100 -- let's -- about 100, say, 40, 44. I don't know the exact, I'd have to go back and look at it.
Q. That's fair. If you can tell me the total is 250 I will -- we will -- I do not care about the pieces as

much.
A. Okay.
Q. You think the total that you have paid out of pocket for Michael Brewer's medical treatment is about $250,000?
A. That's correct.
Q. And I think you said that money came out of from your retirement or from savings?
A. That's correct.
Q. What -- what's your husband do for a living or what did he do for a living?
A. Pardon?
Q. Your husband, what was his profession?
A. A pilot.
Q. He retired?
A. Yes.
Q. Has he ever worked in insurance?
A. No.
Q. Have you ever talked to him about these issues with Golden Rule or with Michael's insurance?
A No.
Q. You had another kid that you mentioned, the name I forget, not the one who's husband is the doctor, the third one, have you ever talked to that third kids about the issues with Michael's insurance or --



A. No.
Q. -- his medical treatment?
A. No.
Q. Other than the conversation you discussed earlier, have you had other conversations with your daughter or your son-in-law, the doctor, about Michael's condition or his insurance issues?
A. His condition, yes; his insurance, no.
Q. Were any of those conversations about Michael's condition prior to November 5th of 2021, that we have not already discussed?
A. No.
Q. Other than -- do you consider yourself a client -- is Nick here representing you as well as Mr. Brewer with regard to this matter?
A. No.
Q. He only represents Michael?
A. Yes.
Q. Let's go off the record for ten minutes.
THE VIDEOGRAPHER: We are off the record at 3:09 p.m.
(A short recess was taken.)
THE VIDEOGRAPHER: And we are back on the record at 3:15 p.m.
BY MR. CLACK:



Q. Mrs. Brewer, you understand that you are under oath just as you were before we took the break?
A. I do.
Q. Are you represented here today by the Cobos Law Firm and by --
MR. CLACK: I apologize, I can't remember --
MR. KACAL: Nicholas Kacal.
Q. By -- by Nicholas?
A. Yes.
Q. Alright. Is it true that to the extent you had conversations with him in his capacity related to the litigation acting on behalf of your son and represented by them in connection with this litigation?
A. I'm so sorry, could you speak louder?
Q. That was a bad question, and I asked it mumbling.
Is it fair to say that all the communications that you have had with the Cobos Law Firm and anyone at the Cobos Law Firm related to this litigation have been while you were represented by them or did you seek legal advice from them either on your own or on behalf of Michael Brewer?
A. Yes.
Q. You mentioned earlier a calendar, do you keep a calendar that goes back to 2021 or a diary or a journal,



anything like that?
A. I do not. A calendar.
Q. Do you think that you have other notes like the one that we looked at that are related to this matter or related to Michael's treatment or related to Michael's insurance purchases in 2021?
A. No.
Q. You at the end of the 2022 went and found Michael a Marketplace plan, correct?
A. Correct.
Q. Why did you at that time find him a Marketplace plan?
A. Because that was our only other option on insurance.
Q. It was only the Marketplace plans that did not have a preexisting condition exclusion, correct?
A. That's correct.
Q. Alright. When did you learn that it was only Marketplace plans that do not have a preexisting condition exclusion?
A. When -- I do not know that when I learned it.
Q. Did you do your own research regarding health insurance at sometime in 2022 and at that time reach a realization that Mr. Brewer needed a Marketplace plan?
A. I reached out to a lady when I was here in League

City, and she just sent me in the right direction as far as logging in and things l ke that.
Q. This is the lady whose name you don't recall?
A. I do not recall.
Q. Did she talk to you about the substance of the Marketplace plans and specifically that they did not have a preexisting condition exclusion?
A. No.
Q. Alright. Who first talked to you about the fact that in order to get coverage given his illness Mr. Brewer needed a Marketplace plan?
A. Who ta ked to me about that?
Q. Yeah.
A. I believe I probably looked on the internet.
Q. When was that, that you looked on the internet and determined that?
A. In June or July.
Q. Of what year?
A. Of 2022.
Q. Had you ever researched Marketplace plans before that?
A. No.
Q. Do you have health insurance?
A. I do.
Q. Who has your insurance been through since you



retired from teaching in 2011?
A. Right now I have Medicare and Blue Cross Blue Shield.
Q. How long have you had Medicare?
A. Since I was 65. Oh, I'm sorry, six years.
Q. Okay. Prior to you getting on Medicare but after you retired from teaching who did you have insurance through?
A. Blue Cross Blue Shield.
Q. Was that a Marketplace plan or some other kind of coverage?
A. No, that was a Blue Cross Blue Shield.
Q. Just some kind of individual Blue Cross Blue Shield coverage?
A. Correct.
Q. Your husband does he have insurance?
A. He is also on Medicare.
Q. How long has he been on Medicare?
A. Eight years.
Q. Was there a gap in time after he retired but before he went on Medicare where he had other insurance?
A. Before Medicare -- I believe he had my teaching up until 2011, I carried him. And then after that he retired and he's a veteran and he has vet and Medicare.
Q. He had business administration benefits?



A. Yes, he has VA administration benefits.
Q. Have you ever sought out or obtained insurance for any other person other than yourself or your husband or Michael Brewer?
A. No.
Q. Have you had any conversations with anyone at Golden Rule other than a single conversation that we talked about earlier?
A. I have not.
Q. Have you ever spoken to Miriam about any of these issues with Michael's insurance?
A. I have not.
Q. Have you any -- have you spoken to any person about the issues with Michael's insurance or his treatment other than the conversations we have already discussed?
A. His treatment, yes.
Q. Is that because you talked to his doctors?
A. No that's because -- I talked to our family about his treatments.
Q. Did you have any conversations with anyone in the family about his treatments prior to his hospitalization at the beginning of December 2021 that we have not already discussed?
A. No.
Q. Have you had any conversations with anyone at



Tobias & Associates that we have not already discussed?
A. No.
Q. Have you done any calculation in looking at the amounts that you paid for Michael's Medicare -- medical care as to how much if that would have been paid by Golden Rule but for the preexisting condition diagnosis?
A. No.
Q. Does that $250,000 number you gave me include any out of pocket expenses he might have incurred under the -- that first certificate that he had for Golden Rule?
A. No.
Q. Does it include any deductible amounts or other out of pocket expenses under the Marketplace plan that he obtained at the end of 2022?
A. At the end of July or August of 2022?
Q. Well, that's -- when did the Marketplace plan that he's on now become effective?
A. September of 2022.
Q. Okay. Does the amount that you gave me earlier, the $250,000 number include any amounts for deduct bles or other out of pocket expenses that he incurred after the Marketplace plan became effective?
A. Yes.
Q. Are those amounts that he incurred at MD Anderson in order to obtain continued care at MD Anderson but that

were then not covered under the Marketplace plan?
A. Could you rephrase that? I'm not sure --
Q. Sure, let me -- let me ask it in a more open-ended way. What are the amounts that you paid for Michael's care after his Marketplace plan became effective in September of 2022?
A. 130 -- did I say 38 or 35, right around that amount.
Q. Is that the amount for his surgery or the other --
A. I'm sorry.
Q. -- or the other amounts to MD Anderson?
A. That's the amount for his surgery.
Q. Why did the Marketplace plan not cover his surgery?
A. Because he was continuing care at MD Anderson.
Q. Is it correct that the Marketplace plan was not accepted by or would not pay benefits for treatment at MD Anderson?
A. That's correct.
Q. Did you make an effort to find a Marketplace plan that would cover treatment at MD Anderson?
A. Yes.
Q. Did you look into or did Michael look into what it would take to have the surgery done at a place that was


covered by the Marketplace plan?
A. No.
Q. I take it you could not find a Marketplace plan that would cover treatment at MD Anderson?
A. That's correct.
Q. Why didn't Michael switch to some other hospital that was covered by the plan to the Marketplace plan to have that surgery done?
A. Because of his doctors, his continuing care of his doctors and the plan that they set up for him.
Q. Did you ask his doctors if they had privileges, surgical privileges at a hospital that would accept the Marketplace plan?
A. No I did not.
Q. Do you know if it was any discussion about what it would take to do the surgery at a place where the Marketplace plan would pay for it?
A. I do not.
Q. Other than those amounts, are there other amounts in that $250,000 number that you paid for Michael's treatment after the Marketplace plan became effective?
A. No.
Q. Do you know what the deductible is on the Marketplace plan?
A. Let me see. Is think it's -- I think it's 6,000.


Q. Okay. Is that 6,000 something that you paid that's included in the 250,000 or is it something that Michael paid?
A. I believe right now with the Marketplace it's his radiation will be the only things that will start Marketplace.
Q. Did he have to pay that deductible in the Fall of 2022?
A. For Marketplace?
Q. Yes.
A. No.
Q. Why not?
A. Because he didn't go to -- because it was -- he didn't start his radiation until now, till right -- until today.
Q. Sorry. Is that because all the treatment that he received in the Fall of 2022 was at MD Anderson and therefore none of it was covered under the Marketplace plan and therefore he did not have to pay that deductible because he was paying it all out of pocket?
A. That's correct.
Q. Okay. Then beginning this year he switched over to some other providers that are covered by the Marketplace plan?
A. It's -- yes.


Q. Do you know the name of the insurer that issued his Marketplace plan?
A. Community Health Choice.
Q. Given the documents that we've looked at here today and the numerous times that Golden Rule attempted to inform or did inform Michael of the preexisting condition exclusion in both of these plans, do you think that you or Michael bear any respons bility for what happened with this coverage and the ultimate denial of his claims under this second plan?
A. No.
Q. And that's because you think you're entitled to rely on that Dear Client e-mail and whatever five minute conversation you had with the agent in November as opposed to the numerous written documents that Golden Rule sent to Michael over the course of his two plans. Is that a fair statement?
A. No.
Q. Why don't you think that you or Michael bear any responsibility for what happened with his claims under the second Golden Rule plan?
A. I think it was a misrepresentation.
Q. Well, you understand that it wasn't a misrepresentation by Golden Rule because Golden Rule on the application and the welcome letters and the plan

itself and the acknowledgment forms and in that question and answer disclosure and the copies of the application made very clear to Michael that both plans had preexisting condition exclusions and that the first plan could not be renewed. You would agree with that, correct?
A. Yes.
Q. So whatever misrepresentation you were referring to it's either included in that Exhibit 3 Dear client e-mail or this five to ten minute conversation that you had with the agent in November of 2021, correct?
A. Correct.
Q. And in your mind whatever statements you chose to pull out of those conversations in that Exhibit 3 Dear Client e-mail, you believe that you and Michael were entitled to rely on those as opposed to the seven or eight documents that Golden Rule provided that set forth the preexisting condition exclusion and that the -- and that these plans could not be removed -- renewed, correct?
MR. KACAL: Objection. Form.
A. I don't know. I really don't know.
Q. Why do you think that Michael was entitled to disregard the welcome letter, the application, the question and answer information sheet that accompanied the application and the plan itself in evaluating whether the preexisting condition exclusion in the second short-term



plan was part of his claims?
A. I do not know. I don't know.
Q. Certainly you would agree with me that Golden Rule made every effort and did extraordinary efforts to make sure that Mr. Brewer knew that the second certificate had a preexisting condition exclusion and that, that exclusion would bar any illness or other condition that arose prior to its effective date, correct?
A. We were not really -- we thought it was a continuation of the illness, yes. We thought it was covered under it and it would just go into the next plan because it was renewable.
Q. Well, that's not my question. Golden Rule told -- told Michael at least twice in documents that Michael attested that he reviewed and understood that these plans were not renewable, correct?
A. Correct.
Q. Golden Rule told Michael innumerable times, at least three times in the application packet, four times in the application packet, plus in the welcome letter, plus in the plan itself that these plans had preexisting condition exclusions, correct?
A. Correct.
Q. So you would agree with me that Golden Rule went out of its way and made every effort to make sure that



Michael or anyone buying this insurance understood that there were preexisting condition exclusions, that the plans were not renewable, and that those preexisting condition exclusions would bar an illness or condition that manifested prior to the effective date of the plan, correct?
MR. KACAL: Objection. Form.
A. I don't know if they went out of their way but, yes, correct.
Q. And your point as you sit here today that -- is that either Mr. Brewer didn't read or didn't understand all of those repeated warnings and all of that information that Golden Rule provided to him. Fair statement?
A. I can't speak for Michael.
Q. You did not read any of that information. Fair statement?
A. No.
Q. Sorry, I asked a bad question.
Did you read any of the information that Golden Rule provided to Michael or provided to your e-mail address for you to pass on to Michael warning about the preexisting condition exclusion?
A. I read some of it.
Q. Alright. What -- what did you read at the time that it was sent out if you recall?



A. It's been 2021, I do not recall. There was a lot going on in our lives at that point.
Q. Did you price Marketplace plans at all in December of '21 when you were looking?
A. No.
Q. Did you price Marketplace plans in June of '21?
A. No..
Q. Did you do any research at either of those times about the difference between Marketplace plans and the cover that -- coverage that Michael actually obtained?
A. No.
Q. Anything else about this litigation that you think I should know that I have not asked you about?
A. No.
MR. CLACK: Pass the witness.
MS. PRIETO: I am some follow up.
E X A M I N A T I O N
BY MS. PRIETO:
Q. Earlier you mentioned that there was a period of time where you had Blue Cross Blue Shield policy, like -- it was like an individual policy. Do you remember that testimony?
A. Me?
Q. Yes.
A. Yes.

Q. Okay. How did you get that policy?
A. I got it as a -- I just got it as a policy, and I have it as a supplement for -- I have it as a supplement for Medicare.
Q. Did you go online or did you speak to an agent to get that policy?
A. I spoke to an agent.
Q. Do you know what -- was that agent -- who that agent is?
A. No, it's been...
Q. Did you tell -- back in November of 2021, did you tell Tobias & Associates that you needed a policy that would provide for cancer treatment?
A. I told them that there was a possibility that it was -- that he had the -- his testicle removed and that, that was going to be an ongoing. I did tell them that and that it looked suspicious, that -- you know, it could be suspicious. So, yes, I told them that he had it, you know, his testicle removed. Yeah, I was upfront with them on that.
Q. My -- my -- my question is a little different. I asked if you had specifically asked for coverage that -- like a policy that would coverage cancer treatment?
A. No, I did not.
Q. Okay. Did you ask Tobias & Associates for a



policy that would cover treatment to his testicle -- to Michael's testicles?
A. I just asked for the renewal of his policy. That's what they said, it was a renewal of policy.
Q. Who then the answer would be no?
A. No.
Q. Okay. Did you ask Tobias & Associates for a policy that would cover any urology treatment?
A. No.
Q. Okay. Did Mr. Davis tell you that the second policy was going to be a continuation of the first policy?
A. He said it was a renewal of the first policy.
Q. And so the answer would be no, he didn't tell you it was --
A. No.
MR. KACAL: Objection. Form.
THE WITNESS: I'm sorry.
MS. PRIETO: I will pass the witness.
MR. KACAL: We will reserve our questions for trial.
THE VIDEOGRAPHER: We are off the record at 3:37 p.m.
(Proceedings ended at 3:37 p.m.)



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL BREWER, §
§
VS. § C.A. NO. 4:22-CV-00969
§
GOLDEN RULE INSURANCE §
COMPANY AND TOBIAS & §
ASSOCIATES, INC. D/B/A §
GETMEHEALTHCARE §

---

REPORTER'S CERTIFICATION
OF CAROLYN ANN BREWER
TAKEN ON FEBRUARY 21, 2023

---

I, Angela Steele, Shorthand Reporter, Notary in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, CAROLYN ANN BREWER, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above foregoing deposition as set forth in typewriting is a full, true and correct transcript of the proceeding has at the time of taking of said deposition.



I further certify that I am not in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of this attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

Certified to by me on this, the 21st day of February, 2023.



Angela S. Steele,
Shorthand Reporter, Notary
Expiration: 10/17/23
Firm Registration No.
ESQUIRE DEPOSITION SOLUTIONS
1235 North Loop West
Suite 510
Houston, Texas 77008
(713) 524-4600

Reference No.: 9151744

Case: BREWER vs GOLDEN RULE INSURANCE

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

____________________________
Ann Brewer

NOTARIZATION OF CHANGES
(If Required)

Subscribed and sworn to on the ______ day of

___________________________, 20____ before me,

(Notary Sign)_________________________________

(Print Name) Notary Public,

in and for the State of _____________________



Reference No.: 9151744
Case: BREWER vs GOLDEN RULE INSURANCE

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
Ann Brewer



Reference No.: 9151744
Case: BREWER vs GOLDEN RULE INSURANCE

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
Ann Brewer