IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL BREWER, )
Plaintiff, )
)
V ) CIVIL ACTION NO
) 4:22-CV-00969
GOLDEN RULE INSURANCE )
COMPANY AND TOBIAS & )
ASSOCIATES, INC D/B/A )
GETMEHEALTHCARE, )
Defendants )

ORAL DEPOSITION OF
CHRISTOPHER DAVIS, APPEARING REMOTELY

FEBRUARY 23, 2023
VOLUME 1 OF 1

ORAL DEPOSITION OF CHRISTOPHER DAVIS, produced as a witness at the instance of the Plaintiff and duly sworn, was taken via Zoom in the above styled and numbered cause on Thursday, February 23, 2023, from 9:59 a m to 2:54 p m , before Letitia D Cobbs, CSR in and for the State of Texas, reported by computerized stenotype machine, with the witness appearing at his residence, Clermont, Florida, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record herein



A P P E A R A N C E S

FOR THE PLAINTIFF MICHAEL BREWER:

MR NICHOLAS G KACAL (Appearing Remotely)
THE COBOS LAW FIRM
711 West Alabama Street
Houston, Texas 77006
Phone: 713-234-5860
E-mail: Nicholas@cobos law

FOR THE DEFENDANT GOLDEN RULE INSURANCE COMPANY:

MR LANCE CLACK (Appearing Remotely)
FIGARI & DAVENPORT, LLP
901 Main Street
Suite 3400
Dallas, Texas 75202
Phone: 214-535-2052
E-mail: Lance clack@figdav com

FOR THE DEFENDANT TOBIAS & ASSOCIATES, INC D/B/A GETMEHEALTHCARE:

MS LEIDA PRIETO (Appearing Remotely)
RYMER, ECHOLS, SLAY & NELSON-ARCHER, P C
2801 Post Oak Boulevard
Suite 250
Houston, Texas 77056
Phone: 713-626-1550
E-mail: Lprieto@resnlaw com

ALSO PRESENT (Appearing Remotely):
MR WILLIAM COX, TOBIAS & ASSOCIATES
MS GRACE KITTLER, ZOOM HOST



I N D E X


| | PAGE |
|---|---|
| Appearances | 02 |
| Stipulations | 04 |
| CHRISTOPHER DAVIS | |
| Examination by Mr Kacal | 04 |
| Examination by Mr Clack | 140 |
| Examination by Mr Kacal | 166 |
| Examination by Mr Clack | 166 |
| Signature and Changes | 168 |
| Reporter's Certificate | 170 |


E X H I B I T S


| NO | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Brewer 774-775; GetMeHealthcare's "About" Web Page | 24 |
| 2 | GRIC 1328-1346; United Independent Producer Contract | 101 |
| 3 | TOBIAS 37-49; Application for Short Term Medical Insurance | 103 |
| 4 | Brewer 678; 11-3-21 Davis E-mail | 107 |
| 5 | Defendant Tobias' Answers, Responses, and Objections to Plaintiff | 116 |
| 6 | Brewer 674; Phone Log | 121 |
| 7 | GRIC 888-889; 1-25-22 Golden Rule Letter to Brewer | 133 |
| 8 | Defendant Golden Rule's Objections and Responses to Plaintiff | 135 |
| 9 | GetMeHealthcare's "Home" Web Page | 164 |
| 10 | GetMeHealthcare's "Bridge Plans" Web Page | 164 |


--o0o--



THE REPORTER: Today is February 23rd, 2023. The time is 9:59 a.m. We are on the record. Will you state your stipulations? Mr. Kacal, would you like to do it by the Rules or --
MS. PRIETO: Yes.
THE REPORTER: Okay. And would y'all agree to waive the federal read-on?
MS. PRIETO: That's fine.
MR. KACAL: Fine with me.
MR. CLACK: Fine.
THE REPORTER: My name is Letitia Cobbs. I am reporting this deposition remotely by stenographic means from League City, Texas. The witness, Christopher Davis, is located in Clermont, Florida.
CHRISTOPHER DAVIS,
having been first duly sworn, testified as follows:
MR. KACAL: Ms. Cobbs, would you be able to spotlight the witness for me?
THE REPORTER: Maybe Grace -- yeah.
MR. KACAL: Thank you.
THE WITNESS: My camera good?
MR. KACAL: Yes, sir.
THE WITNESS: Okay.
EXAMINATION
BY KACAL (10:00 A.M.):

Page 5

Q. Good morning.
**A. Good morning.**
Q. How are you doing this morning, Mr. Davis?
**A. I'm well. How are you doing, sir?**
Q. I'm doing well, myself. Do you understand that you're under oath to speak truthfully here at today's deposition?
**A. Yes, sir.**
Q. And do you intend to truthfully answer the questions asked of you today?
**A. Yes, sir.**
Q. Are you on any medication or had -- consumed any alcohol, anything which could affect your ability to remember or tell the truth here today?
**A. No, sir.**
Q. And do you know why you're in this deposition?
**A. Yes, sir.**
Q. And what is your understanding of why we're here today?
**A. I guess a suit against the insurance company.**
Q. And so, you are aware that this deposition is part of a lawsuit stemming from the procural of healthcare insurance and subsequent denial of benefits, correct?
**A. Correct.**

Page 6

Q. And are you represented by counsel here today?
**A. I am.**
Q. And you understand that I'm not here today to provide you with legal advice, correct?
**A. Correct.**
Q. You understand that I'm here today to gather facts related to the lawsuit?
**A. Yes.**
Q. Have you ever given a deposition before?
**A. Yes.**
Q. How many depositions have you had in the past?
**A. One.**
Q. When would that have been?
**A. Oh, geez. It was many years ago for an auto accident.**
Q. A car wreck?
**A. Yes.**
Q. Were you a party to the lawsuit?
**A. No. I was -- no, I was not.**
Q. Were you a witness to a car wreck?
**A. Yes.**
Q. Have you ever been party to a previous lawsuit?
**A. No, sir.**
Q. Aside from the motor vehicle -- actually strike that.

Page 7

When would that motor vehicle accident have occurred?
**A. I'm not 100 percent sure of the exact date, but it was over 20 years ago.**
Q. Okay. Have you ever given testimony at a trial before?
**A. No, sir.**
Q. So, you're represented by counsel. I'm going to assume that y'all have had the opportunity to discuss, you know, what a deposition is, what it involves. But I would like to just go over a couple of things, ground rules. We're conducting this deposition through Zoom today. So, if at any time the transmission gets garbled or there's any transmission issues, please let me know, and I'll reask my question. I want to have a good record. I want to make sure you understand everything I'm asking you today. Agreed?
**A. Agreed.**
Q. Okay. And so, in response, if your answer gets garbled by the transmission, I may ask you to answer a question again just depending on internet connection issues, okay?
**A. Okay.**
Q. And also, I'll be asking you questions; other counsel may be asking you questions here today. I ask

Page 8

that you allow me to finish my question before you give your answer. In return, I'll allow you to finish your answer before asking my next question. Agreed?
**A. Okay. Yes.**
Q. And if at any time you don't understand the question that I'm asking, please ask me to rephrase. If you answer a question that I ask, I'm going to assume you understood the question, understood?
**A. Yes.**
Q. Okay. And at some time you may hear counsel object to my line of questioning. They may say something to the effect of "Objection" or "Form." In those situations, you will still be required to answer my questions. You understand?
**A. Yes.**
Q. Okay. Now, they may ask you not to answer a question if for some reason a question involves privileges. However, if your attorney doesn't instruct you specifically not to answer my question, you will have to answer whatever question that is presented here today. Do you understand?
**A. Yes.**
Q. And if at any time you don't know the answer to any questions that are asked, please feel free to say, "I don't know." Don't speculate about things that

aren't in your personal knowledge, okay?

**A. Okay.**

Q. All right. And if at any time you need a break, just let me know. More than welcome to accommodate a break for anybody here. Were you able to review any documents before this deposition?

**A. What form of documents?**

Q. I'm just asking: Did you review anything prior to this deposition, any documents?

**A. No.**

Q. Okay. And can you please state and spell your full name for the record?

**A. Yeah. Christopher Lee Davis, C-h-r-i-s-t-o-p-h-e-r; Lee, L-e-e; last name, D-a-v-i-s.**

Q. And I saw earlier that you're in Clermont, Florida; is that correct?

**A. Correct.**

Q. Can you state your current location for the record?

**A. Clermont, Florida.**

Q. The address, please.

**A. Oh, Clermont, Florida**

Q. And that's your residence, correct?

**A. Yes, sir.**



Q. And what's your date of birth?

**A. October 16th, 1979.**

Q. Were you born in Florida?

**A. No.**

Q. Where were you born?

**A. Ohio.**

Q. Ohio. How long did you live in Ohio?

**A. I'm not 100 percent sure when I came down here.**

Q. So, you moved to Florida from Ohio; is that correct?

**A. Correct.**

Q. How long -- have you lived in Florida over ten years?

**A. Yes.**

Q. Did you graduate high school in Florida?

**A. Yes.**

Q. What high school did you attend?

**A. John I. Leonard High School.**

Q. Where is that located?

**A. It's in Greenacres, Florida.**

Q. And did you attend college?

**A. Yes.**

Q. Where?

**A. At Mars Hill College in North Carolina.**

Q. You said Mars Hill; is that correct?



**A. Yeah. Correct.**

Q. And did you receive a degree?

**A. No.**

Q. How long did you go to Mars Hill?

**A. One year.**

Q. Aside from your high school diploma and one year of college, have you received any additional education?

**A. No, sir.**

Q. Have you ever attended any type of insurance classes or insurance courses?

**A. Yes, when I got my license.**

Q. When would that have been?

**A. '07, 2007.**

Q. What type of courses are you required to take? Actually, let me strike that.

What type of license did you obtain in 2007?

**A. It was the Health and Life 2-15 license.**

Q. And is that specific to a certain state, or is that a nationwide license?

**A. It's the Florida license.**

Q. What types of courses or classes were you required to attend in order to obtain that license?

**A. The prerequisite, the courses they required you to take. It was a specific course --**



Q. How long did --

**A. -- at the time. Sorry. Go ahead.**

Q. Actually, no. Please, what -- what was it that you just said? I apologize.

**A. No. It was just the -- the courses they require you to take before you take the state exam.**

Q. Are those online courses? Did you attend an in-person --

**A. No.**

Q. -- class?

**A. It was in person.**

Q. How long did those classes last in total?

**A. I honestly don't remember.**

Q. Would you say you took more than 40 hours of class time?

**A. Honestly, I don't recall the exact time. I apologize.**

Q. Do you know who provided the courses or classes?

**A. It was through Cash Brown, the gentleman's name.**

Q. That's an individual?

**A. Correct. It was -- he had a school.**

Q. Aside from the 2007 Health and Life 2-15

license, have you obtained any other licenses or had any additional education?
**A. No, sir.**
Q. And you said that that was a Florida specific license, correct?
**A. I believe so, yes, sir. Correct.**
Q. Is it true that you are also -- have a license to conduct insurance related business in Texas?
**A. Yes, sir.**
Q. Is that a separate license?
**A. I think --**
THE REPORTER: I'm sorry. I think --
THE WITNESS: Go ahead.
THE REPORTER: Mr. Kacal, you froze on me. Can you --
MR. KACAL: Oh, I apologize. I believe I had asked whether or not he was -- let me just reask the question.
Q. (By Mr. Kacal) So, Mr. Davis, earlier you said you had the Health and Life 2-15 license that was Florida specific. Your license is to conduct insurance related business in Texas as well, correct?
**A. Yes, sir.**
Q. And do you need a separate license to conduct insurance related business in Texas?



**A. I would -- I have a Texas license with a specific number associated with it.**
Q. Did that involve you taking additional courses?
**A. No. No, sir.**
Q. Did you just have to take a state specific test for the Texas license?
**A. No, sir.**
Q. How did you get licensed in Texas?
**A. With the license I have in Florida, I'm able to sell in other states as long as I apply for the license in that state and would get approved.**
Q. When did you apply for a license in Texas?
**A. I am not sure, honestly.**
Q. Would it have been around the same time you obtained your Florida license?
**A. I'm not sure of the exact date I obtained my Texas license.**
Q. Okay. Safe to say it's been over ten years?
**A. Yes.**
Q. After attending Mars Hill in North Carolina, did you obtain a -- where did you go to work after college?
**A. I was a waiter.**
Q. Waiter? And what did you do after that?
**A. I waited tables that whole time, basically.**



Q. Until when?
**A. Until I obtained my license.**
Q. So, from -- after you graduated -- or I apologize. Strike that.
After you attended Mars Hill in North Carolina, you became a waiter, and you did that up till 2007 when you obtained your license, correct?
**A. Correct.**
Q. And when did you -- when would you have attended Mars Hill?
**A. It would have been in '03.**
Q. In 2007, when you obtained your license, did you get a new job?
**A. I did.**
Q. And what was the -- what was -- what was your reason for going out and obtaining an insurance license?
**A. I wanted to have a career.**
Q. Did you know another insurance professional or anything like that? What -- what prompted you to go into the business of insurance?
**A. I worked at a company where -- it was an insurance company.**
Q. Was that before you obtained your license?
**A. Correct. Yes.**
Q. So, you had worked as a waiter, got a new job



working at an insurance company, then obtained your license in 2007, correct?
**A. Correct.**
Q. What did you do -- actually, let me change that.
What insurance company did you originally work for?
**A. It was Health Benefits Direct.**
Q. Would that have been shortly before you obtained your license?
**A. Yes.**
Q. Is that in North Carolina?
**A. No.**
Q. Is that in Florida?
**A. Yes.**
Q. What was your original job title at Health Benefits Direct?
**A. I don't know that I had a specific title.**
Q. What did you do?
**A. I just handled anything that the agents would need, whether paperwork or anything; just training, listening to calls and learning the business, learning the insurance industry.**
Q. Would you say you were an assistant when you first got hired?

**A. Yeah, I guess so.**
Q. But you were ultimately training to become an insurance agent; is that correct?
**A. Yes. Correct.**
Q. Did Health Benefits Direct assist you in obtaining your license?
**A. They directed me to the school.**
Q. Do you remember the name of the school?
**A. Yeah. It was Cash Brown, the Cash Brown school, the one from earlier.**
Q. Cash Brown school.
**A. Yes.**
Q. How long did you work for Health Benefits Direct?
**A. I'm not sure of the exact amount of years. I apologize.**
Q. Was the -- after leaving Health Benefits Direct, did you get employed by Tobias & Associates?
**A. I apologize. Can you repeat that?**
Q. Sure. After leaving Health Benefits Direct, what was your next job? Who was your next employer?
**A. I worked with Michael Tobias.**
Q. You said Michael Tobias; is that correct?
**A. Yes.**
Q. Is that the owner of Tobias & Associates?



**A. Yes.**
Q. Around what time did you start working for Tobias & Associates?
**A. I'm not sure of the exact timeframe. It was after the Health Benefits Direct closed down.**
Q. Over ten years?
**A. Seven -- yes.**
Q. Aside from your jobs with Tobias & Associates and Health Benefits Direct, did any of your previous jobs involve the business of insurance?
**A. No.**
Q. What training did you receive from Health Benefits Direct?
**A. I was able to listen to calls. I was able to prequalify calls; make sure, you know, their names were correct; and just basically learning the -- the -- how the insurance business works with underwriting and whatnot.**
Q. Did they send you to any formal training courses, anything like that?
**A. No. They had daily training there on -- on-site.**
Q. What did that consist of?
**A. Learning the programs and the policies.**
Q. When you say "programs," is that like computer



programs, or what do you mean by "programs"?
**A. It was the CRM, the -- the input --**
Q. Is that part of the customer --
THE REPORTER: I'm sorry.
Q. -- relations management?
THE REPORTER: I'm sorry. What was the end of your answer?
THE WITNESS: Mine?
THE REPORTER: Yeah. The CRM and --
THE WITNESS: Oh, it -- yeah, it was the CRM, just where we input the data.
THE REPORTER: And I did not get the next question.
MR. KACAL: I was just trying to confirm that CRM meant customer relations management.
Q. (By Mr. Kacal) Is that correct, Mr. Davis, that the CRM --
**A. Yes. Yes.**
Q. Thank you.
MS. PRIETO: Let him -- let him finish his question before you answer because it's going to make it hard for the court reporter.
Q. And again, I'll try to allow you to finish your answer before I ask my questions as well. And so, again, you are an employee of Tobias & Associates today,



correct?
**A. Correct.**
Q. And you've been an employee of Tobias & Associates for over ten years, correct?
**A. Correct.**
**Did you hear me or no?**
Q. I did. I did.
**A. Okay. I wasn't sure if you froze. I'm -- I'm sorry about that.**
Q. Do you have a written employment agreement with Tobias & Associates?
**A. I believe so. I'm not 100 percent sure.**
Q. Do you think you'd have a copy of it if you did have a written employment agreement?
**A. If I did, they would have it. I -- I'm -- go ahead. Sorry.**
Q. You don't have a copy of a -- any written employment agreement that you know of?
**A. Nothing on hand at the moment, no.**
Q. Would you have a copy if there was a written employment agreement?
**A. Well, I'm a contractor. So --**
Q. Do you have a contractor agreement with Tobias & Associates?
**A. Yes. I just don't have that on hand.**

Q. No. Of course. I may ask for that later on in the lawsuit. That's the only reason why I'm trying to get that information.
**A. No problem.**
Q. Aside from the Health and Life 2-15, do you hold any other types of licenses or certificates related to the business of insurance?
**A. No, sir.**
Q. You work underneath a Mr. Shane Brodil; is that correct?
**A. Correct.**
Q. Would you be considered a subagent of Mr. Brodil?
**A. I'm not familiar with the term -- with that. I don't know.**
Q. Describe your relationship with Mr. Brodil.
**A. He is the manager at the company I work for.**
Q. So, he would be your direct supervisor, correct?
**A. Correct.**
Q. Do you have any other supervisors at Tobias & Associates?
**A. Not -- no, not that I -- we have HR, but that's it. I mean --**
Q. So, you would bring any concerns that you had



to Mr. Brodil, correct?
**A. Correct.**
Q. How long have you worked with Mr. Brodil?
**A. I'm not sure of the exact year.**
Q. Over five years?
**A. Yes.**
Q. What was your job title when you were initially hired by Tobias & Associates?
**A. Just trainee.**
Q. You were eventually promoted from trainee, correct?
**A. Correct.**
Q. What was your next job title after trainee at Tobias & Associates?
**A. Insurance agent.**
Q. How long were you a trainee with Tobias?
**A. I don't recall the amount of time.**
Q. Were you a trainee for over a year?
**A. I don't know that it was that long, but I don't know the exact time.**
Q. Understood. Safe to say you've been an insurance agent for Tobias & Associates for around ten years?
**A. Correct.**
Q. What's the culture like at Tobias & Associates?



**A. Great.**
Q. You enjoy working there?
**A. Yes.**
Q. Do you work from home, or do you work at an office?
**A. I work remotely.**
Q. Do you ever go into a Tobias & Associates office for work?
**A. No.**
Q. Have you -- have you ever been to a Tobias & Associates' office?
**A. Yes.**
Q. Where is that located?
**A. Boca Raton.**
Q. Are there more than one office location?
**A. I -- I have -- that's the only one I've been to.**
Q. But routinely, you work remotely from home, correct?
**A. Correct.**
Q. And that would be in Clermont, Florida, correct?
**A. Yes, sir.**
Q. Would you agree that Tobias & Associates values their employees' well-being?



**A. Yes, sir.**
Q. Would you agree that Tobias & Associates values their clients' well-being?
**A. Yes, sir.**
Q. Would you agree that Tobias & Associates is a people oriented business?
**A. Yes, sir.**
Q. I would like to show you a document. Give me one second to find it. I'm going to try to share my screen. Give me one second.
**A. No problem.**
**(DAVIS EXHIBIT 1 MARKED.)**
Q. Are you able to see my screen, Mr. Davis?
**A. Yes, sir.**
Q. And do you recognize the document that's -- I'm showing you right now?
**A. I do -- I can't see here. Hold on. Let me get my glasses on. I'm sorry.**
Q. Oh, no problem. And if you need me to make it bigger, let me know.
**A. No problem. It looks like something's blurred out in the middle.**
Q. Yeah. Yeah. This is -- I'll represent that this is a screen shot from a page on the Tobias & Associates website, the "About" page specifically. Have

you ever seen this before?
**A. I'm sure I have at some point.**
Q. And I just want to make sure that we're all talking about the same people. The -- you work for the -- Tobias & Associates, Inc., d/b/a GetMeHealthcare listed at the --
**A. Correct.**
Q. -- bottom of this page, correct?
THE REPORTER: I'm sorry. What was the answer?
**A. Yes.**
Q. Can you -- I'm going to try to zoom in a little bit to make this easier. But can you -- actually, hold on.
Can you read the second paragraph contained on this first page?
**A. Yes.**
Q. Can you read it into the record, please?
**A. "We know that insurance in any walk of life is not the easiest decision to make. Our highly trained health and life plan specialists can guide you through the jungle of choices. With years of combined experience, our highly experienced staff fully serve you with quality, simple, easy issue policies that meet your specific needs. Our priority is to protect your**



**financial needs and the health of your family while always keeping your budget in mind."**
Q. Would you agree that Tobias & Associates places a priority on protecting their clients' financial needs and health?
**A. Yes.**
Q. Would you agree that Tobias & Associates' staff are highly experienced?
MS. PRIETO: Objection, form.
You can answer.
**A. Oh, yes. Sorry.**
Q. Do you need me to reask the question?
**A. No.**
Q. Would you agree that Tobias & Associates' staff are highly experienced?
MS. PRIETO: Form.
You can answer.
**A. Yes.**
Q. Would you agree that Tobias & Associates' agents' role is to obtain quality, simple, easy issue policies that meet the clients' specific needs?
MS. PRIETO: Objection, form.
You can answer.
**A. Yes.**
Q. So, you would agree with that second paragraph



here on the "About" page of the Tobias & Associates' website, correct?
**A. Yes.**
Q. Here in this third paragraph, it states, "We make finding the right plan convenient and easy. Let one of our insurance agents help you find the best medical plan today," correct?
**A. You're asking me if that's correct if that's what that says?**
Q. Yes, sir.
**A. Okay. Yes.**
Q. Would you agree that the insurance agent's role at Tobias & Associates is to help their clients find the best medical plan in a convenient and easy manner?
**A. Yes.**
Q. In the fourth paragraph of this page it states, "Whether it's your first time shopping for an individual and family health plan or you're looking to renew existing coverage, we give you the information you need to make the best decision for you and your family," correct?
**A. Yes.**
Q. Would you agree that it's the role of the insurance agent at Tobias & Associates to provide their clients with information they need to make the best



decisions for their families when purchasing insurance?
MS. PRIETO: Objection, form.
**A. Yes.**
Q. And would you agree that you have an obligation to provide your clients with information so that they can make the best decision for their specific needs?
MR. CLACK: Objection, form.
**A. Yes.**
Q. And you would agree that it's your role to provide that type of information whether or not it's the client's first time shopping or whether they're looking to renew an existing coverage, correct?
MR. CLACK: Objection, form.
**A. Yes.**
Q. What type of duties are involved in your role as an insurance agent at Tobias & Associates?
**A. I enroll clients in policies.**
Q. Do you do anything else besides enrolling clients in policies?
**A. No.**
Q. As part of your employment with Tobias, do you solicit insurance applications from clients?
**A. I'm not sure I understand the question. Do I solicit?**
Q. Sure. Do you reach out to potential clients in

order to procure business or help them with their insurance needs?
**A. No.**
Q. So, you don't reach out to clients in order to assist them with their insurance needs; is that correct?
**A. You mean soliciting new people?**
Q. Sure. New people, old customers. Do you solicit business for Tobias & Associates?
**A. I will reach out to clients that currently have policies with us.**
Q. But you wouldn't reach out to someone who doesn't have a policy that was obtained through Tobias & Associates in the past, correct?
**A. Correct.**
Q. Do you ever do cold calls?
**A. No.**
Q. Do you negotiate insurance agreements between the insurance company and the client?
**A. No.**
Q. Would you agree that you help your clients procure insurance policies?
**A. Define "procure."**
Q. Apply for and obtain.
**A. Yes.**
Q. Do you ever collect premiums from clients?



**A. No. Physically, I do not collect premiums.**
Q. Does Tobias & Associates collect premiums from the clients?
**A. The insurance companies collect the premiums.**
Q. So, neither you nor the employees at Tobias would ever collect the initial premiums on an insurance -- for an insurance policy, correct?
**A. I'm not sure I understand your question. Do you mean -- sorry. Do you mean get the payment information for the policy that they are purchasing?**
Q. Sure. Yes. Do you -- did you gather payment information for the applied-for insurance policies?
**A. Yes.**
Q. Does Tobias process those payments?
**A. It's the insurance company that processes the applications.**
Q. Okay. So, your role is simply to gather the payment information and forward that information to the insurance carrier?
**A. Correct.**
Q. As an insurance agent, do you have any specific responsibilities or obligations when working with your clients?
**A. Just to ensure they have the best policy for their needs. Excuse me.**



Q. How do you ensure that your clients have the best policy for their needs?
**A. I find a plan that fits their budget and their ideal needs for insurance coverage.**
Q. And how do you find the plan that best fits their budget and coverage needs?
**A. We find out what would be affordable for them on a monthly basis, and we look for the programs that fit that specific budget.**
Q. So, when you're selecting or presenting insurance coverage options to your clients, the first step would be to ask, "What's your budget?" Is that correct?
**A. Yes. It really varies by the client, but typically your budget is going to determine what coverage you can afford.**
Q. And so, you would determine the budget, find out what plans fit inside that budget, and you would present those options to the client; is that correct?
**A. Yes.**
Q. Aside from determining what their budget is, is there any other information that you seek out from your clients in order to ensure they have the best policy for their needs?
**A. We would ask what they would need, if they need**



**a high deductible, a low deductible, if they would like doctor visit co-pays or not.**
Q. Do you ever discuss the difference between Affordable Care Act compliant plans and non-Affordable Care Act compliant plans?
**A. Yes.**
Q. When would you do that?
**A. When a client would ask or if -- basically if they brought it up to me, yes.**
Q. So, you wouldn't bring that up unless a client specifically asked you; is that correct?
**A. I would make sure they would have no qualifying events or maybe a special enrollment period.**
Q. What do you mean when you say that you would make sure they don't have any qualifying events?
**A. Maybe they lost coverage through their employer. They -- maybe they've moved; maybe they've gotten married, process of adoption, and so on.**
Q. Is there anything else that you try to do on a regular basis in order to ensure that your clients have the best policy for their needs?
**A. No. I just make sure that the policy fits their needs.**
Q. Do you represent -- I apologize.
Do you represent yourself as an agent of

the insurance company when working with clients?
**A. Oh, okay. There we go. Sorry about that. What was that? I'm sorry. Can you repeat that?**
Q. Sure. Do you ever represent yourself as an agent of the insurance company whenever you're working with clients?
**A. No. I'm a broker.**
Q. So, you would agree that -- actually, let me get that back.
Would you agree that an insurance company relies on agents such as you to procure insurance policies for their clients?
MR. CLACK: Objection, form.
**A. The -- I'm sorry. "Procure" again? You mean --**
Q. Sure. Would you agree that insurance companies rely upon agents such as yourself in order to apply for -- in order for clients to apply for and obtain insurance policies?
**A. They -- we do the enrollment for the insurance policy with the clients if that's what you're asking. I don't --**
Q. Would you agree that you have an obligation to obtain the highest possible price for a policy on behalf of the insurance company?



**A. Did you ask me if I'm -- I have an obligation to get the highest price for the insurance company?**
Q. Uh-huh. Yes, sir.
**A. No, sir. We're trying to keep the client in mind.**
Q. And would you agree that you have an obligation to sell as many policies as possible within the applicable underwriting guidelines?
**A. No, sir.**
Q. Would you agree that your commission compensation is based on the number of policies you sell and the price of premiums for those policies?
**A. No, sir.**
Q. Do you represent yourself as an agent of the client when you're working with your clients?
**A. I work for the client. So, I don't get the question, really.**
Q. What -- aside from ensuring that your clients have the best policy for their needs, do you believe you have any other responsibilities or obligations that you owe to your clients?
**A. As far as -- no. I want to make sure they have the best policy for their needs.**
Q. Would you agree that your clients look to and rely on you in obtaining the best possible coverage for



them?
**A. That they look to me to provide the best policy?**
Q. And that they rely on you to obtain the best possible coverage.
**A. Yes.**
Q. Would you agree you have an obligation to ask your clients questions regarding what type of treatment they have had or what type of treatment they may need in the future?
**A. I can't -- future or -- I don't know what's happening in the future. So, I don't -- but can you rephrase that question --**
Q. Of course.
**A. -- or repeat -- repeat that?**
Q. Let me break it up, actually. Would you agree that you have an obligation to ask your clients questions about what treatment they've had in the past?
**A. We ask the medical questions, their past history.**
Q. Would you agree that you have an obligation to do so whenever you're helping your clients obtain a new policy?
**A. Yes.**
Q. And would you agree you have an obligation to



ask them what type of treatment they may anticipate in the future?
**A. We ask the medical questions required.**
Q. Do you ever ask the client, "Hey, what type of treatment do you think you may need coming up?"
**A. Yes.**
Q. When would you do that?
**A. At the time of the application or when you speak to them.**
Q. Do you ask that question for most of your clients?
**A. Yes, because it would be for a preexisting condition if -- for then, and then I would recommend a different policy.**
Q. Do you regularly discuss preexisting conditions with your clients?
**A. Yes.**
Q. Would you say you have an obligation to ask them about any type of preexisting conditions they may have when applying for insurance?
**A. Yes.**
Q. Would you agree you have an obligation to discuss different types of insurance coverages available to your clients?
**A. Yes.**

Page 37

Q. Would you agree that you have an obligation to get quotes from multiple different insurance carriers for your clients?
**A. Yes.**
Q. Would you agree you have an obligation to advise your clients of risks that are involved with purchasing insurance policies?
**A. Risks?**
Q. Sure. Would you agree that you have an obligation to advise your clients that coverage may not apply in certain situations?
**A. Such as?**
Q. Preexisting conditions.
THE REPORTER: I'm sorry. I'm sorry. Y'all -- Mr. Kacal, you froze up on me on that question. I'm sorry. Can you repeat it?
MR. KACAL: I think I was asking whether or not Mr. Davis believes he has an obligation to advise his clients that coverage may not apply in certain situations.
**A. I just ask all the medical questions to qualify.**
Q. When you say you "ask all the medical questions," is -- are those the questions that are contained in the application, or is there a list of

Page 38

questions that are provided to you by Tobias & Associates?
**A. It would be the medical questions on the application.**
Q. Do you ever ask any questions that aren't contained in the application?
**A. No, sir.**
Q. So, when getting information from the clients, you strictly stick to the questions contained on an insurance application, correct?
**A. Once -- yes, sir.**
Q. And just to clarify, would you have the questions listed on an application before or after you selected a specific insurance carrier?
**A. I mean, it's -- it would be -- basically, I can't determine all the medical questions on that specific application.**
Q. So -- and let -- let me try to rephrase because I think I asked a bad question there.
The applications you submit, they're company specific applications, correct?
**A. Correct.**
Q. So, you would provide carrier options before you looked at and asked questions related to a specific application, correct?

Page 39

**A. Yeah. I qualify the clients through eligibility. The -- with -- as well as the ACA policies and if they have an SEC -- SEP.**
Q. And I'm sorry, Mr. Davis. You broke up a little bit on my end. Is there any way I can have you repeat that answer?
**A. I said I -- I qualify them with a policy through their -- their -- their questions, the medical questions.**
Q. But you would first get a number of different insurance carriers that -- or plans which would fit within their budget needs, correct?
**A. Yes.**
Q. So, let me just try to get a flow chart going on about this process. You would first ask the client, "What is your budget?" Correct?
**A. Correct.**
Q. And then you would select plans from multiple carriers that fit within that budget, correct?
**A. Correct.**
Q. And you would present those options to the client and discuss those options with the client, correct?
**A. Correct.**
Q. The client would say, "I think I want to go

Page 40

with this plan," Plan B, C, or D. And then you would get the application specific for that plan, correct?
**A. I would find out -- I determined what policy that would fit if they had any medical conditions.**
Q. So, you would get the plans that fit within the budget. Then you would ask questions related to their medical conditions, correct?
**A. I mean, their -- correct. Yes.**
Q. So, you would ask them medically related questions before looking at a specific application, correct?
**A. Well, yes. I'd -- I'd need to know what they qualify for as far as medically.**
Q. And so, do you have a list of questions that you ask to determine that before you see the application?
**A. It's -- no. I look up the plan and find out which one, and then I determine which medical conditions they have.**
Q. So, maybe I'm confused. Would you determine what medical conditions they had before or after selecting the specific application?
**A. Well, no. All right. When I get the application, I find out what would be affordable. I make sure they don't have no medical conditions that**

Page 41

**would disqualify them from that specific plan. And if they did, I would then look for a different program.**
Q. So, you would look at the application to determine what medical conditions are related to that plan, determine whether or not the client has any relevant conditions, and then you may select a different plan based on the answers; is that correct?
**A. If they had preexisting conditions, I would have to determine what program they could qualify for.**
Q. And you would do that before looking at specific applications or after?
**A. Before.**
Q. What types of questions do you ask to determine what type of conditions a client may have before looking at a specific insurance application?
**A. Are they currently undergoing treatment, any hospitalization, any current medications, any -- have they had any conditions: heart attack, stroke, et cetera; determine where they fit for their policy.**
Q. And you do this for all your clients, correct?
**A. Yes, sir.**
Q. And, again, there's no specific script or anything like that whenever you're asking these questions, correct?
**A. No, sir.**

Page 42

Q. You just know to ask these questions through your training and experience as an agent, correct?
**A. Yes, sir.**
Q. Would you agree you have an obligation to advise your clients of changes in coverage when obtaining a new policy?
**A. Yes, sir.**
Q. Would you agree you have an obligation to recommend policies with the best price and the broadest coverage?
MR. CLACK: Objection, form.
**A. Best price or most affordable?**
Q. Most affordable.
**A. Okay. Yes, I'd like them to have the most affordable policy. Yes.**
Q. Would you agree that you have an obligation to assist your clients with completing insurance applications?
**A. It's -- we fill out the -- I don't -- I can't really -- can you rephrase that -- can you repeat the question?**
Q. Sure. I'm going to ask it a couple of different ways, actually. So, would you agree that you have an obligation to help your clients fill out an insurance application?

Page 43

MR. CLACK: Objection, form.
**A. I populate their -- I ask their information -- name, address, zip code -- for the application. I --**
Q. And is that a part of your job as an insurance agent at Tobias & Associates?
**A. Yes.**
Q. And as an insurance agent at Tobias & Associates, do you help the clients submit these insurance applications to the insurance companies?
**A. We fill the application out and then send it to the client; whereas, the client then reviews all the information's correct and then signs the application, themselves, and fills it --**
Q. If the client's having trouble, whether technical trouble or otherwise, in actually getting the application submitted, would you assist them over the phone: "Hey, here's what you need to do"?
**A. If -- if they've had trouble, yes.**
Q. Would you agree you have an obligation to help explain the terms of an insurance application form to your clients?
**A. The terms?**
MR. CLACK: Objection, form.
But go ahead.
**A. I mean, I explain. But they need to do it,**

Page 44

**themselves, and review them just -- I'm here just basically as a help guide.**
Q. Sure. And as part of your role as an insurance agent, if the client doesn't understand certain words or nomenclature related to the business of insurance, would you help explain that to the client?
**A. Oh, yeah. I would review the questions with them, yes.**
Q. And if they said, "You know, I don't really understand what this means," would you explain it to them?
Or would you say, you know, "Hey, I'm not authorized to explain this"? How does that work?
**A. Yeah, I would help to explain it. That's what an agent does.**
Q. Okay. Would you agree you have an obligation to explain to your clients what coverages are included in an application?
MS. PRIETO: Objection, form.
MR. CLACK: Objection, form.
**A. Explain to them what coverage is in the application? Of course.**
Q. Would you agree you have an obligation to keep your clients fully informed so they can remain insured at all times?

Page 45

**A. Yes.**
Q. Would you agree you have an obligation to present your clients with the quote or policy which is in the best interest of the client?
MR. CLACK: Objection, form.
**A. Yes.**
Q. When are you allowed to solicit business from prior clients?
**A. I apologize. Your phone -- your -- you cut out at that question.**
Q. Sure. Of course. I'll -- I'll reask the question.
When are you allowed to contact clients regarding obtaining new insurance coverage?
**A. When am I allowed?**
Q. Can you just -- yeah. Let me rephrase the question.
Are there any limits on when you can contact a prior client regarding their insurance coverage or their future insurance coverage needs?
**A. None that I know of.**
Q. How do you identify when to reach out to clients?
**A. If their plan is going to expire.**
Q. Do you have a -- a list or how -- how do you do

Page 46

that? How do you identify when a prior client's insurance may be coming to an end?
**A. It is listed on a website.**
Q. Is that a public website? Is that, like, a Tobias & Associates database?
**A. No. It would be through the insurance, the -- the back end of the insurance where the names and everything and their policies are. We reach out to them so they don't go uninsured if they expire.**
Q. Do you, like, calendar the expiration dates and then reach out a couple weeks before in order to inform the client? How does that process work?
**A. My job basically is to prevent them from expiring; so, I reach out and let them know their policy could be expiring soon.**
Q. And do you get, like, notifications from the insurance carriers, or how do you know whenever a plan's going to expire?
**A. We get notified from our CRM, an alert.**
Q. How do you normally reach out to clients?
**A. I will most likely e-mail and call.**
Q. You said you don't normally cold call, correct?
**A. No. That wouldn't be cold calling because they're clients.**
Q. And you wouldn't send an e-mail to anyone who's

Page 47

not a previous client of Tobias, correct?
**A. No. I reach out to clients whose policies are expiring.**
Q. But you don't look to see clients who may have been with a different insurance agent or different agency/company and try to get business from new clients?
**A. No.**
Q. When you're discussing insurance coverage with your clients, does Tobias & Associates provide you with any documents showing notices, warnings, disclosures that you're required to give to your clients?
**A. I'm not sure I understand what you mean by that.**
Q. Let me rephrase it. Does Tobias & Associates have a document that contains statements that you're required to give to your clients whenever you contact them?
**A. No specific statements to the clients, no.**
Q. And earlier you said sometimes you assist your clients with completing -- filling out insurance applications, correct?
**A. Well, I prepopulate the application and get it over to the client.**
Q. Can you explain what you mean by "prepopulating"?

Page 48

**A. Correct. It would be if that -- okay. The first name, address, e-mail, phone number, anything, you know, pertinent to the client.**
Q. So, when you say "prepopulating," does that mean that you fill in all the blanks in an --
**A. Yeah.**
Q. -- application? Is that what you mean?
**A. I ask the question; I put in the answers for the spots.**
Q. And you would go through each blank or box on the application, correct?
**A. Correct. It's -- and then it's up to them to review it and make sure it's correct.**
Q. And you don't read any of the notices or disclosures in the application, itself, correct?
**A. I read it all.**
Q. So, you would read the entire application verbatim and pause where there's a -- a blank?
**A. Yeah. I read through there, yes.**
Q. Okay. So, you wouldn't skip over any portions of the application even if it doesn't require an answer? You would --
**A. Correct.**
Q. Would you normally do this over the phone?
**A. Yes, but they also read it when they get it on**

**their side as well.**
Q. Do you do this for all your clients, prepopulate the applications over the phone?
**A. Yes.**
Q. Do you ever send the clients a list of written questions before going over the insurance application?
**A. A list of written questions?**
Q. Sure. It's -- when you're gathering information for --
**A. No.**
Q. So, you would never send a client a written question or a set of written questions in order to determine what's their budget; what's their coverage needs; what's the information I'm going to need to put on an application? Everything would be over the phone, correct?
**A. I would do -- if they requested that, then, yes. If not, then no.**
Q. Has any client ever requested that in the past?
**A. I don't recall, honestly.**
Q. Fair to say that all of the client interactions in which you do recall, you assisted them with their applications over the phone?
**A. Typically, yes, on the phone or via e-mail sometimes if they can't answer the phone. But yes,**



**mostly phone.**
Q. What do you do for your deaf clients?
**A. At this point I haven't had a deaf client. So --**
Q. Fair enough.
**A. -- I can't answer that, sir.**
Q. Fair enough. And, again, earlier you said you -- you read the application verbatim to the client over the phone, correct?
**A. Yes.**
Q. And you don't skip over any of the language that doesn't require an answer, correct?
**A. Correct. I can't skip it.**
Q. How long does this process take, from determining the budget, finding coverage options that fit within the budget, determining which plans they qualify for, finding that specific application, prepopulating that application? How long does that process normally take?
**A. It varies depending on the client. We -- you have older clients; you have younger clients. It just varies on the specific client that -- sometimes slower; sometimes faster. Some comprehend faster. It just depends. I can't give you an exact time.**
Q. Sure. Well, let me ask you specifically: Have



you ever had that process take less than ten minutes?
**A. I honestly don't recall.**
Q. Does it ever take you over an hour to complete that process?
**A. Yeah. People get breaks, like, families, and kids come in and out. It just happens that way. So, sometimes --**
Q. And --
**A. Go ahead. Sorry.**
Q. Actually, no. If -- if you have anything additional to add, I'd --
**A. No. That's -- that was it. That was it.**
Q. Okay. And so, you were saying there's -- there's not a normal timeframe. It really varies based on the person, correct?
**A. Yes.**
Q. How many different insurance carriers do you work with at Tobias & Associates?
**A. I don't know the exact number.**
Q. Over five?
**A. Let me see. It's, like, over ten or so, I think, at this point. Top carriers mostly, though.**
THE REPORTER: I'm sorry.
THE WITNESS: It was just -- I said ten.
Q. (By Mr. Kacal) Can you name some of those



carriers for me?
**A. It would be through United, National General. We have Blue Cross -- I mean, all the big ones, Cigna, Aetna.**
Q. One of those carriers is Golden Rule Insurance Company, correct?
**A. Correct.**
Q. And are they included in -- strike that.
Earlier when you said you worked with United, you meant UnitedHealthcare, correct?
**A. Yes. That is Golden Rule/United.**
Q. So, Golden Rule would be the -- a UnitedHealthcare company, correct?
**A. Correct.**
Q. And you -- earlier you stated that you normally present multiple carrier options to your clients, correct?
**A. Correct.**
Q. About how many different options do you normally present a client when it comes to carrier options?
**A. It varies depending on the state.**
Q. In Texas.
**A. Again, it varies on zip code and counties.**
Q. Do you try to present at least five different

carrier options to your clients? Is that -- would you agree with that?
**A. I can't put a number on it, honestly, because some -- some states don't have as many as others. So, I can't really --**
Q. Would you agree you strive to present as many options as you can to your clients?
**A. Yes.**
Q. And you assist clients with prepopulating applications from all -- all of these different carriers that Tobias & Associates works with, correct?
**A. Correct.**
Q. Are there any companies that Tobias & Associates works with that you haven't specifically helped a client apply for a plan through that carrier?
**A. Off the top of my head, I do not know.**
Q. Is there any carrier which you work with a majority of the time?
**A. No, not specifically.**
Q. Do you have any carriers that you prefer to work with?
**A. No.**
Q. How do the applications differ between the different carriers?
**A. How do -- the format and the look and the feel**



**of it.**
Q. Are there any carriers whose applications are substantially longer than the others?
**A. Not necessarily, no.**
Q. Any carriers whose applications are significantly shorter than the others?
**A. No.**
Q. Any carriers' application significantly more complicated or complex than others?
**A. No.**
Q. Fair to say they're basically the same aside from the formatting?
**A. Yes.**
MR. CLACK: Objection, form.
Q. What percentage of the applications you assist your clients with are for insurance coverage through Golden Rule Insurance Company or UnitedHealthcare?
**A. I don't have a specific number.**
Q. Would you agree that less than 10 percent of the applications you assist your clients with are through Golden Rule Insurance Company or UnitedHealthcare?
**A. I don't have a number specifically.**
Q. But, again, you -- you don't work with any specific carrier on a -- a majority of the time,



correct?
**A. No.**
Q. The applications for insurance normally contain a number of different coverage options you can select, correct?
**A. Correct.**
Q. And would you identify the plan you're looking for before or after looking at the application?
**A. Say -- say that again.**
Q. Sure. Let me rephrase it, actually.
So, earlier you stated the first step is to find out what's affordable for the client, correct?
**A. Yeah.**
Q. Second step, find out any kind of condition which may affect being able to apply for certain plans, correct?
**A. Yeah. I don't look at the -- I just have to figure out what they qualify for. So, I don't know until what they qualify for.**
Q. But you're getting a list of plans, and then you select one of those and get the application, correct?
**A. Correct.**
Q. So, when you're going over the application, itself, the plan that we're applying for has already



been selected and discussed with the client, correct?
**A. When -- say that again.**
Q. Sure. So, you select the plan with the client, and then you'll get the application and go over it with the client over the phone, correct?
**A. Well, I look for what's affordable, and I go over that to help them.**
Q. Yeah. I think we're missing each other just a little bit here. I -- what I'm really trying to discover is, would you be discussing, "Hey, I want the Elite Plus A, or I" --
"Do you want the Value Plan?" while you're going over the application, or has that already been determined by the time you get to the application, itself?
**A. I would determine what would fit their needs and price and what's included in those plans and what is not.**
Q. And that would be determined before you start going over the application, itself, with a client, correct?
**A. Correct. Yes.**
MS. PRIETO: Lance [sic], are -- are you at a good stopping point to take a ten-minute break?
MR. KACAL: If y'all need a ten-minute

break, I -- I'll always accommodate a break if you need it.

MS. PRIETO: I'm sorry, Nick. Thanks.

MR. KACAL: Of course. Ten minutes, guys? 11:20.

MR. CLACK: Sounds good.

THE REPORTER: Off the record at 11:11 a.m.

(RECESS FROM 11:11 A.M. TO 11:23 A.M.)

(WHEREUPON MR. COX LEFT THE PROCEEDINGS.)

THE REPORTER: Back on the record at 11:23 a.m.

Q. (By Mr. Kacal) Okay. Mr. Davis, you understand that you are still under oath just as you were before we took the break, correct?

**A. Yes.**

Q. And you intend to answer the questions truthfully here today, correct?

**A. Yes.**

Q. And when I left off before the break, I think we had been discussing what percentage of applications were to Golden Rule Insurance Company or UnitedHealthcare. What percentage of the applications you assist your clients with are for insurance coverage through ACA compliant or marketplace plans?

**A. I don't know the specific number.**



Q. Would you say that a majority of the plans you assist your clients with are ACA compliant?

**A. I, again, don't have a number of that specifically. So, I don't know. It varies --**

Q. Would there be -- go ahead.

**A. It varies depending on time of the year. So, I don't really -- I -- it just depends.**

Q. Would you say that you help more with ACA compliant plans or with short-term plans?

**A. There is really -- it just -- again, it varies. I can't say either.**

Q. About even; is that fair?

**A. You can -- again, I don't know specifically a number. So --**

Q. What are the differences in applying for ACA compliant plans versus short-term plans?

**A. The short-term plans have underwriting where you need to qualify for. The ACA plans are designed for if you're looking for long-term policies and plans that they want to go through through -- for -- yeah. One's long-term; one's short-term, basically.**

Q. Are the applications -- is the application process longer for a short-term policy?

**A. It -- it varies depending on states.**

Q. What factors would influence the amount of time



it would take to apply for a plan?

**A. Just the amount of time, maybe, the person has or I -- I mean -- and the applications are different here and there; but, again, it just depends on the individual.**

Q. Fair enough. Would -- would you say that the ACA compliant applications or the short-term policy applications are more complex?

**A. I can't gauge that because different age -- different people have different situations.**

Q. Is it fair to say that you normally present clients with ACA compliant coverage options when assisting them with obtaining coverage?

**A. It's not -- I -- it varies by situation.**

Q. What factors would influence the decision to present an ACA compliant plan to your client?

**A. Like, if they have health conditions, if they qualify for it with maybe a change in address, got married, adoption, those types of scenarios.**

Q. And so, when would you not present ACA compliant plan options?

**A. If they are looking for something really affordable or they don't have -- if they're outside of open enrollment and they don't have an SEP, like a special -- a special qualification. So, that's when I**



**would.**

THE REPORTER: That's what you're looking for? Is that what you said?

THE WITNESS: No. I said -- no. I said, "That's when I would."

THE REPORTER: Okay.

THE WITNESS: Sorry.

Q. (By Mr. Kacal) So, when you're assisting clients outside of the open enrollment period, normally you're -- you're not going to be presenting ACA options because they're not available at that time; is that correct?

**A. I will see if they qualify. And then -- if not, then we determine what policy then. We try to be in the best interest of the client.**

Q. And do you explain, "Hey, you're -- you don't qualify for an ACA compliant plan; so, we're going to give you these options?" Or do you discuss ACA compliance at all in those situations?

**A. If it's outside of open enrollment, we give them the option to see if they qualify. Sorry.**

Q. If they don't qualify, do you normally inform the clients, "Hey, you may qualify at a later date for an ACA compliant plan, but for now, here are your options"?

Page 61

**A. Case by case, and they're different. But if they're outside of open enrollment and they don't have an SEP, then, yes, I would go with a short-term program.**
Q. And you would discuss with them how that's not ACA compliant, correct?
**A. Yes, sir. Yes, sir.**
Q. And would you ever give them advice on when they may become eligible to get an ACA compliant plan?
**A. Advice such as?**
Q. Sure. You know, "Hey, right now you're not eligible, but you may become eligible for an ACA compliant plan if A, B, or C." Do you ever give that type of advice to your clients?
**A. I would go over it at the beginning and then also let them know when open enrollment would be that specific year.**
Q. You would reach out to them and let them know, "Hey, it's open enrollment"?
**A. No, sir. I -- that -- that's just not possible to reach out to all my current clients that have plans at that time.**
Q. Okay. Were you ever required to record your phone calls with your clients?
**A. No.**
Q. You've never recorded a phone call with a

Page 62

client?
**A. No, not from my personal -- no, sir.**
Q. Have other agents you've worked with needed to record phone conversations with clients in the past?
**A. They do a voice verification in the office.**
Q. Explain that process.
**A. It would be to go over the application on different policies to do the -- to -- to go over the questions of the policy with the client if they weren't able to sign it electronically.**
Q. So, you're saying --
**A. So, if they --**
Q. Go ahead.
**A. Sorry. If they didn't have the means to sign it electronically, then they'd do the voice verification for that client and go over the policy.**
Q. So, in situations where a client isn't able to e-sign an application, you perform something known as a voice verification, and that would involve recording the process of prepopulating the application for the client. And then a signature is not needed; is that correct?
MR. CLACK: Objection, form.
**A. It is -- it varies by policy.**
Q. Well, kind of explain to me what's involved in the voice verification process. What do you -- what do

Page 63

you mean by "voice verification"?
**A. That is not my department. I don't do the voice verifications, myself.**
Q. Okay. So, you've never performed a voice verification, correct?
**A. No, sir.**
Q. And you work remotely. Have you ever had a client sign an application in person?
**A. No, sir.**
Q. So, all the applications you've assisted your clients with would have been e-signed; fair to say?
**A. E-signed --**
THE REPORTER: I'm sorry. You cut out on me. Can you repeat the question?
Q. Let me repeat the question. All of the applications you've assisted your clients with in the past --
THE REPORTER: I'm sorry. It's still frozen. Don't talk right now. Can you repeat it again? I'm sorry. My internet is not good.
MR. KACAL: Am I coming through clearly, guys, or just let me know.
THE REPORTER: Okay. Right now -- yes, go ahead.
MR. KACAL: Good to go? Okay.

Page 64

Q. (By Mr. Kacal) All right. All the applications you've assisted your clients with in the past have all been e-signed, correct?
**A. Or I will transfer them to do the voice verification if they're not able to do the electronic signature.**
Q. And would that necessitate repeating the process of going through the questions, or would you determine that a voice verification would be needed prior --
THE REPORTER: I'm sorry. I may need to get off and come back on or something because it keeps cutting out. I'm sorry.
MR. KACAL: Let -- let's take five, see if we can fix it, and we'll come back. Fair enough?
THE REPORTER: Yes. Off the record at 11:33 a.m.
(RECESS FROM 11:33 A.M. TO 11:38 A.M.)
THE REPORTER: Okay. Back on the record at 11:38 a.m.
Q. (By Mr. Kacal) Mr. Davis, you understand that you're still under oath just as you were before the break, correct?
**A. Yep.**
Q. Okay. And you intend to tell the truth here to

Page 65

the questions posited today, correct?
**A. Yes.**
Q. And before we went on break, I think I was trying to get an understanding of the voice verification or recording process at Tobias & Associates. You stated that sometimes client phone calls are recorded, but they would not be recorded by you. That would be done at a separate department, correct?
**A. Correct.**
Q. And what -- what's the name of that department?
**A. The verification department.**
Q. Do you know who's in charge of that department?
**A. I do not.**
Q. How often are your calls transferred to the verification department?
**A. It varies. I don't have the number.**
Q. I'm just trying to get a feel of whether that's something that regularly happens or if that's a rare occurrence.
**A. It -- it just -- it depends on the -- the client, if they're able to, you know, log into a computer and review the application on their -- their own. So --**
Q. And I think I was asking prior to the break whether or not -- if a voice verification was needed,

Page 66

would that restart the process of going through the insurance application?
**A. It wouldn't restart it. It would just -- I don't know what you mean by that.**
Q. Sure. So --
**A. Could you ask it again?**
Q. Let me -- let me rephrase the question. You stated that, if a customer is unable to e-sign an application, then a voice verification needs to be completed, correct?
**A. (Witness nods.)**
Q. And --
**A. Correct.**
Q. -- would you determine whether a client was able to e-sign an application before or after you prepopulate an application for that client?
**A. It would be -- I mean, it varies because sometimes maybe their internet would be bad or -- so, it just -- it varies. I can't determine.**
Q. But there may be a situation where you're assisting the client, prepopulating the application. You discover they're not able to e-sign. So, they need to start the process over in a voice verification and have all the questions asked or recorded live, correct?
**A. Correct.**

Page 67

Q. And how does the voice verification process work? Is there ever a signature on the application, or does the voice verification serve as the signature?
**A. They've varied from different policies; so, I'm not 100 percent sure because I'm not in that department.**
Q. But you would not be on any of these voice verifications because you never do that. It's a separate department, correct?
**A. Correct.**
Q. And Mr. Davis, what is a product brochure in relation to an insurance policy?
**A. It outlines the policy: the policy exclusions, the policy benefits, contact numbers, and such.**
Q. How does that differ from the policy, itself?
**A. It would encompass all of that within there, I believe, with that plan depending on the carrier.**
Q. So, a product brochure is basically an outline of what's contained in the policy without it being an official policy contract, correct?
**A. I can't answer that because I don't know if it's a contract or not, depending. I mean, I don't know what you mean by -- it's a brochure; so, it's not a contract.**
Q. Sure. And when -- the product brochure would contain all the terms and exclusions that are contained

Page 68

in a policy or plan, correct?
**A. The -- they should. But it varies by, like, carrier. So, some -- well, most do, yes.**
Q. And you know, there's a couple of questions I'd like to ask about your background that I think I skipped over earlier. I think I saw that you're wearing a wedding ring. Are you married?
**A. Yes.**
Q. How long have you been married?
**A. Put me on the spot. It will be 13 years now. Yeah.**
Q. And then, what's your wife's name or partner's name?
**A. Amanda.**
Q. And do you have any children?
**A. Yes.**
Q. How many children do you have?
**A. Two.**
Q. What are their names?
**A. Is that relevant or --**
Q. Please.
**A. I'm sorry. What did you say?**
Q. Yeah. I'm just trying to get -- and you can just leave it at first names. What are the first names of your children?

**A. Bryce and Kayla.**
Q. Bryce and Kayla?
**A. Yeah.**
Q. How old are they?
**A. 22 and 13.**
Q. Bryce is 22; Kayla 13?
**A. No. Other way.**
Q. Have you ever assisted Kayla with getting insurance?
**A. You -- you cut out. I'm sorry. You're frozen.**
Q. Is Kayla on your insurance plan, or does she have her own insurance?
**A. She has her own insurance.**
Q. Did you assist her with obtaining insurance?
**A. No.**
Q. I'd like to ask a couple of questions about the training you received at Tobias. Earlier you said you spent somewhere around a year as a trainee when you first got hired, correct?
**A. Correct.**
Q. And most of the training you received was daily training or shadowing type activities, correct?
**A. Correct.**
Q. Have you ever had any formal training with Tobias & Associates?



**A. Define "formal."**
Q. Any kind of, like, week-long classes or, "Here's a module online you need to complete"?
**A. I don't recall exact training. It's been so long.**
Q. Do you have any type of annual training there at Tobias?
**A. Product -- maybe product changes and whatnot.**
Q. And that would just be going over, "Hey, these policies -- or these products are no longer available," or, "Here's the modifications in these products we were selling previously." Is that correct?
**A. Yes.**
Q. And earlier you stated that you hold the Health and Life 2-15 license, correct?
**A. Yes.**
Q. Is there any type of an annual recertification related to that license?
**A. Yeah. We have to do continuing education.**
Q. How often do you have to do that?
**A. It's every two years.**
Q. What's all involved in that recertification process?
**A. It varies depending on the questions that -- it's just medical -- well, it's not medical. It's just**



**insurance questions pertaining to licensing and whatnot.**
Q. And are those classes that you need to attend, or what does the continuing education consist of?
**A. No. It's an online link. You just -- you fill out the forms and do the application -- or do the continuing education.**
Q. Is it, like, an online module with -- that presents you with information and then asks you questions about that information?
**A. Yes.**
Q. And then you just need to submit an application for recertification; is that correct?
**A. Yes.**
Q. How many hours of continuing education are you required to receive every two years?
**A. I don't know the exact number.**
Q. Would you say it's more than 50 hours every two years?
**A. Honestly, I don't know.**
**(DOGS BARKING.)**
**A. No. I don't think it's 50. I'm sorry. My dogs are barking. I apologize.**
Q. I've been there, Mr. Davis. It's quite all right.
And so, just to clarify, we have the



continuing education and recertification every two years related to your license, but no annual training from Tobias & Associates; is that correct?
**A. Correct.**
Q. After being promoted to an insurance agent, did you receive additional training from Tobias & Associates?
**A. I don't recall. It was a long time ago.**
Q. Do you receive regular training now in your role at Tobias & Associates?
**A. Again, product knowledge, different products.**
Q. How often do y'all go over product changes?
**A. As needed.**
Q. Have you ever received any training related to how and when to reach out to prior clients regarding insurance coverage?
**A. That's not a training thing; so, no.**
Q. Has anyone at Tobias & Associates ever said, "Hey, here's what you're allowed to do when contacting clients"?
**A. No.**
Q. Has anyone ever said, "Hey, here's what you should not do when contacting clients"?
**A. I don't -- it's -- well, not a training. It's just general knowledge of being an insurance agent.**

Q. Sure. And has anyone at Tobias & Associates ever, whether it's formal training or not, come to you and said, "Hey, when we're contacting clients, here's a list of things we don't do"?
**A. Nothing specific.**
Q. Are you authorized to make representations regarding potential insurance policies to your clients?
**A. I'm not sure what you mean by that question.**
Q. Sure. Yeah. Are you authorized to say, "This coverage option has preexisting -- or preexisting condition exclusions"? Or, "This policy is a short-term policy"? Or, "This policy is termed at 184 days"?
Can you make representations regarding a potential insurance policy when you're applying for that policy with the client?
**A. You let the client know about the plan specific. It just varies policy by policy.**
Q. And you -- that's a normal course of your business, right? You regularly explain, "Hey, this is the type of policy that you're applying for," things like that, correct?
**A. Yes.**
Q. Have you ever seen -- received training related to explaining coverage options to clients?
**A. Coverage options? It's -- there's -- I don't**



**know what you mean by that. The training for coverage options?**
Q. Sure. Have you ever had a training where -- from Tobias & Associates where they discussed, "Hey, here's how to discuss different coverage plans with your clients"?
**A. We did -- there's been no specific training for that, no.**
Q. Fair enough to say it's an on-the-job training where you're watching your fellow insurance agents and learning on the job; is that correct?
**A. No. I've been in the industry -- I've been doing this for a long time. I've had lots of training, and continually I'm learning things. So, it's depending, like I said, on an as-needed basis, the new stuff. So, I can't --**
Q. Sure. The -- but there's no written policy or handbook that you've been given saying, "Here's how we discuss coverage options with clients"; is that correct?
**A. I don't know that there's anything specific to coverage options.**
Q. What about specific to explaining policy exclusions?
**A. Yeah. That's my job, to explain the policy exclusions and let the client know.**



Q. And have you ever received, like, a handbook or a written policy from Tobias on how to explain policy exclusions?
**A. No, because policies differ.**
Q. So, there's no written policy from Tobias on how to do that, correct?
**A. It varies from client to client or -- or insurance to insurance.**
Q. Would there be any type of written materials from the insurance carriers, themselves, that say, "Hey, here's how to explain the policy exclusions in this policy"?
**A. It would be sent in the application to the client when they go over it and do the signature.**
Q. And so, at Tobias & Associates, your role in explaining the policy exclusions consists solely of, "Here's the information that's contained in the application. I'm conveying that information to you." Is that correct?
**A. I read the -- let them know the exclusions of the policy. Policy to policy, insurer to insurer, they vary. So, if it's an ACA plan, if it's a short-term policy, if it's a -- yeah, one of those two.**
Q. Do you go over each exclusion while you're doing the application process with your clients?



**A. Yes. We read the application.**
Q. Aside from the language that's contained in the application, itself, do you ever discuss the possible effects of a preexisting condition exclusion or other type of exclusion with a client?
**A. We let the client know that with the policy -- they exclude preexisting conditions on short-term policies.**
Q. And outside of the language that's inside the application, itself, would you give any additional information about the effects of those types of exclusions?
**A. No, because it -- what do you mean, "the effects"? I don't know.**
Q. Sure. How the -- that exclusion may apply to the client --
**A. It would exclude --**
Q. -- in regards to their specific situation.
**A. -- any -- we would --**
THE REPORTER: I'm sorry.
**A. -- let them know that.**
THE REPORTER: What was the end of the question?
MR. KACAL: I believe the end of the question was, and how it applies to the client's

specific situation.
THE REPORTER: The answer?
THE WITNESS: It's cutting out on your end. I'm sorry.
Q. Let me -- let me reask the question. So --
**A. Yeah, because I -- it cut out. I apologize.**
Q. Outside of the language that's contained in the application, itself, do you ever explain how an exclusion may affect the client's specific situation?
**A. If they tell me they have a preexisting condition, I let them know the preexisting condition will not be covered. And we find a specific policy that would have coverage for them. We're always looking out for the client.**
Q. And have you ever received any training from Tobias & Associates regarding renewal -- renewing policies versus obtaining a new policy and how that -- how that's communicated to the client?
**A. It just depends on the policy, itself. Some policies, like dental, would renew. Accident policies renew. Then you reapply for the other short terms. It just depends on the policies, itself.**
Q. Are short-term policies able to be renewed, any of them?
**A. They reapply for them.**



Q. But it's your understanding that short-term policies can't be renewed, correct?
**A. If they're able to get another term of the policy that they're on. It wouldn't be that same exact deductible, no. It wouldn't be -- but it would be the same carrier and the same plan.**
Q. What is your understanding of the difference between a renewal of a policy and obtaining a new insurance policy?
**A. Well, if you renew it, it just gets on that plan to renew the policy. I don't -- if you reapply, you have to reapply for a short-term plan. So --**
Q. Is it your understanding that you don't need to reapply for a renewal?
**A. You have to reapply for any insurance policy.**
Q. So, you would be reapplying whether or not you're obtaining a new policy or you're renewing your old policy, correct?
**A. You would have to reapply for the -- the policy, yes.**
Q. Is there any difference between renewing a policy and obtaining a new policy?
**A. If you're -- you're reapplying for the short-term policy to get back on the same policy or the same type of policy, you won't be getting that specific plan. It's -- the deductible starts over and whatnot.**



Q. I guess -- I think we're missing each other just a little bit on the question. I'm trying to understand if -- if there's any difference between a renewal of a policy and obtaining a new policy. Would a renewal simply be the obtaining of a new policy, or is renewing a policy different from obtaining a new policy?
**A. Well, you can renew plans. Like, a dental plan, you can renew, if you want to renew your accident plan. So, I mean, it just really depends on the -- the policy, itself.**
Q. So, there could be a difference between the renewal of a policy and obtaining a new policy, correct?
**A. Well, obtaining a new policy is obtaining a new policy.**
Q. Uh-huh.
**A. So, I don't --**
Q. So, would a renewal mean that you still have the same policy; the term is just extended?
**A. It would -- no. It would just mean the same -- it depend -- it depends on the insurance, itself. Again, we -- we have many different plans. So, they vary. Like I said, if it's the dental plan; it's medical; it's something --**
Q. Could a renewal of a policy mean that the



policy is -- the policy term is simply extended; is that what a renewal --
**A. No --**
Q. -- could be?
**A. -- because it wouldn't be the same plan. You'd -- you'd have to -- it depends on if it's a dental or medical or accident. It just depends. So, the terminology will vary.**
Q. So, the -- the term "renewal" may vary depending on the type of insurance policy being applied for, correct?
**A. Correct.**
Q. And have you ever had any training on explaining the difference between a renewal and obtaining a new policy?
**A. There's been no specific training on that, no, sir.**
Q. Have you ever obtained an employee handbook from Tobias?
**A. Yes.**
Q. Does that handbook have Tobias' workplace policies?
**A. I don't know. I'm sure it -- I don't -- I haven't had one in -- or seen mine in a while. So --**
Q. But you've read one in the past, correct?

**A. Yes.**
Q. Do you remember whether or not they discuss Tobias' policy on dealing with clients?
**A. I don't recall.**
Q. Fair to say that outside of your daily, day-to-day training, you haven't received or you don't remember receiving any type of written policies on how and when to interact with Tobias' clients, correct?
**A. There's been no training on that, no.**
Q. Well, I'm asking for written policies. Let me rephrase.
So, if I were to try to determine what Tobias & Associates' policies were regarding interacting with clients, is there any type of written materials that I could --
**A. No. Oh, sorry to cut you off. Sorry to cut you off.**
Q. You answered the question. So, there's -- there's no written materials to explain that process to the insurance agents and the employees at Tobias & Associates, correct?
**A. Not that I recall.**
Q. That type of information would be communicated in day-to-day training or while shadowing an insurance agent, correct?



**A. Yes.**
Q. Did you guys receive training regarding the Affordable Care Act?
**A. Yes.**
Q. What type of training did you receive regarding the Affordable Care Act?
**A. It just depends on the -- the policies change. So, the state mandates change. It varies from time to time.**
Q. Were you working for Tobias & Associates when the Affordable Care Act was implemented?
**A. Yes.**
Q. Was that a big deal at Tobias & Associates?
**A. I'd assume it was a big deal for everyone in the insurance industry.**
Q. And did Tobias & Associates set up any type of, "Hey, we all need to go to a class and discuss how the ACA is going to affect our business going forward," anything like that?
**A. There was no specific group class if -- no.**
Q. Did they issue any type of materials or -- explaining the ACA and its effects on y'all's business?
**A. Yes.**
Q. What type of materials? E-mails? Handbooks?
**A. Possibly handouts. It depends. It was a**



**little while ago. I don't recall.**
Q. You haven't received any recent materials regarding the ACA, though, correct?
**A. Nothing recent, no.**
Q. Did those handouts contain advice on how to explain the ACA changes to your clients?
**A. I don't recall the exact literature. I apologize.**
Q. Did you have any discussions with your supervisor about how to explain the ACA changes to your clients?
**A. None that -- I don't have any specifics; so, I can't really -- I don't recall.**
Q. Fair to say that, from what you remember, your training from Tobias & Associates related to ACA consisted of a couple of handouts? Fair to say?
**A. No.**
Q. What else did it involve?
**A. We would go over the policies, the plan difference, and whatnot. It wouldn't be -- it wasn't just handouts. We'd have meetings.**
Q. When you say -- when you say "we," who is "we"?
**A. It varies depending on what group you were in. So, they do at different times go over the plans and what changes.**



Q. So, y'all would have meetings to kind of discuss the handouts and -- and the changes in the business related to ACA?
**A. Correct.**
Q. And you said you haven't had any of those meetings recently, correct?
**A. I'd have -- I don't recall any recent ones, no.**
Q. Okay. What type of plans are ACA compliant?
**A. The -- like, Obamacare through healthcare.gov policies.**
Q. And -- and what types of plans wouldn't be ACA compliant?
**A. You said "would not"?**
Q. Would not be ACA compliant.
**A. Anything that's not through the Affordable Care Act.**
Q. Well, the short-term policies are not ACA compliant, correct?
**A. Correct.**
Q. Are there any other types of policies aside from short-term policies that you sell or you assist your clients with that aren't ACA compliant?
THE REPORTER: That aren't?
**A. There is limited --**
THE WITNESS: Oh, sorry. Yeah. Go ahead,

Page 85

ma'am. Sorry.
THE REPORTER: I'm sorry. That are or are not?
MR. KACAL: That are not ACA compliant.
**A. There's limited medical policies that are not.**
Q. And I think I saw some materials earlier in this case that one type of policy would be a limited medical indemnity plan; is that correct? Is that what you mean when you referred to limited medical?
**A. Yes.**
Q. What's the difference between a short-term plan and a limited medical indemnity plan?
**A. The limited medical indemnity plan is designed for people who won't qualify for an ACA plan or a short-term policy, designed to help insure, provide coverage, for clients that don't qualify for either of those.**
Q. What types of factors would preclude a client from qualifying for a short-term policy?
**A. They vary by the character -- or vary by the carrier. So, it depends. Preexisting medical conditions.**
Q. So, a client who has a preexisting medical condition wouldn't qualify for a short-term plan; is that correct?

Page 86

**A. It would depend on the -- carrier specific. That's why they put the application in, and they go through underwriting with the company, itself, after they fill out the application.**
Q. So, there are some short-term plans where an individual with preexisting conditions would qualify, some short-term plans where they wouldn't qualify, correct?
**A. Preexisting conditions will not be covered by them, but they still will qualify.**
Q. And the limited medical indemnity plan, are there qualification factors for those? Or that's the last stop, and everybody qualifies for one of those?
**A. Those as well vary. It really just depends on the individual. It's an individual basis.**
Q. Are there situations where an individual simply couldn't be covered by an ACA compliant, short-term, or limited medical indemnity plan?
**A. Not that I've came along. There's a policy typically they can find that could provide some sort of coverage in some way, shape, or form for clients.**
Q. Would you agree that it's important to discuss and explain the difference between an ACA compliant plan and a non-ACA compliant plan with individuals who have preexisting conditions?

Page 87

**A. Of course.**
Q. How often do you have those types of discussions with your clients?
**A. It's a day by day. It varies. It just depends.**
Q. But you do that regularly in your role at Tobias, correct?
**A. Yes. Correct.**
Q. I'd like to ask you a couple of questions about your relationship with Golden Rule Insurance Company, okay?
**A. Okay.**
Q. You're not an employee of Golden Rule Insurance Company, correct?
**A. Correct.**
Q. How would you define your relationship with Golden Rule Insurance Company?
**A. I -- I sell the -- the policies.**
Q. Do you have any kind of contractual relationship between yourself and Golden Rule Insurance Company?
**A. I have to be contracted to sell a policy with Golden Rule.**
Q. Have you ever received any training from Golden Rule Insurance Company?

Page 88

**A. No.**
MR. CLACK: Objection, form.
THE WITNESS: Sorry.
Q. (By Mr. Kacal) Earlier you stated you have a contractual relationship with Golden Rule Insurance Company, correct?
**A. What is that?**
Q. Earlier you stated you had a contractual relationship with Golden Rule Insurance Company, correct?
**A. We have to be approved by them to write a policy under them.**
Q. And do you have that type of agreement with all the insurance carriers that you work with?
**A. Yes.**
Q. And earlier you stated y'all work with about ten, give or take a few, different carriers; is that correct?
**A. Yes. Sorry if I'm --**
Q. What's the --
**A. Sorry if I'm answering too fast. Sorry. Sorry.**
Q. What all is involved in the process of obtaining that authorization from the carrier?
**A. I do not know. We have a department that**

**handles that.**
Q. So, there are staff members at Tobias & Associates who obtain authorization for all the agents with the different carriers; is that correct?
**A. Correct.**
Q. Are you considered an independent agent for Golden Rule Insurance Company?
**A. Yes.**
Q. I'd like to show you a document. Give me one second to grab it and try to share it on my screen.
Are you able to see a document, Mr. Davis?
**A. Yeah.**
Q. Have you seen this document before? And I'll scroll through it. Let me -- allow me to go through it before you answer.
Have you ever seen this document before?
**A. A long time ago. Pretty sure. I honestly can't recall.**
MR. KACAL: Actually, let me -- let me take -- I may have to take a quick break. Can we go off the record?
THE REPORTER: Off the record at 12:15 p.m.
(RECESS FROM 12:15 P.M. TO 12:24 P.M.)
THE REPORTER: Back on the record at 12:24 p.m.



Q. (By Mr. Kacal) And Mr. Davis, you understand that you are still under oath just as you were before we took the break, correct?
**A. Yep. Yes.**
Q. And you intend to answer the questions we posit here today truthfully, correct?
**A. Yes.**
Q. And before the break I think that we were looking at a document, and I'm going to try to share that document once again.
Are you able to see this document? And I'm going to try --
**A. As good as -- yeah, as good as I can. It's good. You're fine.**
Q. Okay. Awesome. So, have you ever seen this document before?
**A. When I signed up for -- or for the licensing and got approved for different states.**
Q. And is this an agreement between yourself and UnitedHealthcare Life Insurance Company?
**A. I believe that's what it states. Yeah.**
Q. Do you remember entering into this agreement?
**A. Honestly, it's been a while. So, I remember I did at some point.**
Q. And there were staff at Tobias & Associates who



helped you obtain this agreement, correct?
**A. Yes.**
Q. I'd like to draw your attention down to the second page of this agreement. Right here, do you see the portion of the page where it starts 1.2?
**A. Yeah.**
Q. Can you read that section for me?
**A. 1.2, you want me to read that?**
Q. Yes, please.
**A. You're going to have to zoom in. I can't -- that's small on my end. Again, I apologize.**
Q. Is that better?
**A. Yeah. It says, "You are an independent contractor relative to the Company. Although this Contract entitles you to submit Insurance Product applications to the Company on behalf of your Clients, you shall not represent or imply to anyone that you act on behalf of the Company, except as expressly set forth in this Contract."**
Q. And so, your relationship with Golden Rule Insurance Company would be that you are an independent contractor for them, correct?
**A. Yes.**
Q. I'd like to scroll down to the next section here. Can you read this section that starts 1.3?



**A. "Unauthorized Acts. Subject to your general authority under Section 1.1 herein, you are prohibited from engaging in any act that: (1) [that] we expressly prohibit in this Section 1.3; or (2) is not reasonably necessary for you to exercise your authority or perform your duties under this Contract. You are prohibited from: incurring any debt or obligation" --**
Q. Let's -- let's stop there. So -- thank you. Would you agree that this contract between yourself and United prohibits you from certain things when interacting with clients? Is that correct?
**A. I don't know. What do you mean by --**
Q. What do you --
**A. You said "certain things." So, that could be anything. So --**
Q. Sure. Would you agree that this section is listing out actions you're prohibited from performing?
**A. Yes. That has actions I'm prohibited from performing, yeah.**
Q. Let me scroll down. And in this section where it's listing actions you're prohibited from performing, it lists Item J, correct?
**A. Okay.**
Q. I'm sorry. I couldn't hear you. Could you repeat your answer?

Page 93

**A. Yeah. You asked me if I saw it. I said yeah.**
Q. Okay. And -- and in Exhibit -- or on -- on Bullet Point J, it says that you're prohibited from engaging in unfair and deceptive practices in violation of federal or state laws, correct?
**A. Correct.**
Q. And it goes on to state that you're prohibited from practices which "include, but are not limited to, submitting applications for Insurance Products that are unsuitable or not in the best interest of your Client(s)," correct?
**A. Correct. Correct. Sorry.**
Q. And you would agree you have an obligation to obtain products that are in the best interest of your clients, correct?
**A. Obtain products? You mean --**
Q. Let me rephrase. Would you agree that you have an obligation to submit applications for insurance products that are suitable and in the best interests of your clients?
**A. Yes.**
MR. CLACK: Objection, form.
MS. PRIETO: Same objection.
Q. (By Mr. Kacal) And let me scroll down a little farther on this page. There's a section on the fourth

Page 94

page of this document that starts with, "While you are free.. ," correct?
**A. Okay. Yes.**
Q. Can you read -- can you read that section including the bullets points below?
**A. "While you are free to give your Clients good, honest advice, you are...not authorized, under any circumstances, to obligate or bind the Company in any manner, such as issuing binders; performing field underwriting or determining eligibility; or offering personal assurances concerning issues of underwriting, claim resolution; or coverage."**
Q. And so --
THE REPORTER: Oh, no. Y'all froze on me again. I'm sorry. I'm not hearing --
Q. You're prohibited from giving --
THE REPORTER: I'm sorry. I'm not hearing any of that. Give it just a second. It still says unstable. But I lost him as he was reading.
Okay. Can you repeat the -- what you read, Mr. Davis?
**A. "While you are free to give your Clients good, honest advice, you are not...authorized, under any circumstances, to obligate or bind the Company in any manner, such as issuing binders; performing field**

Page 95

**underwriting or determining eligibility; or offering personal assurances concerning issues of underwriting, claim resolution; and coverage." Excuse me.**
Q. And so, you would agree that you're prohibited from determining eligibility by way of this contract, correct?
**A. Correct.**
Q. And you would agree that you are authorized to give good, honest advice to your clients, correct?
**A. Correct.**
Q. And then, I may come back to this in a moment, but I'd like to ask you a couple of questions about your compensation structure at Tobias. How are you paid as an employee of Tobias & Associates?
**A. It -- it's -- basically it depends on the policy.**
Q. Do you receive a salary, or are you paid per hour at all?
**A. No. It's a draw versus commission.**
Q. So, your compensation is based exclusively on commissions and bonuses, correct?
**A. No, because I have an hourly.**
Q. So, you do have an hourly pay rate at Tobias?
**A. It's -- it's a draw. So, it's, like, whatever -- if I don't have any -- I make commissions on**

Page 96

**the insurance policies, correct.**
Q. Do you get paid per hour?
**A. It's not an hourly pay, no. I'm an independent.**
Q. So, I'm just -- I'm trying to confirm whether or not you have a salary or if you have any hourly pay.
**A. No. No salary -- no hourly pay. But it's a weekly draw, a certain amount each week.**
Q. What does that mean exactly, "a weekly draw"?
**A. A weekly amount that I make.**
Q. Is that amount determined by any factors, or does that amount stay constant week by week?
**A. It's constant week by week.**
Q. Is it updated annually?
**A. No, not that I've known.**
Q. You've received the same amount for each weekly draw since you've been promoted to an insurance agent at Tobias & Associates?
**A. As far as I can remember, yes.**
Q. What's the amount of your weekly draw?
**A. It is 600.**
Q. And do all insurance agents at Tobias & Associates receive a 600-dollar weekly draw?
**A. I don't know anyone else's pay.**
Q. I'm sorry. Can you repeat that? I didn't hear

Page 97

you.
**A. I do not know anyone else's pay.**
Q. But you've received $600 per week from Tobias & Associates in weekly draws for at least the last five years, correct?
**A. Correct.**
Q. And on top of a weekly draw, are you paid any additional sums by Tobias & Associates?
**A. It's commission.**
Q. And that's paid by Tobias?
**A. Yes.**
Q. Do you also receive commissions from insurance carriers?
**A. No.**
Q. Do you ever receive any types of bonuses?
**A. No.**
Q. So, your compensation is based exclusively on weekly draws and commissions, correct?
**A. Yes.**
Q. And both of those are paid by Tobias & Associates, correct?
**A. Yes.**
Q. What determines the amount of commission payments?
**A. It varies.**

Page 98

Q. Based on what?
**A. Plan, by carrier. It's -- the different -- it varies for each carrier.**
Q. Would the term of a policy obtained affect the amount of the commission?
**A. No.**
Q. Would the amount of premiums for that policy affect the amount of commission?
**A. Yes.**
Q. Would the type of coverage provided affect the amount of the commission?
**A. Define "type of coverage."**
Q. Sure. Would you receive a different commission percentage between an ACA compliant plan and a short-term plan?
**A. No, not that -- there again, it varies on carriers because different carriers pay different percentages.**
Q. Okay. Within the same carrier, has there been any situations where you would get a different percentage for helping a client obtain an ACA compliant plan versus a short-term plan?
**A. No.**
MR. CLACK: Objection, form.
Q. Within the same carrier, would there be a

Page 99

difference in commission percentage for you whether or not the plan obtained was a short-term policy or a limited medical indemnity plan?
**A. No.**
Q. So, the commission percentage varies solely on which carrier is issuing the policy; is that correct?
**A. Correct.**
Q. And the commission amount is that percentage of premiums collected on the policy; is that correct?
**A. Correct.**
Q. And you said the different carriers have a different commission percentage; is that correct?
**A. Correct.**
Q. Which carrier offers the lowest commission percentage to agents?
**A. I honestly do not know.**
Q. Which carrier provides the highest commission percentage for agents?
**A. I right now do not have an idea of the highest commission.**
Q. Are they relatively the same?
**A. Yes.**
Q. What is the average percentage you receive on a commission?
**A. There's no specific average.**

Page 100

Q. Would there be any situation where your commission would be higher than 25 percent of the premiums collected on a policy?
**A. Not typically. I don't -- again, it -- it varies, honestly.**
Q. About how much do you make in commissions each year?
**A. They vary due to -- year to year with --**
Q. How often do you receive commission payments?
**A. Weekly.**
Q. Would that be one payment comprised of multiple commission payments?
**A. Yes.**
Q. So, you would be issued your weekly draw and the commissions for the week at the same time; is that correct?
**A. Yes.**
Q. And who keeps track of these commission payments?
**A. The billing department.**
Q. Do you -- are -- do you have any obligation of submitting, "Hey, here's the premiums for this policy; here's the percentage for this carrier. Please hold my commission payment in this amount"? Or is that all handled by HR?

Page 101

**A. I have no part of that.**
Q. Okay. Do you know how much you made in commission payments in 2021?
**A. I do not.**
Q. Do you know how much your gross earnings were in 2021?
**A. I do not.**
Q. Do you believe you made over $100,000 in 2021?
**A. I did not.**
Q. And would you say 2021 was an average year for your commissions?
**A. I can't answer that due to the fact that COVID screwed up everything. So, I have no idea to where -- what to gauge what off of. So, I cannot answer that.**
Q. Fair enough. Fair enough. I'm going to go back to this document we were looking at just a moment ago which I'll have marked as Exhibit 2. Give me one moment.
(DAVIS EXHIBIT 2 MARKED.)
Q. Are you able to see the Exhibit 2 that we were looking at earlier?
**A. Yes.**
Q. I am going to scroll down to 3.1 here. Can you -- can you see Section 3.1 on the screen?
**A. Yes.**

Page 102

Q. So, Section 3.1 states, "...we will pay commissions to you on Issued Business in accordance with and subject to the Commission Schedules in effect," correct?
**A. Yes.**
Q. Have you seen the commission schedules from UnitedHealthcare?
**A. I don't recall.**
Q. Do you know whether these commission schedules are updated regularly?
**A. I do not know.**
Q. You don't remember looking at the commission schedule that determines the amount of money you make on commissions with GRIC?
**A. I do not.**
Q. Do you ever go back to verify that you've received the correct commission payment?
**A. No.**
Q. Do you -- would you be able to obtain a copy of the commission schedule?
**A. I don't have access to that that I know of.**
Q. Let me scroll just a bit. And I'm trying to find a specific sentence. However, I don't seem to see it right now. So, I may come back to that later.
But to your knowledge, you don't have a

Page 103

copy of the commission schedule. You're not sure if you can obtain a copy; is that correct?
**A. Correct.**
Q. And you receive commission payments from all the carriers you work with at Tobias, correct?
**A. Correct.**
Q. And would you say you make more based on weekly draws or commissions?
**A. It varies.**
Q. And earlier you said that the commission percentage wouldn't vary based on whether it was an ACA compliant plan or a short-term plan or a limited medical indemnity plan, correct?
**A. Well, they'd vary with those types of plans. Just -- I don't know them specifically.**
Q. Do you know which type of plan would provide the highest commission percentage?
**A. I do not.**
Q. I'm going to show you another document that I'll mark as Exhibit 3.
(DAVIS EXHIBIT 3 MARKED.)
Q. Are you able to see this document, Mr. Davis?
**A. Yes.**
Q. Have you ever seen this document before?
**A. Yeah. It's an application for**

Page 104

**UnitedHealthcare.**
Q. I'd like to scroll down to the second page of this Exhibit 3. Here it shows a list of different coverage options or -- or plans, correct?
**A. Yes.**
Q. What are the differences between these plans shown on this application?
**A. As far as what? What would you want to know the differences in?**
Q. Well, I see that there are differences in the percentage paid and the deductible. Aside from the percentage paid and the deductible, what's the difference between these plans?
**A. Some of them -- a couple of them will have doctor visits co-pays, and a couple of them will have more overall coverage. It just depends on which one.**
Q. When you say they "will have more overall coverage," what does that mean exactly?
**A. Like, the A has $2 million of coverage for the policy; whereas, the regular one without the A is just typically $1 million of coverage max.**
Q. Would you receive a different commission percentage based on which one of these plans was selected?
**A. No.**

Q. Have you seen this specific application before?
**A. The Golden Rule Insurance application?**
Q. For Michael Brewer dated --
**A. I don't recall, honestly. I see lots of applications.**
Q. Do you have any records that would show how much you were paid in commissions in 2021?
**A. I don't know.**
Q. Do you believe Tobias may have that information?
**A. He could, yeah.**
Q. Are you ever required to return a commission payment?
**A. No, not that I -- honestly, I don't recall that part.**
Q. Do you recall ever having to return a commission payment?
**A. No.**
Q. And you don't recall whether or not you may be required to do so under certain circumstances or not, correct?
**A. Correct.**
Q. And earlier you stated you don't receive any types of bonuses, correct?
**A. Correct.**



Q. Aside from the weekly draw and the commissions, are there any other benefits that are provided by Tobias & Associates?
**A. No.**
Q. I am going to bring up Exhibit No. 3 once again. And earlier you stated that you weren't sure whether or not you'd seen this specific application in the past, correct?
**A. Correct.**
Q. Have -- are you familiar with who Michael Brewer is?
**A. Only because of that name there.**
Q. Do you know whether or not you assisted Michael Brewer with this application? And I can -- I can go down to the date if that helps.
**A. You just passed it. I think I just saw --**
Q. I believe it was signed June 9th, 2021. Do you see that?
**A. Yes. I honestly do not recall.**
Q. Okay. So, you are unsure whether or not you assisted Michael Brewer with the June 9th, 2021, application, correct?
**A. I don't remember that far back, honestly.**
Q. Would you have any records which would show whether or not you assisted with this specific policy application?
**A. None currently on me, no. I don't have any.**
Q. Would Tobias have any type of records which would show which applications you assisted with?
**A. Yes.**
Q. Do you know who assisted Mr. Brewer with the June 9th, 2021, policy?
**A. I do not.**
Q. Ultimately this lawsuit revolves around an insurance policy that you helped Mr. Brewer obtain, correct?
**A. I -- that's -- that's why I guess I'm here, yes.**
Q. When did you first become aware of Mr. Brewer as a client?
**A. I don't remember.**
Q. I'd like to show you another document. Let me find it real quick.
(DAVIS EXHIBIT 4 MARKED.)
Q. Are you able to see this document, Mr. Davis?
**A. Yes.**
Q. Have you ever seen this document before?
**A. Yes.**
Q. Is this document an e-mail that was sent by you?





**A. Yes.**
Q. And at the top of this e-mail, you can see that it was sent on November 3rd, 2021, correct?
**A. That's the date, yes, there.**
Q. Is this an automated e-mail?
**A. It's a -- it's just a copy and paste e-mail. It's automated, yeah.**
Q. So, I'm trying to determine the process of you having sent this e-mail. Is this something that was done without you having to input anything? It was automatic in a computer?
**A. It's just copy and paste and sent to the clients whose policies are ending soon with United.**
Q. So, you would have had a Word document that has this language contained in it, copied it, pasted it into an e-mail, and sent it off; is that correct?
**A. It would have been just an e-mail template.**
Q. Okay. And would you have sent off more than one e-mail at a time, or do you do this process over and over for each e-mail sent?
**A. It would -- it would be more than one at a time.**
Q. So, you would send this out to multiple clients at the same time; is that correct?
**A. Correct.**

Q. And would you have some list of clients whose plans were going to expire soon, and you would just lump them all into this one e-mail and send it off to all of them at the same time? Is that correct?
**A. That's correct.**
Q. And Mr. Davis, would you be so kind as to read the body of this e-mail?
**A. Yeah. "Dear Client, I wanted to reach out [to you] as your UnitedHealthcare medical insurance policy is coming to it's" [sic] "expiration/renewal date. In order to renew this coverage or explore alternative carrier options, please contact me directly via email or phone at 561-910-4194. If you would like to renew your current plan at the same level of coverage, I can resend the electronic signature via text or email. Please, do not hesitate to reach out if you have any questions. Thank you in advance, Christopher Davis."**
Q. And would you consider this to be a solicitation e-mail?
**A. No. It's more of an e-mail letting them know their current insurance is expiring or has ended.**
Q. So, the purpose of this e-mail is to inform your clients, "Your insurance coverage is going to end," correct?
**A. Yep. Oh, I'm sorry. Yes.**



Q. And would you agree that another purpose of this e-mail is to inform them that, if they'd like to obtain additional coverage -- that they can reach out to you?
**A. Correct.**
Q. And this was sent from cdavis@getmehealthcare.com, correct?
**A. Correct. Correct. Sorry.**
Q. Is that your e-mail address?
**A. Yes.**
Q. Are you able to receive e-mails at that address?
**A. Yes.**
Q. Do you have more than one e-mail address for the purposes of working at Tobias & Associates?
**A. Not that I know of, no.**
Q. Aside from personal e-mail addresses, do you have any other e-mail addresses that you use in your business?
**A. No.**
Q. Whose phone number is listed here in the body of this e-mail?
**A. It's my office line.**
Q. So, it's not a personal phone line, correct?
**A. Correct.**



Q. Does Tobias & Associates pay the bill for that line?
**A. It's an office line through them.**
Q. Do you know who pays the bill?
**A. I do not.**
Q. But you don't pay the bill, correct?
**A. Correct.**
Q. Do you know who this e-mail was sent to?
**A. That -- no, because it's -- no, not that one.**
Q. And there would have been multiple individuals that this was sent to, correct?
**A. Correct.**
Q. And, again, you're aware that you assisted Mr. Michael Brewer with obtaining an insurance policy, correct?
**A. I don't recall him specifically, no.**
Q. Would it surprise you to hear that this was sent to Mr. Brewer or his mother?
**A. No. If they're our client, no.**
Q. The first sentence of this e-mail states, "I wanted to reach out [to you] as your UnitedHealthcare medical insurance policy is coming to it's" [sic] "expiration/renewal date," correct?
**A. Correct.**
Q. And that would be referencing the policy that



the recipient currently had as of November 3rd, 2021, correct?
**A. Correct.**
Q. How many sentences are contained in this e-mail?
**A. I don't know.**
Q. Well, I count one, two, three, four in the body of the e-mail; is that correct?
**A. Yes.**
Q. How many times is the word "renew" or "renewal" used in this e-mail?
**A. Two, three? Three.**
Q. And this e-mail states, "If you would like to renew your current plan at the same level of coverage, I can resend the electronic signature via text or email," correct?
**A. Correct.**
Q. Would you agree that this e-mail represents that the recipient could renew their current plan that they held as of November 3rd, 2021?
**A. It could -- let me see here. Current plan. If they wanted to get the same program with the short-term policy.**
Q. So, you would agree that, if they wanted to get the same program, they could renew the plan they had as

of November 3rd, 2021; is that correct?
**A. Yeah. They could reapply for that, and -- if they get approved for it.**
Q. And is there a difference between renewing a policy and reapplying for a policy?
**A. Yeah. The -- like I said, the dental and stuff would renew; the short-term, you've got to reapply.**
Q. And so, you sent that -- this e-mail saying that they could reapply for a policy, correct?
**A. Yeah. That'd be their reapplication for a policy, yes.**
Q. Would you agree this e-mail also states that they could renew their plan?
**A. Yeah. It says they could renew on there.**
MR. KACAL: Let's go ahead and take a -- actually, it's 1:00 o'clock. Can we go off the record?
MR. CLACK: Yeah.
THE REPORTER: Off the record at 1:01 p m.
(RECESS FROM 1:01 P.M. TO 1:35 P.M.)
THE REPORTER: Back on the record at 1:35 p m.
Q. (By Mr. Kacal) Mr. Davis, you understand that you are under oath now just as you were before the break, correct?
**A. Yes.**



Q. And you intend to answer the questions posited today truthfully, correct?
**A. Yes.**
Q. Before the break began, we were looking at Exhibit 4 which was an e-mail sent by you on November 3rd, 2021. Do you remember that?
**A. Yes. Well, I remember you putting up the e-mail before, yes.**
Q. And I'm going to go ahead and share my screen again, and we'll take a look at that Exhibit 4 once more.
Are you able to see my screen, Mr. Davis?
**A. Yep.**
Q. All right. And this e-mail states, "If you would like to renew your current plan at the same level of coverage, I can resend the electronic signature via text or email," correct?
**A. That's what it says there, yes. Excuse me.**
Q. And I think one of the last questions I had asked before the break was whether or not this e-mail was informing the recipient that they could renew the plan they had as of November 3rd, 2021, correct?
**A. That was your question, I -- I believe, yes.**
Q. And you answered that, yes, this e-mail was informing the recipient they could renew the plan they



had as of November 3rd, 2021, correct?
**A. I don't recall. But are you asking me if that's what I said?**
Q. Sure. Or let me just reask the question. Is this e-mail informing the recipient that they could renew the plan they had at the same level of coverage of November 3rd, 2021?
**A. Well, they could reapply or renew because it says expiration or renewal. So --**
Q. So, they could reapply --
**A. -- it's a broad -- sorry.**
Q. Oh, no. Go ahead. Finish.
**A. It -- it's just a broad statement letter.**
Q. Okay. But you would agree that this says that they could renew their current plan, correct?
**A. It does say that on there.**
Q. Okay. All right.
(DOGS BARKING.)
**A. One second. Sorry about that.**
Q. No problem at all.
**A. I'm just going to open the door. Sorry about that. I know them well.**
Q. No problem at all. No problem at all. I'd like to show you a new exhibit. We'll mark this as Exhibit 5.



(DAVIS EXHIBIT 5 MARKED.)
Q. Mr. Davis, are you able to see this document?
**A. Yes.**
Q. Have you ever seen this document before?
**A. I don't remember. I don't know.**
Q. All right. I'll represent to you that this is Tobias & Associates' written answers to requests from Plaintiff Michael Brewer. Do you understand that?
**A. Okay. Yes.**
Q. Did you assist anyone at Tobias & Associates with providing answers for this document?
**A. Geez, I didn't see the document physically that I remember. I can't recall, honestly.**
Q. Did you ever discuss this case with counsel for Tobias & Associates? I don't want to know what was said, but have you ever had discussions about this case with counsel for Tobias & Associates?
**A. Yeah. I learned that there was a case, yeah.**
Q. Did they ask you factual questions about the basis of this lawsuit?
**A. I don't remember.**
Q. I'd like to draw your attention to a specific request and answer related to the e-mail we were previously looking at. Are you able to see "Request For Admission No. 7" contained on Page 17 of this document?

**A. Yes, I see it.**
Q. And this request reads, "Please admit that on November 3, 2021, Christopher Davis sent an email to Plaintiff Michael Brewer stating that Plaintiff was able to 'renew [his] current plan at the same level of coverage,'" correct?
**A. That's what it says, yeah.**
Q. And the response -- could you please read the response?
**A. "Denied that the email referenced in this request, which was not attached to the request or otherwise directly identified, but which is believed to be the email set forth in Plaintiff's complaint, stated that Plaintiff could renew his current plan at the same level of coverage."**
Q. And given the language that was contained in that November 3rd, 2021, e-mail, why do you believe Tobias & Associates denied that it stated --
MS. PRIETO: Objection, form.
I'm going to instruct you not to answer.
Q. Okay. Mr. Brewer [sic], would you agree with me that the e-mail stated that the recipient could renew their current plan at the same level of coverage?
**A. You said "Mr. Brewer." I'm confused.**
Q. Oh, I apologize, Mr. Davis. Mr. Davis, would



you agree that the November 3rd, 2021, e-mail stated that the recipient could renew his current plan at the same level of coverage?
**A. Well, it was a broad e-mail. So, it could have pertained to any different policies. So, if it expired, they could reapply. So, again, it doesn't have a specific name on it. It's just a broad e-mail.**
Q. And so, you sent these e-mails out to everyone who's having plans that are coming up for expiration, correct?
**A. Yes.**
Q. Do you do any type of investigation into those plans or clients prior to sending these type of e-mails?
**A. As -- no, due to the fact that there's multiple included in that e-mail. So, no, that's not a case by case e-mail.**
Q. What acts or information -- strike that.
What would you do prior to sending an e-mail like this related to a specific client's file?
**A. There's -- just find out when the policy ends and send the e-mail. That's it. It's --**
Q. Would you --
**A. There's multiple --**
Q. -- look at what type --
THE REPORTER: I'm sorry.



Q. I apologize. Please finish your answer.
**A. Sorry. There's multiple different plans within that. So -- and people within that.**
Q. Would -- would you look to determine what type of plan the client had before you sent this type of e-mail out?
**A. No.**
Q. You would just determine, "These clients have expiration dates coming up" and send out a proper form e-mail; is that correct?
**A. Correct. It could be dental; it could be accident; could be medical. Correct.**
Q. And one sec.
**A. No problem.**
Q. And, again, how would you become aware that a specific client's policy was coming up on expiration?
**A. We're notified in the CRM of policies that are going to be expiring soon or may have expired and/or lapsed.**
THE REPORTER: I'm sorry. "May have expired" what?
**A. And we want to do right by them.**
THE WITNESS: Oh, "and/or lapsed," l-a-p-s-e-d.
Q. (By Mr. Kacal) Would you discuss specific



clients' prior plans with other agents before sending those types of e-mails?
**A. No. There's too many, honestly.**
Q. And you wouldn't review the policy or the application prior to sending that type of e-mail, would you?
**A. No.**
Q. Do you know whether -- earlier you stated that you don't remember whether or not you assisted Mr. Brewer with obtaining the policy that he applied for on June 9th, 2021, correct?
**A. Yes. Correct.**
Q. Do you remember assisting Mr. Brewer or his mother in obtaining a policy from Golden Rule Insurance Company around November of 2021?
**A. I do not.**
Q. You have no recollection of that?
**A. No, sir, I don't.**
Q. Would you be able to provide any insight as to what was said over the phone with Mr. Brewer or Ms. Brewer related to that application?
**A. Unfortunately, I do not, sir.**
Q. And would you have any type of recollection on what type of investigation you would have done before having that phone call with Mr. Brewer or Ms. Brewer?

**A. I do not.**
Q. Okay. Standing here today, do you have any information which would -- strike that.
Would you be able to dispute Ms. Brewer's recollection of what was said over the phone calls in November?
**A. I don't remember the phone calls, sir. So --**
Q. Do you dispute that you assisted Mr. Brewer or his mother in obtaining a policy from Golden Rule Insurance Company in November, 2021?
**A. I don't recall, sir.**
Q. And you don't remember having phone calls with Mr. Brewer or Ms. Brewer?
**A. No, sir.**
Q. I'd like to show you another document. I guess this will be Exhibit 6. Give me one sec.
(DAVIS EXHIBIT 6 MARKED.)
Q. Can you see my screen, Mr. Davis?
**A. Yeah.**
Q. It's little. Let me make -- let me make it a little larger for everybody.
**A. Okay.**
Q. Are you able to see this document --
**A. Yeah.**
Q. -- Mr. Davis?



**A. Yes, sir.**
Q. Okay.
**A. Excuse me.**
Q. Have you ever seen this document before?
**A. No.**
Q. I will represent to you that this is a phone log of calls between Ms. Brewer and the 516 number listed on that November 3rd, 2021, e-mail that was Exhibit 4. Are you able to see this call log?
**A. I am.**
Q. And in looking at the dates and times and phone numbers and minutes, does that refresh your recollection at all as to whether you had phone conversations with Mr. Brewer or Ms. Brewer?
**A. No, sir, it doesn't.**
Q. Would you dispute that any of these phone calls occurred?
**A. I don't remember them, honestly, that far back, sir.**
Q. And because you don't remember any of these phone calls, you wouldn't have any knowledge of additional phone calls that might have occurred between you and Ms. Brewer that aren't contained on this log, correct?
**A. That is correct, sir.**



Q. And this 561-910-4194 number, that is your office line, correct?
**A. Yes, sir.**
Q. Does that line go to any other Tobias & Associates employees aside from yourself?
**A. No, sir.**
Q. So, if I called that number, I would get only you, correct?
**A. Yes.**
Q. Do you know whether or not you told Mr. Brewer or Ms. Brewer over the phone that they could renew their current plan from GRIC?
**A. I do not recall, sir.**
Q. Would it surprise you that Ms. Brewer testified that you informed her over the phone on November 5th, 2021, that Michael Brewer's previous policy could be renewed?
**A. I don't recall the conversation, honestly. So --**
Q. Would it surprise you to hear that Ms. Brewer testified that you placed her on a long hold during one of those calls on November 5th, 2021?
**A. I, unfortunately, don't recall that either, sir. I don't --**
Q. Generally, whenever you're talking with your



clients over the phone, do you have need to put them on hold?
**A. That's -- I have -- it would just depend, I guess. I don't specifically recall any of that. So, no.**
Q. Do you know what reasons might prompt you to place a client on hold during a phone call?
**A. Looking up something or if maybe my dog was barking. I mean, other than that, nothing -- not for a long time, no. I don't typically do that. But --**
Q. So, you have no recollection on whether or not you asked Mr. Brewer or Ms. Brewer about Michael's medical history in November 5th, 2021, correct?
**A. No, sir. I'm sorry. No, sir, I don't recall.**
Q. If you had assisted Mr. Brewer or Ms. Brewer in obtaining or applying for a new policy with Golden Rule Insurance Company, you would have asked them the questions contained on the application form, correct?
**A. Yes.**
Q. But you -- your testimony is that you don't have any independent recollection of what was said or what was asked during those phone calls, correct?
**A. Correct, sir. I don't recall.**
Q. Do you recall whether or not it was communicated to you that Mr. Brewer had recently gone

through surgery as of the date of the November 5th, 2021, phone calls?

**A. No, sir. I don't recall any of that.**

Q. Do you have any recollection of whether or not you discussed the effects of a preexisting condition exclusion with Ms. Brewer or Mr. Brewer in November of 2021?

**A. I have no recollection of that conversation, sir.**

Q. And my next few questions are probably going to be fairly similar to the last few. If you don't have any recollection, please just let me know. But I'd like to get through a couple, okay?

**A. Yes, sir.**

Q. Do you have any recollection of whether or not you suggested an ACA compliant plan to Ms. Brewer or Mr. Brewer in November of 2021?

**A. I don't recall.**

Q. Do you have any recollection of whether or not you discussed the differences between an ACA compliant plan and a short-term plan with Ms. Brewer or Mr. Brewer in November of 2021?

**A. I do not recall, sir.**

Q. Do you know whether or not you discussed Mr. Brewer's recent diagnoses over the phone in November



of 2021?

**A. No, sir, I don't recall that as well.**

Q. Do you recall whether or not you read the disclosures and notices contained with the Golden Rule Insurance Company application to Ms. Brewer or Mr. Brewer over the phone in November of 2021?

**A. I do not recall.**

Q. Do you recall whether or not you read the Statement of Understanding contained in the application to Ms. Brewer or Mr. Brewer in November of 2021?

**A. I do not recall, sir.**

Q. Generally, after you prepopulate an application with a client over the phone, what are the next steps in getting that application completed and submitted?

**A. We then send it over to the client so they can make sure everything's correct. They go over it and read the agreements and sign it, and then it goes to the -- to UnitedHealthcare Golden Rule.**

Q. And I'd like to get just a little more detail on how that process works. Do you send an e-mail and just attach the application that you prepopulated?

**A. Yes. Correct.**

Q. And --

**A. And then they have to -- sorry.**

Q. Go ahead.



**A. Then they'd have to log into the application with their information it states on there, and then they review the application to make sure everything's correct on their end.**

Q. And would that have -- would that e-mail have come from the cdavis@getmehealthcare.com address?

**A. It would have been from UnitedHealthcare --**

Q. So --

**A. -- Golden Rule. Sorry. Golden Rule.**

Q. And do you have a -- a Golden Rule e-mail address?

**A. No.**

Q. So, I -- maybe I'm confused. I feel like there may be a step I'm missing there. You said that you would send the application to the client after prepopulating it over the phone, correct?

**A. Correct.**

Q. Is it true that you would send that application in to the insurance carrier, and then they would send an e-mail to the client?

**A. No. No. The client fills out the application after we send it to them. Then they process it. But once they hit "send," it goes to the -- the insurance company.**

Q. Earlier you stated that they would get the



e-mail with the prepopulated application from United, correct?

**A. It would -- yeah, it would be from their -- the Golden Rule website, correct.**

Q. So, you would submit that prepopulated application to the United website which, in turn, would send it to the client; is that correct?

**A. Correct. Yes.**

Q. And is that done through the CRM software?

**A. No. It's done through the UnitedHealthcare website.**

Q. So, you would actually send an e-mail to one of their e-mail addresses; is that correct?

**A. To one of whose e-mail addresses?**

Q. Well, I'm trying to clarify the process. You prepopulate an application, right? What is --

**A. Yes.**

Q. -- the next thing you do?

**A. We e-mail the application to the client. The client then goes over, makes sure all of the information's correct, enters the billing information, and reviews it, goes over the plan of benefits, and makes sure they read it over. I mean, that's -- it goes -- then they sign it and submit it to the insurance company.**

Page 129

Q. So, I'd like to clarify a difference that I'm hearing in your answer. So, maybe I'm just confused here. But you said the client receives the e-mail from United, correct?
**A. Correct.**
Q. So, they won't receive that e-mail from you?
**A. No. If -- they'll get it from the -- UnitedHealthcare. Or, if for some reason, it's going to spam, we'll copy and paste the link and send them the link from United.**
Q. So, do you submit the prepopulated application into the United website, and then United sends that e-mail to the client? Is that how that works?
**A. Yeah. Once you -- it -- it's sent from United directly after.**
Q. Okay. The client will then receive an e-mail where they could access what type of information?
**A. The plan information, the benefits. And they go over their medical information, make sure everything's entered correctly, making sure their billing info is correct, and make sure -- I mean, they have the final say with the policy. So --**
Q. And they're able to e-sign the application you prepopulated through the link contained in the e-mail, correct?

Page 130

**A. Correct.**
Q. Okay.
**A. I'm sorry. Yes. Correct.**
Q. And do you normally contact the clients to assist them with that process over the phone?
**A. It varies.**
Q. Do you have any recollection of whether or not you assisted Mr. Brewer or Ms. Brewer with that process over the phone in November, 2021?
**A. I do not.**
Q. Do you draft the language that's contained in the e-mails the client receives? That's a bad question. Let me -- let me reask it.
Earlier you stated that the client will receive an e-mail with a link in which they can e-sign the application you prepopulated, correct?
**A. Yes.**
Q. And the language and wording contained in that e-mail, was that drafted by you, or is that something that's created by United or whatever carrier would be being applied for?
**A. It's -- it's carrier generated.**
Q. Okay. Do you know whether or not you received a commission for assisting Mr. Brewer and Ms. Brewer with obtaining the Golden Rule Insurance Company policy

Page 131

in November of 2021?
**A. I do not.**
Q. And earlier you stated you don't receive any types of bonuses, correct?
**A. Correct.**
Q. Earlier you agreed that your clients rely on you in helping them to obtain the best possible coverage, correct?
**A. Correct.**
Q. But sitting here today, though, you have no recollections of the actions you took to discover what type of insurance coverage Michael Brewer needed, correct?
**A. Correct.**
Q. And you have no recollection of the actions you took to ask Ms. Michael -- or Ann Brewer questions regarding the treatment Michael had received?
**A. I do not recall any of that.**
THE REPORTER: I'm sorry. The question -- Ambu -- Michael or who?
MR. KACAL: Ann Brewer.
THE REPORTER: Thank you.
MR. KACAL: It's A-n-n. Sorry.
Q. (By Mr. Kacal) And sitting here today, you have no recollection as to what discussions you had with

Page 132

Michael or Ann Brewer regarding the different types of insurance coverages they had available to them as of November of 2021, correct?
**A. Correct.**
Q. And you have no recollection of the actions you took to explain to Michael or Ann Brewer what coverages were included in the application you assisted them with?
**A. Correct. I do not recall.**
Q. And you have no recollections of the actions you took to explain any terms contained in that insurance application?
**A. Correct. I do not recall any of that. Excuse me.**
Q. And you have no recollection as to whether or not you advised Mr. Brewer or Ms. Brewer that a preexisting conditions exclusion may be contained in the policy they were applying for?
**A. I do not recall.**
Q. And you have no recollection on whether or not you discussed what a preexisting conditions exclusion may mean for them going forward?
**A. No, sir. I do not recall.**
Q. Is it true you have no recollection as to whether or not you informed Michael Brewer or his mother of the possible need for an ACA compliant plan in

Page 133

November of 2021?
**A. I do not recall, sir.**
Q. Sitting here today, can you recall any actions you took to present Michael or Ann Brewer with a quote or policy which was in Michael's best interest?
**A. I don't recall, sir.**
Q. Let me put up another exhibit. One second.
(DAVIS EXHIBIT 7 MARKED.)
Q. Mr. Davis, are you able to see my screen?
**A. Yes.**
Q. Have you ever seen this document before?
**A. No.**
Q. Do you see that this is a letter that was sent to Michael Brewer on January 25th, 2022?
**A. Yes, I see that.**
Q. And do you see on the second paragraph of the body of this letter it states, "The plan you applied for and were issued is a Short Term medical plan. Short term policies do not provide coverage for preexisting conditions," correct?
**A. Yes. That's what it says.**
Q. Do you have any recollection of whether or not you told Mr. Brewer or Ms. Brewer that their plan would cover preexisting conditions?
**A. I do not recall, sir.**

Page 134

Q. Do you recall whether or not you informed Mr. Brewer or Ms. Brewer in November of 2021 whether they would be able to enjoy a continuation of coverage from their current plan?
**A. I do not recall, sir.**
Q. Here on the second page of this letter, it states, "Therefore, these expenses are not covered and we are unable to accept liability under this plan for any expense, including any related condition(s) indicated in the attached list(s)," correct?
**A. That's what it says, yes.**
Q. What is your understanding of what that means?
**A. It's -- basically, they're not going to cover any of the expenses under the -- that are related to the condition.**
Q. Would you agree that this letter is informing Mr. Michael Brewer that his healthcare claims were being denied based on the preexisting conditions exclusion?
**A. That's what it looks like it says, yeah.**
Q. Were you aware that Mr. Brewer had been denied -- let me rephrase this.
Were you aware that Mr. Brewer's claims for treatment were denied following the application you assisted him with in November of 2021?
**A. No, sir.**

Page 135

Q. Is this the first you're hearing that Mr. Brewer had claims denied by Golden Rule Insurance Company?
**A. Yes, sir. I don't speak claims. It's -- we're not able to know clients' claims due to HIPAA law. So, we can't --**
Q. So, you don't know what happens with the policies that you help procure, correct?
**A. Correct.**
Q. I'd like to show you another document which I'm going to mark as Exhibit 8.
(DAVIS EXHIBIT 8 MARKED.)
Q. Are you able to see this document, Mr. Davis?
**A. Yes.**
Q. And have you ever seen this document before?
**A. No. I don't --**
Q. I'll represent --
**A. -- recall seeing it, no.**
Q. I apologize. Go ahead.
**A. I don't recall or remember seeing this, no.**
Q. Okay. I'll represent to you that this is a document similar to Exhibit No. 5 we looked at earlier. However, this is Golden Rule Insurance Company's answers to questions posited by Plaintiff Michael Brewer. Do you understand that?

Page 136

**A. Okay.**
Q. And I'd like to go down to one of the requests and answers.
(SNEEZING.)
THE WITNESS: God bless you.
THE REPORTER: Thank you.
Q. (By Mr. Kacal) Okay. Hold on. Mr. Davis, do you see here where it says "Request No. 20"?
**A. Yes.**
Q. And Request No. 20 states, "Please admit that Golden Rule Insurance Company denied coverage for Mr. Brewer's cancer related treatment under Golden Rule Policy ID No. 096-540-158 despite the fact that such treatment was covered under his previous policy: Golden Rule Policy ID No. 096-422-291," correct?
**A. Yes, that's what it says.**
Q. And in response, Golden Rule Insurance Company stated, "Admit. Plaintiff received treatment for cancer while Short Term Medical Insurance Plan no. 096422291 was in force. Treatment for cancer Plaintiff received after Short Term Medical Insurance Plan no. 0965409158 became effective was barred by the pre-existing condition exclusion of Plan no. 0965409158," correct?
**A. That's what it says, correct. Yes.**
Q. And this is basically informing us that

Mr. Brewer received cancer treatment during the term of his first policy and that the claims for the cancer related treatment were denied under his subsequent policy, correct?
**A. That's what it states, I believe. Yes, it does.**
Q. And you stated that you -- this is the first time you're hearing that Mr. Brewer was denied coverage based on the policy you helped him obtain, correct?
**A. Correct.**
Q. Do you believe you could have helped Mr. Brewer obtain a policy which would have covered his cancer treatments?
**A. I don't -- I don't know because I didn't remember the conversation to begin with.**
Q. Could you have obtained a policy for Mr. Brewer that would cover preexisting conditions?
**A. We could have looked for something for him to try and see if we could find if he qualified for an ACA plan or something.**
Q. And -- but you have no recollection of whether or not you looked for an ACA compliant plan that would have covered his cancer treatments, correct?
**A. I don't recall any conversation with them.**
Q. Would you agree that denial of coverage for



treatment like cancer treatment could result in one of your client's untimely death?
MS. PRIETO: Objection, form.
**A. I don't know. You want me to answer "yes" or "no" to that? I don't know what you mean for that one. That's --**
Q. Sure. So, would you agree it's possible that, if a client of yours had a preexisting condition and then you helped him apply for a short-term plan, he could be denied treatment that he needed to survive?
**A. I don't know how to answer that either way. So, I wouldn't know.**
MS. PRIETO: Objection, form.
Q. Ultimately, based on the denial letter we looked at as Exhibit 8 and the response we just looked at -- I'm sorry -- the denial letter, Exhibit 7, and the response we just looked at in Exhibit 8, is it fair to say that Mr. Brewer was denied coverage for cancer related treatment due to a preexisting condition?
**A. I believe that's what it said on the form, yes.**
Q. Would you consider that situation to have been in the best interest of Mr. Brewer?
MS. PRIETO: Objection, form.
**A. I don't know how to respond to that question either. I don't --**



Q. Fair. Would it surprise you to discover that Mr. Brewer and his mother had to come out of pocket hundreds of thousands of dollars to pay for the cancer related treatment for which they were denied coverage?
**A. I -- medical bills are expensive, sir. I don't know how to respond to that one either. It's just --**
Q. And so, it's important to make sure that your clients have coverage especially for treatment that they anticipate they may need going forward, correct?
**A. Yeah. It's important to have coverage, yes.**
Q. Do you remember having any calls with Michael Brewer or Ann Brewer after you helped them submit the application to Golden Rule Insurance Company?
**A. No, sir, I do not remember any calls.**
MR. KACAL: I have no further questions at this time. I pass the witness.
MS. PRIETO: Lance, I think you're muted.
MR. CLACK: Sorry. I didn't know I was muted. Nick, can you put the rest of those exhibits -- do you have some more exhibits because, if you can put those in the chat, I will just use the ones that you marked.
MR. KACAL: Yes. Hold on. Thank you for saying that. I'll put them in the chat. Y'all want to take a five-minute break?



MR. CLACK: Yeah. Yeah.
MR. KACAL: Or do y'all just want to move forward?
MR. CLACK: Let's take five minutes.
MR. KACAL: I can do this while we go. You got it.
THE REPORTER: Off the record at 2:13 p m.
(RECESS FROM 2:13 P.M. TO 2:20 P.M.)
THE REPORTER: Back on the record at 2:20 p m.

EXAMINATION

BY MR. CLACK (2:20 P.M.):
Q. All right. Mr. Davis, you understand you are under oath just as you were before we took the break?
**A. Yes, sir.**
Q. I represent Golden Rule Insurance Company, and I just have a few questions that hopefully will not require too much time. How long have you been selling insurance?
**A. Since '07. And it's, what, 2023? So, like, 12 and a half years.**
Q. And in all that time, is this the first time that there have been any complaints or that you have been involved in a -- in litigation over a policy you sold?

**A. Yes, sir.**
Q. Have -- how long have you been at Tobias?
**A. I've been with them a long time. I'm not sure 100 percent of the timeframe, but it's been a while.**
Q. Okay. Have there ever been any complaints by anyone at Tobias about your work or any of the policies that you have sold?
**A. No, sir.**
Q. Do you have a -- a standard -- or before I get to that: How many different companies do you sell short-term coverage for?
**A. Short-term, it's three or four.**
Q. Tell me -- can you tell me the names of the ones other than Golden Rule?
**A. Yeah. National General, Corbel, and -- short-term -- I think those are the only three.**
Q. National General and Corbel, and Golden Rule?
**A. Correct. Yes, sir.**
Q. And do you get paid essentially the same commission on all those different types of coverage?
**A. Yes, sir.**
Q. Do you have a process you go through in selecting which of those three you're going to offer to a new client, or do you offer all three of them?
**A. I offer all three.**



Q. Yeah. And then, ultimately, does the client make a decision as to which of the ones they want?
**A. Yes.**
Q. When a new client calls in -- what are the -- the differences between those policies? When they say, "Tell me about your short-term coverage," what do you tell them about those three types of coverage?
**A. It'll -- I find out where they're located and -- to make sure that there's a good doctor network, and it typically would be the one with the best doctor network for them with the lowest coverage.**
Q. And when you say "the lowest coverage," do you mean the lowest premium?
**A. Or lowest premium. I apologize. Most affordable.**
Q. All right. So, the two things that you talk to them about initially are the doctor network and the premium?
**A. Correct.**
Q. Then do you also sell ACA compliant policies?
**A. Yes, sir. That's --**
Q. How many --
**A. -- if they're -- oh, I'm sorry.**
Q. Go ahead. I didn't mean to cut you off.
**A. Well, I -- I'm sorry. That was -- you -- that was answering your last question as if they were calling and looking for specifically the short-term, correct?**



Q. Yes. That was -- and that was my question, specifically short-term.
**A. Okay.**
Q. Now I'm sort of moving to something different which is, how many different carriers do you sell ACA policies for?
**A. It's countless. It's -- depending on states, they vary. So --**
Q. Is there any difference in your compensation based on whether you sell an ACA compliant policy or a short-term policy?
**A. No.**
Q. Are there circumstances where a person calls in asking about short-term coverage and -- and you steer them to an ACA policy for one reason or another?
**A. Yes.**
Q. What are those circumstances?
**A. Medical conditions, qualifying life events, special enrollment periods where -- like a pregnancy, loss of coverage through a job, preexisting conditions, that they moved, those types of situations.**
Q. So, if a client called in and they told you that they were having treatment or ongoing treatment for



a medical condition, is that one of the circumstances where you would steer them to an ACA plan?
**A. Absolutely.**
Q. If a person called in and told you they were seeking coverage for an individual who had had a surgery and that they had a condition that was suspicious and was going to require ongoing treatment, would you send them an application for short-term coverage?
**A. No, sir.**
Q. Why not?
**A. Because they would be denied, and it'd be doing a disservice to the client because they would not have coverage for that condition.**
Q. Why wouldn't they have coverage for that -- that ongoing condition that was already being treated?
**A. Short-term policies don't cover preexisting conditions.**
Q. Is that true of all the short-term policies you sell?
**A. Yes, sir.**
Q. Is that something that you have known and been aware of throughout the time that you have been selling health insurance?
**A. Yes, sir.**
Q. Have you ever sent an application for a

Page 145

short-term policy to a person where you knew that that person had had ongoing treatment or a condition that had already been diagnosed that was going to require further treatment?
**A. No, sir.**
Q. If Ann Brewer, when she called in in November to talk to you about coverage for Michael Brewer -- if she had told you that Michael had had a surgery and that it looked suspicious and that he was having ongoing treatment, would you have sent him an application for short-term coverage?
**A. No, sir.**
Q. What would you have done?
**A. I would have looked to an ACA plan. And if I wasn't able to help him, I'd refer him over to healthcare.gov.**
Q. Is that the -- the -- another website where people can get ACA plans?
**A. Yes, sir. Correct.**
Q. And you don't have any financial incentive to sell a short-term plan versus an ACA plan, do you?
**A. I do not. No, sir.**
Q. All right. Tell me just briefly, if you can, the general process that you follow when a -- when a client calls you up.

Page 146

**A. Now, is -- to clarify, would it be a new client or an existing client?**
Q. That -- that's a good question. And just to put some legs on it, you looked earlier at a phone call log indicating that Ms. Brewer -- that Ann Brewer had called you on or about November 5th of 2021, correct?
**A. Correct. I saw that, yes.**
Q. And we know that at that time she was an -- or Michael Brewer was an existing client, and she was calling to get a new policy because his original short-term coverage was expiring. Do you recall that?
**A. I don't recall the conversation, but I recall that part of what the -- was said before.**
Q. Right. And just the -- based on the documents that we've looked at here today or that you looked at with Mr. Kacal this morning, we know that to be the case, right?
**A. Correct.**
Q. All right. So, in that situation, and specifically in November, 2021, if you had an existing client call in with an expiring short-term policy, describe briefly how your conversation with them would normally have gone.
**A. At that point it's open enrollment. So, I would make sure I'd get them -- if they had ongoing treatment, I'd make sure I'd get them on an ACA compliant plan so they'd make sure they had coverage for any treatment that would come forth after.**

Page 147

Q. Would you have specifically asked whether the proposed insured was having any kind of ongoing treatment or had been diagnosed with any kind of medical condition while that first short-term plan was in place?
**A. Yes. We ask if there's any new medical conditions, medications, treatments, or anything abnormal.**
Q. If Ann Brewer had disclosed Michael's cancer and his ongoing treatment in that phone call, would you have sent her an application for another short-term plan?
**A. No, I would not.**
Q. Based on that and -- and your practice over 12 years, even though you don't recall that specific conversation, can you say with a high degree of certainty that Ann Brewer did not tell you anything about Michael Brewer's medical condition or his ongoing treatment or his cancer during that phone call on November 5th, 2021?
**A. I -- I can't recall the phone call. But I would not say -- I would not -- if somebody called in and said that they had a preexisting condition, I would not recommend a new short-term policy.**

Page 148

Q. So, based on that and based on the fact that you did send out the application for the new short-term policy here, does that tell you that Ann Brewer didn't tell you anything about Michael's surgery or his ongoing treatment for -- for issues with his testicles or about his cancer during that call on November 5th, 2021?
**A. Yeah. I would not send an application knowing that someone had a preexisting condition.**
Q. All right. I want to look at these policies -- these applications -- I'm sorry -- briefly. Let me see. All right. You should have now on your screen the first page of the application, and this is going to be the first application, Tobias 37. Do you see that?
**A. Yes.**
Q. All right. And is this something -- I -- or you tell me. A person calls in; they ask about coverage. Tell me what you discuss with them before you send out the link to this application that -- that we haven't already talked about?
**A. I -- there's nothing really additional. I just make sure -- pardon me -- the information -- oh, sorry about that -- the information's correct and ask the questions within the application, prepopulate it, and then send it over to the client.**

Page 149

Q. Okay. And when you're going through those questions and prepopulating it -- this "Applicant Information" at the top, is that something that you prepopulate and then you send it over?
**A. Correct. Yes.**
Q. Okay. And then there's some address information. You take that down over the phone and prepopulate it?
**A. That was -- correct. Yes, sir. We enter that as well.**
Q. And then there's some contact information. Do you take that information over the phone and prepopulate it?
**A. Yes, sir.**
Q. And then, if we go to the second page, there's this section for "Plan Selection." Do you see that?
**A. Yes, sir.**
Q. For an application like this, for Golden Rule coverage, what kind of discussion do you normally have with the client as between the different plan options?
**A. I'd let her know that one specifically would give them 100 percent coverage after deductible on that program. It would not include doctor visits before a deductible, and I'd let them know that that plan, again, is $2 million max coverage per -- per term.**

Page 150

Q. Do you prepopulate the -- the information in this Plan Selection box before you send it over?
**A. After they've chosen a plan, correct. Yes.**
Q. And then there's a deductible amount, and you can see on this first application the deductible amount was $2500?
**A. Yes, sir.**
Q. Do you have a discussion normally with the client about the appropriate deductible amount for that person?
**A. Yes.**
Q. Tell me what you usually discuss with your clients about the deductible.
**A. The -- deductible-wise, they usually know going in that they want a high or a low deductible. And what determines is the monthly premium and then if they can afford it or not. So, we just try to find, like, a happy medium between the both and make sure what we can -- you know, we get them the best policy for their money.**
Q. Gotcha. Then, below that, there are some health questions. Do you go over the health questions on the phone with the --
**A. Yes, sir.**
Q. -- applicant?

Page 151

**A. Sorry.**
Q. Sorry?
**A. Yes, sir. Yes, sir.**
Q. Do you -- do you prepopulate these boxes before you send over the application?
**A. Yes, sir.**
Q. And then there is an e-signature down here below the Statement of Understanding. Do you discuss anything -- the Statement of Understanding with the client before you send them the application?
**A. Yes, sir.**
Q. What do you normally tell the person on the phone about the Statement of Understanding before you send the application?
**A. You let them know everything in there and then also to make sure to read over everything when they get their policy to make sure everything's correct, whether it be spelling of names, dates of birth, phone numbers. And then they enter the billing information, and then they have to accept the policy and sign it as well.**
Q. When you say you let them know everything in there, do you read off these ten items that are listed under the Statement of Application [sic]?
**A. Yes, sir.**
Q. Would that include this Item No. 2 where it

Page 152

says, "No benefits will be paid for a health condition that exists prior to the date insurance takes effect"?
**A. Yes, sir.**
Q. Would you have followed that procedure for Ann Brewer when she called you in November of 2021?
**A. I follow it for all my clients.**
Q. Every call, you do it the same way, right?
**A. Yes, sir. It becomes habit after doing it for so long.**
Q. And so, because you do it the same way every time, we know that you would have read this Statement of Understanding to Ann Brewer in November, '21, including Item No. 2, "No benefits will be paid for a health condition that exists prior to the date insurance takes effect," correct?
**A. Yes, sir.**
Q. Below that there is an e-signature. Is the e-signature something that you prepopulate before you send over the application?
**A. No. They sign that, themselves.**
Q. Okay. The -- the applicant has to fill this in?
**A. Yes.**
Q. There's some information here about the FACT membership. And other than the e-signature, do you --

do you prepopulate this information about the payments for the FACT membership?
**A. Yeah. They're able to -- that's something they do on their end. They pick when the monthly -- because they can -- they can pick if they want a single payment or a monthly payment, and then they're able to pick how they want to set it up through electronic funds or credit card.**
Q. All right. So, this payment option information, that's something the applicant has to fill in?
**A. Yes.**
Q. There is a -- a disclosure that should be on your screen now that's part of the application. Is this disclosure something that you go over with the applicant over the phone?
**A. That one -- no, that one is sent to them specifically.**
Q. Okay. This one is sent to them as part of the application, but it's not something you discuss over the phone?
**A. Correct.**
Q. At the bottom of this form -- we will get there -- there's a -- there's a box here where it's -- where it is checked. And it says, "Yes, I read and



understand the benefits and limits of this plan." Is that a box that you prepopulate?
**A. No.**
Q. That's a box the applicant has to check?
**A. Yes, sir.**
Q. And then, below that, there's an e-signature, and is that also information that the applicant has to fill out?
**A. Yes, sir.**
Q. And then there is, at the end, this "Acknowledgement Of Application Completion." Do you see that?
**A. Yes, sir.**
Q. And there's an "X" here by the "list of acknowledgements." Is this a form that you prepopulate, or does the applicant have to put that "X" in the box?
**A. Yeah. That's something that they would do. I don't have anything to do with that part of the policy.**
Q. And then, below that, that e-signature is something the applicant fills out?
**A. Yes, sir.**
Q. Is there anything else that you discuss over the phone with the applicants, prior to sending them the link to the application, that we have not already talked about?



**A. No, sir.**
Q. I think you have on your screen now, if I did it right -- yeah -- the application for the second policy starting at Tobias 52. The one thing that I want to direct your attention to on this one is, you can see this is the "Plan Selection" page for the second short-term policy. Do you see that language?
**A. Yes, sir.**
Q. There is a selection here for a 5,000-dollar deductible. Do you see that?
**A. Yes, sir.**
Q. All right. And do you recall that on the first application the deductible was $2500?
**A. Yes, I remember seeing that.**
Q. Certainly, if you had been aware that Michael Brewer was undergoing ongoing medical treatment, you would not have represented -- you would not have recommended that he increase his deductible, would you?
**A. No, not -- and I wouldn't -- being that -- I wouldn't recommend a short-term policy, but even then, I wouldn't recommend a higher deductible.**
Q. Right. You wouldn't have recommended this coverage at all, but you certainly wouldn't have recommended at a higher deductible. Fair statement?
**A. Correct. Yes, sir.**



Q. And so, does that also support the conclusion that we reached earlier that, given what we know happened here, there is no way Ann Brewer told you about Michael Brewer's ongoing treatment during those calls in November of 2021?
**A. Yes, sir.**
Q. Okay. I also note that the plan selected here is the Value Plan. And if you recall, on the first application, the plan was the Premier Elite. Do you recall that?
**A. Yes, sir. I see that there.**
Q. What is the difference between the Premier Elite and the Value, generally?
**A. The other program was $2500 max out of pocket. This one is a 5,000-dollar deductible, and then you pay 30 percent of the next 10,000. So, it's -- it's way more out of pocket.**
Q. Okay. Other than the difference in the deductible and the coinsurance and the out-of-pocket costs, are the benefits under the two plans basically the same?
**A. It's -- yeah. They're both basically: Meet your deductible; then you have coverage. Whereas, the other one had $2 million in coverage, this is only 1 million.**

Page 157

Q. All right. Other than that additional difference, are the -- are the things that are covered, the procedures, the doctor network, those kind of things, basically the same under both plans?
**A. Yes, sir.**
Q. Is it fair to say that, other than the difference in the deductible, the maximum benefit, and the out-of-pocket expense, it's basically the same coverage?
**A. Yes, sir.**
Q. Does the fact that this second application has a -- an additional out-of-pocket amount, because it's the Value instead of the Premier Elite, support your conclusion that Ann Brewer did not tell you anything about Michael Brewer's ongoing treatment because, if she had, you would not have recommended this policy with the higher out-of-pocket costs?
**A. That is correct. I would not recommend that policy.**
Q. Okay. One question before we leave it: I notice on both these, Mr. Brodil's name is entered as the producer instead of your name. Can you tell me why he is listed as the producer instead of you?
**A. I -- I'm not 100 percent sure on that one. I believe with that -- let me see there. It was written**

Page 158

**under his name, but I was representing the -- UnitedHealthcare through him.**
Q. Is that normal in your business?
**A. Yes, sir.**
Q. All right. You should have in front of you now the phone call logs for the November phone calls that Ann Brewer placed to you. Do you see that page?
**A. Yes. Yes, sir.**
Q. Okay. And it shows these three calls on November 5th and then two calls on November 8th, correct?
**A. Yes, sir.**
Q. With regard to these three calls on November 5th, are those time periods consistent with what you would expect for filling out a -- a second application under these circumstances?
**A. They vary, but it -- it could be, yes.**
Q. There was some discussion earlier that Ms. Brewer claimed she was placed on hold for certain portions of that time. Is that unusual when you're helping a client fill out an application?
**A. Yeah.**
Q. It's unusual for people to be placed on hold?
**A. Yeah. I don't typically put them on for long periods of time, no.**

Page 159

Q. Okay. Is there ever a situation where you have to go ask somebody, "Hey, can we sell somebody short-term coverage if they have this medical condition or that medical condition"?
**A. I've been doing it a while. So, I pretty much know what I'm doing, but I'll -- I could send an IM or something, but I didn't -- you know, I don't -- with that -- I don't usually have that problem.**
Q. If you have a situation like that, is that your normal practice, to send an instant message? I mean, do you ever have a circumstance where you would put someone on hold ten minutes and run somewhere else and try and find somebody?
**A. No. No, sir.**
Q. Is it fair to say that, if someone describes any kind of significant medical issue to you or any kind of ongoing treatment, you don't have to go ask anybody about whether they can be issued short-term coverage because you know that they can't, that they will not get the coverage they need with a short-term policy?
**A. That's correct, sir.**
**(DOGS BARKING.)**
**A. Sorry about my dogs.**
Q. That's okay. I have on the screen now this e-mail that I think has previously been marked as

Page 160

Exhibit 3, but it's an e-mail that came from your account on November 3rd, 2021. Do you see that e-mail?
**A. Yes, sir.**
Q. And I think there's been some discussion of it previously, but I wanted to ask: Do you actually type these out, or is there some kind of automated system that sends these out?
**A. I just copy and paste it, and it sends out automatically.**
Q. Okay. There's some form, and you just -- when you say you copy and paste it, what do you paste it into? Is it just, like, a program with a list of addresses, or how does that work?
**A. Yeah. Just the e-mails, yeah. And it sends out the e-mail.**
Q. All right. And is that why -- you know, like, for instance, it has the "Dear Client." That's because everyone's getting the same e-mail no matter what kind of coverage they have?
**A. Yes, sir.**
Q. And then it says here, "Your...medical insurance policy is coming to it's" [sic] "expiration/renewal date." Do you see that?
**A. Yes, sir.**
Q. Is that because this same form e-mail goes to

people with short-term policies that are expiring, but it may also go to people with ACA or other plans that can be renewed?
**A. Yes, sir.**
Q. Can short-term policies be renewed?
**A. No, sir.**
Q. Have you ever seen a company that sold a short-term policy that could be renewed?
**A. No.**
Q. Is it -- do you make that clear to your clients, that the short-term coverage can't be renewed?
**A. Yes, sir.**
Q. Okay. I noticed that, on the first short-term policy application, it had a term that basically got it to open enrollment before it expired. Do you recall that?
**A. Yes, sir. I saw that.**
Q. Is that the standard practice with short-term policies, that you try and write them to a time period that someone can get an ACA policy or that they know they're going to be getting some other type of ACA compliant coverage?
**A. Yes, sir. It works as a way to bridge the gap between when they lost coverage and open enrollment. That way they make sure they can get into an ACA**



**program.**
Q. Are those policies sometimes referred to as bridge policies?
**A. Yes, sir.**
Q. Do you know -- is that how they are identified on the -- the GetMeHealth [sic] website?
**A. I believe so, yes.**
Q. Yeah. I wanted to pull up -- let me pull this up. So, you can see there is -- should be on your screen now, the GetMeHealth [sic] website. Do you recognize this website?
**A. Yes, sir.**
Q. Has it been essentially unchanged since about 2019?
**A. Yes, sir. Probably -- yeah. Yes.**
Q. I notice down at the bottom it's got a 2019 copyright on it. Do you see where I've highlighted that?
**A. Yes, sir.**
Q. And that's where I got that date. But as far as you recall, it hasn't really changed since 2019. Fair statement?
**A. That's a fair statement.**
Q. All right. Up at the top, there's a button there for "Plans." And it lists five kinds of plans:



"Bridge Plans, Dental Plans, Life Insurance, Fixed Indemnity," and "Medicare Supplement." Do you see that?
**A. Yes, sir.**
Q. Does the -- the entry for "Bridge Plans," does that include things like the Golden Rule plan that we are talking about here today?
**A. Yes, sir.**
Q. All right. And if we click on "Bridge Plans," is this the page for short-term medical or bridge plans like the Golden Rule plan that we've been talking about here today?
**A. Correct. It just gives them a little breakdown so they understand a little bit better what they're getting.**
Q. Yeah. And it -- it talks -- it uses that phrase "short-term" here, correct?
**A. Yes, sir.**
Q. All right. And then, if we scroll down, one of the things it says is that, "Short-term plans are temporary coverage with limited benefits. They are not ACA-compliant, don't cover pre-existing conditions and are not guaranteed-issue. You may still be subject to the tax penalty up until 2019." Did I read that correctly?
**A. Yes, sir.**



Q. So, it says it right there on the website that these short-term plans will not cover preexisting conditions?
**A. That's correct.**
Q. Okay. And I think that's -- this sentence about 2019, that's the other place that led me to believe that this language had been here since at least 2019, and that fits with your recollection?
**A. Yes, sir.**
MR. CLACK: All right. Before I forget, somewhere -- what exhibit number are we up to here today?
THE REPORTER: Should be No. 9.
Q. (By Mr. Clack) All right. I have now on the screen a PDF of that "Home" page. Do you see that?
**A. Yes.**
MR. CLACK: And then I'm going to make that Exhibit 9. And then I also have a PDF of that "Bridge Plans" page, and I'm going to mark that as Exhibit 10.
(DAVIS EXHIBITS 9-10 MARKED.)
Q. Do you see that?
**A. Yes.**
Q. All right. And are those pages -- glancing at them, they are -- they are PDFs of the website that we were just looking at, correct?

Page 165

**A. Yes, sir.**
Q. All right. There we go. All right. In the 12 years that you have been selling insurance, have you ever sold a short-term plan that was rescinded for misrepresentations on the application?
**A. No, sir.**
Q. Not to your knowledge?
**A. Not that I can remember, no.**
Q. In -- in the 12 years that you have been selling short-term plans, have you ever had another situation where someone complained because their claims were denied as a result of the preexisting condition exclusion?
**A. Not that I can recall.**
Q. Certainly, if you had known back in November of 2021 what you know now about Michael Brewer's health condition, you would have steered him into an ACA compliant plan, correct?
**A. Yes, sir.**
Q. And the fact that you didn't steer him to an ACA compliant plan is strong evidence that you did not know and were not told that he had any ongoing health issues or was receiving any medical treatment during those calls on November 5th, 2021, correct?
**A. Yes, sir.**

Page 166

MR. CLACK: I will pass the witness.
EXAMINATION
BY MR. KACAL (2:52 P.M.):
Q. Let me wrap this up really quickly. Mr. Davis, again, you don't have any recollection of any interaction between yourself or -- and Michael Brewer or Ann Brewer, correct?
**A. Correct. Yes, sir.**
Q. You don't have any recollection of assisting Michael Brewer or Ms. Brewer with completing the -- or prepopulating the application that we've looked at today, correct?
**A. Correct. Sorry.**
Q. Do you have any reason to dispute Ms. Brewer's testimony that she informed you that Michael Brewer had recently had a surgery when completing the application in November of 2021?
**A. I don't remember speaking to her. So, I don't --**
MR. KACAL: Okay. I pass the witness.
EXAMINATION
BY MR. CLACK (2:53 P.M.):
Q. One follow-up question. To that last question about disputing Mr. -- Ms. Brewer's testimony, certainly, if Ms. Brewer had told you about Michael

Page 167

Brewer's medical condition, you would have sold her an ACA plan instead of another short-term plan, correct?
**A. Correct.**
Q. So, based on that, you can dispute her testimony because, even though you don't remember the call, given your practice and pattern in 12 years of how you've always done things, what you did in this case tells us that you were not informed about Michael Brewer's medical condition. Fair statement?
**A. That's a fair statement, yes, sir.**
MR. CLACK: Pass the witness.
MR. KACAL: I have no further questions.
MS. PRIETO: I'll reserve.
THE REPORTER: Okay. Off the record --
MR. CLACK: Give me one second. I am -- I will have this other -- all right. Those last two exhibits are now in the chat.
THE REPORTER: Okay. Off the record at 2:54 p m.
(TIME IS 2:54 P.M.)
--o0o--

Page 168

SIGNATURE AND CHANGES
WITNESS NAME: CHRISTOPHER DAVIS DATE: 02/23/2023
PAGE LINE CHANGE REASON

________________________________________________
________________________________________________
________________________________________________

I, CHRISTOPHER DAVIS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page

_________________________
CHRISTOPHER DAVIS

THE STATE OF TEXAS )
COUNTY OF ____________ )

Before me ___________________ on this day personally appeared ____________________ known to me [or proved to me on the oath of __________________ or through ____________________ (description of identity card or other document)] to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed

Given under my hand and seal of office this ______ day of _______________, 2023

________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF T E X A S

My Commission Expires:
______________________



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL BREWER, )
Plaintiff, )
)
V. ) CIVIL ACTION NO.
) 4:22-CV-00969
GOLDEN RULE INSURANCE )
COMPANY AND TOBIAS & )
ASSOCIATES, INC. D/B/A )
GETMEHEALTHCARE, )
Defendants. )

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
CHRISTOPHER DAVIS, APPEARING REMOTELY
TAKEN FEBRUARY 23, 2023

I, Letitia D. Cobbs, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, CHRISTOPHER DAVIS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to MR. NICHOLAS G. KACAL;

That a copy of this certificate was served on all parties and/or the witness shown herein on __________________________.



I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ day of ________, 2023.

________________________________________
Letitia D. Cobbs, CSR, CSR NO. 4054
Expiration Date: 10-31-24

Liberty Litigation Support, LLC
Firm Registration No. 708
7171 Highway 6 North, Suite 250
Houston, Texas 77095
Phone: 281-200-5310
Fax: 281-533-8997